

1   Michael A. Ladra, State Bar No. 064307 (mladra@wsgr.com)
    Terry T. Johnson, State Bar No. 121569 (tjohnson@wsgr.com)
2   James C. Yoon, State Bar No. 177155 (jyoon@wsgr.com)
    Matthew R. Reed, State Bar No. 196305 (mreed@wsgr.com)
3   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
4   650 Page Mill Road
    Palo Alto, CA 94304-1050
5   Telephone:  (650) 493-9300
    Facsimile:  (650) 565-5100
6
    Attorneys for Defendants
7   ELIYAHOU HARARI and
    SANDISK CORPORATION
8

ORIGINAL FILED

08 MAY -6 PM 1: 56

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA S.J.

E-FILING

ADR

9
10                  UNITED STATES DISTRICT COURT
11                NORTHERN DISTRICT OF CALIFORNIA

                                    C08    02332 MMC

12   STMICROELECTRONICS, INC., a corporation )   CASE NO.:
                                              )
13               Plaintiff,                   )   NOTICE OF REMOVAL
                                              )
14          vs.                               )
                                              )
15   ELIYAHOU HARARI, an individual;          )
     SANDISK CORPORATION, a corporation; and  )
16   DOES 1 to 20, inclusive.                 )
                                              )
17               Defendants.                  )
18
19
20
21
22
23
24
25
26
27
28

NOTICE OF REMOVAL

1.     PLEASE TAKE NOTICE that defendants Eliyahou Harari ("Harari"), an individual, and SanDisk Corporation ("SanDisk"), a Delaware corporation, (collectively "Defendants"), hereby remove the civil action pending in the Superior Court of the State of California, County of Santa Clara, captioned *STMicroelectronics, Inc. v. Harari, et al.*, case number 1-07-CV-080123, to the United States District Court for the Northern District of California.

2.     As requested by the clerk's office for the Northern District of California, San Jose division, Defendants provide a copy of the initial Complaint in response to the requirement under 28 U.S.C. § 1446(a). *See* Exhibit 1. If, at a future date, the Court should require copies of any other process, pleadings, and/or orders served upon Defendants in the above referenced civil action, Defendants will promptly provide such copies. As required by 28 U.S.C. § 1446(d), Defendants will provide written notice of the filing of this Notice of Removal to Plaintiff, and also file a copy of this Notice with the clerk of the Superior Court of the State of California, Santa Clara County.

## GROUNDS FOR REMOVAL JURISDICTION

3.     This action is a civil action of which this Court would have original jurisdiction under 28 U.S.C. § 1331 and/or 28 U.S.C. § 1338, and which may be removed to this Court pursuant to 28 U.S.C. § 1441, because papers recently provided by STMicroelectronics, Inc. ("Plaintiff") raise a substantial question under federal law. In particular, Plaintiff recently disclosed for the first time a dramatically new interpretation of the contract language at the core of the case and which is indisputably a question of federal law.

4.     On October 14, 2005, Plaintiff commenced an action in the Superior Court for the County of Alameda.

5.     Defendants removed the action to federal court on November 16, 2005 and answered the Complaint. Plaintiff filed a motion to remand, which this Court denied (the Honorable Jeremy Fogel presiding). Defendants then filed a summary judgment motion based on the statute of limitations, establishing that Plaintiff had constructive notice of the patents it now claims to own, and actual notice of the question of ownership of these patents well prior to

1   the statutory period. The motion was fully briefed, but on July 18, 2006, before resolution of

2   Defendants' motion, the Court remanded the action to Alameda County Superior Court based on

3   Plaintiff's request for reconsideration of the Court's prior order denying Plaintiff's motion to

4   remand.

5        6.     On August 11, 2006, Defendants filed a motion to transfer venue to Santa Clara

6   County Superior Court. The Alameda County Superior Court denied the motion on September

7   12, 2006. On October 6, 2006, Defendants filed a Petition for Writ of Mandate regarding the

8   venue transfer order. On January 17, 2007, the Court of Appeal issued a writ, and on January 23,

9   2007, the Alameda Superior Court transferred the case to Santa Clara County Superior Court.

10       7.     The Santa Clara County Superior Court held a case management conference on

11   December 4, 2007 and requested that Defendants file an early motion for summary adjudication

12   on the question of the statute of limitations.

13       8.     Having successfully avoided judicial consideration of Defendants' statute of

14   limitations defense for almost two years, Plaintiff was soon to face the issue on the merits. In

15   light of the strength of the statute of limitations issue, and in an obvious attempt to rely on recent

16   Federal Circuit case law to circumvent Defendants' defense, Plaintiff recently indicated a change

17   in position on a substantial federal issue integral to its allegations. Throughout the entire history

18   of this case, the parties had not disputed that the terms of Defendant Harari's Employee

19   Agreement Regarding Confidentiality and Inventions, dated February 22, 1984 (the "Inventions

20   Agreement") constituted an agreement to assign (and not a present assignment). The parties'

21   dispute was focused instead on whether the Inventions Agreement provided Plaintiff the right to

22   demand assignment of the inventions at issue in this case. For example, Plaintiff stated to this

23   Court in opposition to Defendants' motion for summary judgment nearly two years ago that

24   "[u]nder the terms of the Inventions Agreement, Harari was obligated to assign his patent rights

25   to WSI [Plaintiff's predecessor in interest], but *only if* WSI chose, in its discretion, to seek

26   patents on Harari's inventions." Pltf's Opp'n to Defs' Mot. for Summary Judgment, filed

27   5/19/2006 at 19.

28

9.      In a complete about-face, on April 7, 2008, Plaintiff changed its position on the interpretation of the Inventions Agreement, and for the first time indicated that, in its view, Harari's inventions "were automatically assigned to WSI per the terms of the agreement." Pltf's First Suppl. Resp. to Def. SanDisk's First Set of Form Interrogs. – Limited Civil Cases (Economic Litigation) at 25.[1]  By interpreting the Inventions Agreement so as to effect an *automatic assignment* of Harari's inventions, Plaintiff changed its position one hundred and eighty degrees, and by so doing put at issue a substantial question of federal law.

10.      The Federal Circuit recently stated that "the question of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent cases.  We have accordingly treated it as a matter of federal law." *DDB Technologies L.L.P. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008).  In the present case, the federal question of whether the Inventions Agreement constitutes an automatic assignment or merely an obligation to assign is at the very core of Plaintiff's claims.

11.      Removal is timely pursuant to 28 U.S.C. § 1446(b) because less than 30 days have elapsed since April 7, 2008, the date Plaintiff served the interrogatory response first indicating this substantial question of federal law.  Therefore, this action may properly be removed to this Court under 28 U.S.C. § 1441.

---

[1]  In a subsequent pleading with the Superior Court, Plaintiff reiterated its change of position on this issue by stating "[t]o be clear, it is ST's position that the agreement between WSI and Dr. Harari operated to automatically assign his inventions to WSI." Reply in Support of ST's Mot. to Compel Discovery to SanDisk Corporation, dated 4/11/2008, at 3 n.2.

1

## INTRADISTRICT ASSIGNMENT

2        12.    Pursuant to Civil Local Rule 3-2(c), this action may be assigned on a district-wide

3    basis because this action falls in the category of an Intellectual Property action.

4

5    Dated: May 6, 2008                                    Respectfully submitted,

6                                                          WILSON SONSINI GOODRICH & ROSATI
                                                           Professional Corporation
7

8

9    By: _____
                                                                 Michael A. Ladra
10

11   Attorneys for Defendants
     ELIYAHOU HARARI and
     SANDISK CORPORATION
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2776
2776 4/5

1 | Russell L. Johnson (SBN 53833)
Edward V. Anderson (SBN 83148)
2 | Teague I. Donahey (SBN 197531)
Matthew L. McCarthy (SBN 217871)
3 | SIDLEY AUSTIN BROWN & WOOD LLP
555 California Street, Suite 2000
4 | San Francisco, California 94104-1715
Telephone:    415-772-1200
5 | Facsimile:    415-772-7400

ENDORSED
FILED
ALAMEDA COUNTY

OCT 14 2005

CLERK OF THE SUPERIOR COURT
By ___DOLORES J. SILVA___
Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ALAMEDA

STMICROELECTRONICS, INC.,
a corporation,

          Plaintiff,

v.

ELIYAHOU HARARI, an individual;
SANDISK CORPORATION,
a corporation;
and DOES 1 to 20, inclusive,

          Defendants.

No.  **HG 05237216**

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF FOR BREACH OF FIDUCIARY DUTY, BREACH OF WRITTEN CONTRACT, FRAUD, CONVERSION, INDUCING BREACH OF CONTRACT, UNJUST ENRICHMENT, AND UNFAIR COMPETITION**

Unlimited Civil Case

Plaintiff STMICROELECTRONICS, INC. alleges as follows:

### PARTIES

1.     Plaintiff STMicroelectronics, Inc. ("ST") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Carrollton, Texas.

2.     ST is informed and believes, and on this basis alleges, that defendant Eliyahou Harari ("Harari") is and was at all times mentioned herein a resident of California currently living in Los Gatos, California.

3.     ST is informed and believes, and on this basis alleges, that defendant SanDisk Corporation ("SanDisk") is a Delaware corporation with its principal place of business in

1
COMPLAINT

1    Sunnyvale, California.

2        4.    ST is ignorant of the true names and capacities of the persons sued as Does 1

3    through 20 and therefore sues these persons by such fictitious names.  ST is informed and

4    believes, and on this basis alleges, that each of these fictitiously named persons is responsible in

5    some manner for the acts and omissions herein alleged.  ST will amend this complaint to allege

6    their true names and capacities when ascertained.

7                        **FACTS COMMON TO ALL COUNTS**

8              **ST Acquired Wafer Scale Integration And Is The**
9              **Successor In Interest To All Of Its Legal Rights**

10       5.    The claims for relief at issue in this case had their genesis in Harari's breach of

11   his fiduciary and other legal obligations while an employee, officer, consultant and/or director

12   of Wafer Scale Integration, Inc. ("WSI").  ST is the successor to all WSI's legal rights,

13   including the present claims against Harari and SanDisk.

14       6.    WSI was a California corporation with its principal place of business in

15   Fremont, California.  It was co-founded in 1983 by Harari.  WSI designed and sold

16   programmable system devices, including memory systems and nonvolatile memories.  While

17   Harari was an officer and/or a director of WSI, it was designing and developing flash memory

18   products.

19       7.    On July 27, 2000, ST and WSI merged, with ST remaining as the surviving

20   corporation.  Pursuant to the Agreement and Plan of Merger between ST and WSI, ST

21   succeeded to "all rights and property" of WSI.

22       8.    As a result of the 2000 merger, WSI is no longer a separate legal entity from ST.

23            **Harari Was An Officer And/Or Director Of WSI From Its**
24            **Founding In 1983 Until His Resignation In 1989**

25       9.    Harari was a co-founder of WSI, and served numerous roles at WSI between its

26   founding on August 1, 1983 and his resignation in March of 1989, including:

27       •   Chief Executive Officer (CEO):  August 1, 1983 until June 11, 1986;

28       •   Chief Technology Officer (CTO):  June 11, 1986 until February 28, 1988;

                                       2

1  • <u>Director</u>: August 1, 1983 through March 15, 1989; and

2  • <u>Chairman of the Board</u>:  November 30, 1983 until June 15, 1985, and again

3     from June 11, 1986 until February 28, 1988.

4      10.    On information and belief, during at least a part of this time WSI was located,

5  and Harari worked, in Fremont, California.

6  **Harari's Obligation to Assign Inventions to WSI**

7      11.    Early in the period that Harari was an employee, officer and director of WSI, he

8  signed two agreements with the company: (1) an Employee Agreement Regarding

9  Confidentiality and Inventions dated February 22, 1984 (the "Inventions Agreement") (attached

10  hereto as Exhibit A); and (2) a Key Employee Agreement dated February 27, 1984 (the "Key

11  Employee Agreement") (attached hereto as Exhibit B).

12      12.    Through the Inventions Agreement, Harari agreed to the following:

13          2.    I will maintain in confidence and will not disclose or use, either
              during or after the term of my employment without the prior written
14          consent of [WSI], any proprietary or confidential information or know-
              how belonging to [WSI] …. Upon termination of my employment or at
15          the request of my supervisor before termination, I will deliver to [WSI] all
              writtern and tangible material in my possession incorporating the
16          Proprietary Information or otherwise relating to [WSI's] business. …

17          3.    I will promptly disclose and describe to [WSI] (i) all
              inventions, improvements, discoveries and technical developments
18          ("Inventions"), whether or not patentable, made or conceived by me, either
              alone or with others, during the term of my employment, provided that
19          [WSI] shall receive such information in confidence.  I hereby assign and
              agree to assign to [WSI] my entire right, title and interest in and to such
20          Inventions which relate in any way to or are useful in [WSI's] business as
              presently conducted or as conducted at any future time during my
21          employment, and agree to cooperate with WSI and its designee(s) both
              during and after my employment in the procurement and maintenance, at
22          [WSI's] expense and at its discretion, of patents, copyrights, and/or other
              protection of [WSI's] rights in such inventions.  I will keep and maintain
23          adequate and current written records of all such Inventions, which shall be
              and remain the property of the [WSI].

24          4.    ….

25          (c)  During my employment by [WSI], I will not engage in any
26          employment, consulting or other activity in any business without [WSI's]
              express written agreement.
27

28

### WSI's Development of Flash Electrically Erasable Programmable Read Only Memory

13.    WSI, a company which designed and produced various kinds of semiconductor memory (memory on a chip) for computers and electronic devices, dedicated substantial resources and effort to research and development of new memory technologies.

14.    Semiconductor memory can be either volatile or nonvolatile. Volatile memory requires a power source to maintain data in memory while nonvolatile memory requires no power to retain data.

15.    The main memory in computers has traditionally been dynamic random access memory ("DRAM") or static random access memory ("SRAM") both of which are volatile memories. Thus, if the computer is turned off, any data stored in a DRAM or SRAM will be lost.

16.    Computers have also used nonvolatile memories such as read only memory ("ROM") and programmable read only memory (PROM) and electrically programmable read-only memory (EPROM). In the late 1980s, when Harari was still an employee, officer and director of WSI, a new nonvolatile memory technology called electrically erasable programmable read only memory (EEPROM or E$^2$PROM) was developed which offered a substantial advantage over ROM, PROM or EPROM because it was electrically reprogrammable. When an EEPROM is quickly erasable and reprogrammable it is referred to as "flash EEPROM," or "flash memory." If the computer is turned off, data in these memories is not lost.

17.    WSI, while Harari was its chief technical officer, began development work on flash memory. By at least 1987, WSI was involved in research and development efforts regarding flash memory technology. By 1989, WSI had a prototype flash memory product, and was anticipating revenues from this line of business. As an employee, CTO and/or director of WSI, Harari was aware of WSI's research and development efforts with regard to flash memory.

18.    As a director and officer of WSI, Harari was in a position of trust and confidence

4

1  and had fiduciary obligations, including at least the following: (a) to act in good faith and in the

2  best interests of WSI and its shareholders; (b) to put the interests of WSI and its shareholders

3  ahead of his private interests; (c) to not enter into any business in competition with WSI; (d) to

4  bring business opportunities in the line of business of WSI to the attention of WSI and not to

5  appropriate the opportunity for himself; (e) to protect and preserve the assets of WSI; and (f) to

6  disclose material facts to WSI concerning his business dealings in the same field as WSI's

7  business endeavors.

8    ### Harari Filed Four Patent Applications While A Director Of
9    ### and Consultant to WSI, But Did Not Assign Them To WSI

10      19.    WSI, in order to protect its intellectual property, routinely applied for United

11  States patents to cover inventions developed in the course of its business. As an employee,

12  officer, and director of WSI, Harari had fiduciary and contractual obligations to assist WSI with

13  the protection of its intellectual property, and to assign inventions which related to WSI's

14  business to WSI.

15      20.    Harari and WSI entered into an Agreement dated February 29, 1988 (the

16  "Consulting and Directorship Agreement") (attached hereto as Exhibit C). In this agreement

17  Harari resigned his duties as an employee and officer of WSI effective February 28, 1988.

18      21.    In the Consulting and Directorship Agreement WSI and Harari also agreed that:

19  (a) WSI would continue to nominate Harari as a director until an IPO took place; (b) Harari

20  would be a paid consultant to WSI for 11 months at his then current salary; (c) WSI had the

21  right to extend the consulting agreement for a period of six months; and (d) Harari would

22  "continue to be bound by and comply with the terms of his Employee Agreement Regarding

23  Confidentiality and Inventions dated February 22, 1984" – the Inventions Agreement. The

24  obligations in the Inventions Agreement as extended by the Consulting and Directorship

25  Agreement included, among other things, three important obligations. First, to maintain in

26  confidence and not to use or disclose any proprietary, confidential or know-how of WSI without

27  the company's prior written consent. Second, to assign "all inventions, improvements,

28  discoveries and technical developments ("Inventions"), whether or not patentable." And, third,

1   Harari's agreement that he would "not engage in any employment, consulting or other activity

2   in any business without the Company's express written agreement."

3       22.    On information and belief, the Consulting and Directorship Agreement was

4   entered into, and at least some of the obligations of both WSI and Harari were to be performed,

5   in Fremont, California.

6       23.    Furthermore, as a director of WSI, Harari continued in a position of trust and

7   confidence and had all of the same fiduciary obligations he previously had when he was an

8   officer and director. *See, supra,* ¶ 18.

9       24.    On April 26, 1988, less than two months after resigning as an officer of WSI, but

10  while still serving as a director of and consultant to WSI with a continuing obligation to assign

11  inventions to WSI, Harari filed Patent Application 07/185,699 with the United States Patent and

12  Trademark Office ("PTO"), which resulted in U.S. Patent 4,933,739, entitled "Trench resistor

13  structures for compact semiconductor memory and logic devices." This patent relates to

14  memory devices that were within WSI's line of business.

15      25.    On June 8, 1988, while still serving as a director of and consultant to WSI with a

16  continuing obligation to assign inventions to WSI, Harari filed Patent Application 07/204,175

17  with the PTO, which resulted in twenty-two issued patents. This application related to flash

18  memory products that were within WSI's line of business.

19      26.    On July 8, 1988, while still serving as a director of and consultant to WSI with a

20  continuing obligation to assign inventions to WSI, Harari filed Patent Application 07/216,873

21  with the PTO, which resulted in three issued patents. This application related to memory

22  products that were within WSI's line of business.

23      27.    On March 15, 1989, Harari filed Patent Application 07/323,779 with the PTO,

24  which resulted in U.S. Patent 5,070,032, entitled "Method of making dense flash EEPROM

25  semiconductor memory structures." This patent relates to flash memory devices that were

26  within WSI's line of business.

27      28.    On March 21, 1989, Harari tendered his resignation from the Board of Directors

28  of WSI, requesting that his resignation date be back dated to March 15, 1989 – the same day he

1    had filed his most recent patent application.  Harari made this request without disclosing to the

2    Board that he had filed any of the above-referenced patent applications.

### Harari Filed Two Patent Applications Three Weeks After Tendering His Resignation As A Director Of WSI

5        29.    In addition to the four applications Harari filed while still a director of WSI,

6    Harari filed two more patent applications three weeks after tendering his resignation as a

7    director of WSI, but before the Board of Directors accepted his resignation.  On information

8    and belief, ST alleges that the inventions disclosed in these applications were invented and

9    developed while Harari was an officer and/or director and/or a consultant of WSI.

10       30.    Specifically, on April 13, 1989, Harari filed two Patent Applications with the

11   PTO – numbered 07/337,566 and 07/337,579.  These applications related to flash EEPROM

12   memories which were then under development at WSI.  Patent Application 07/337,566 has

13   resulted in the issuance of twenty-one patents and Patent Application 07/337,579 has resulted in

14   the issuance of two patents.

15       31.    On May 17, 1989, the Board of Directors of WSI met and accepted Harari's

16   resignation effective after the Board meeting of March 15, 1989.  The Board agreed to Harari's

17   request to back date his resignation without knowing that Harari had filed patent applications on

18   April 26, 1988, June 8, 1988, July 8, 1988, March 15, 1989, and April 13, 1989.

### While An Employee, Officer and/or Director Of WSI, Harari Only Disclosed and Assigned One Patent Application to WSI

21       32.    On information and belief, Harari did not disclose any of the following six patent

22   applications to WSI at any time:  (a) 07/185,699;  (b) 07/204,175;  (c) 07/216,873;

23   (d) 07/323,779;  (e) 07/337,566;  or (f) 07/337,579.  WSI had no way of knowing of Harari's

24   conduct, as patent applications filed with the PTO are confidential and Harari did not disclose

25   this information to WSI.

26       33.    On information and belief, the ideas disclosed in these patent applications were

27   known to or conceived by Harari while he was as a director and/or consultant of WSI, and the

28   evidence at trial may prove that he had or conceived of these ideas during his tenure as an

1    employee and officer as well.  Moreover, on information and belief, ST believes that Harari

2    actively worked on the preparation of all these patent applications during his tenure as a director

3    and/or consultant to WSI, and that Harari concealed this activity from WSI.

4          34.    These six patent applications all contain ideas and designs that would have

5    benefited the design and development work being done at WSI on flash memory.

6          35.    In contrast to the six patent applications Harari filed in his own name without

7    disclosing them to WSI, Harari disclosed only *one* patent application to WSI during his entire

8    five-and-a-half year tenure as an employee, officer, director and/or consultant.  Harari was

9    forced to disclose that patent application because there was a co-inventor on the application

10    who would fulfill his obligations to make the disclosure.  In other words, Mr. Harari concealed

11    from WSI every patent application he was able to conceal because he was either listed as the

12    sole inventor or a co-inventor with a non-WSI employee.

13          36.    Harari's assignment of only a single application to WSI is particularly

14    noteworthy in light of the significant number of applications he has filed during his career.

15    Over a period of twenty-eight years, Harari has filed one hundred and thirty-one patent

16    applications – an average of almost five applications per year.  However, Harari disclosed only

17    one patent application to WSI during his entire five-and-one-half-year tenure as an employee,

18    officer, director and/or consultant of that company.  In fact, from 1975 until 1983, Harari filed

19    at least one patent application each year.

20          37.    However, in 1984, 1985, 1986, and 1987, all years during which Harari served as

21    an employee, officer and/or director of WSI, Harari did not file a single patent application.

22          38.    In the years following his departure from WSI, from 1989 until 2002, Harari

23    filed at least *four* patent applications *each* year.  Indeed, within the first five months after

24    Harari resigned his position as CTO of WSI, while still a director and consultant to WSI with an

25    obligation to assign inventions, Harari filed three different applications with the PTO – none of

26    which were disclosed or assigned to WSI.  Each of these patent applications likely would have

27    been in process for months before filing with the PTO.

28          39.    Perhaps most tellingly, Harari filed an application on March 15, 1989, a date

8

COMPLAINT

1   which he later requested be set as his effective date of resignation from the board of directors of

2   WSI. Harari's attempt to back-date his resignation to coincide with the filing of this application

3   is clear evidence of his intent to conceal his patent-filing activities from WSI, and to obtain for

4   himself patent rights that he knew should have been assigned to WSI.

### Harari Founded SanDisk, A Competitor Of WSI, While Serving As A Director Of WSI

7       40.   In or about June 1988, Harari founded SanDisk Corporation. (SanDisk was

8   originally named "SunDisk," but changed its name in 1995 prior to its initial public offering.

9   For clarity, this Complaint will consistently refer to the corporation as "SanDisk.")

10      41.   Harari founded SanDisk while serving as a Director of WSI, and therefore was

11  under a fiduciary obligation not to enter into any business in competition with WSI. Moreover,

12  Harari had a fiduciary obligation to present corporate opportunities in WSI's line of business to

13  WSI, and not to appropriate such opportunities to himself or another company.

14      42.   On information and belief, SanDisk, since its inception, has focused its research

15  and development efforts on developing cost-effective flash memory storage products – a

16  technology which WSI had been developing since at least 1987, and was continuing to develop

17  at the time SanDisk was formed by Harari.

18      43.   Moreover, at the time Harari founded SanDisk, he was well aware of WSI's

19  research into flash memory technology. Harari served as CTO of WSI, and thus headed WSI's

20  research efforts on flash memory until February of 1988. As a Director of WSI, Harari received

21  reports regarding WSI's flash memory work until at least January of 1989, several months after

22  he founded SanDisk and filed four of the patent applications whose ownership is at issue in this

23  suit.

24      44.   On information and belief, from its inception and founding by Harari, SanDisk

25  was in direct competition with WSI. As an officer and/or director of WSI, Harari had an

26  obligation to present any corporate opportunity appropriate for WSI to it. Harari's involvement

27  with SanDisk was a serious violation of Harari's fiduciary duties to WSI.

28      45.   Furthermore, Harari assigned the patents which resulted from the above-

1  described applications to SanDisk, thereby benefiting a company in direct competition with

2  WSI, to whom he owed fiduciary duties of loyalty and good faith.  As alleged in more detail

3  below, those assignments have recently resulted in injury to ST who is the successor-in-interest

4  to WSI.

5  ### SanDisk Sued ST, The Successor Of WSI, For Infringement Of
   ### Patents Which Should Have Been Assigned to WSI
6

7      46.    On October 15, 2004, SanDisk filed two complaints alleging that ST infringed

8  U.S. Patent 5,172,338 ("the '338 patent").  One complaint styled *In the Matter of Certain*

9  *NAND Flash Memory Circuits and Products Containing Same*, Investigation No. 337-TA-526

10  was filed in the United States International Trade Commission (the "ITC action") and the other

11  styled *SanDisk Corp. v. STMicroelectronics, Inc.*, case number C04-04379 JF, was filed in the

12  Northern District of California (the "Northern District action").  The International Trade

13  Commission initiated an investigation in the ITC action and a hearing before the Administrative

14  Law Judge ("ALJ") has occurred and the initial determination of the ALJ is due in October

15  2005.  In the Northern District action, the claims of infringement of the '338 patent have been

16  stayed pending completion of the ITC action.

17      47.    The '338 patent resulted from the continuation-in-part of an application filed by

18  Harari less than one month after he resigned as a director of WSI.  On information and belief,

19  any invention disclosed in the '338 patent was conceived of or made, and the application was

20  being prepared, while Harari was still a director of WSI.

21      48.    On April 22, 2005, SanDisk filed its answer, affirmative defenses and

22  counterclaims in an action styled *STMicroelectronics, Inc. v. SanDisk Corp.*, case number

23  4:05CV45 pending in the United States District Court of the Eastern District of Texas (Sherman

24  Division).  In its counterclaims, SanDisk alleged that ST infringed U.S. Patents 5,583,812 (the

25  "812 patent") and 5,719,808 (the "808 patent").

26      49.    The '812 patent resulted from various continuations-in-part and divisional

27  applications going back to the June 8, 1988 patent application 07/204,175, from which it

28  claimed priority.  On information and belief, any invention disclosed in the June 8, 1988 patent

1   application 07/204,175 from which the '812 patent claims priority was conceived of or made,

2   and the application was being prepared, while Harari was still a director of WSI.

3        50.    The '808 patent resulted from various continuations-in-part and divisional

4   applications going back to the April 13, 1989 patent application 07/337,566, from which it

5   claimed priority.  On information and belief, any invention disclosed in the April 13, 1989

6   patent application 07/337,566 from which the '808 patent claims priority was conceived of or

7   made, and the application was being prepared, while Harari was still a director of WSI.

8        51.    These applications and the patents which ultimately issued from these

9   applications, should have been assigned to WSI and then to ST when it acquired WSI.  ST has

10  suffered substantial damage as a result of the assertion of these patents by SanDisk.

11       52.    When ST began to defend itself in this suit, it, like its predecessor WSI, was

12  unaware of Harari's filing of the undisclosed patent applications in 1988 and 1989.  During the

13  course of preparing its defense, ST slowly discovered the disparate facts from which it began to

14  piece together Harari's conduct during and following his tenure as an employee, officer and

15  director of WSI.

16       53.    WSI, and later ST, were unaware of Harari's assignment of these patents and

17  applications until well after SanDisk filed suit against ST in October 2004 because Harari had

18  concealed his patent applications from WSI, despite his contractual and fiduciary obligations to

19  disclose and/or assign them.

20       54.    All of the causes of action asserted by ST herein, and all of the relief ST seeks,

21  arise under state law.  None of the causes of action asserted by ST are created by federal law or

22  involve the construction or application of federal law, including the patent laws of the United

23  States.

### FIRST COUNT
#### Breach of Fiduciary Duty
#### (As to defendant Harari)

26       55.    ST realleges and incorporates herein by reference each and every allegation set

27  forth in paragraphs 1-54, above.

28       56.    While an officer, director and/or consultant of WSI, Harari violated his fiduciary

1  Agreement, paragraph 8, and in the Inventions Agreement, paragraph 7.  Unless restrained by

2  appropriate injunctive relief, ST will continue to suffer irreparable injury.

3      63.    WSI, and later ST, were unaware of Harari's conduct until SanDisk filed suit

4  against ST in October of 2004 because Harari concealed his patent applications from WSI,

5  despite his contractual and fiduciary obligations to disclose them.

6  **SECOND COUNT**<br>**Breach of Written Contract**

7  **(As to defendant Harari)**

8      64.    ST realleges and incorporates herein by reference each and every allegation set

9  forth in paragraphs 1-63, above.

10     65.    WSI performed all conditions, covenants, and promises required of it to be

11  performed in accordance with the terms and conditions of the Inventions Agreement and the

12  Consulting and Directorship Agreement.

13     66.    The consideration Harari received under the Inventions Agreement and the

14  Consulting and Directorship Agreement was fair and reasonable at the time the agreements

15  were entered into and over the course of WSI's performance.

16     67.    Harari breached the Inventions Agreement and the Consulting and Directorship

17  Agreement by at least the following acts:  (a) failing to maintain in confidence, disclosing and

18  using for his own benefit, proprietary, confidential, know-how, and other information of WSI

19  disclosed in the above-described patent applications; (b) failing to disclose and describe to WSI

20  the inventions disclosed in the above-described patent applications; (c) failing to assign to WSI

21  the patents which resulted from the above-described patent applications; (d) failing to cooperate

22  with WSI during and following his tenure in the procurement and maintenance of patents

23  related to the inventions disclosed in the above-described patent applications; (e) failing to

24  provide WSI with adequate and current written records of the inventions disclosed in the above-

25  described patent applications; (f) assigning to SanDisk the patents which resulted from the

26  above-described patent applications and (g) engaging in employment, consulting or other

27  activity without WSI's consent.

28     68.    Harari's breaches of these agreements occurred in Fremont, California where

13<br>COMPLAINT

1    WSI was located.

2        69.    Harari's actions in breaching and continuing to breach the Inventions

3    Agreement, and the Consulting and Directorship Agreement has injured ST in an amount not

4    yet ascertained.

5        70.    WSI, and later ST, were unaware of Harari's breaches of these agreements until

6    SanDisk filed suit against ST in October of 2004, because he concealed his patent applications

7    from WSI, despite his contractual and fiduciary obligations to disclose them.

8        71.    ST cannot be fully compensated for Harari's refusal and failure to perform his

9    obligations under the Invention Agreement and the Consulting and Directorship Agreement by

10   damages alone and ST has no adequate remedy at law.  The harm to ST can only adequately

11   remedied if specific performance is ordered requiring that Harari assign to ST, as sole owner

12   where Harari is the sole inventor and as a joint owner where Harari is a joint inventor, U.S.

13   Patent Applications 07/185,699, 07/204,175, 07/216,873, 07/337,566, and 07/337,579 and all

14   patents which have issued from these applications.

15                              **THIRD COUNT**
                                   **Fraud**
16                            **(As to defendant Harari)**

17       72.    ST realleges and incorporates herein by reference each and every allegation set

18   forth in paragraphs 1-71, above.

19       73.    While an officer and/or director of WSI, Harari owed contractual and fiduciary

20   obligations to WSI.

21       74.    Harari intentionally failed to disclose to WSI that he had conceived of or

22   developed inventions related to WSI's line of business, and further failed to disclose to WSI

23   that he had filed applications with the PTO regarding those inventions.  For example, Harari

24   failed to disclose to WSI that he filed a patent application on March 15, 1989, when he asked

25   that his resignation from the board of WSI be made effective as of that date.

26       75.    Harari's failure to disclose material facts occurred in Fremont, California where

27   WSI was located.

28       76.    WSI had no way of knowing of Harari's conduct, as patent applications filed

                                      14

1  with the PTO are confidential, and Harari did not disclose this information.

2      77.    On information and belief, ST alleges that Harari intended to deceive WSI and

3  its successors by concealing his inventions and patent applications, because he intended them to

4  profit himself and his assignees rather than WSI, and because he sought to avoid his contractual

5  and fiduciary obligations to assign the patents to WSI.

6      78.    WSI reasonably relied on Harari's deception because it expected him, as an

7  officer and director of the company, to abide by his contractual and fiduciary duties by

8  disclosing his inventions and assigning the resulting patents to WSI.

9      79.    As a direct result of Harari's failure to assign the patents to WSI, WSI and its

10  successors suffered injury through their loss of intellectual property in the patents that resulted

11  from the applications, as well as the profits, royalties, and other benefits generated by those

12  patents as well as having to defend themselves from allegations of infringement regarding three

13  of these patents

14      80.    Harari's fraudulent actions were done with bad faith, malice, and oppression in

15  that Harari was aware that, if successful, his efforts to conceal patent applications and to assign

16  resulting patents to SanDisk instead of WSI would result in substantial financial harm and other

17  injury to WSI and its successors.  Accordingly, ST is entitled to an award of punitive damages.

18      81.    WSI, and later ST, were unaware of Harari's conduct until after SanDisk filed

19  suit against ST in October of 2004 because Harari concealed his patent applications from WSI,

20  despite his contractual and fiduciary obligations to disclose them.  Thus, the existence of

21  Harari's fraud was itself concealed by his fraudulent conduct.

22                          **FOURTH COUNT**
                             Conversion
23                        (As to all defendants)

24      82.    ST realleges and incorporates herein by reference each and every allegation set

25  forth in paragraphs 1-81, above.

26      83.    Pursuant to the terms of the Inventions Agreement, the Key Employee

27  Agreement and the Consulting and Directorship Agreement, as well as to Harari's fiduciary

28  obligations to WSI, WSI (and later ST as its successor) had a right to possess the intellectual

                                    15
                                 COMPLAINT

1  property associated with the inventions disclosed in the above-described patent applications.

2      84.    Harari and SanDisk intentionally prevented WSI (and later ST as its successor)

3  from having access to the above-described intellectual property in that Harari failed to disclose

4  the existence of the inventions to WSI, and then assigned the resulting patents to SanDisk,

5  instead of WSI.  SanDisk then exploited these patents for commercial gain, up to, and

6  including, filing suit against ST for infringement of certain of the patents.

7      85.    WSI (and later ST as its successor) did not consent to Harari's concealment or

8  assignment of the inventions, and did not consent to SanDisk's commercial exploitation of the

9  patents.  Indeed, ST was unaware of Harari's improper concealment and assignment until after

10  SanDisk filed suit against ST in October of 2004.

11      86.    As a direct result of SanDisk's and Harari's actions in converting WSI's

12  property, ST, as the successor in interest to WSI, has been harmed in an amount not yet

13  ascertained.

14                          **FOURTH COUNT**
                        **Inducing Breach Of Contract**
15                        **(As to defendant SanDisk)**

16      87.    ST realleges and incorporates herein by reference each and every allegation set

17  forth in paragraphs 1-86, above.

18      88.    On information and belief, SanDisk was aware of the existence of the various

19  contracts between Harari and WSI because Harari was an officer and director of SanDisk, as

20  well as a party to the agreements.

21      89.    On information and belief, SanDisk intentionally caused Harari to breach his

22  contracts with WSI by, at least, inducing and/or participating in the assignment of patents to

23  SanDisk that were contractually required to be assigned to WSI.

24      90.    As a direct result of SanDisk's and Harari's actions in breaching and continuing

25  to breach the contracts with WSI, ST, as the successor in interest to WSI, has been harmed in an

26  amount not yet ascertained.

27      91.    SanDisk's inducement of Harari to breach his contracts with WSI was done with

28  bad faith, malice, and oppression in that Harari, on his own behalf and on behalf of SanDisk,

10/17/05  MON 13:52 FAX                    SIDLEY                                    ☒019

1   was aware that, if successful, his efforts to conceal patent applications and to assign the

2   resulting patents to SanDisk instead of WSI would result in substantial financial harm and other

3   injury to WSI and its successors.  Accordingly, ST is entitled to an award of punitive damages.

4          92.    Because Harari concealed his patent applications from WSI, despite his

5   contractual and fiduciary obligations to disclose them, WSI, and later ST, were unaware of

6   SanDisk's inducement of Harari to breach his agreements until after SanDisk filed suit against

7   ST in October of 2004.

**FIFTH COUNT**
**Unjust Enrichment**
**(As to all defendants)**

8

9

10         93.    ST realleges and incorporates herein by reference each and every allegation set

11  forth in paragraphs 1-92, above.

12         94.    On information and belief, ST alleges that, through the actions described above,

13  Harari and SanDisk have received benefits including, but not limited to, profits from sales of

14  products covered by the patents resulting from the above-described patent applications, and

15  royalties and other benefits from licenses and other arrangements relating to those patents.

16         95.    The benefits described in the preceding paragraph were unjustly obtained and

17  retained by Harari and SanDisk because the patents which generated those benefits should have

18  been assigned to WSI.

19         96.    WSI, and later ST, were unaware that Harari and SanDisk had been unjustly

20  enriched until after SanDisk filed suit against ST in October of 2004 because Harari concealed

21  his patent applications, and his assignment of the resulting patents, from WSI, despite his

22  contractual and fiduciary obligations to disclose them.

**SIXTH COUNT**
**Unfair Competition (Cal. Bus. & Prof. Code § 17200, _et seq._)**
**(As to SanDisk)**

23

24

25         97.    ST realleges and incorporates herein by reference each and every allegation set

26  forth in paragraphs 1-96, above.

27         98.    Harari had contractual and fiduciary obligations to assign the patent applications

28  which led to the issuance of the '338, '812 and '808 patents to WSI.  Had Harari complied with

17

COMPLAINT

1    his contractual and fiduciary obligations, ST, as WSI's successor-in-interest would be the

2    current owner of the '338, '812 and '808 patents which SanDisk is presently asserting against

3    ST, as well as a large number of additional patents which issued or claim priority from

4    applications which should have been assigned to WSI.

5         99.    SanDisk has sued ST for infringement of the '338, '812 and '808 patents –

6    patents which rightfully should be assigned to ST as successor-in-interest to WSI.

7         100.    SanDisk's patent infringement actions based on patents that it improperly

8    obtained to the detriment of ST constitute an unfair or unlawful business practice in violation of

9    California Business & Professions Code § 17200, *et seq.*

10        101.    ST has suffered injury in fact and has lost money as a direct result of defendants'

11   unfair or unlawful business practices, including, at least, the substantial funds which ST has

12   been forced to expend to defend itself against SanDisk's infringement actions.

13        102.    The continuing wrongful conduct of defendants, as alleged above, unless and

14   until restrained by order of this Court, will cause great and irreparable harm to ST.

15

16                                **PRAYER FOR RELIEF**

17        WHEREFORE, Complainant ST prays for the following relief:

18        A.    That plaintiff be awarded its actual damages, in an amount to be proven at trial;

19        B.    That plaintiff be awarded its incidental and consequential damages in an amount

20   to be proven at trial;

21        C.    That plaintiff be awarded exemplary damages according to proof at trial;

22        D.    That ownership of all patents which issued or claim priority from the

23   applications filed by Harari during and after his tenure as an officer and/or director of WSI,

24   which should have properly been assigned to WSI, be assigned to plaintiff, as the sole owner if

25   Harari is the sole inventor or as a co-owner if Harari is a co-inventor;

26        E.    That all inventions and the patents relating thereto which were conceived of or

27   resulted from inventive activity on the part of Harari, that took place while Harari was an

28   employee, officer, and/or director of WSI, be assigned to plaintiff;

1    F.    That plaintiff be awarded its costs;

2    G.    That plaintiff be awarded its attorneys' fees;

3    H.    That plaintiff be awarded pre-judgment and post-judgment interest at the

4    maximum legal rate; and

5    I.    That plaintiff be granted other and further relief as this Court may deem proper.

6

7    Dated: October 14, 2005                    SIDLEY AUSTIN BROWN & WOOD LLP

8

9                                              By _____

10                                             Attorneys for Plaintiff
                                               STMICROELECTRONICS, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1      **VERIFICATION**

2          I, Archibald McK. Malone, am Vice President-Finance and Chief Financial Officer of

3      plaintiff STMicroelectronics, Inc.  I am authorized to make this verification for and on behalf of

4      plaintiff STMicroelectronics, Inc., and I make this verification for that reason.

5          I have read the foregoing **VERIFIED COMPLAINT FOR BREACH OF**

6      **FIDUCIARY DUTY AND OTHER RELIEF** and know the contents thereof.  I am informed

7      and believe and on that ground allege that the matters stated in the document described above

8      are true.

9          I declare under penalty of perjury under the laws of the State of California that the

10     foregoing is true and correct.

11         Executed on October 13, 2005 at Phoenix, Arizona.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
SF1 141986804

10/17/05  MON 13:46 FAX                    SIDLEY                              ☑001

# SIDLEY AUSTIN BROWN & WOOD LLP

| CHICAGO | 555 CALIFORNIA STREET | BEIJING |
|---|---|---|
| DALLAS | SAN FRANCISCO, CALIFORNIA 94104 | GENEVA |
| LOS ANGELES | TELEPHONE 415 772 1200 | HONG KONG |
| NEW YORK | FACSIMILE 415 397 4621 | LONDON |
| WASHINGTON, D.C. | www.sidley.com | SHANGHAI |
| | FOUNDED 1866 | SINGAPORE |
| | | TOKYO |

WRITER'S DIRECT NUMBER                                     WRITER'S E-MAIL ADDRESS
(415) 772-7400                                              mpowers@sidley.com

## FACSIMILE TRANSMISSION FORM

DATE: **October 17, 2005**

Total No. of pages including
cover sheet: **43**

FROM: **Russell L. Johnson**        EXT.: **4-7422**

C/M No.: **11333-39601**
EIN: **41970**

SPECIAL INSTRUCTIONS:  IF <u>NOT USA</u> PLEASE INDICATE COUNTRY & CITY CODE NUMBER

### TRANSMISSION (BROADCAST) TO:

| NAME | COMPANY | FACSIMILE NUMBER | CONFIRMATION NUMBER |
|---|---|---|---|
| Michael A. Ladra, Esq. | Wilson Sonsini Goodrich & Rosati | (650) 493-6811 | (650) 493-9300 |

**Please see attached.**

*Problems with this transmission should be reported to:*
THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL(S) OR ENTITY(IES) TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE.

*SF1 1421184v.1*

10/17/05  MON 13:53 FAX                    SIDLEY                                    ☒023

# EXHIBIT A

D824a
112283

## EMPLOYEE AGREEMENT REGARDING CONFIDENTIALITY & INVENTIONS

This Agreement is intended to formalize in writing certain understandings and procedures which have been in effect since the time I was initially employed by Wafer Scale Integration, Inc. ("Company").

In return for new or continued employment by Company, I acknowledge and agree that:

1.    All previous work done by me for Company in any way to the conception, design, development or support of products for Company is the property of Company.

2.    I will maintain in confidence and will not disclose or use, either during or after the term of my employment without the prior written consent of Company, any proprietary or confidential information or know-how belonging to Company ("Proprietary Information"), whether or not it is in written or permanent form, except to the extent required to perform duties on behalf of Company in my capacity as an employee.  Such Proprietary Information includes, but is not limited to, technical and business information relating to Company's inventions or products, research and development, production processes, manufacturing and engineering processes, machines and equipment, finances, customers, marketing, and production and future business plans.  Upon termination of my employment or at the request of my supervisor before termination. I will deliver to Company all written and tangible material in my possession incorporating the Proprietary Information or otherwise relating to Company's business.  These obligations with respect to Proprietary Information extend to information belonging to customers and suppliers of Company who may have disclosed such information to me as the result of my status as an employee of the Company.

3.    I will promptly disclose and describe to Company (i) all inventions, improvements, discoveries and technical developments ("Inventions"), whether or not patentable, made or conceived by me, either alone or with others, during the term of my employment, provided that Company shall receive such information in confidence.  I hereby assign and agree to assign to Company my entire right, title and interest in and to such Inventions which relate in any way to or are useful in Company's business as presently conducted or as conducted at any future time during my employment, and agree to cooperate with Company and its designee(s) both during and after my employment in the procurement and maintenance, at Company's expense and at its discretion, of patents, copyrights, and/or other protection of Company's rights in such inventions.  I will keep and maintain adequate and current written records of all such Inventions, which shall be and remain the property of Company.

4.    (a)  There is no other contract or duty on my part now in existence to assign Inventions.

(b)  I will not disclose or induce Company to use any confidential information or material that I am now or shall become aware of which belongs to anyone other than Company.

(c)  During my employment by Company, I will not engage in any employment, consulting or other activity in any business without the Company's express written agreement.

5.    All records, reports, notes, compilations, or other recorded matter, and copies or reproductions thereof, relating to Company's operations, activities or business, made or received by me during any period of employment with Company are and shall be the Company's exclusive property, and I will keep the same at all times in Company's custody and subject to its control, and will surrender the same at the termination of my employment if not before and will not take with me any reproduction of same or any Proprietary Information that is embodied in tangible medium of expression.

*Attachment A*

0824a
112283

6.    I have attached hereto a complete and detailed list of all inventions owned by me or by others, conceived or made by me prior to my employment by the Company. These are the only inventions which are not subject to this Agreement. In addition. I will provide the Company with a sealed envelope which contains written and pictorial descriptions of each such invention. Such envelope may be opened by the Company upon termination of my employment or five years from the date of this Agreement, whichever occurs first.

7.    A breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to Company for which there will be no adequate remedy of law, and Company shall be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including monetary damages if appropriate).

8.    I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I represent that I have not brought and will not bring to the Company or use in the performance of my responsibilities at the Company any materials or documents of a former employer that are not generally available to the public, unless I have obtained express written authorization from the former employer for their possession and use.

9.    The waiver by Company of a breach of provision of this contract by Employee shall not operate or be construed as a waiver of any other or subsequent breach by Employee. If any provision of this Agreement is held to be invalid, void or unenforceable, the remaining provisions shall nevertheless continue in full force and effect without being impaired or invalidated in any way. This Agreement shall be construed in accordance with, and governed by, the laws of the State of California. This Agreement shall be binding on me, my heirs, executors, assigns and administrators and shall inure to the benefit of the Company and its successors and assigns.

10.    Company has informed me that, in accordance with Section 2872 of the California Labor Code, this Agreement does no require me to assign to Company, any invention for which no equipment, supplies, facilities or trade secret information of Company was used and which was developed entirely on my own time, and (a) which does not relate (1) to the business of Company or (2) to Company's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for Company. This limited exclusion does not apply to any patent or invention covered by a contract between Company and the United States or any of its agencies requiring full title to such patent or invention to be in the United States. I ACKNOWLEDGE RECEIPT of a copy of this Agreement.

EMPLOYEE:

Date: 2.22.84

Signature

E. HARARI
Printed Name

COMPANY:

By Edward R. Martin

Title DIRECTOR, HUMAN RESOURCES
2.

Date: 2/22/84

10/17/05  MON 13:54 FAX          SIDLEY                    ☒026

## ATTACHMENT A  (WSI)

### List of patent disclosures belonging to Eli Harari

ILED    1. A uniquely addressed high density RAM cell and its associated peripheral circuitry in a memory array.   *U.S. Patent issued.*

ILED    2. Low power high density charge pumped static RAM cells and method of operating same in a memory array.   *Fully cove 1 & 2.*

※ 3. A variable threshold MOSFET with graded substrate potential.

※ 4. A double gate MOSFET with improved load characteristics.

※ 5. A fast electrically programmable, UV erasable RAM (PRAM).

ILED    6. A high efficiency EPROM and E²PROM with drain overlap (device and process).   *Three U.S patents gra Fully covers*

※ 7. A process to minimize encroachment of bird's beak effect.

※ 8. A process for reduced diffusion parasitic capacitances by reduced field encroachment.

※ 9. A high density decoder.

ILED    10. High density dynamic RAM relying for storage on substrate potential.   *U.S. R grant Fully cov*

※ 11. Use of substrate potential for a radiation detector array or a thermal detector, or a sense amplifier.

ILED    12. Dynamic Loadless logic for serial memory and pipeline parallel signal processing.   *U.S. patent granted Fully Cove*

ILED    13. Dynamic RAM cell with signal amplification.   *Three U.S. patents filed 12 (Attorney designation*

※ING
ILED    14. Static RAM cell with JFET bistable element. *U.S patent filed, Not yet granted. Fully Covers 14.*   *M60, M60/1, Fully Covers,*

※ING
ILED    15. E²PROM cell with drain protection for read and program disturb. *U.S. patent filed, Not yet granted. Fully Covers 15.*

※ 16. PROM cell with vertical filament fuse element.

---

*※ Full description of these inventions is held in a sealed envelope by Harari's patent attorney's firm in Santa Clara — Mr. Alan MacPherson is the patent attor*

*408 246/405*

*2.13.84*

*Three patents in item 6. are covered in a separate Agreement between WSI and E. Harari.*

*E. Harari*

# EXHIBIT B

WAFER SCALE INTEGRATION, INC.
4633 Old Ironsides Drive, Suite 420
Santa Clara, CA  95050

February 27, 1984

KEY EMPLOYEE AGREEMENT

(Name and address of employee)
Eli Harari
2320 Friars Lane..
Los Altos, CA 94022

Wafer Scale Integration, Inc., a California corporation (the "Company") agrees with you as follows:

1.  **Position and Responsibilities.**

1.1  You shall serve in an executive capacity as **President and Chief Executive Officer** or in a position substantially equivalent thereto and perform the duties customarily associated with such capacity from time to time and at such place or places as the Company shall designate or as shall be appropriate and necessary in connection with such employment.

1.2  You will, to the best of your ability, devote your full time and best efforts to the performance of your duties hereunder and the business and affairs of the Company.  You agree to serve as a director and/or officer of the Company if elected by the shareholders and the Board, as the case may be, and to perform such executive duties as may be assigned to you by the Company's chief executive officer or the Board of Directors from time to time.

1.3  You will duly, punctually and faithfully perform and observe any and all rules and regulations which the Company may now or shall hereafter establish governing the conduct of its business.

2.  **Term of Employment.**

2.1  The term of your employment shall be four years commencing with the date hereof, provided your employment may be terminated at any time as provided in Section 2.2.

EXHIBIT H

2.2  The Company shall have the right, on written notice to you, to terminate your employment:

(a)  immediately at any time for cause, or

(b)  at any time without cause provided the Company shall be obligated to pay to you as severance pay an amount equal to 3 months' basic salary, less applicable taxes and other required withholdings and any amount you may owe to the Company, payable in equal monthly installments on the last day of each month commencing the month next following the date of termination.

2.3  For purposes of Section 2.2 and Section 7.4, the term "cause" shall mean the willful breach or habitual neglect of the duties you are required to perform under this Agreement or otherwise as an employee of the Company.

3.  <u>Compensation</u>.  The Company shall pay to you for the services to be rendered hereunder a basic salary at an annual rate of $ __79,000__ , subject to increase in accordance with the policies of the Company, as determined by its Board of Directors, in force from time to time, payable in installments in accordance with Company policy. You shall also be entitled to all rights and benefits for which you shall be eligible under deferred bonus, management bonus reserve, pension, group insurance, profit-sharing or other Company benefits which may be in force from time to time and provided to you or for the Company's employees generally.

4.  <u>Other Activities During Employment</u>.

4.1  Except with the prior written consent of the Company's chief executive officer, acting upon instructions from the Board of Directors, you will not during the term of this Agreement undertake or engage in any other employment, occupation or business enterprise other than ones in which you are a passive investor.

4.2  Except as permitted by Section 4.3, you will not acquire, assume or participate in, directly or indirectly, any position, investment or interest adverse or antagonistic to the Company, its business or prospects, financial or otherwise, or take any action towards or looking towards any of the foregoing.

4.3  During the term of your employment by the Company, except on behalf of the Company or its subsidiaries, you will not, directly or indirectly, whether as an

officer, director, stockholder, partner, proprietor, associate, representative, or otherwise, become or be interested in any other person, corporation, firm, partnership or other entity whatsoever which directly competes with the Company, throughout the world, in any line of business engaged in (or planned to be engaged in) by the Company; provided, however, that anything above to the contrary notwithstanding, you may own, as a passive investor, securities of any competitor corporation, so long as your holdings in any one such corporation shall not in the aggregate constitute more than 1% of the voting stock of such corporation.

    5.    Former Employment.

    5.1  You represent and warrant that your employment by the Company will not conflict with and will not be constrained by any prior employment or consulting agreement or relationship.  You represent and warrant that you do not possess confidential information arising out of prior employment which, in your best judgment, would be utilized in connection with your employment by the Company in the absence of Section 5.2.

    5.2  If, in spite of the second sentence of Section 5.1, you should find that confidential information belonging to any former employer might be useable in connection with the Company's business, you will not intentionally disclose to the Company or use on behalf of the Company any such confidential information; but during your employment by the Company you will use in the performance of your duties all information which is generally known and used by persons with training and experience comparable to your own and all information which is common knowledge in the industry or otherwise legally in the public domain.

    6.    Agreement Regarding Confidentiality and Inventions.  You agree to be bound by the provisions of the Employee Agreement Regarding Confidentiality and Inventions dated as of _____February 21, 1984_____ by and between you and the Company (the "Confidentiality and Inventions Agreement").

    7.    Post-Employment Activities.

    7.1  For a period of 24 months after the termination or expiration of your employment with the Company hereunder, absent the Company's prior written approval upon instructions of its Board of Directors, you will not directly or indirectly engage in activities (similar or

reasonably related to those in which you shall have engaged hereunder during the two years immediately preceding the termination of your employment with the Company) for, nor render services (similar or reasonably related to those which you shall have rendered hereunder during such two years) to, any firm or business organization which directly competes with the Company in any line of business engaged in (or planned to be engaged in at the time of the termination of your employment with the Company) by the Company, whether now existing or hereafter established, nor shall you engage in such activities nor render such services to any other person or entity engaged or about to become engaged in such activities to, for or on behalf of any such firm or business organization, nor shall you entice, induce or encourage any of the Company's other employees to engage in any activity which, were it done by you, would violate any provision of the Confidentiality and Inventions Agreement or this Section 7.

7.2  The Company upon instructions of its Board of Directors may give you written approval(s) to personally engage in any activity or render services referred to in Section 7.1 if it secures written assurances (satisfactory to the Company and its counsel) from you and from the prospective employer(s) that the integrity of the Confidentiality and Inventions Agreement will not in any way be jeopardized by such activities, provided the burden of so establishing the foregoing to the satisfaction of the Company and said counsel shall be upon you and your prospective employer(s).

7.3  For a period 24 months following the termination of your employment by the Company, the provisions of Section 4.3 shall be applicable to you and you shall comply therewith.  As applied to such 24 month period, the term "any line of business engaged in (or planned to be engaged in) by the Company", as used in Section 4.3, shall be applied as at the date of termination of your employment.

7.4  The provisions of Sections 7.1, 7.2 and 7.3 shall be of no force or effect if the termination or expiration of your employment occurs more than four years from the date of this Agreement.

8.  Remedies.  Your duties under the Confidentiality and Inventions Agreement and Section 7 shall survive termination of your employment with the Company.  You acknowledge that a remedy at law for any breach or threatened breach by

you of the provisions of the Confidentiality and Inventions Agreement or Section 7 would be inadequate and you therefore agree that the Company shall be entitled to injunctive relief in case of any such breach or threatened breach.

9.   Post-Employment Consultation.

9.1  Upon the termination of your employment with the Company pursuant Sections 2.1 or 2.2 above, the Company shall have the option to retain you as a consultant by notifying you of its desire to so retain you within 30 days of such termination in writing mailed to you at your last address as it appears in the Company's records.  Whether or not you are retained, you shall, for a period of 24 months after such termination, notify the Company of any change in address and each subsequent employment (stating the name and address of the employer and the nature of your position) or business activity in which you engage during such 24 months.

9.2  If the Company retains you as a consultant, you shall during the period of such retention hold yourself available to render consulting services in your area of expertise or special competence for up to six months for not more than sixteen hours per month, for which the Company shall pay you monthly under this Section 9 an amount equal to 25% of your monthly basic salary obtaining under Section 3 at the time of termination of your employment, whether or not you shall be called upon to render any services in any such month.  Any out-of-pocket expenses which your consulting activities for the Company may require will be reimbursed against receipts and vouchers therefor in accordance with the Company's policies in force from time to time.

9.3  During any period in which you are retained by the Company as a consultant, the Company may terminate your status as a consultant by giving you 90 days' written notice, during which 90-day period you shall continue to receive your monthly consulting fee but shall not be obligated to render or hold yourself available to render any consulting services during such period.  Thereafter the Company shall have no further liability for consulting fees.  All other prohibitions of the Confidentiality and Inventions Agreement and Section 7 shall survive termination of your status as a consultant.

10. Post-Employment Earnings.

10.1 If after conscientious effort during any period in which you are subject to the restrictions of Section 7.1, you are unable primarily due to such restrictions to obtain a comparable position which, together with any termination payments or consulting fees then being paid to you by the Company, if any, shall be as remunerative as your monthly remuneration with the Company when your employment terminated (hereinafter your "remuneration"), then, anything in Section 9 to the contrary notwithstanding, the Company shall (subject to Section 10.3) pay to you monthly, as an additional consulting fee or otherwise, a sum (the "Guarantee") such that your then monthly remuneration shall be equal to not less than your remuneration.

10.2 In order to receive the Guarantee, you shall notify the Company in writing of the monthly amount which you believe you are entitled to under Section 10.1. You must establish such amount to the Company's reasonable satisfaction, whereupon the Company shall promptly (and in any event within 15 days of receipt of your notification) pay to you the amount of the Guarantee so established. The Company shall continue to pay such Guarantee, on a monthly basis for the duration of the restriction period under Section 7.1, unless your circumstances change so as to justify a modification or the elimination of the Guarantee, or unless the Company shall exercise its right to terminate the Guarantee under Section 10.3

10.3 The Company at any time may, upon 90 days' written notice, notify you that it prospectively shall not make any further payments of the Guarantee, whereupon you shall thenceforth cease to bound by any of the restrictions of Section 7.1 or 7.3. All prohibitions of the Confidentiality and Inventions Agreement, however, shall survive the Company's decision not to continue the Guarantee.

11. Assignment. This Agreement and the rights and obligations of the parties hereto shall bind and inure to the benefit of any successor or successors of the Company by reorganization, merger or consolidation and any assignee of all or substantially all of its business and properties, but, except as to any such successor or assignee of the Company, neither this Agreement nor any rights or benefits hereunder may be assigned by the Company or by you.

12. Interpretation. In case any one or more of the provisions contained in this Agreement shall, for any

reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

13.  _Notices_. Any notice which the Company is required or may desire to give to you shall be given by personal delivery or registered or certified mail, return receipt requested, addressed to you at the address of record with the Company, or at such other place as you may from time to time designate in writing. Any notice which you are required or may desire to give to the Company hereunder shall be given by personal delivery or by registered or certified mail, return receipt requested, addressed to the Company at its principal office, or at such other office as the Company may from time to time designate in writing. The date of personal delivery or the date of mailing any such notice shall be deemed to be the date of delivery thereof.

14.  _Waivers_. If either party should waive any breach of any provision of this Agreement, he or it shall not thereby be deemed to have waived any preceding or succeeding breach of the same or any other provision of this Agreement.

15.  _Complete Agreement_; _Amendments_. The foregoing, together with an Employee Stock Purchase Agreement and Confidentiality and Inventions Agreement between you and the Company, is the entire agreement of the parties with respect to the subject matter hereof and thereof and may not be amended, supplemented, cancelled or discharged except by written instrument executed by both parties hereto.

16.  _Headings_. The headings of the sections hereof are inserted for convenience only and shall not be deemed to constitute a part hereof nor to affect the meaning thereof.

If you are in agreement with the foregoing, please so
indicate by signing and returning the enclosed copy of this
letter.

WAFER SCALE INTEGRATION, INC.

By _Edward L. Martin_____

ACCEPTED AND AGREED:

_Eli Harari_____
            Employee

8.

# EXHIBIT C

## AGREEMENT

THIS AGREEMENT is made by and between ELIYAHOU HARARI, 2320 Friars Lane, Los Altos, California 94022 (hereinafter "Harari") and WAFERSCALE INTEGRATION, INC., a California corporation having its principal place of business at 47280 Kato Road, Fremont, California 94538 (hereinafter "WSI") and is entered into as of February 29, 1988.

WHEREAS, WSI has requested that Harari resign his positions as an employee and officer of WSI; and

WHEREAS, Harari has agreed to resign such positions.

NOW, THEREFORE, WSI and Harari agree as follows:

### ARTICLE 1

1.1   Harari agrees to resign the above-referenced positions and WSI accepts such resignation effective on February 28, 1988 (the "Termination Date").

1.2   WSI agrees that Harari was not terminated for "cause" as that term is used in Harari's Key Employee Agreement dated February 27, 1984.

1.3   WSI hereby agrees to extend to Harari, to the same extent as WSI's other directors and officers, the arrangements to protect WSI's directors and officers against liability authorized by WSI's Board of Directors at its meeting on December 10, 1987.  Harari acknowledges that approval of such arrangements by WSI's shareholders is required before such arrangements become effective and WSI agrees to submit such arrangements to its shareholders for consideration promptly.

1.4   The parties agree that WSI will continue to nominate Harari for reelection as a director of WSI until an IPO, unless a mutual agreement is reached for his earlier resignation from WSI's Board; provided, however, that in the event the Board of Directors of WSI determines that Harari is pursuing activities in conflict with his duties and responsibilities to WSI, Harari upon request of the Board shall resign as a director and WSI shall have no further obligation to nominate Harari for reelection.

1.5   WSI agrees that Harari's resignation is under conditions permitting Harari to license the "Harari Patents" to third parties under paragraph 2.6 of the "Patent Agreement."  "Harari Patents" shall mean the patents licensed by Harari to WSI under the Patent Agreement entered into between WSI and Harari on February 28, 1984, and amended on June 5, 1984 (the "Patent Agreement").

1.6   Harari shall not, for a period of twenty-four (24) months after the Termination Date, without WSI's consent, solicit or induce any employee of WSI to cease to be employed by WSI, or hire or induce to join Harari or any entity which employs Harari or in which Harari has an interest in any capacity, any employee of WSI, and any person who, within 30 days prior to the date such person is hired by or joins Harari or such entity, was an employee of WSI.

## ARTICLE 2

2.1   Promptly after the execution and delivery of this Agreement by Harari and WSI, WSI shall pay Harari a 1987 bonus in the amount of $15,000, reduced for all applicable taxes and required withholdings.  At the Termination Date, Harari shall receive from WSI a payment equal to the sum of accrued salary and accrued vacation.  Starting with the next regular pay period of WSI commencing after the Termination Date, WSI will pay to Harari, as severance pay and in consideration of Harari's consulting obligations provided for in Section 2.4 below, an amount equal to eleven months of Harari's current base salary, payable in equal installments every two weeks over an eleven month period.  Such payments will be made on WSI's regular salary payment dates and will be reduced for all applicable taxes and required withholdings.  Except as expressly provided in this Agreement, WSI shall have no obligation to pay to Harari, and Harari shall have no right or claim to receive from WSI, any severance or similar payments in connection with the cessation of his employment by WSI.  WSI will continue to pay for Harari's health care and life insurance benefits at the current level for a period of 11 months after the Termination Date.

2.2   WSI will extend the term of Harari's Promissory Note dated February 21, 1984, in the amount of $22,000 plus accrued interest until the earlier of 6 months after the date of WSI's IPO or January 2, 1992; provided, however, that until Harari's obligations under the Promissory Note are paid in full, Harari shall pay to WSI 20% of the total proceeds from each sale of WSI stock by Harari, promptly after the completion of each such sale.  Each such payment will be credited first to accrued and unpaid interest and then to unpaid principal.  Except as modified by this Agreement, such Promissory Note and related Joint Escrow Instructions dated February 21, 1984, shall remain in full force and effect.

2.3   (a)   WSI will not prevent, impede or delay any transfer by Harari of any of Harari's WSI shares in any transaction exempt from registration under applicable federal and state securities laws, and as to which Harari has

10/17/05  MON 13:58 FAX                SIDLEY                                    ☒039

complied with the transfer requirements provided for in Harari's February 21, 1984 investment letter.

(b)  Harari will be entitled to transfer registration rights to transferees of Harari's WSI shares in accordance with Section 8 of Harari's Founders' Registration Rights Agreements dated as of February 21, 1984, which registration rights will be subject to all of the terms and conditions set forth in such agreement, as amended. Section 10 of such agreement is hereby amended to extend the lockup or standoff period provided for therein from 120 days to 150 days and to remove any requirement that all holders of registration rights enter into similar lockup agreements as a condition to Harari's lockup obligation, and Harari hereby agrees to be bound by such Section 10, as amended.

2.4  For a period of eleven months after the Termination Date, Harari will be available to WSI to provide consultation as reasonably requested by WSI up to 32 hours per month and Harari hereby agrees to provide such consultation.  Such consultation will be, at WSI's discretion, in the areas of strategic partnerships, present and/or future foundries or pilot lines, investor relations and financing, personnel and administration.  Consultation in the areas of current and new technology, new devices, or new products and markets will be specifically excluded except where mutually agreed on a case by case basis.  Any consultation up to 32 hours per month during the eleven months period following the Termination Date shall be provided by Harari without additional compensation beyond the payments provided for in Section 2.1 above.

2.5  At its option, WSI may extend by 6 months the period during which Harari will be available to provide consultation to WSI under the terms of Section 2.4, and Harari hereby agrees to provide such consultation.

2.6  WSI shall pay Harari for all consulting provided by Harari above 32 hours per month during the eleven month period following the Termination Date, and for all consulting provided by Harari during the extended consulting period provided in Section 2.5, consulting fees at the rate of $1,000 per 8-hour day (or equivalent), such consulting fees to be paid in arrears on WSI's regular salary payment dates and to be reduced for all applicable taxes and required withholdings.

2.7  Out-of-pocket expenses required by Harari's consulting activities for WSI will be reimbursed against receipts therefor in accordance with WSI's policies in force from time to time.

2.8    WSI will reimburse Harari reasonable legal expenses incurred in connection with this Agreement not to exceed $5,000.

## ARTICLE 3

3.1    Except with respect to the obligations created by, acknowledged, or arising out of this Agreement, Harari does hereby for himself and his legal successors and assigns, release and discharge WSI and its shareholders, officers, directors, employees, agents, attorneys, legal successors and assigns, of and from any and all claims, actions and causes of action, whether now known or unknown, suspected or unsuspected which Harari now has, owns or holds or at any other time had, owned or held or shall or may have, own or hold against any of the foregoing based upon or arising out of any matter, cause, fact, thing, act or omission whatsoever occurring or existing at any time to and including the date hereof (all of which are hereinafter referred to as and included within the "Released Matters"). As used in this Article 4, WSI includes any and all parents, divisions and subsidiaries of WSI.

3.2    Harari acknowledges that he is familiar with Section 1542 of the Civil Code of the State of California which provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

Harari waives any right or benefit which he has or may have under Section 1542 of the Civil Code of the State of California to the full extent that he may lawfully waive all such rights and benefits pertaining to the subject matter of this Agreement. Harari acknowledges that he is aware that he may hereafter discover claims or facts in addition to or different from those which he now knows or believes to exist with respect to the subject matter of this Agreement or WSI, and that it is his intention hereby fully, finally and forever to settle and release all of the Released Matters in consideration of WSI's execution and delivery of this Agreement. The release herein given shall remain in effect as a full and complete release notwithstanding the discovery or existence of any additional or different claim or fact.

3.3    Harari acknowledges and agrees that he shall continue to be bound by and comply with the terms of his Employee Agreement Regarding Confidentiality and Inventions dated February 22, 1984, a copy of which is attached to this Agreement.

Z703b
022588                                    4.

## ARTICLE 4

4.1   This Agreement is personal to the parties and may not be assigned except (a) in the case of Harari's death, to his estate, or (b) by WSI to a third party in connection with any sale to or acquisition by such third party of that number of shares or other form of equity of WSI (or any entity to which WSI has assigned, in accordance with the terms hereof, the rights granted herein) representing the right to control WSI or any such entity, or upon a sale to any such third party of all or substantially all of the assets of WSI or such entity, provided that such third party assumes all the obligations of WSI as specified in this Agreement.  Subject to the foregoing sentence, this Agreement and the rights and obligations of the parties set forth herein shall inure to the benefit of, and shall be binding upon, WSI's and Harari's successors and assigns.

4.2   This Agreement sets forth the entire understanding between the parties as to its subject matter and merges all prior discussions between them, and no one of the parties shall be bound by any modification, or by any conditions, definitions, warranties, or representations, with respect to the subject matter of this Agreement, other than as is expressly provided in this Agreement, or as duly set forth subsequent to the date hereof in writing signed by a duly authorized representative thereof.

4.3   A notice, request, or statement hereunder shall be deemed to be sufficiently given or rendered when sent by certified mail and addressed to the addresses given above or to such other address as may be specified by written notice.

4.4   This Agreement may be executed in counterparts which, taken together, shall constitute one and the same agreement and shall be effective as of the date first written above.

4.5   This Agreement shall be governed by and construed in accordance with California law.

IN WITNESS WHEREOF, the parties have executed this Agreement making it effective as of the day first above written.

Date:  _2.29.88_                    _Eli Harari  Chairman_
                                    Eliyahou Harari

                                    WAFERSCALE INTEGRATION, INC.

Date:  _2/29/88_                    By: _____

                                    Title: _PRESIDENT_

2703h
D22588                              5.

0824a
112283

## EMPLOYEE AGREEMENT REGARDING CONFIDENTIALITY & INVENTIONS

This Agreement is intended to formalize in writing certain understandings and procedures which have been in effect since the time I was initially employed by Wafer Scale Integration, Inc. ("Company").

In return for new or continued employment by Company, I acknowledge and agree that:

1.   All previous work done by me for Company in any way to the conception, design, development or support of products for Company is the property of Company.

2.   I will maintain in confidence and will not disclose or use, either during or after the term of my employment without the prior written consent of Company, any proprietary or confidential information or know-how belonging to Company ("Proprietary Information"), whether or not it is in written or permanent form, except to the extent required to perform duties on behalf of Company in my capacity as an employee. Such Proprietary Information includes, but is not limited to, technical and business information relating to Company's inventions or products, research and development, production processes, manufacturing and engineering processes, machines and equipment, finances, customers, marketing, and production and future business plans. Upon termination of my employment or at the request of my supervisor before termination, I will deliver to Company all written and tangible material in my possession incorporating the Proprietary Information or otherwise relating to Company's business. These obligations with respect to Proprietary Information extend to information belonging to customers and suppliers of Company who may have disclosed such information to me as the result of my status as an employee of the Company.

3.   I will promptly disclose and describe to Company (i) all inventions, improvements, discoveries and technical developments ("Inventions"), whether or not patentable, made or conceived by me, either alone or with others, during the term of my employment, provided that Company shall receive such information in confidence. I hereby assign and agree to assign to Company my entire right, title and interest in and to such Inventions which relate in any way to or are useful in Company's business as presently conducted or as conducted at any future time during my employment, and agree to cooperate with Company and its designee(s) both during and after my employment in the procurement and maintenance, at Company's expense and at its discretion, of patents, copyrights, and/or other protection of Company's rights in such inventions. I will keep and maintain adequate and current written records of all such Inventions, which shall be and remain the property of Company.

4.   (a)  There is no other contract or duty on my part now in existence to assign Inventions.

(b)  I will not disclose or induce Company to use any confidential information or material that I am now or shall become aware of which belongs to anyone other than Company.

(c)  During my employment by Company, I will not engage in any employment, consulting or other activity in any business without the Company's express written agreement.

5.   All records, reports, notes, compilations, or other recorded matter, and copies or reproductions thereof, relating to Company's operations, activities or business, made or received by me during any period of employment with Company are and shall be the Company's exclusive property, and I will keep the same at all times in Company's custody and subject to its control, and will surrender the same at the termination of my employment if not before and will not take with me any reproduction of same or any Proprietary Information that is embodied in tangible medium of expression.

10/17/05   MON 13:59 FAX                    SIDLEY                                      ☒043

*Attachment A*                                                    0824a
                                                                 112283

6.   I have attached hereto a complete and detailed list of all inventions owned by
me or by others, conceived or made by me prior to my employment by the Company.  These
are the only inventions which are not subject to this Agreement.  In addition, I will
provide the Company with a sealed envelope which contains written and pictorial
descriptions of each such invention.  Such envelope may be opened by the Company upon
termination of my employment or five years from the date of this Agreement, whichever
occurs first.

7.   A breach of any of the promises or agreements contained herein will result in
irreparable and continuing damage to Company for which there will be no adequate remedy
of law, and Company shall be entitled to injunctive relief and/or a decree for specific
performance, and such other relief as may be proper (including monetary damages if
appropriate).

8.   I represent that my performance of all the terms of this Agreement and as an
employee of the Company does not and will not breach any agreement to keep in confidence
proprietary information acquired by me in confidence or in trust prior to my employment
by the Company.  I represent that I have not brought and will not bring to the Company
or use in the performance of my responsibilities at the Company any materials or
documents of a former employer that are not generally available to the public, unless I
have obtained express written authorization from the former employer for their
possession and use.

9.   The waiver by Company of a breach of provision of this contract by Employee
shall not operate or be construed as a waiver of any other or subsequent breach by
Employee.  If any provision of this Agreement is held to be invalid, void or
forceable, the remaining provisions shall nevertheless continue in full force and
effect without being impaired or invalidated in any way.  This Agreement shall be
construed in accordance with, and governed by, the laws of the State of California.
This Agreement shall be binding on me, my heirs, executors, assigns and administrators
and shall inure to the benefit of the Company and its successors and assigns.

10.  Company has informed me that, in accordance with Section 2872 of the California
Labor Code, this Agreement does no require me to assign to Company; any invention for
which no equipment, supplies, facilities or trade secret information of Company was used
and which was developed entirely on my own time, and (a) which does not relate (1) to
the business of Company or (2) to Company's actual or demonstrably anticipated research
or development, or (b) which does not result from any work performed by me for Company.
This limited exclusion does not apply to any patent or invention covered by a contract
between Company and the United States or any of its agencies requiring full title to
such patent or invention to be in the United States.  I ACKNOWLEDGE RECEIPT of a copy of
this Agreement.

                                          EMPLOYEE:

Date:  _2.22.84_                          _____
                                          Signature

                                          E. HARARI
                                          Printed Name

                                          COMPANY:

L  :  _2/22/84_                           By _Edward R. Martin_

                                          Title  DIRECTOR, HUMAS RESOURCES
                                          2.

ATTACHMENT A  (WSI)

List of patent disclosures belonging to Eli Harari

ED    1.  A uniquely addressed high density RAM cell and its          } U.S. Patent
          associated peripheral circuitry in a memory array.            issued.

ED    2.  Low power high density charge pumped static RAM cells       } Fully Covers
          and method of operating same in a memory array.              1 & 2.

✻ 3.  A variable threshold MOSFET with graded substrate potential.

✻ 4.  A double gate MOSFET with improved load characteristics.

✻ 5.  A fast electrically programmable, UV erasable RAM (PRAM).

ED    6.  A high efficiency EPROM and E²PROM with drain overlap       Three U.S
          (device and process).                                       patents granted
                                                                      fully covers 6.

✻ 7.  A process to minimize encroachment of bird's beak effect.

✻ 8.  A process for reduced diffusion parasitic capacitances
          by reduced field encroachment.

✻ 9.  A high density decoder.

ED    10.  High density dynamic RAM relying for storage on substrate  U.S. patent
           potential.                                                 granted.
                                                                      fully covers.

✻ 11.  Use of substrate potential for a radiation detector
           array or a thermal detector, or a sense amplifier.

ED    12.  Dynamic Loadless logic for serial memory and pipeline     U.S. patent
           parallel signal processing.                                granted.
                                                                      Fully Covers

ED    13.  Dynamic RAM cell with signal amplification.               12.
                                                         Three U.S. patents filed
NG    14.  Static RAM cell with JFET bistable element.                (Attorney designation
ED         U.S patent filed, Not yet granted. Fully Covers 14.        M169, M601, M601
                                                                      fully Covers 13.
NG    15.  E²PROM cell with drain protection for read and program
ED         disturb.  U.S. patent filed, Not yet granted. fully covers 15.

✻ 16.  PROM cell with vertical filament fuse element.

✻ Full description of these inventions is held in a sealed
envelope by Harari's patent attorney's firm in
Santa Clara — Mr. Alan MacPherson is the patent attorney.
                                                    408 246 1405
                                                    2.13.84
Three patents in item 6. are covered in a
separate Agreement between WSI and E.Harari.   E H Harari

2774034

# SUMMONS
### (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:** *(Aviso a Acusado)*
ELIYAHOU HARARI, AN INDIVIDUAL,
SANDISK CORPORATION, A CORPORATION
AND DOES 1 to 20, INCLUSIVE

<table>
<tr><td align="center">FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE)</td></tr>
</table>

**YOU ARE BEING SUED BY PLAINTIFF:**
*(A Ud. le está demandando)*
STMICROELECTRONICS, INC., A CORPORATION

| | |
|---|---|
| You have **30 CALENDAR DAYS** after this summons is served on you to file a typewritten response at this court.<br><br>A letter or phone call will not protect you; your typewritten response must be in proper legal form if you want the court to hear your case.<br><br>If you do not file your response on time, you may lose the case, and your wages, money and property may be taken without further warning from the court.<br><br>There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book). | *Después de que le entreguen esta citación judicial usted tiene un plazo de 30 DIAS CALENDARIOS para presentar una respuesta escrita a máquina en esta corte.*<br><br>*Una carta o una llamada telefónica no le ofrecerá protección; su respuesta escrita a máquina tiene que cumplir con las formalidades legales apropiadas si usted quiere que la corte escuche su caso.*<br><br>*Si usted no presenta su respuesta a tiempo, puede perder el caso, y le pueden quitar su salario, su dinero y otras cosas de su propiedad sin aviso adicional por parte de la corte.*<br><br>*Existen otros requisitos legales. Puede que usted quiera llamar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de referencia de abogados o a una oficina de ayuda legal (vea el directorio telefónico).* |

CASE NUMBER (Número del Caso):
HG 05237216

The name and address of the court is: (El nombre y dirección de la corte es)
Alameda Superior Court
24405 Amador Street
Hayward, California 94544
Hayward Hall of Justice

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es)
Russell L. Johnson (SBN 53833)
Sidley Austin Brown & Wood LLP
555 California Street, Suite 2000
San Francisco, CA 94104
(415) 772-1200

DATE: OCT 1 4 2005        Arthur Sims, Clerk, by  DOLORES J. SILVA        , Deputy
(Fecha)                        (Actuario)                                     (Delegado)

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. — as an individual defendant.
2. — as the person sued under the fictitious name of (specify):

3. — on behalf of (specify):

| under: | —X CCP 416.10 (corporation) | — CCP 416.60 (minor) |
|---|---|---|
| | — CCP 416.20 (defunct corporation) | — CCP 416.70 (conservatee) |
| | — CCP 416.40 (association or partnership) | — CCP 416.90 (individual) |
| | — other: | |

4. — by personal delivery on (date):