1  RUSSELL L. JOHNSON (SBN 53833)
   rljohnson@sidley.com
2  EDWARD V. ANDERSON (SBN 83148)
   evanderson@sidley.com
3  TEAGUE I. DONAHEY (SBN 197531)
   tdonahey@sidley.com
4
   SIDLEY AUSTIN LLP
5  555 California Street, Suite 2000
   San Francisco, California 94104-1715
6  Telephone:    415-772-1200
   Facsimile:    415-772-7400
7
   Attorneys for Plaintiff
8  STMicroelectronics, Inc.

9                   **UNITED STATES DISTRICT COURT**

10                 **NORTHERN DISTRICT OF CALIFORNIA**

11                    **SAN FRANCISCO DIVISION**

12

13  STMICROELECTRONICS, INC.,            )   Case No. C 08 02332 MMC
     a Corporation,                       )
14                                        )   **NOTICE OF MOTION TO REMAND IN**
                                          )   **CASE NO. 05-04691 JF**
15              Plaintiff,                )
                                          )
16        vs.                             )
                                          )
17  ELIYAHOU HARARI, an individual;      )
    SANDISK CORPORATION, a corporation; and )
18  DOES 1 TO 20, inclusive              )
                                          )
19              Defendants.              )
                                          )
20  _____)

21

22

23

24

25

26

27

28

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2      PLEASE TAKE NOTICE that, on Monday, May 12, 2008, Plaintiff STMicroelectronics, Inc.

3  filed a motion to remand in Related Case No. 05-04691 JF.  The motion is attached hereto.

4

5

6

7  Dated:  May 12, 2008                         SIDLEY AUSTIN LLP

8

9                                        By: /s/ Russell L. Johnson
                                               Russell L. Johnson

10                                       Attorneys for Plaintiff
                                         STMicroelectronics, Inc.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION TO REMAND IN CASE NO. 05-04691 JF
Case No. C 08 02332 MMC

1  RUSSELL L. JOHNSON (SBN 53833)
rljohnson@sidley.com
2  EDWARD V. ANDERSON (SBN 83148)
evanderson@sidley.com
3  TEAGUE I. DONAHEY (SBN 197531)
tdonahey@sidley.com
4
SIDLEY AUSTIN LLP
5  555 California Street, Suite 2000
San Francisco, California 94104-1715
6  Telephone:    415-772-1200
Facsimile:    415-772-7400
7
Attorneys for Plaintiff
8  STMicroelectronics, Inc.

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11                   SAN JOSE DIVISION

12

13  STMICROELECTRONICS, INC.,          )   Case No. C 05-04691 JF
a Corporation,                     )
14                                     )   Related Case No. C 08 02332 MMC
                                       )
15              Plaintiff,             )   **STMICROELECTRONICS, INC.'S**
                                       )   **MOTION TO REMAND DEFENDANTS'**
16        vs.                          )   **SECOND REMOVAL**
                                       )
17  ELIYAHOU HARARI, an individual;    )   **Before:      Hon. Jeremy Fogel**
SANDISK CORPORATION, a corporation; )   **Date:        July 25, 2008**
and                                )   **Time:        9:00 a.m.**
18  DOES 1 TO 20, inclusive            )   **Courtroom:   3**
                                       )
19              Defendants.            )   **MOTION TO SHORTEN TIME FILED**
                                       )
20                                     )
                                       )
21  ─────────────────────────────────  )

22

23

24

25

26

27

28

1

## **<u>TABLE OF CONTENTS</u>**

2

Page

3

NOTICE OF MOTION AND MOTION ........................................................................1

4

ISSUES TO BE DECIDED ...........................................................................................1

5

MEMORANDUM OF POINTS AND AUTHORITIES ................................................2

6

I.     INTRODUCTION .................................................................................................2

7

II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY.............................2

8

III.   ARGUMENT ........................................................................................................4

9

       A.     Defendants Must Establish Under the Well-Pleaded Complaint Rule that
Federal Law Creates ST's Cause of Action or that ST's Right to Relief

10

              Necessarily Depends on the Resolution of a Substantial Federal Question .................4

11

       B.     This Court's July 18, 2006 Order Holding that Federal Question
Jurisdiction Does Not Exist Under § 1338 is Res Judicata.............................5

12

13

       C.     Defendants Have Not Perfected Removal Pursuant to § 1446(b)....................8

14

             1.     Defendants' Notice of Removal is Untimely under the First
Paragraph of § 1446(b) ...............................................................8

15

             2.     There is Genuine Doubt As to What Constitutes "Other Paper"
Under the Second Paragraph of § 1446(b) to Confer Federal

16

                  Question Jurisdiction ...................................................................9

17

             3.     If Any Paper May Constitute "Other Paper" Under the Second
Paragraph of § 1446(b), Defendants' Notice of Removal is

18

                  Untimely .......................................................................................9

19

       D.     Substantively, ST's Claims Do Not Necessarily Depend on the Resolution
of a Substantial Question of Federal Patent Law...........................................10

20

21

             1.     Construction of Assignment Clauses Under Federal Patent Law
is *Not Essential* for ST to Obtain the Relief It Seeks....................................11

22

             2.     The Issue of Automatic Assignment Does Not Create a *Substantial*
Question of the Patent Law.........................................................12

23

24

             3.     Defendants' Argument that Construction of a Patent Assignment
Clause Voids Their Statute of Limitations Defense Does Not
Establish Federal Jurisdiction ...................................................13

25

       E.     ST is Entitled to Its Fees and Costs Because Defendants' Basis for
Removal is Frivolous .....................................................................................13

26

27

IV.   CONCLUSION....................................................................................................14

28

-ii-

# TABLE OF AUTHORITIES

Page

## CASES

*AT&T v. Integrated Network Corp.*
972 F.2d 1321 (Fed. Cir. 1992)...............................................................................11, 13

*Bd. of Regents v. Nippon Tel. & Tel. Corp.*
414 F.3d 1358 (Fed. Cir. 2005)...........................................................................................12

*Beghin-Say Int'l Inc. v. Ole-Bendt Rasmussen*
733 F.2d 1568 (Fed. Cir. 1984)...................................................................................10, 11

*Christianson v. Colt Industries Operating Corp.* (1988)
486 U.S. 800 ..................................................................................................5, 11, 12

*DDB Technologies L.L.P. v. MLBA Advanced Media, L.P.*
517 F.3d 1284 (Fed. Cir. 2008).................................................................................. *passim*

*FilmTec Corp. v. Allied-Signal Inc.*
939 F.2d 1568 (Fed. Cir. 1991).............................................................................................7

*Franchise Tax Bd. v. Constr. Laborers Vacation Trust*
463 U.S. 1 (1983)........................................................................................................5, 13, 14

*Gaus v. Miles, Inc.*
980 F.2d 564 (9th Cir. 1992) ................................................................................................4

*Jim Arnold Corp. v. Hydrotech Sys., Inc.,*
109 F.3d 1567 (Fed. Cir. 1997)....................................................................................12, 13

*Martin v. Franklin Capital Corp.*
546 U.S. 132 (2005)................................................................................................................8, 14

*Matheson v. Progressive Specialty Ins. Co.*
319 F.3d 1089 (9th Cir. 2003) .............................................................................................5

*Moore v. Permanente Med. Group, Inc.*
981 F.2d 443 (9th Cir. 1992) ...............................................................................................13

*Peabody v. Schroll Trust*
892 F.2d 772 (9th Cir. 1989) ............................................................................................5, 6

*Shamrock Oil & Gas Corp. v. Sheets*
313 U.S. 100 (1941).................................................................................................................4

*Speedplay, Inc. v. Bebop, Inc.*
    211 F.3d 1245 (Fed. Cir. 2000)........................................................................7

*Valdez v. Allstate Ins. Co.*
    372 F.3d 1115 (9th Cir. 2004) ......................................................................4

*Wilson v. Sandford*,
    51 U.S. 99 (1850)..........................................................................................11

**STATUTES**

28 U.S.C. § 1331............................................................................................................4

28 U.S.C. § 1338..................................................................................................... *passim*

28 U.S.C. § 1446..............................................................................................8, 9, 10

28 U.S.C. § 1447...................................................................................................5, 14

33 U.S.C. § 403..............................................................................................................6

1

**NOTICE OF MOTION AND MOTION**

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE that, at 9:00 a.m. on Friday, July 25, 2008, or as soon thereafter as

4

the matter may be heard, in Courtroom 3 of the above-entitled Court, there will be a hearing, of

5

STMicroelectronics, Inc.'s ("ST") motion for an order to remand this case to the Superior Court for

6

the State of California, County of Santa Clara; and to award ST its just costs and actual expenses,

7

including attorneys fees, incurred as a result of the removal.

8

PLEASE TAKE NOTICE that, on Friday, May 9, 2008, a motion to shorten time on this

9

motion was filed which requests that briefing in this case be expedited and that this motion be

10

decided without oral argument.

11

This motion is based on the memorandum in support of the motion submitted herein, the

12

motion for an order shortening time on this motion [Docket No. 100], the Declaration of Russell L.

13

Johnson filed herewith ("Johnson Decl."), the pleadings and other papers already on file in this case,

14

and all other matters presented to the Court.

15

**ISSUES TO BE DECIDED**

16

1.      Does an interrogatory answer by ST give rise to a federal cause of action or raise a

17

substantial question of federal law to permit removal pursuant to 28 U.S.C. § 1446(b) as Defendants

18

contend?

19

2.      If so, was Defendants' removal timely under 28 U.S.C. § 1446(b)?

20

3.      If not, was Defendants' basis for removal objectively unreasonable such that ST

21

should be awarded its just costs and actual expenses, including attorneys fees, incurred as a result of

22

the removal.

23

24

25

26

27

28

-1-

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

This Court previously held that "adjudication of Plaintiff's state law claims does not require resolution of a substantial question of patent law." Ignoring this Court's unequivocal ruling, Defendants have removed this case a second time, arguing that a federal question exists because federal law governs interpretation of the assignment clause in one of the contracts at issue in this case. Defendants' argument is without merit and any removal is procedurally barred.

It is well established that the well-pleaded complaint rule determines whether federal question jurisdiction is proper. Under the rule, § 1338(a) jurisdiction extends "only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law." ST's complaint has remained unchanged since this Court remanded this case.

This Court's previous ruling that ST's complaint raises no issue under federal patent law to confer removal jurisdiction is res judicata. Any argument that ST's interrogatory response is a sufficient change so as to avoid the res judicata effect of this Court's prior ruling is frivolous as a matter of law. The assignment issue now raised by Defendants has been at issue in this case since the filing of the complaint, and if federal law governs the interpretation of the assignment clause, this was true when the case was originally removed. Thus, removal is now barred by the time limitations in 28 U.S.C. § 1446(b).

Defendants' second motion for removal is not objectively reasonable and is yet another example of the dilatory tactics Defendants have used throughout this case to prevent a trial on the merits. ST should be awarded the attorneys fees and costs incurred as a result of Defendants' second motion for removal.

## II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

Defendant Eliyahou Harari ("Harari") was a co-founder of Wafer Scale Integration ("WSI"), a company that has since merged with ST. Compl. ¶ 7, Johnson Decl. Ex. A. During his tenure with WSI, Harari served several positions, including Chief Executive Officer ("CEO"), Chief Technology

1    Officer ("CTO"), Director, and Chairman of the Board.  *Id.* ¶ 9.  While Harari was an officer and/or

2    director of WSI, it was designing and developing flash memory products.  *Id.* ¶ 6.

3         Early in his employment with WSI, Harari signed an Employee Agreement Regarding

4    Confidentiality & Inventions ("Inventions Agreement").  *Id.* ¶ 11.  Harari's Inventions Agreement

5    provided in relevant part:

> I will promptly disclose and describe to [WSI] (i) all inventions, improvements,
> discoveries and technical developments ('Inventions'), *whether or not patentable*,
> made or conceived by me, either alone or with others, during the term of my
> employment …  I *hereby assign and agree to assign* to [WSI] my entire right, title
> and interest in and to such Inventions which relate in any way to or are useful in
> [WSI]'s business as presently conducted or as conducted at any future time during my
> employment.

10   *Id.* Ex. A. (*emphases added*).

11        On February 29, 1988, WSI and Harari entered into a Consulting and Directorship

12   Agreement ("Consulting Agreement").  *Id.* ¶ 20.  The Consulting Agreement disclosed Harari's

13   resignation from WSI as an employee and officer.  *Id.*  The Consulting Agreement also provided that

14   WSI would continue to nominate Harari as director until an IPO took place, Harari would be a paid

15   consultant to WSI for 11 months at his then salary, and Harari would "continue to be bound by and

16   comply with the terms of [the Inventions Agreement]."  *Id.* ¶ 21.  However, within two months after

17   ending his employment but still serving in his capacity as a director of WSI and bound by the

18   obligations set forth in the Consulting Agreement, Harari began filing patent applications without

19   disclosing them to WSI.  *Id.* ¶ 24.  Harari filed a total of six patent applications that eventually

20   resulted in 50 issued patents.  *Id.* ¶¶ 24-31.  In this case, ST is seeking an ownership interest in those

21   50 patents because Harari had an obligation to assign them to WSI.

22        In June 1988, Harari founded the corporate entity that became Defendant SanDisk

23   Corporation ("SanDisk").  *Id.* ¶ 40.  Harari assigned the patents that issued from the six patent

24   applications to SanDisk.  *Id.* ¶ 45.

25        ST filed its complaint on October 14, 2005 in the Superior Court of the State of California,

26   Alameda County on several legal theories to recover ST's interest in the 50 patents that should have

27   been assigned to ST and to recover for ST's losses.

28

1    After the complaint was filed, Defendants removed the case to federal court, where it was

2   assigned to this Court as a related case.  First Notice of Removal, Johnson Decl. Ex. B.  ST's motion

3   to remand was initially denied.  However, this Court subsequently granted a motion for

4   reconsideration and remanded this case, finding that the "adjudication of [ST's] state law claims

5   does not require resolution of a substantial question of patent law."  Order Granting Plaintiff's

6   Motion for Reconsideration and Remanding Action at 7, Johnson Decl. Ex. C.

7    After the case was remanded, Defendants filed a motion for judgment on the grounds that

8   ST's causes of action require "the resolution of a substantial question of federal patent law over

9   which federal courts have exclusive jurisdiction."  Defendants' Motion for Judgment on the

10   Pleadings at 2, Johnson Decl. Ex. D.  On March 11, 2008, the Superior Court denied the motion,

11   holding that:

12    Defendants have failed to show from the face of the Complaint, or matters
     judicially noticeable, that any of plaintiff's causes of action are created by federal
13   patent law or that plaintiff's right to relief necessarily depends on resolution of a
     substantial question of federal patent law. (*Christianson v. Colt Industries Operating*
14   *Corp.* (1988) 486 U.S. 800, 809.)

15    The Complaint in this case concerns a question of patent ownership, a
     question exclusively for state courts. (*Jim Arnold Corp. v. Hydrotech Sys., Inc,.*
16   109 F.3d 1567, 1572 (Fed. Cir. 1997).)

17   Order re: Defendants' Motion for Judgment on the Pleadings at 1, Johnson Decl. Ex. G.

18    On May 6, 2008, Defendants removed this action for a second time, alleging jurisdiction

19   under §§ 1331 and 1338.  Second Notice of Removal, Johnson Decl. Ex. K.

20   **III.   ARGUMENT**

21    **A.    Defendants Must Establish Under the Well-Pleaded Complaint Rule that
            Federal Law Creates ST's Cause of Action or that ST's Right to Relief**
22    **Necessarily Depends on the Resolution of a Substantial Federal Question**

23    The removal statutes are construed restrictively so as to limit removal jurisdiction.  *Shamrock*

24   *Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-09 (1941).  Because removal is disfavored, there is a

25   "strong presumption" against removal jurisdiction.  *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir.

26   1992).  The burden of establishing federal jurisdiction for purposes of removal is on the party

27   seeking removal in view of this presumption.  *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1117 (9th

28

1  Cir. 2004).  Doubts as to removability are resolved in favor of remanding the case to state court.

2  *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003).

3      Defendants allege for a second time that this Court has "original jurisdiction under 28 U.S.C.

4  § 1331 and/or 28 U.S.C. § 1338."  Second Notice of Removal ¶ 3.  Under Supreme Court precedent,

5  the well-pleaded complaint rule determines if there is federal question jurisdiction.  *Christianson v.*

6  *Colt Indus. Operating Corp.*, 486 U.S. 800, 808-09 (1988).  Accordingly, the test for when § 1331

7  jurisdiction, and more specifically § 1338 jurisdiction, exists is whether "a well-pleaded complaint

8  establishes that either federal patent law creates the cause of action or that the plaintiff's right to

9  relief necessarily depends on resolution of a substantial question of federal patent law in that patent

10  law is a necessary element of one of the well-pleaded claims."  *Id.* at 809.  In addition, a case may

11  not be removed to federal court on the basis of a federal defense, even if the defense is anticipated in

12  the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at

13  issue in the case.  *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 14 (1983).

14      **B.**    **This Court's July 18, 2006 Order Holding that Federal Question**
15                **Jurisdiction Does Not Exist Under § 1338 is Res Judicata**

16      This Court settled as res judicata the question of federal question jurisdiction on the basis of

17  § 1338 by its July 18, 2006 order granting ST's motion for reconsideration to remand.  *Peabody v.*

18  *Schroll Trust*, 892 F.2d 772, 776 (9th Cir. 1989) (order granting remand constituted res judicata on

19  issue of federal question jurisdiction).  *See also* 28 U.S.C. § 1447(d) ("An order remanding a case to

20  the State court from which it was removed is not reviewable on appeal or otherwise").  Defendants

21  could not in "good faith" move for removal a second time under § 1338 unless ST interjected some

22  new federal law issue into the case.  *See Peabody,* 892 F.2d at 776.

23      Significantly, no change has been made to the causes of action in ST's complaint since the

24  filing of the first motion for removal.  Johnson Decl. ¶ 3.  The language in Harari's Inventions

25  Agreement remains the same.  The only change that Defendants have identified in their second

26  notice of removal is ST's purportedly "new" theory that there was an automatic assignment instead

27  of an agreement to assign, and that, in *DDB Technologies L.L.P. v. MLBA Advanced Media, L.P.,*

28

1    517 F.3d 1284 (Fed. Cir. 2008) the Federal Circuit interpreted such an agreement under federal law.[1]

2    Even if Defendants correctly contend that ST altered the theory of its case to rely on federal law, the

3    Ninth Circuit found this argument unavailing to confer federal question jurisdiction in *Peabody*.

4         The underlying action in *Peabody* involved a claimed public right of access to a lagoon under

5    state contract law.  The defendant in *Peabody* removed the action to federal district court, alleging

6    federal question jurisdiction on two bases – 33 U.S.C. § 403, a statute requiring a permit from the

7    United States Army Corps of Engineers for dredging, and the takings clause of the fifth amendment.

8    The case lay dormant in federal court for several years before the plaintiff successfully moved for

9    remand.  Following remand, the plaintiff moved for partial summary judgment.  The defendant

10    contended that the plaintiff altered its case to rely on federal common law in the plaintiff's motion

11    for partial summary judgment.  This theory – that plaintiff's cause of action was now based solely on

12    federal law – was the basis for the defendant's second motion for removal.  The plaintiff moved to

13    remand and to impose sanctions.  The district court granted the plaintiff's motion.  The defendant

14    sought review of the district court's imposition of sanctions.  The Ninth Circuit affirmed the award

15    of sanctions, holding that:

16           A second presentation of the same, previously rejected, theory to the same court fairly
       defines 'frivolous.'  Unless [the defendant] can show some relevant change
17           subsequent to the first remand, the sanctions award was proper.

18    *Peabody*, 892 F.2d at 775.  The Ninth Circuit specifically found that the defendant's theory of the

19    plaintiff's "allegedly new reliance on federal common law revealed by [the plaintiff's] Motion for

20    Partial Summary Judgment" did not represent the necessary relevant change to the plaintiff's case to

21    overcome sanctions for improper removal.  *Id.* at 776-77.  Similarly, ST's purported reliance on

22    *DDB Technologies*, which is allegedly "at the very core of [ST's] claims," cannot overcome the res

23    judicata effect of this Court's order granting remand where there has been no amendment to ST's

24    complaint.  Second Notice of Removal ¶ 10.

25

26    [1] In *DDB Technologies*, the plaintiff sued for patent infringement, and this was the basis for federal
jurisdiction.  The Federal Circuit did not hold that interpretation of an assignment clause was a
27    substantial question which created federal jurisdiction.

28

1    The proper construction of the patent assignment clause in Harari's Inventions Agreement

2 has always been at issue in this case.  If the assignment provision constitutes an automatic

3 assignment, no further acts are required and legal title was transferred to WSI by operation of law

4 once the invention is made.  If the clause is construed as a promise to assign, after the invention was

5 made, WSI has equitable rights, but assignment must be executed by Dr. Harari to transfer legal title.

6 Moreover, Defendants' basis for federal question jurisdiction, §1338, is the same basis this Court has

7 already rejected without a relevant change to ST's case.  Under *Peabody*, Defendants' second

8 motion for removal is frivolous as a matter of law.

9    In addition, it is not true that construction of a patent assignment clause or the theory of

10 automatic assignment is new federal law that did not exist before *DDB Technologies*.  *See, e.g.,*

11 *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000) (an assignee "automatically

12 obtained title" to an invention where the disputed contract provided that all inventions covered by

13 the contract "shall belong exclusively to [assignee] and [assignor] hereby conveys, transfers and

14 assigns to [assignee] … all right, title and interest in and to Inventions").  *See also FilmTec Corp. v.*

15 *Allied-Signal Inc.,* 939 F.2d 1568, 1570-73 (Fed. Cir. 1991) (where the contractor agreed to "grant

16 and does hereby grant" to the client the rights to any invention, whether patentable or not, "no

17 further act would be required once an invention came into being; the transfer of title would occur by

18 operation of law").  Therefore, if Defendants are correct, federal law has been and is now equally

19 applicable under either construction asserted by ST and the alleged change in ST's position – from a

20 contention that is was an obligation to assign to an automatic assignment – did not suddenly make

21 the case subject to federal law for the first time.

22    Defendants could and *should* have raised this argument before this Court remanded this case

23 the first time.  Defendants should be precluded from asserting this new argument in view of the

24 preclusive effect of this Court's July 18, 2006 order granting remand.

25

26

27

28

-7-

1      ### C.      Defendants Have Not Perfected Removal Pursuant to § 1446(b)

2              Defendants invoke 28 U.S.C. § 1446(b) to remove the instant case from the Superior Court of

3      California, Santa Clara County to this Court.  Second Notice of Removal ¶ 11.  Section 1446,

4      entitled, "Procedure for removal," provides in relevant part:

5              (b)  The notice of removal of a civil action or proceeding shall be filed within thirty
               days after the receipt by the defendant, through service or otherwise, of a copy of the
6              initial pleading setting forth the claim for relief upon which such action or proceeding
               is based, or within thirty days after the service of summons upon the defendant if such
7              initial pleading has then been filed in court and is not required to be served on the
               defendant, whichever period is shorter.
8
               If the case stated by the initial pleading is not removable, a notice of removal may be
9              filed within thirty days after receipt by the defendant, through service or otherwise, of
               a copy of an amended pleading, motion, order or other paper from which it may first
10             be ascertained that the case is one which is or has become removable …

11     Because the removal statutes are intended to be interpreted strictly to limit removal jurisdiction, this

12     Court should remand this case due to Defendants' failure to abide by the procedural limitations

13     prescribed by § 1446(b).  *See also Martin v. Franklin Capital Corp.*,

14     546 U.S. 132, 137 (2005) ("A remand is necessary if a defendant improperly asserts [the right of

15     removal]").

16             ### 1.      Defendants' Notice of Removal is Untimely under the First
                          Paragraph of § 1446(b)
17

18             Defendants argue that federal law only became applicable when ST allegedly changed its

19     assignment theory from a right to demand an assignment to an automatic assignment.  Second Notice

20     of Removal, ¶¶ 8-9.  If *DDB Technologies* is applicable to this case and federal law is controlling

21     with respect to the construction of patent assignment clauses as Defendants contend, then federal law

22     was applicable under either theory asserted by ST, and was controlling upon the filing of the

23     complaint.  Thus, Defendants are clearly wrong when they argue that the right of removal first arose

24     when ST allegedly altered its theory of the case by contending that Harari's Inventions Agreement

25     was an automatic assignment in ST's April 9, 2008 interrogatory responses.  Pursuant to the first

26     paragraph of § 1446(b), removal is untimely here because it comes more than 30 days after the

27     complaint was filed.

28

-8-

2.      **There is Genuine Doubt As to What Constitutes "Other Paper"**
        **Under the Second Paragraph of § 1446(b) to Confer Federal**
        **Question Jurisdiction**

Defendants also contend that ST's April 9, 2008 interrogatory responses can constitute the

"other paper from which it may first be ascertained that the case is one which is or has become

removable" to confer federal question jurisdiction.  *See* Second Notice of Removal ¶ 11.  As federal

question jurisdiction can only be established by the well-pleaded complaint rule, it would be an

extraordinary leap of logic to consider how a plaintiff's discovery response could amend the

complaint so as to confer original jurisdiction under § 1338.  Defendants certainly cite no authority

for this proposition.  What is certain is that any doubt as to removability are resolved in favor of

remanding the case to state court.  Because the question remains as to what "paper" other than the

complaint itself can establish "that federal patent law creates the cause of action or that the plaintiff's

right to relief necessarily depends on resolution of a substantial question of federal patent law,"

remand is proper here.

3.      **If Any Paper May Constitute "Other Paper" Under the Second**
        **Paragraph of § 1446(b), Defendants' Notice of Removal is**
        **Untimely**

Even if Defendants' theory is correct — that any "paper" can give rise to removal —

Defendants' motion is nonetheless untimely.  Section 1446(b) requires the filing of the notice of

removal within 30 days of service of the "other paper from which *it may first be ascertained* that the

case is one which is or has become removable" (*emphasis added*).  On March 3, 2008, in *Certain*

*Flash Memory Controllers, Drives, Memory Cards, and Media Players and Products Containing*

*Same*, ITC Inv. No. 337-TA-619, Complainant SanDisk was served with the Respondents' Reply to

SanDisk's Opposition to Respondents' Motion to Terminate the Investigation, Johnson Decl. Ex. H

("March 3 Paper").  In the March 3 Paper, Defendant SanDisk first ascertained that Harari's

Inventions Agreement may have been an "automatic assignment" under federal law.  *Id.* 3-4.

Specifically, SanDisk was informed that:

> As stated in the *DDB Technologies* case, "[i]f the contract expressly grants rights in
> future inventions, 'no further act [is] required once an invention [comes] into being,"
> and "the transfer of title [occurs] by operation of law." Exhibit 1, Case No. 2007-
> 1211 at 10 *quoting FilmTec v. Allied Signal*, 939 F.2d 1568, 1573 (Fed. Cir. 1991).

-9-

1
2
3
4

> Dr. Harari's assignment stated that he "assign[ed]. . .my entire right, title, and interest in and to such Inventions which relate in any way to or are useful in Company's business."  STM Complaint, exhibit A, paragraph 3, included as Exhibit 1 of Respondents Motion to Terminate the '808 Patent.  The assignment did not say that he <u>would</u> assign or that he was <u>obligated</u> to assign.  Accordingly, under the *DDB Technologies* case and its predecessors, there was no contractual obligation to assign the '808 patent, because the assignment took place automatically upon invention.

5   *Id.* 4.  This "paper," along with the Federal Circuit's opinion in *DDB Technologies*, was served on

6   Michael A. Ladra and James C. Yoon — the same two attorneys who filed Defendants' second

7   notice of removal.  Yet Defendants waited over 60 days to file their notice of removal.  Thus, even if

8   Defendants' theory that any paper can give rise to removal under the second paragraph of § 1446(b),

9   the notice of removal was untimely here because it was filed more than 60 days after SanDisk's

10  receipt of the March 3, 2008 "paper."

11
12

> **D.**    **Substantively, ST's Claims Do Not Necessarily Depend on the Resolution of a Substantial Question of Federal Patent Law**

13      Although Defendants' motion for removal makes the conclusory statement that "a substantial

14  question of federal patent law" is raised by an interrogatory answer given by ST, Defendants make

15  no showing that the alleged legal issue is "substantial."  Furthermore, even if the alleged federal law

16  issue is substantial, Defendants make no attempt to show that a cause of action in the complaint

17  "necessarily depends on resolution of a substantial question of federal law."  Thus, Defendants'

18  notice of removal does not make a prima facie showing that the case is removable.

19      Defendants contend that ST's statement in an interrogatory answer that the Inventions

20  Agreement constitutes an automatic assignment "puts at issue a substantial question of federal law,"

21  thereby conferring federal question jurisdiction.   Second Notice of Removal ¶¶ 9-10.   This

22  argument is utterly baseless because the Federal Circuit has rejected such a proposition:

23
24

> That the involved contracts may or may not constitute agreements to assign future patent applications does not convert a contract dispute cognizable in state courts to a federal question appropriate for determination in a federal court.

25  *Beghin-Say Int'l Inc. v. Ole-Bendt Rasmussen*, 733 F.2d 1568, 1571 (Fed. Cir. 1984).  Moreover, the

26  federal court system has consistently held "for over 130 years that contract disputes involving

27  patents do not arise 'under any Act of Congress relating to patents,' as required by 28 U.S.C. §

28

1    1338." *See id.* (citing to *Wilson v. Sandford*, 51 U.S. 99 (1850) and its progeny).  Assuming

2    arguendo that Dr. Harari's assignment is a matter of federal law and not state law, removal is not

3    proper here because the *Christianson* test has not been met.

    1.    **Construction of Assignment Clauses Under Federal Patent Law is**
4
          ***Not Essential* for ST to Obtain the Relief It Seeks**
5

6         The Supreme Court has held that "a claim supported by alternative theories in the complaint

7    may not form the basis for § 1338(a) jurisdiction unless patent law is essential to *each* of those

8    theories." *Christianson*, 486 U.S. at 810 (*emphasis added*).  "[T]he appearance on the complaint's

9    face of an alternative, nonpatent theory compels the conclusion that the … claim does not 'arise

10   under' patent law." *Id.* at 813.  A case arises under federal patent law when the plaintiff's complaint

11   establishes that "some right, title or interest under the patent laws, or at least make[s] it appear that

12   some right or privilege will be defeated by one construction, or sustained by the opposite

13   construction of these laws." *Id.* at 807-08.

14        The legal theory of automatic assignment upon which ST purportedly relies is applicable to

15   "all inventions, improvements, discoveries and technical developments ('Inventions'), *whether or*

16   *not patentable*" under the terms of the Inventions Agreement.  Complaint Ex. A. (*emphasis added*).

17   On its face then, the assignment clause is not limited to the assignment of patents.  It can be applied

18   to other forms of intellectual property that sound in state law, such as unpatentable inventions and

19   inventions held as trade secrets.  *See, e.g., AT&T v. Integrated Network Corp.*, 972 F.2d 1321, 1324

20   (Fed. Cir. 1992).  The Inventions Agreement demonstrates facially that the construction of the

21   assignment clause is not limited to patents and that ST may obtain relief on alternative theories

22   independent of the patent law.  Thus, SanDisk cannot establish that the construction of the

23   assignment clause in Harari's employment contract is solely a patent law question necessary for ST

24   to obtain relief to establish § 1338(a) jurisdiction.  Therefore, ST's alleged reliance on the legal

25   theory of automatic assignment does not establish that its causes of action *necessarily depend* upon

26   the determination of a federal patent law question.

27

28
                                           -11-

1    Moreover, Defendants have failed to identify how the resolution of the question of automatic

2    assignment is a necessary element of any of ST's claims. ST is entitled to relief whether the

3    assignment clause in Harari's employment contract constituted an agreement to assign or an

4    automatic assignment because the former construction grants equitable rights and the latter confers

5    legal title. Clearly, the determination of the patent assignment clause under federal law neither

6    defeats nor sustains ST's right to relief. ST can prevail whether it has legal or equitable title. As a

7    matter of law then, construction of the assignment clause in the Inventions Agreement under federal

8    law is not a necessary element of any of ST's claims.

9            **2.**      **The Issue of Automatic Assignment Does Not Create a *Substantial***

10                       **Question of the Patent Law**

11   Section 1338 jurisdiction is proper where ST's "right to relief necessarily depends on

12   resolution of a *substantial* question of federal patent law." *Christianson*, 486 U.S. at 809 (*emphasis*

13   *added*). There is a "long-settled understanding that the mere presence of a federal issue in a state

14   cause of action does not automatically confer federal-question jurisdiction." *Merrell Dow Pharms.*

15   *Inc. v. Thompson*, 478 U.S. 804, 813 (1986). Rather, there must be a question of federal law

16   sufficiently substantial to confer federal question jurisdiction. *See id*. at 813-14 & n.12.

17   Defendants have cited to no authority for their claim that interpretation of the assignment

18   clause in a state court contract action is a "substantial" question of federal patent law. Defendants'

19   assertion is clearly incorrect because the Federal Circuit has limited the "substantial" matters of

20   federal patent law to integral issues such as inventorship, infringement, validity, and enforceability

21   to confer jurisdiction under § 1338(a). *Bd. of Regents v. Nippon Tel. & Tel. Corp.,* 414 F.3d 1358,

22   1363 (Fed. Cir. 2005). *Cf. AT&T*, 972 F.2d at 1324 ("when an invention was conceived may be

23   more of a question of common sense than of patent law"). Moreover, the law is clear that contract

24   suits over ownership of patents is a matter of state law, not federal law. *Jim Arnold Corp. v.*

25   *Hydrotech Sys., Inc.*, 109 F.3d 1567, 1572 (Fed. Cir. 1997). ("It may seem strange at first blush that

26   the question of whether a patent is valid and infringed ordinarily is one for federal courts, while the

27   question of who owns the patent rights and on what terms typically is a question exclusively for state

28

1    courts.  Yet that long has been the law.  It is well settled that if the patentee pleads a cause of action

2    based on rights created by a contract, or on the common law of torts, the case is not one 'arising

3    under' the patent laws.").

4            **3.    Defendants' Argument that Construction of a Patent Assignment**
                      **Clause Voids Their Statute of Limitations Defense Does Not**
5                     **Establish Federal Jurisdiction**

6            Defendants assert that ST has altered its theory of the nature of Harari's Inventions

7    Agreement "to circumvent Defendants' [statute of limitations] defense."  Second Notice of Removal

8    ¶ 8.  This is the only instance Defendants have identified where the application of federal law is a

9    necessary element of a party's claims or defenses.[2]   However, the fact that the holding in *DDB*

10   *Technologies* may defeat Defendants' statute of limitations defense does not render this case

11   removable.  In determining whether removal jurisdiction is proper, defenses based on federal law are

12   ignored, even if the defense is anticipated in the complaint and both parties agree that the defense is

13   the only issue in the case.  *See Franchise Tax Bd.*, 463 U.S. at 14.  Thus, ST's interrogatory answer

14   stating there was an automatic assignment did not make this case removable even if this implicates

15   the statute of limitations defense.

16           **E.    ST is Entitled to Its Fees and Costs Because Defendants' Basis for Removal is**
                      **Frivolous**
17

18           If the Court remands this case, Defendants should be ordered to pay ST's "costs and any

19   actual expenses, including attorney fees, incurred as a result of the removal."  28 U.S.C. § 1447(c).[3]

20   A district court may grant such fees and costs "where the removing party lacked an objectively

21   reasonable basis for seeking removal."  *Martin*, 546 U.S. at 141.  As discussed previously,

22   Defendants' grounds for the second notice of removal is frivolous as a matter of law because

23   Defendants' assert the same basis for federal question jurisdiction that this Court previously rejected

24   [2] In *DDB Technologies*, the Federal Circuit held that the statue of limitations defense was
     unavailable to the defendant because the assignment clause in an employment contract provided for
25   an automatic assignment.  *DDB Technologies*, 517 F.3d at 1290.

26   [3] This Court may retain jurisdiction over the issue of determining fees and costs even after
     remanding this case to state court.  *Moore v. Permanente Med. Group, Inc.*, 981 F.2d 443, 445 (9th
27   Cir. 1992).

28                                         -13-

1   without any relevant change to ST's case.  Accordingly, ST is entitled to its fees and costs because

2   the basis for Defendants' motion for removal is not objectively reasonable.

3         Awarding fees under § 1447(c) is particularly appropriate to deter "removals sought for the

4   purpose of prolonging litigation and imposing costs on the opposing party," and the waste of judicial

5   resources.  *Id.* at 140.  Defendants' latest motion for removal follows a lengthy and consistent

6   pattern of employing baseless procedural motions to prevent progress towards a trial on the merit.[4]

7   After nearly three years, only a limited amount of discovery has occurred in this case.  Meanwhile

8   both ST and the courts – state and federal – have expended considerable resources to address each of

9   Defendants' procedural motions, including this latest motion for removal.  To deter Defendants from

10  continuing to delay litigation and to enable ST to recover some of the expense necessary to challenge

11  Defendants' frivolous removal motion, ST requests that the Court retain jurisdiction after remand to

12  determine the amount and that ST be given 10 days after entry of the remand order to submit an

13  application for an award of attorneys fees and costs.

14  **IV.    CONCLUSION**

15        For the foregoing reasons, ST requests that this Court: (1) remand this case to state court

16  forthwith and (2) enter an order awarding ST its costs and actual expenses and giving ST 10 days to

17  make application for its fees.

18

19  Dated: May 12, 2008                    SIDLEY AUSTIN LLP

20

21                                         By: /s/ Russell L. Johnson
                                                   Russell L. Johnson

22                                         Attorneys for Plaintiff
                                           STMicroelectronics, Inc.

23

24

25

26  _____
    [4] ST's Motion to Shorten Briefing Schedule for ST's Motion to Remand [Docket No. 100]
    extensively discusses the volume of procedural motions by Defendants that have effectively delayed
27  this action for more than two and a half years.

28

1  RUSSELL L. JOHNSON (SBN 53833)
   rljohnson@sidley.com
2  EDWARD V. ANDERSON (SBN 83148)
   evanderson@sidley.com
3  TEAGUE I. DONAHEY (SBN 197531)
   tdonahey@sidley.com
4
   SIDLEY AUSTIN LLP
5  555 California Street, Suite 2000
   San Francisco, California 94104-1715
6  Telephone:    415-772-1200
   Facsimile:    415-772-7400
7
8  Attorneys for Plaintiff
   STMicroelectronics, Inc.

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11                  **SAN JOSE DIVISION**

12

13 STMICROELECTRONICS, INC.,             )  Case No. 05-04691 JF
    a Corporation,                       )
14                                       )  Related Case No. 08-02332 MMC
                                         )
15              Plaintiff,               )  **DECLARATION OF RUSSELL L.**
                                         )  **JOHNSON IN SUPPORT OF ST'S**
16         vs.                           )  **MOTION TO REMAND DEFENDANTS'**
                                         )  **SECOND REMOVAL**
17 ELIYAHOU HARARI, an individual;       )
   SANDISK CORPORATION, a corporation; and )  **Before:     Hon. Jeremy Fogel**
18 DOES 1 TO 20, inclusive               )  **Date:       July 25, 2008**
                                         )  **Time:       9:00 a.m.**
19              Defendants.              )  **Courtoom:   3**
                                         )
20                                       )  **MOTION TO SHORTEN TIME FILED**
                                         )
21                                       )
                                         )
22 _____     )

23

24

25

26

27

28

1    I, Russell L. Johnson, declare and state:

2        1.    I am a member of the firm Sidley Austin LLP, and am one of the attorneys of record

3    for Plaintiff STMicroelectronics, Inc. ("ST").  I make this declaration in support of ST's Motion to

4    Remand.

5        2.    Attached hereto as Exhibit A is a true and correct copy of ST's Complaint for

6    Damages and Equitable Relief for Breach of Fiduciary Duty, Breach of Written Contract, Fraud,

7    Conversion, Inducing Breach of Contract, Unjust Enrichment, and Unfair Competition

8    ("Complaint"), filed in the Superior Court of the State of California, Alameda County on October

9    14, 2005.

10       3.    ST has not amended the Complaint since it has been filed.

11       4.    Attached hereto as Exhibit B is a true and correct copy of Defendants Eliyahou

12   Harari's ("Harari") and SanDisk Corporation's ("SanDisk") (collectively, "Defendants") Notice of

13   Removal to the United States District Court for the Northern District of California Under 28 U.S.C.

14   § 1441(a) & (b), filed on November 15, 2005.

15       5.    Attached hereto as Exhibit C is a true and correct copy of this Court's Order Granting

16   Plaintiff's Motion for Reconsideration and Remanding Action to Alameda County Superior Court,

17   entered on July 18, 2006.

18       6.    Attached hereto as Exhibit D is a true and correct copy of Defendants' Notice of

19   Motion and Motion for Judgment on the Pleadings filed in the Superior Court of the State of

20   California, Santa Clara County, filed on February 7, 2008.

21       7.    Attached hereto as Exhibit E is a true and correct copy of ST's Opposition to

22   Defendants' Motion for Judgment on the Pleadings filed in the Superior Court of the State of

23   California, Santa Clara County, filed on February 20, 2008.

24       8.    Attached hereto as Exhibit F is a true and correct copy of Defendants' Reply in

25   Support of their Motion for Judgment on the Pleadings filed in the Superior Court of the State of

26   California, Santa Clara County, filed on February 27, 2008.

27

28

1    9.    Attached hereto as Exhibit G is a true and correct copy of the Superior Court of

2    California, Santa Clara County's Order re: Defendants' Motion for Judgment on the Pleadings,

3    entered on March 11, 2008.

4    10.    Attached hereto as Exhibit H is a true and correct copy of Respondents' Reply to (1)

5    SanDisk's Memorandum in Opposition to Respondent's Motion to Terminate the Investigation for

6    Good Cause or Alternatively to Stay the Investigation, filed in the International Trade Commission

7    in *Certain Flash Memory Controllers, Drives, Memory Cards, and Media Players and Products*

8    *Containing Same*, ITC Inv. No. 337-TA-619 on March 3, 2008.

9    11.    Attached hereto as Exhibit I is a true and correct copy of ST's First Supplemental

10    Responses to Defendant SanDisk's First Set of Form Interrogatories – Limited Civil Cases

11    (Economic Litigation), served on April 7, 2008.

12    12.    Attached hereto as Exhibit J is a true and correct copy of Plaintiff's Reply in Support

13    of its Motion to Compel Discovery of SanDisk Corporation, filed in the Superior Court of the State

14    of California, Santa Clara County on April 11, 2008.

15    13.    Attached hereto as Exhibit K is a true and correct copy of the Defendants' Notice of

16    Removal, filed in the United States District Court, Northern District of California on May 6, 2008.

17    I declare under penalty of perjury that the foregoing is true and correct.  Executed at San

18    Francisco, California on this 12th day of May, 2008.

19

20    _____/s/_____

21    Russell L. Johnson

22

23

24

25

26

27

28

JOHNSON DECLARATION ISO ST'S MOTION TO REMAND
Case No. C 05-04691 JF
Related Case No. C 08-02332 MMC

# Exhibit A

1   Russell L. Johnson (SBN 53833)
    Edward V. Anderson (SBN 83148)
2   Teague I. Donahey (SBN 197531)
    Matthew L. McCarthy (SBN 217871)
3   SIDLEY AUSTIN BROWN & WOOD LLP
    555 California Street, Suite 2000
4   San Francisco, California 94104-1715
    Telephone:    415-772-1200
5   Facsimile:    415-772-7400

6

7

ENDORSED
FILED
ALAMEDA COUNTY

OCT 1 4 2005

CLERK OF THE SUPERIOR COURT
By ___ DOLORES J. SILVA ___
                              Deputy

8                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                              COUNTY OF ALAMEDA

10

11  STMICROELECTRONICS, INC.,                No.  **HG**  05237216
    a corporation,
12
                    Plaintiff,              **COMPLAINT FOR DAMAGES AND**
13                                          **EQUITABLE RELIEF FOR BREACH**
    v.                                      **OF FIDUCIARY DUTY, BREACH OF**
14                                          **WRITTEN CONTRACT, FRAUD,**
                                            **CONVERSION, INDUCING BREACH**
15  ELIYAHOU HARARI, an individual;         **OF CONTRACT, UNJUST**
    SANDISK CORPORATION,                    **ENRICHMENT, AND UNFAIR**
16  a corporation;                          **COMPETITION**
    and DOES 1 to 20, inclusive,
17                                          Unlimited Civil Case
                    Defendants.
18

19

20          Plaintiff STMICROELECTRONICS, INC. alleges as follows:

21                                  **PARTIES**

22          1.      Plaintiff STMicroelectronics, Inc. ("ST") is a corporation organized and existing

23  under the laws of the State of Delaware with its principal place of business in Carrollton, Texas.

24          2.      ST is informed and believes, and on this basis alleges, that defendant Eliyahou

25  Harari ("Harari") is and was at all times mentioned herein a resident of California currently

26  living in Los Gatos, California.

27          3.      ST is informed and believes, and on this basis alleges, that defendant SanDisk

28  Corporation ("SanDisk") is a Delaware corporation with its principal place of business in

                                        1
                                    COMPLAINT

1 | Sunnyvale, California.

2 |     4.     ST is ignorant of the true names and capacities of the persons sued as Does 1

3 | through 20 and therefore sues these persons by such fictitious names. ST is informed and

4 | believes, and on this basis alleges, that each of these fictitiously named persons is responsible in

5 | some manner for the acts and omissions herein alleged. ST will amend this complaint to allege

6 | their true names and capacities when ascertained.

7 | **FACTS COMMON TO ALL COUNTS**

8 |
9 | **ST Acquired Wafer Scale Integration And Is The**
**Successor In Interest To All Of Its Legal Rights**

10 |     5.     The claims for relief at issue in this case had their genesis in Harari's breach of

11 | his fiduciary and other legal obligations while an employee, officer, consultant and/or director

12 | of Wafer Scale Integration, Inc. ("WSI"). ST is the successor to all WSI's legal rights,

13 | including the present claims against Harari and SanDisk.

14 |     6.     WSI was a California corporation with its principal place of business in

15 | Fremont, California. It was co-founded in 1983 by Harari. WSI designed and sold

16 | programmable system devices, including memory systems and nonvolatile memories. While

17 | Harari was an officer and/or a director of WSI, it was designing and developing flash memory

18 | products.

19 |     7.     On July 27, 2000, ST and WSI merged, with ST remaining as the surviving

20 | corporation. Pursuant to the Agreement and Plan of Merger between ST and WSI, ST

21 | succeeded to "all rights and property" of WSI.

22 |     8.     As a result of the 2000 merger, WSI is no longer a separate legal entity from ST.

23 |
24 | **Harari Was An Officer And/Or Director Of WSI From Its**
**Founding In 1983 Until His Resignation In 1989**

25 |     9.     Harari was a co-founder of WSI, and served numerous roles at WSI between its

26 | founding on August 1, 1983 and his resignation in March of 1989, including:

27 |     &bull;  Chief Executive Officer (CEO): August 1, 1983 until June 11, 1986;

28 |     &bull;  Chief Technology Officer (CTO): June 11, 1986 until February 28, 1988;

2
COMPLAINT

1      • Director: August 1, 1983 through March 15, 1989; and

2      • Chairman of the Board: November 30, 1983 until June 15, 1985, and again

3        from June 11, 1986 until February 28, 1988.

4      10.    On information and belief, during at least a part of this time WSI was located,

5  and Harari worked, in Fremont, California.

6                   **Harari's Obligation to Assign Inventions to WSI**

7      11.    Early in the period that Harari was an employee, officer and director of WSI, he

8  signed two agreements with the company: (1) an Employee Agreement Regarding

9  Confidentiality and Inventions dated February 22, 1984 (the "Inventions Agreement") (attached

10  hereto as Exhibit A); and (2) a Key Employee Agreement dated February 27, 1984 (the "Key

11  Employee Agreement") (attached hereto as Exhibit B).

12      12.    Through the Inventions Agreement, Harari agreed to the following:

13          2.    I will maintain in confidence and will not disclose or use, either
            during or after the term of my employment without the prior written
14          consent of [WSI], any proprietary or confidential information or know-
            how belonging to [WSI] .... Upon termination of my employment or at
15          the request of my supervisor before termination, I will deliver to [WSI] all
            written and tangible material in my possession incorporating the
16          Proprietary Information or otherwise relating to [WSI's] business. ...

17          3.    I will promptly disclose and describe to [WSI] (i) all
            inventions, improvements, discoveries and technical developments
18          ("Inventions"), whether or not patentable, made or conceived by me, either
            alone or with others, during the term of my employment, provided that
19          [WSI] shall receive such information in confidence. I hereby assign and
            agree to assign to [WSI] my entire right, title and interest in and to such
20          Inventions which relate in any way to or are useful in [WSI's] business as
            presently conducted or as conducted at any future time during my
21          employment, and agree to cooperate with WSI and its designee(s) both
            during and after my employment in the procurement and maintenance, at
22          [WSI's] expense and at its discretion, of patents, copyrights, and/or other
            protection of [WSI's] rights in such inventions. I will keep and maintain
23          adequate and current written records of all such Inventions, which shall be
            and remain the property of the [WSI].
24
            4.    ....
25
            (c) During my employment by [WSI], I will not engage in any
26          employment, consulting or other activity in any business without [WSI's]
            express written agreement.
27

28

                                    3
                              COMPLAINT

## WSI's Development of Flash Electrically Erasable Programmable Read Only Memory

13.     WSI, a company which designed and produced various kinds of semiconductor memory (memory on a chip) for computers and electronic devices, dedicated substantial resources and effort to research and development of new memory technologies.

14.     Semiconductor memory can be either volatile or nonvolatile. Volatile memory requires a power source to maintain data in memory while nonvolatile memory requires no power to retain data.

15.     The main memory in computers has traditionally been dynamic random access memory ("DRAM") or static random access memory ("SRAM") both of which are volatile memories. Thus, if the computer is turned off, any data stored in a DRAM or SRAM will be lost.

16.     Computers have also used nonvolatile memories such as read only memory ("ROM") and programmable read only memory (PROM) and electrically programmable read-only memory (EPROM). In the late 1980s, when Harari was still an employee, officer and director of WSI, a new nonvolatile memory technology called electrically erasable programmable read only memory (EEPROM or $E^2PROM$) was developed which offered a substantial advantage over ROM, PROM or EPROM because it was electrically reprogrammable. When an EEPROM is quickly erasable and reprogrammable it is referred to as "flash EEPROM," or "flash memory." If the computer is turned off, data in these memories is not lost.

17.     WSI, while Harari was its chief technical officer, began development work on flash memory. By at least 1987, WSI was involved in research and development efforts regarding flash memory technology. By 1989, WSI had a prototype flash memory product, and was anticipating revenues from this line of business. As an employee, CTO and/or director of WSI, Harari was aware of WSI's research and development efforts with regard to flash memory.

18.     As a director and officer of WSI, Harari was in a position of trust and confidence

1    and had fiduciary obligations, including at least the following: (a) to act in good faith and in the
2    best interests of WSI and its shareholders; (b) to put the interests of WSI and its shareholders
3    ahead of his private interests; (c) to not enter into any business in competition with WSI; (d) to
4    bring business opportunities in the line of business of WSI to the attention of WSI and not to
5    appropriate the opportunity for himself; (e) to protect and preserve the assets of WSI; and (f) to
6    disclose material facts to WSI concerning his business dealings in the same field as WSI's
7    business endeavors.

8
9
### Harari Filed Four Patent Applications While A Director Of and Consultant to WSI, But Did Not Assign Them To WSI

10    19.    WSI, in order to protect its intellectual property, routinely applied for United
11    States patents to cover inventions developed in the course of its business. As an employee,
12    officer, and director of WSI, Harari had fiduciary and contractual obligations to assist WSI with
13    the protection of its intellectual property, and to assign inventions which related to WSI's
14    business to WSI.

15    20.    Harari and WSI entered into an Agreement dated February 29, 1988 (the
16    "Consulting and Directorship Agreement") (attached hereto as Exhibit C). In this agreement
17    Harari resigned his duties as an employee and officer of WSI effective February 28, 1988.

18    21.    In the Consulting and Directorship Agreement WSI and Harari also agreed that:
19    (a) WSI would continue to nominate Harari as a director until an IPO took place; (b) Harari
20    would be a paid consultant to WSI for 11 months at his then current salary; (c) WSI had the
21    right to extend the consulting agreement for a period of six months; and (d) Harari would
22    "continue to be bound by and comply with the terms of his Employee Agreement Regarding
23    Confidentiality and Inventions dated February 22, 1984" – the Inventions Agreement. The
24    obligations in the Inventions Agreement as extended by the Consulting and Directorship
25    Agreement included, among other things, three important obligations. First, to maintain in
26    confidence and not to use or disclose any proprietary, confidential or know-how of WSI without
27    the company's prior written consent. Second, to assign "all inventions, improvements,
28    discoveries and technical developments ("Inventions"), whether or not patentable." And, third,

5

1   Harari's agreement that he would "not engage in any employment, consulting or other activity
2   in any business without the Company's express written agreement."

3       22.    On information and belief, the Consulting and Directorship Agreement was
4   entered into, and at least some of the obligations of both WSI and Harari were to be performed,
5   in Fremont, California.

6       23.    Furthermore, as a director of WSI, Harari continued in a position of trust and
7   confidence and had all of the same fiduciary obligations he previously had when he was an
8   officer and director. *See, supra,* ¶ 18.

9       24.    On April 26, 1988, less than two months after resigning as an officer of WSI, but
10  while still serving as a director of and consultant to WSI with a continuing obligation to assign
11  inventions to WSI, Harari filed Patent Application 07/185,699 with the United States Patent and
12  Trademark Office ("PTO"), which resulted in U.S. Patent 4,933,739, entitled "Trench resistor
13  structures for compact semiconductor memory and logic devices." This patent relates to
14  memory devices that were within WSI's line of business.

15      25.    On June 8, 1988, while still serving as a director of and consultant to WSI with a
16  continuing obligation to assign inventions to WSI, Harari filed Patent Application 07/204,175
17  with the PTO, which resulted in twenty-two issued patents. This application related to flash
18  memory products that were within WSI's line of business.

19      26.    On July 8, 1988, while still serving as a director of and consultant to WSI with a
20  continuing obligation to assign inventions to WSI, Harari filed Patent Application 07/216,873
21  with the PTO, which resulted in three issued patents. This application related to memory
22  products that were within WSI's line of business.

23      27.    On March 15, 1989, Harari filed Patent Application 07/323,779 with the PTO,
24  which resulted in U.S. Patent 5,070,032, entitled "Method of making dense flash EEPROM
25  semiconductor memory structures." This patent relates to flash memory devices that were
26  within WSI's line of business.

27      28.    On March 21, 1989, Harari tendered his resignation from the Board of Directors
28  of WSI, requesting that his resignation date be back dated to March 15, 1989 – the same day he

1    had filed his most recent patent application. Harari made this request without disclosing to the

2    Board that he had filed any of the above-referenced patent applications.

### Harari Filed Two Patent Applications Three Weeks After Tendering His Resignation As A Director Of WSI

5    29.    In addition to the four applications Harari filed while still a director of WSI,

6    Harari filed two more patent applications three weeks after tendering his resignation as a

7    director of WSI, but before the Board of Directors accepted his resignation. On information

8    and belief, ST alleges that the inventions disclosed in these applications were invented and

9    developed while Harari was an officer and/or director and/or a consultant of WSI.

10    30.    Specifically, on April 13, 1989, Harari filed two Patent Applications with the

11    PTO – numbered 07/337,566 and 07/337,579. These applications related to flash EEPROM

12    memories which were then under development at WSI. Patent Application 07/337,566 has

13    resulted in the issuance of twenty-one patents and Patent Application 07/337,579 has resulted in

14    the issuance of two patents.

15    31.    On May 17, 1989, the Board of Directors of WSI met and accepted Harari's

16    resignation effective after the Board meeting of March 15, 1989. The Board agreed to Harari's

17    request to back date his resignation without knowing that Harari had filed patent applications on

18    April 26, 1988, June 8, 1988, July 8, 1988, March 15, 1989, and April 13, 1989.

### While An Employee, Officer and/or Director Of WSI, Harari Only Disclosed and Assigned One Patent Application to WSI

21    32.    On information and belief, Harari did not disclose any of the following six patent

22    applications to WSI at any time: (a) 07/185,699; (b) 07/204,175; (c) 07/216,873;

23    (d) 07/323,779; (e) 07/337,566; or (f) 07/337,579. WSI had no way of knowing of Harari's

24    conduct, as patent applications filed with the PTO are confidential and Harari did not disclose

25    this information to WSI.

26    33.    On information and belief, the ideas disclosed in these patent applications were

27    known to or conceived by Harari while he was as a director and/or consultant of WSI, and the

28    evidence at trial may prove that he had or conceived of these ideas during his tenure as an

7

1  employee and officer as well. Moreover, on information and belief, ST believes that Harari
2  actively worked on the preparation of all these patent applications during his tenure as a director
3  and/or consultant to WSI, and that Harari concealed this activity from WSI.

4      34.    These six patent applications all contain ideas and designs that would have
5  benefited the design and development work being done at WSI on flash memory.

6      35.    In contrast to the six patent applications Harari filed in his own name without
7  disclosing them to WSI, Harari disclosed only *one* patent application to WSI during his entire
8  five-and-a-half year tenure as an employee, officer, director and/or consultant. Harari was
9  forced to disclose that patent application because there was a co-inventor on the application
10 who would fulfill his obligations to make the disclosure. In other words, Mr. Harari concealed
11 from WSI every patent application he was able to conceal because he was either listed as the
12 sole inventor or a co-inventor with a non-WSI employee.

13     36.    Harari's assignment of only a single application to WSI is particularly
14 noteworthy in light of the significant number of applications he has filed during his career.
15 Over a period of twenty-eight years, Harari has filed one hundred and thirty-one patent
16 applications – an average of almost five applications per year. However, Harari disclosed only
17 one patent application to WSI during his entire five-and-one-half-year tenure as an employee,
18 officer, director and/or consultant of that company. In fact, from 1975 until 1983, Harari filed
19 at least one patent application each year.

20     37.    However, in 1984, 1985, 1986, and 1987, all years during which Harari served as
21 an employee, officer and/or director of WSI, Harari did not file a single patent application.

22     38.    In the years following his departure from WSI, from 1989 until 2002, Harari
23 filed at least *four* patent applications *each* year. Indeed, within the first five months after
24 Harari resigned his position as CTO of WSI, while still a director and consultant to WSI with an
25 obligation to assign inventions, Harari filed three different applications with the PTO – none of
26 which were disclosed or assigned to WSI. Each of these patent applications likely would have
27 been in process for months before filing with the PTO.

28     39.    Perhaps most tellingly, Harari filed an application on March 15, 1989, a date

1   which he later requested be set as his effective date of resignation from the board of directors of

2   WSI. Harari's attempt to back-date his resignation to coincide with the filing of this application

3   is clear evidence of his intent to conceal his patent-filing activities from WSI, and to obtain for

4   himself patent rights that he knew should have been assigned to WSI.

### Harari Founded SanDisk, A Competitor Of WSI, While Serving As A Director Of WSI

7       40.     In or about June 1988, Harari founded SanDisk Corporation. (SanDisk was

8   originally named "SunDisk," but changed its name in 1995 prior to its initial public offering.

9   For clarity, this Complaint will consistently refer to the corporation as "SanDisk.")

10      41.     Harari founded SanDisk while serving as a Director of WSI, and therefore was

11  under a fiduciary obligation not to enter into any business in competition with WSI. Moreover,

12  Harari had a fiduciary obligation to present corporate opportunities in WSI's line of business to

13  WSI, and not to appropriate such opportunities to himself or another company.

14      42.     On information and belief, SanDisk, since its inception, has focused its research

15  and development efforts on developing cost-effective flash memory storage products – a

16  technology which WSI had been developing since at least 1987, and was continuing to develop

17  at the time SanDisk was formed by Harari.

18      43.     Moreover, at the time Harari founded SanDisk, he was well aware of WSI's

19  research into flash memory technology. Harari served as CTO of WSI, and thus headed WSI's

20  research efforts on flash memory until February of 1988. As a Director of WSI, Harari received

21  reports regarding WSI's flash memory work until at least January of 1989, several months after

22  he founded SanDisk and filed four of the patent applications whose ownership is at issue in this

23  suit.

24      44.     On information and belief, from its inception and founding by Harari, SanDisk

25  was in direct competition with WSI. As an officer and/or director of WSI, Harari had an

26  obligation to present any corporate opportunity appropriate for WSI to it. Harari's involvement

27  with SanDisk was a serious violation of Harari's fiduciary duties to WSI.

28      45.     Furthermore, Harari assigned the patents which resulted from the above-

9

COMPLAINT

1   described applications to SanDisk, thereby benefiting a company in direct competition with

2   WSI, to whom he owed fiduciary duties of loyalty and good faith. As alleged in more detail

3   below, those assignments have recently resulted in injury to ST who is the successor-in-interest

4   to WSI.

### SanDisk Sued ST, The Successor Of WSI, For Infringement Of Patents Which Should Have Been Assigned to WSI

7   46.    On October 15, 2004, SanDisk filed two complaints alleging that ST infringed

8   U.S. Patent 5,172,338 ("the '338 patent"). One complaint styled *In the Matter of Certain*

9   *NAND Flash Memory Circuits and Products Containing Same,* Investigation No. 337-TA-526

10  was filed in the United States International Trade Commission (the "ITC action") and the other

11  styled *SanDisk Corp. v. STMicroelectronics, Inc.,* case number C04-04379 JF, was filed in the

12  Northern District of California (the "Northern District action"). The International Trade

13  Commission initiated an investigation in the ITC action and a hearing before the Administrative

14  Law Judge ("ALJ") has occurred and the initial determination of the ALJ is due in October

15  2005. In the Northern District action, the claims of infringement of the '338 patent have been

16  stayed pending completion of the ITC action.

17  47.    The '338 patent resulted from the continuation-in-part of an application filed by

18  Harari less than one month after he resigned as a director of WSI. On information and belief,

19  any invention disclosed in the '338 patent was conceived of or made, and the application was

20  being prepared, while Harari was still a director of WSI.

21  48.    On April 22, 2005, SanDisk filed its answer, affirmative defenses and

22  counterclaims in an action styled *STMicroelectronics, Inc. v. SanDisk Corp.,* case number

23  4:05CV45 pending in the United States District Court of the Eastern District of Texas (Sherman

24  Division). In its counterclaims, SanDisk alleged that ST infringed U.S. Patents 5,583,812 (the

25  "812 patent") and 5,719,808 (the "808 patent").

26  49.    The '812 patent resulted from various continuations-in-part and divisional

27  applications going back to the June 8, 1988 patent application 07/204,175, from which it

28  claimed priority. On information and belief, any invention disclosed in the June 8, 1988 patent

1  application 07/204, 175 from which the '812 patent claims priority was conceived of or made,

2  and the application was being prepared, while Harari was still a director of WSI.

3        50.    The '808 patent resulted from various continuations-in-part and divisional

4  applications going back to the April 13, 1989 patent application 07/337,566, from which it

5  claimed priority.  On information and belief, any invention disclosed in the April 13, 1989

6  patent application 07/337,566 from which the '808 patent claims priority was conceived of or

7  made, and the application was being prepared, while Harari was still a director of WSI.

8        51.    These applications and the patents which ultimately issued from these

9  applications, should have been assigned to WSI and then to ST when it acquired WSI.  ST has

10  suffered substantial damage as a result of the assertion of these patents by SanDisk.

11        52.    When ST began to defend itself in this suit, it, like its predecessor WSI, was

12  unaware of Harari's filing of the undisclosed patent applications in 1988 and 1989.  During the

13  course of preparing its defense, ST slowly discovered the disparate facts from which it began to

14  piece together Harari's conduct during and following his tenure as an employee, officer and

15  director of WSI.

16        53.    WSI, and later ST, were unaware of Harari's assignment of these patents and

17  applications until well after SanDisk filed suit against ST in October 2004 because Harari had

18  concealed his patent applications from WSI, despite his contractual and fiduciary obligations to

19  disclose and/or assign them.

20        54.    All of the causes of action asserted by ST herein, and all of the relief ST seeks,

21  arise under state law.  None of the causes of action asserted by ST are created by federal law or

22  involve the construction or application of federal law, including the patent laws of the United

23  States.

24                      **FIRST COUNT**
                      **Breach of Fiduciary Duty**

25                    **(As to defendant Harari)**

26        55.    ST realleges and incorporates herein by reference each and every allegation set

27  forth in paragraphs 1-54, above.

28        56.    While an officer, director and/or consultant of WSI, Harari violated his fiduciary

1   duty to WSI by at least the following acts: (a) failing to disclose to WSI at least the inventions

2   described in U.S. Patent Applications 07/185,699, 07/204,175, 07/216,873, 07/337,566 and

3   07/337,579; (b) filing these Patent Applications to further his own interests rather than those of

4   WSI; (c) founding SanDisk in order to directly compete with WSI's established line of

5   business; and (d) assigning to SanDisk patents which resulted from applications filed while a

6   director of WSI, and/or patents which cover inventions conceived of or made while Harari was

7   an employee, officer, and/or director of WSI.

8       57.    Harari's breaches of his fiduciary duty to WSI occurred in Fremont, California,

9   where WSI was located.

10      58.    The above-described actions by Harari were contrary to the best interests of WSI

11  and its shareholders, and were done with a reckless disregard for Harari's fiduciary duties,

12  under circumstances Harari knew or should have known would result in damage to WSI and its

13  shareholders.

14      59.    Harari's actions described above were undertaken in bad faith, and were an

15  effort by Harari to derive an improper personal benefit based on, and in violation of, his

16  position of trust as an officer, director, or consultant of WSI.

17      60.    As a proximate result of the acts of defendant Harari described herein, ST as the

18  successor-in-interest to WSI has been and will continue to be damaged in an amount not yet

19  ascertained.

20      61.    Harari's breach of his fiduciary obligations was done with bad faith, malice, and

21  oppression in that Harari was aware that, if successful, his efforts to conceal patent applications

22  and to assign resulting patents to SanDisk instead of WSI would result in substantial financial

23  harm and other injury to WSI and its successors. Accordingly, ST is entitled to an award of

24  punitive damages.

25      62.    ST cannot be fully compensated in damages and is without adequate remedy at

26  law because the full amount of damage ST will suffer will be difficult to ascertain and damages

27  alone will not fully compensate it for the loss of the patents and other injury that ST has

28  suffered. Defendant Harari agreed that such irreparable harm would occur in the Key Employee

1   Agreement, paragraph 8, and in the Inventions Agreement, paragraph 7.  Unless restrained by

2   appropriate injunctive relief, ST will continue to suffer irreparable injury.

3        63.    WSI, and later ST, were unaware of Harari's conduct until SanDisk filed suit

4   against ST in October of 2004 because Harari concealed his patent applications from WSI,

5   despite his contractual and fiduciary obligations to disclose them.

6                                **SECOND COUNT**
                            **Breach of Written Contract**
7                            **(As to defendant Harari)**

8        64.    ST realleges and incorporates herein by reference each and every allegation set

9   forth in paragraphs 1-63, above.

10       65.    WSI performed all conditions, covenants, and promises required of it to be

11  performed in accordance with the terms and conditions of the Inventions Agreement and the

12  Consulting and Directorship Agreement.

13       66.    The consideration Harari received under the Inventions Agreement and the

14  Consulting and Directorship Agreement was fair and reasonable at the time the agreements

15  were entered into and over the course of WSI's performance.

16       67.    Harari breached the Inventions Agreement and the Consulting and Directorship

17  Agreement by at least the following acts:  (a) failing to maintain in confidence, disclosing and

18  using for his own benefit, proprietary, confidential, know-how, and other information of WSI

19  disclosed in the above-described patent applications; (b) failing to disclose and describe to WSI

20  the inventions disclosed in the above-described patent applications; (c) failing to assign to WSI

21  the patents which resulted from the above-described patent applications; (d) failing to cooperate

22  with WSI during and following his tenure in the procurement and maintenance of patents

23  related to the inventions disclosed in the above-described patent applications; (e) failing to

24  provide WSI with adequate and current written records of the inventions disclosed in the above-

25  described patent applications; (f) assigning to SanDisk the patents which resulted from the

26  above-described patent applications and (g) engaging in employment, consulting or other

27  activity without WSI's consent.

28       68.    Harari's breaches of these agreements occurred in Fremont, California where

                                        13

1    WSI was located.

2        69.    Harari's actions in breaching and continuing to breach the Inventions

3    Agreement, and the Consulting and Directorship Agreement has injured ST in an amount not

4    yet ascertained.

5        70.    WSI, and later ST, were unaware of Harari's breaches of these agreements until

6    SanDisk filed suit against ST in October of 2004, because he concealed his patent applications

7    from WSI, despite his contractual and fiduciary obligations to disclose them.

8        71.    ST cannot be fully compensated for Harari's refusal and failure to perform his

9    obligations under the Invention Agreement and the Consulting and Directorship Agreement by

10   damages alone and ST has no adequate remedy at law.  The harm to ST can only adequately

11   remedied if specific performance is ordered requiring that Harari assign to ST, as sole owner

12   where Harari is the sole inventor and as a joint owner where Harari is a joint inventor, U.S.

13   Patent Applications 07/185,699, 07/204,175, 07/216,873, 07/337,566, and 07/337,579 and all

14   patents which have issued from these applications.

15                              **THIRD COUNT**
                                   **Fraud**
16                          **(As to defendant Harari)**

17       72.    ST realleges and incorporates herein by reference each and every allegation set

18   forth in paragraphs 1-71, above.

19       73.    While an officer and/or director of WSI, Harari owed contractual and fiduciary

20   obligations to WSI.

21       74.    Harari intentionally failed to disclose to WSI that he had conceived of or

22   developed inventions related to WSI's line of business, and further failed to disclose to WSI

23   that he had filed applications with the PTO regarding those inventions.  For example, Harari

24   failed to disclose to WSI that he filed a patent application on March 15, 1989, when he asked

25   that his resignation from the board of WSI be made effective as of that date.

26       75.    Harari's failure to disclose material facts occurred in Fremont, California where

27   WSI was located.

28       76.    WSI had no way of knowing of Harari's conduct, as patent applications filed

                                        14
                                    COMPLAINT

1    with the PTO are confidential, and Harari did not disclose this information.

2    77.    On information and belief, ST alleges that Harari intended to deceive WSI and

3    its successors by concealing his inventions and patent applications, because he intended them to

4    profit himself and his assignees rather than WSI, and because he sought to avoid his contractual

5    and fiduciary obligations to assign the patents to WSI.

6    78.    WSI reasonably relied on Harari's deception because it expected him, as an

7    officer and director of the company, to abide by his contractual and fiduciary duties by

8    disclosing his inventions and assigning the resulting patents to WSI.

9    79.    As a direct result of Harari's failure to assign the patents to WSI, WSI and its

10   successors suffered injury through their loss of intellectual property in the patents that resulted

11   from the applications, as well as the profits, royalties, and other benefits generated by those

12   patents as well as having to defend themselves from allegations of infringement regarding three

13   of these patents

14   80.    Harari's fraudulent actions were done with bad faith, malice, and oppression in

15   that Harari was aware that, if successful, his efforts to conceal patent applications and to assign

16   resulting patents to SanDisk instead of WSI would result in substantial financial harm and other

17   injury to WSI and its successors.  Accordingly, ST is entitled to an award of punitive damages.

18   81.    WSI, and later ST, were unaware of Harari's conduct until after SanDisk filed

19   suit against ST in October of 2004 because Harari concealed his patent applications from WSI,

20   despite his contractual and fiduciary obligations to disclose them.  Thus, the existence of

21   Harari's fraud was itself concealed by his fraudulent conduct.

22   **FOURTH COUNT**
     **Conversion**
23   **(As to all defendants)**

24   82.    ST realleges and incorporates herein by reference each and every allegation set

25   forth in paragraphs 1-81, above.

26   83.    Pursuant to the terms of the Inventions Agreement, the Key Employee

27   Agreement and the Consulting and Directorship Agreement, as well as to Harari's fiduciary

28   obligations to WSI, WSI (and later ST as its successor) had a right to possess the intellectual

1 | property associated with the inventions disclosed in the above-described patent applications.

2 | 84.     Harari and SanDisk intentionally prevented WSI (and later ST as its successor)

3 | from having access to the above-described intellectual property in that Harari failed to disclose

4 | the existence of the inventions to WSI, and then assigned the resulting patents to SanDisk,

5 | instead of WSI. SanDisk then exploited these patents for commercial gain, up to, and

6 | including, filing suit against ST for infringement of certain of the patents.

7 | 85.     WSI (and later ST as its successor) did not consent to Harari's concealment or

8 | assignment of the inventions, and did not consent to SanDisk's commercial exploitation of the

9 | patents. Indeed, ST was unaware of Harari's improper concealment and assignment until after

10 | SanDisk filed suit against ST in October of 2004.

11 | 86.     As a direct result of SanDisk's and Harari's actions in converting WSI's

12 | property, ST, as the successor in interest to WSI, has been harmed in an amount not yet

13 | ascertained.

14 | ## FOURTH COUNT
### Inducing Breach Of Contract
15 | ### (As to defendant SanDisk)

16 | 87.     ST realleges and incorporates herein by reference each and every allegation set

17 | forth in paragraphs 1-86, above.

18 | 88.     On information and belief, SanDisk was aware of the existence of the various

19 | contracts between Harari and WSI because Harari was an officer and director of SanDisk, as

20 | well as a party to the agreements.

21 | 89.     On information and belief, SanDisk intentionally caused Harari to breach his

22 | contracts with WSI by, at least, inducing and/or participating in the assignment of patents to

23 | SanDisk that were contractually required to be assigned to WSI.

24 | 90.     As a direct result of SanDisk's and Harari's actions in breaching and continuing

25 | to breach the contracts with WSI, ST, as the successor in interest to WSI, has been harmed in an

26 | amount not yet ascertained.

27 | 91.     SanDisk's inducement of Harari to breach his contracts with WSI was done with

28 | bad faith, malice, and oppression in that Harari, on his own behalf and on behalf of SanDisk,

1   was aware that, if successful, his efforts to conceal patent applications and to assign the

2   resulting patents to SanDisk instead of WSI would result in substantial financial harm and other

3   injury to WSI and its successors. Accordingly, ST is entitled to an award of punitive damages.

4           92.     Because Harari concealed his patent applications from WSI, despite his

5   contractual and fiduciary obligations to disclose them, WSI, and later ST, were unaware of

6   SanDisk's inducement of Harari to breach his agreements until after SanDisk filed suit against

7   ST in October of 2004.

8                                    **FIFTH COUNT**
                                   **Unjust Enrichment**
9                                  **(As to all defendants)**

10          93.     ST realleges and incorporates herein by reference each and every allegation set

11  forth in paragraphs 1-92, above.

12          94.     On information and belief, ST alleges that, through the actions described above,

13  Harari and SanDisk have received benefits including, but not limited to, profits from sales of

14  products covered by the patents resulting from the above-described patent applications, and

15  royalties and other benefits from licenses and other arrangements relating to those patents.

16          95.     The benefits described in the preceding paragraph were unjustly obtained and

17  retained by Harari and SanDisk because the patents which generated those benefits should have

18  been assigned to WSI.

19          96.     WSI, and later ST, were unaware that Harari and SanDisk had been unjustly

20  enriched until after SanDisk filed suit against ST in October of 2004 because Harari concealed

21  his patent applications, and his assignment of the resulting patents, from WSI, despite his

22  contractual and fiduciary obligations to disclose them.

23                                   **SIXTH COUNT**
                    **Unfair Competition (Cal. Bus. & Prof. Code § 17200, *et seq.*)**
24                                    **(As to SanDisk)**

25          97.     ST realleges and incorporates herein by reference each and every allegation set

26  forth in paragraphs 1-96, above.

27          98.     Harari had contractual and fiduciary obligations to assign the patent applications

28  which led to the issuance of the '338, '812 and '808 patents to WSI. Had Harari complied with

1  his contractual and fiduciary obligations, ST, as WSI's successor-in-interest would be the

2  current owner of the '338, '812 and '808 patents which SanDisk is presently asserting against

3  ST, as well as a large number of additional patents which issued or claim priority from

4  applications which should have been assigned to WSI.

5      99.    SanDisk has sued ST for infringement of the '338, '812 and '808 patents –

6  patents which rightfully should be assigned to ST as successor-in-interest to WSI.

7      100.    SanDisk's patent infringement actions based on patents that it improperly

8  obtained to the detriment of ST constitute an unfair or unlawful business practice in violation of

9  California Business & Professions Code § 17200, *et seq.*

10      101.    ST has suffered injury in fact and has lost money as a direct result of defendants'

11  unfair or unlawful business practices, including, at least, the substantial funds which ST has

12  been forced to expend to defend itself against SanDisk's infringement actions.

13      102.    The continuing wrongful conduct of defendants, as alleged above, unless and

14  until restrained by order of this Court, will cause great and irreparable harm to ST.

15

16  **PRAYER FOR RELIEF**

17      WHEREFORE, Complainant ST prays for the following relief:

18      A.    That plaintiff be awarded its actual damages, in an amount to be proven at trial;

19      B.    That plaintiff be awarded its incidental and consequential damages in an amount

20  to be proven at trial;

21      C.    That plaintiff be awarded exemplary damages according to proof at trial;

22      D.    That ownership of all patents which issued or claim priority from the

23  applications filed by Harari during and after his tenure as an officer and/or director of WSI,

24  which should have properly been assigned to WSI, be assigned to plaintiff, as the sole owner if

25  Harari is the sole inventor or as a co-owner if Harari is a co-inventor;

26      E.    That all inventions and the patents relating thereto which were conceived of or

27  resulted from inventive activity on the part of Harari, that took place while Harari was an

28  employee, officer, and/or director of WSI, be assigned to plaintiff;

1    F.    That plaintiff be awarded its costs;

2    G.    That plaintiff be awarded its attorneys' fees;

3    H.    That plaintiff be awarded pre-judgment and post-judgment interest at the

4    maximum legal rate; and

5    I.    That plaintiff be granted other and further relief as this Court may deem proper.

6

7    Dated: October 14, 2005                    SIDLEY AUSTIN BROWN & WOOD LLP

8

9                                              By    _____

10                                                  Attorneys for Plaintiff
                                                    STMICROELECTRONICS, INC.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, Archibald McK. Malone, am Vice President-Finance and Chief Financial Officer of plaintiff STMicroelectronics, Inc. I am authorized to make this verification for and on behalf of plaintiff STMicroelectronics, Inc., and I make this verification for that reason.

I have read the foregoing **VERIFIED COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND OTHER RELIEF** and know the contents thereof. I am informed and believe and on that ground allege that the matters stated in the document described above are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 13, 2005 at Phoenix, Arizona.

_____

# EXHIBIT A

0824a
112283

## EMPLOYEE AGREEMENT REGARDING CONFIDENTIALITY & INVENTIONS

This Agreement is intended to formalize in writing certain understandings and procedures which have been in effect since the time I was initially employed by Wafer Scale Integration, Inc. ("Company").

In return for new or continued employment by Company, I acknowledge and agree that:

1.    All previous work done by me for Company in any way to the conception, design, development or support of products for Company is the property of Company.

2.    I will maintain in confidence and will not disclose or use, either during or after the term of my employment without the prior written consent of Company, any proprietary or confidential information or know-how belonging to Company ("Proprietary Information"), whether or not it is in written or permanent form, except to the extent required to perform duties on behalf of Company in my capacity as an employee. Such Proprietary Information includes, but is not limited to, technical and business information relating to Company's inventions or products, research and development, production processes, manufacturing and engineering processes, machines and equipment, finances, customers, marketing, and production and future business plans. Upon termination of my employment or at the request of my supervisor before termination. I will deliver to Company all written and tangible material in my possession incorporating the Proprietary Information or otherwise relating to Company's business. These obligations with respect to Proprietary Information extend to information belonging to customers and suppliers of Company who may have disclosed such information to me as the result of my status as an employee of the Company.

3.    I will promptly disclose and describe to Company (i) all inventions, improvements, discoveries and technical developments ("Inventions"), whether or not patentable, made or conceived by me, either alone or with others, during the term of my employment, provided that Company shall receive such information in confidence. I hereby assign and agree to assign to Company my entire right, title and interest in and to such Inventions which relate in any way to or are useful in Company's business as presently conducted or as conducted at any future time during my employment, and agree to cooperate with Company and its designee(s) both during and after my employment in the procurement and maintenance, at Company's expense and at its discretion, of patents, copyrights, and/or other protection of Company's rights in such inventions. I will keep and maintain adequate and current written records of all such Inventions, which shall be and remain the property of Company.

4.    (a)  There is no other contract or duty on my part now in existence to assign Inventions.

(b)  I will not disclose or induce Company to use any confidential information or material that I am now or shall become aware of which belongs to anyone other than Company.

(c)  During my employment by Company. I will not engage in any employment, consulting or other activity in any business without the Company's express written agreement.

5.    All records, reports, notes, compilations, or other recorded matter, and copies or reproductions thereof, relating to Company's operations, activities or business, made or received by me during any period of employment with Company are and shall be the Company's exclusive property, and I will keep the same at all times in Company's custody and subject to its control, and will surrender the same at the termination of my employment if not before and will not take with me any reproduction of same or any Proprietary Information that is embodied in tangible medium of expression.

/ Attachment A .

0824a
112283

6. I have attached hereto a complete and detailed list of all inventions owned by me or by others, conceived or made by me prior to my employment by the Company. These are the only inventions which are not subject to this Agreement. In addition, I will provide the Company with a sealed envelope which contains written and pictorial descriptions of each such invention. Such envelope may be opened by the Company upon termination of my employment or five years from the date of this Agreement, whichever occurs first.

7. A breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to Company for which there will be no adequate remedy of law, and Company shall be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including monetary damages if appropriate).

8. I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I represent that I have not brought and will not bring to the Company or use in the performance of my responsibilities at the Company any materials or documents of a former employer that are not generally available to the public, unless I have obtained express written authorization from the former employer for their possession and use.

9. The waiver by Company of a breach of provision of this contract by Employee shall not operate or be construed as a waiver of any other or subsequent breach by Employee. If any provision of this Agreement is held to be invalid, void or menforceable, the remaining provisions shall nevertheless continue in full force and effect without being impaired or invalidated in any way. This Agreement shall be construed in accordance with, and governed by, the laws of the State of California. This Agreement shall be binding on me, my heirs, executors, assigns and administrators and shall inure to the benefit of the Company and its successors and assigns.

10. Company has informed me that, in accordance with Section 2872 of the California Labor Code, this Agreement does no require me to assign to Company; any invention for which no equipment, supplies, facilities or trade secret information of Company was used and which was developed entirely on my own time, and (a) which does not relate (1) to the business of Company or (2) to Company's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for Company. This limited exclusion does not apply to any patent or invention covered by a contract between Company and the United States or any of its agencies requiring full title to such patent or invention to be in the United States. I ACKNOWLEDGE RECEIPT of a copy of this Agreement.

EMPLOYEE:

Date: 2.22.84

Signature

E. HARARI
Printed Name

COMPANY:

Date: 2/22/84

By Edward R. Martin

Title DIRECTOR, HUMAS RESOURCES
2.

ATTACHMENT A (WSI)

### List of patent disclosures belonging to Eli Harari

_ED        1. A uniquely addressed high density RAM cell and its         ⎫ U.S. Patent
              associated peripheral circuitry in a memory array.          ⎬ issued
ILED       2. Low power high density charge pumped static RAM cells      ⎬ Fully cover
              and method of operating same in a memory array.            ⎭ 1 & 2.

  ✳ 3. A variable threshold MOSFET with graded substrate potential.

  ✳ 4. A double gate MOSFET with improved load characteristics.

  ✳ 5. A fast electrically programmable, UV erasable RAM (PRAM).

ILED       6. A high efficiency EPROM and E²PROM with drain overlap       Three U.S.
              (device and process).                                       patents gran
                                                                          fully covers

  ✳ 7. A process to minimize encroachment of bird's beak effect.

  ✳ 8. A process for reduced diffusion parasitic capacitances
        by reduced field encroachment.

  ✳ 9. A high density decoder.

ILED      10. High density dynamic RAM relying for storage on substrate   U.S. Pa
              potential.                                                   grant
  ✳ 11. Use of substrate potential for a radiation detector              fully co
              array or a thermal detector, or a sense amplifier.

ILED      12. Dynamic Loadless logic for serial memory and pipeline       U.S. patent
              parallel signal processing.                                 granted
                                                                          fully cove
ILED      13. Dynamic RAM cell with signal amplification.                 Three U.S. patents filed
                                                                          12
ING       14. Static RAM cell with JFET bistable element. (Attorney designation
LED           U.S patent filed. Not yet granted. Fully Covers 14,        M60, M60/1 &
                                                                          fully covers,
ING       15. E²PROM cell with drain protection for read and program      
LED           disturb. U.S. patent filed, Not yet granted. fully covers 15.

  ✳ 16. PROM cell with vertical filament fuse element.

✳ Full description of these inventions is held in a sealed
envelope by Harari's patent attorney's firm in
Santa Clara — Mr. Alan MacPherson is the patent attor
                                                    408 246 / 405
                                                    2.13.84
Three patents in item 6. are covered in a
separate Agreement between WSI and E. Harari.    E Harari

EXHIBIT B

WAFER SCALE INTEGRATION, INC.
4633 Old Ironsides Drive, Suite 420
Santa Clara, CA  95050

February 27, 1984

## KEY EMPLOYEE AGREEMENT

(Name and address of employee)
            Eli Harari
            2320 Friars Lane
            Los Altos, CA 94022
     Wafer Scale Integration, Inc., a California corporation
(the "Company") agrees with you as follows:

1.   Position and Responsibilities.

     1.1  You shall serve in an executive capacity as
          President and Chief Executive Officer
or in a position substantially equivalent thereto and per-
form the duties customarily associated with such capacity
from time to time and at such place or places as the Com-
pany shall designate or as shall be appropriate and neces-
sary in connection with such employment.

     1.2  You will, to the best of your ability, devote
your full time and best efforts to the performance of your
duties hereunder and the business and affairs of the Com-
pany.  You agree to serve as a director and/or officer of
the Company if elected by the shareholders and the Board,
as the case may be, and to perform such executive duties as
may be assigned to you by the Company's chief executive
officer or the Board of Directors from time to time.

     1.3  You will duly, punctually and faithfully
perform and observe any and all rules and regulations which
the Company may now or shall hereafter establish governing
the conduct of its business.

2.   Term of Employment.

     2.1  The term of your employment shall be four
years commencing with the date hereof, provided your
employment may be terminated at any time as provided in
Section 2.2.

EXHIBIT H

2.2  The Company shall have the right, on written notice to you, to terminate your employment:

(a)  immediately at any time for cause, or

(b)  at any time without cause provided the Company shall be obligated to pay to you as severance pay an amount equal to 3 months' basic salary, less applicable taxes and other required withholdings and any amount you may owe to the Company, payable in equal monthly installments on the last day of each month commencing the month next following the date of termination.

2.3  For purposes of Section 2.2 and Section 7.4, the term "cause" shall mean the willful breach or habitual neglect of the duties you are required to perform under this Agreement or otherwise as an employee of the Company.

3.  <u>Compensation</u>.  The Company shall pay to you for the services to be rendered hereunder a basic salary at an annual rate of $  79,000  , subject to increase in accordance with the policies of the Company, as determined by its Board of Directors, in force from time to time, payable in installments in accordance with Company policy. You shall also be entitled to all rights and benefits for which you shall be eligible under deferred bonus, management bonus reserve, pension, group insurance, profit-sharing or other Company benefits which may be in force from time to time and provided to you or for the Company's employees generally.

4.  <u>Other Activities During Employment</u>.

4.1  Except with the prior written consent of the Company's chief executive officer, acting upon instructions from the Board of Directors, you will not during the term of this Agreement undertake or engage in any other employment, occupation or business enterprise other than ones in which you are a passive investor.

4.2  Except as permitted by Section 4.3, you will not acquire, assume or participate in, directly or indirectly, any position, investment or interest adverse or antagonistic to the Company, its business or prospects, financial or otherwise, or take any action towards or looking towards any of the foregoing.

4.3  During the term of your employment by the Company, except on behalf of the Company or its subsidiaries, you will not, directly or indirectly, whether as an

2.

officer, director, stockholder, partner, proprietor, associ-
ate, representative, or otherwise, become or be interested
in any other person, corporation, firm, partnership or other
entity whatsoever which directly competes with the Company,
throughout the world, in any line of business engaged in (or
planned to be engaged in) by the Company; provided, however,
that anything above to the contrary notwithstanding, you may
own, as a passive investor, securities of any competitor
corporation, so long as your holdings in any one such
corporation shall not in the aggregate constitute more than
1% of the voting stock of such corporation.

    5.    Former Employment.

        5.1  You represent and warrant that your employ-
ment by the Company will not conflict with and will not be
constrained by any prior employment or consulting agreement
or relationship.  You represent and warrant that you do not
possess confidential information arising out of prior
employment which, in your best judgment, would be utilized
in connection with your employment by the Company in the
absence of Section 5.2.

        5.2  If, in spite of the second sentence of
Section 5.1, you should find that confidential information
belonging to any former employer might be useable in con-
nection with the Company's business, you will not inten-
tionally disclose to the Company or use on behalf of the
Company any such confidential information; but during your
employment by the Company you will use in the performance of
your duties all information which is generally known and
used by persons with training and experience comparable to
your own and all information which is common knowledge in
the industry or otherwise legally in the public domain.

    6.    Agreement Regarding Confidentiality and Inven-
tions.  You agree to be bound by the provisions of the
Employee Agreement Regarding Confidentiality and Inventions
dated as of _____February 21, 1984_____ by and between you
and the Company (the "Confidentiality and Inventions
Agreement").

    7.    Post-Employment Activities.

        7.1  For a period of 24 months after the termina-
tion or expiration of your employment with the Company here-
under, absent the Company's prior written approval upon
instructions of its Board of Directors, you will not
directly or indirectly engage in activities (similar or

reasonably related to those in which you shall have engaged hereunder during the two years immediately preceding the termination of your employment with the Company) for, nor render services (similar or reasonably related to those which you shall have rendered hereunder during such two years) to, any firm or business organization which directly competes with the Company in any line of business engaged in (or planned to be engaged in at the time of the termination of your employment with the Company) by the Company, whether now existing or hereafter established, nor shall you engage in such activities nor render such services to any other person or entity engaged or about to become engaged in such activities to, for or on behalf of any such firm or business organization, nor shall you entice, induce or encourage any of the Company's other employees to engage in any activity which, were it done by you, would violate any provision of the Confidentiality and Inventions Agreement or this Section 7.

7.2  The Company upon instructions of its Board of Directors may give you written approval(s) to personally engage in any activity or render services referred to in Section 7.1 if it secures written assurances (satisfactory to the Company and its counsel) from you and from the prospective employer(s) that the integrity of the Confidentiality and Inventions Agreement will not in any way be jeopardized by such activities, provided the burden of so establishing the foregoing to the satisfaction of the Company and said counsel shall be upon you and your prospective employer(s).

7.3  For a period 24 months following the termination of your employment by the Company, the provisions of Section 4.3 shall be applicable to you and you shall comply therewith.  As applied to such 24 month period, the term "any line of business engaged in (or planned to be engaged in) by the Company", as used in Section 4.3, shall be applied as at the date of termination of your employment.

7.4  The provisions of Sections 7.1, 7.2 and 7.3 shall be of no force or effect if the termination or expiration of your employment occurs more than four years from the date of this Agreement.

8.  _Remedies_.  Your duties under the Confidentiality and Inventions Agreement and Section 7 shall survive termination of your employment with the Company.  You acknowledge that a remedy at law for any breach or threatened breach by

4.

you of the provisions of the Confidentiality and Inventions Agreement or Section 7 would be inadequate and you therefore agree that the Company shall be entitled to injunctive relief in case of any such breach or threatened breach.

9. Post-Employment Consultation.

9.1 Upon the termination of your employment with the Company pursuant Sections 2.1 or 2.2 above, the Company shall have the option to retain you as a consultant by notifying you of its desire to so retain you within 30 days of such termination in writing mailed to you at your last address as it appears in the Company's records. Whether or not you are retained, you shall, for a period of 24 months after such termination, notify the Company of any change in address and each subsequent employment (stating the name and address of the employer and the nature of your position) or business activity in which you engage during such 24 months.

9.2 If the Company retains you as a consultant, you shall during the period of such retention hold yourself available to render consulting services in your area of expertise or special competence for up to six months for not more than sixteen hours per month, for which the Company shall pay you monthly under this Section 9 an amount equal to 25% of your monthly basic salary obtaining under Section 3 at the time of termination of your employment, whether or not you shall be called upon to render any services in any such month. Any out-of-pocket expenses which your consulting activities for the Company may require will be reimbursed against receipts and vouchers therefor in accordance with the Company's policies in force from time to time.

9.3 During any period in which you are retained by the Company as a consultant, the Company may terminate your status as a consultant by giving you 90 days' written notice, during which 90-day period you shall continue to receive your monthly consulting fee but shall not be obligated to render or hold yourself available to render any consulting services during such period. Thereafter the Company shall have no further liability for consulting fees. All other prohibitions of the Confidentiality and Inventions Agreement and Section 7 shall survive termination of your status as a consultant.

10.    Post-Employment Earnings.

10.1 If after conscientious effort during any
period in which you are subject to the restrictions of
Section 7.1, you are unable primarily due to such restric-
tions to obtain a comparable position which, together with
any termination payments or consulting fees then being paid
to you by the Company, if any, shall be as remunerative as
your monthly remuneration with the Company when your employ-
ment terminated (hereinafter your "remuneration"), then,
anything in Section 9 to the contrary notwithstanding, the
Company shall (subject to Section 10.3) pay to you monthly,
as an additional consulting fee or otherwise, a sum (the
"Guarantee") such that your then monthly remuneration shall
be equal to not less than your remuneration.

10.2 In order to receive the Guarantee, you shall
notify the Company in writing of the monthly amount which
you believe you are entitled to under Section 10.1.    You
must establish such amount to the Company's reasonable
satisfaction, whereupon the Company shall promptly (and in
any event within 15 days of receipt of your notification)
pay to you the amount of the Guarantee so established.    The
Company shall continue to pay such Guarantee, on a monthly
basis for the duration of the restriction period under
Section 7.1, unless your circumstances change so as to
justify a modification or the elimination of the Guarantee,
or unless the Company shall exercise its right to terminate
the Guarantee under Section 10.3

10.3 The Company at any time may, upon 90 days'
written notice, notify you that it prospectively shall not
make any further payments of the Guarantee, whereupon you
shall thenceforth cease to bound by any of the restrictions
of Section 7.1 or 7.3.    All prohibitions of the Confiden-
tiality and Inventions Agreement, however, shall survive the
Company's decision not to continue the Guarantee.

11.    Assignment.    This Agreement and the rights and
obligations of the parties hereto shall bind and inure to
the benefit of any successor or successors of the Company by
reorganization, merger or consolidation and any assignee of
all or substantially all of its business and properties,
but, except as to any such successor or assignee of the
Company, neither this Agreement nor any rights or benefits
hereunder may be assigned by the Company or by you.

12.    Interpretation.    In case any one or more of the
provisions contained in this Agreement shall, for any

reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

13. Notices. Any notice which the Company is required or may desire to give to you shall be given by personal delivery or registered or certified mail, return receipt requested, addressed to you at the address of record with the Company, or at such other place as you may from time to time designate in writing. Any notice which you are required or may desire to give to the Company hereunder shall be given by personal delivery or by registered or certified mail, return receipt requested, addressed to the Company at its principal office, or at such other office as the Company may from time to time designate in writing. The date of personal delivery or the date of mailing any such notice shall be deemed to be the date of delivery thereof.

14. Waivers. If either party should waive any breach of any provision of this Agreement, he or it shall not thereby be deemed to have waived any preceding or succeeding breach of the same or any other provision of this Agreement.

15. Complete Agreement; Amendments. The foregoing, together with an Employee Stock Purchase Agreement and Confidentiality and Inventions Agreement between you and the Company, is the entire agreement of the parties with respect to the subject matter hereof and thereof and may not be amended, supplemented, cancelled or discharged except by written instrument executed by both parties hereto.

16. Headings. The headings of the sections hereof are inserted for convenience only and shall not be deemed to constitute a part hereof nor to affect the meaning thereof.

If you are in agreement with the foregoing, please so indicate by signing and returning the enclosed copy of this letter.

WAFER SCALE INTEGRATION, INC.

By _Edward L. Martin_

ACCEPTED AND AGREED:

_Eli Harari_
Employee

# EXHIBIT C

## AGREEMENT

THIS AGREEMENT is made by and between ELIYAHOU HARARI, 2320 Friars Lane, Los Altos, California 94022 (hereinafter "Harari") and WAFERSCALE INTEGRATION, INC., a California corporation having its principal place of business at 47280 Kato Road, Fremont, California 94538 (hereinafter "WSI") and is entered into as of February 29, 1988.

WHEREAS, WSI has requested that Harari resign his positions as an employee and officer of WSI; and

WHEREAS, Harari has agreed to resign such positions.

NOW, THEREFORE, WSI and Harari agree as follows:

### ARTICLE 1

1.1    Harari agrees to resign the above-referenced positions and WSI accepts such resignation effective on February 28, 1988 (the "Termination Date").

1.2    WSI agrees that Harari was not terminated for "cause" as that term is used in Harari's Key Employee Agreement dated February 27, 1984.

1.3    WSI hereby agrees to extend to Harari, to the same extent as WSI's other directors and officers, the arrangements to protect WSI's directors and officers against liability authorized by WSI's Board of Directors at its meeting on December 10, 1987. Harari acknowledges that approval of such arrangements by WSI's shareholders is required before such arrangements become effective and WSI agrees to submit such arrangements to its shareholders for consideration promptly.

1.4    The parties agree that WSI will continue to nominate Harari for reelection as a director of WSI until an IPO, unless a mutual agreement is reached for his earlier resignation from WSI's Board; provided, however, that in the event the Board of Directors of WSI determines that Harari is pursuing activities in conflict with his duties and responsibilities to WSI, Harari upon request of the Board shall resign as a director and WSI shall have no further obligation to nominate Harari for reelection.

1.5    WSI agrees that Harari's resignation is under conditions permitting Harari to license the "Harari Patents" to third parties under paragraph 2.6 of the "Patent Agreement." "Harari Patents" shall mean the patents licensed by Harari to WSI under the Patent Agreement entered into between WSI and Harari on February 28, 1984, and amended on June 5, 1984 (the "Patent Agreement").

1.6    Harari shall not, for a period of twenty-four (24) months after the Termination Date, without WSI's consent, solicit or induce any employee of WSI to cease to be employed by WSI, or hire or induce to join Harari or any entity which employs Harari or in which Harari has an interest in any capacity, any employee of WSI, and any person who, within 30 days prior to the date such person is hired by or joins Harari or such entity, was an employee of WSI.

## ARTICLE 2

2.1    Promptly after the execution and delivery of this Agreement by Harari and WSI, WSI shall pay Harari a 1987 bonus in the amount of $15,000, reduced for all applicable taxes and required withholdings.  At the Termination Date, Harari shall receive from WSI a payment equal to the sum of accrued salary and accrued vacation.  Starting with the next regular pay period of WSI commencing after the Termination Date, WSI will pay to Harari, as severance pay and in consideration of Harari's consulting obligations provided for in Section 2.4 below, an amount equal to eleven months of Harari's current base salary, payable in equal installments every two weeks over an eleven month period.  Such payments will be made on WSI's regular salary payment dates and will be reduced for all applicable taxes and required withholdings.  Except as expressly provided in this Agreement, WSI shall have no obligation to pay to Harari, and Harari shall have no right or claim to receive from WSI, any severance or similar payments in connection with the cessation of his employment by WSI.  WSI will continue to pay for Harari's health care and life insurance benefits at the current level for a period of 11 months after the Termination Date.

2.2    WSI will extend the term of Harari's Promissory Note dated February 21, 1984, in the amount of $22,000 plus accrued interest until the earlier of 6 months after the date of WSI's IPO or January 2, 1992; provided, however, that until Harari's obligations under the Promissory Note are paid in full, Harari shall pay to WSI 20% of the total proceeds from each sale of WSI stock by Harari, promptly after the completion of each such sale.  Each such payment will be credited first to accrued and unpaid interest and then to unpaid principal.  Except as modified by this Agreement, such Promissory Note and related Joint Escrow Instructions dated February 21, 1984, shall remain in full force and effect.

2.3    (a)  WSI will not prevent, impede or delay any transfer by Harari of any of Harari's WSI shares in any transaction exempt from registration under applicable federal and state securities laws, and as to which Harari has

complied with the transfer requirements provided for in
Harari's February 21, 1984 investment letter.

(b)   Harari will be entitled to transfer
registration rights to transferees of Harari's WSI shares in
accordance with Section 8 of Harari's Founders' Registration
Rights Agreements dated as of February 21, 1984, which
registration rights will be subject to all of the terms and
conditions set forth in such agreement, as amended.
Section 10 of such agreement is hereby amended to extend the
lockup or standoff period provided for therein from 120 days
to 150 days and to remove any requirement that all holders of
registration rights enter into similar lockup agreements as a
condition to Harari's lockup obligation, and Harari hereby
agrees to be bound by such Section 10, as amended.

2.4    For a period of eleven months after the Termination
Date, Harari will be available to WSI to provide consultation
as reasonably requested by WSI up to 32 hours per month and
Harari hereby agrees to provide such consultation.   Such
consultation will be, at WSI's discretion, in the areas of
strategic partnerships, present and/or future foundries or
pilot lines, investor relations and financing, personnel and
administration.   Consultation in the areas of current and new
technology, new devices, or new products and markets will be
specifically excluded except where mutually agreed on a case
by case basis.   Any consultation up to 32 hours per month
during the eleven months period following the Termination
Date shall be provided by Harari without additional
compensation beyond the payments provided for in Section 2.1
above.

2.5    At its option, WSI may extend by 6 months the
period during which Harari will be available to provide
consultation to WSI under the terms of Section 2.4, and
Harari hereby agrees to provide such consultation.

2.6    WSI shall pay Harari for all consulting provided by
Harari above 32 hours per month during the eleven month
period following the Termination Date, and for all consulting
provided by Harari during the extended consulting period
provided in Section 2.5, consulting fees at the rate of
$1,000 per 8-hour day (or equivalent), such consulting fees
to be paid in arrears on WSI's regular salary payment dates
and to be reduced for all applicable taxes and required
withholdings.

2.7    Out-of-pocket expenses required by Harari's
consulting activities for WSI will be reimbursed against
receipts therefor in accordance with WSI's policies in force
from time to time.

2.8    WSI will reimburse Harari reasonable legal expenses incurred in connection with this Agreement not to exceed $5,000.

### ARTICLE 3

3.1    Except with respect to the obligations created by, acknowledged, or arising out of this Agreement, Harari does hereby for himself and his legal successors and assigns, release and discharge WSI and its shareholders, officers, directors, employees, agents, attorneys, legal successors and assigns, of and from any and all claims, actions and causes of action, whether now known or unknown, suspected or unsuspected which Harari now has, owns or holds or at any other time had, owned or held or shall or may have, own or hold against any of the foregoing based upon or arising out of any matter, cause, fact, thing, act or omission whatsoever occurring or existing at any time to and including the date hereof (all of which are hereinafter referred to as and included within the "Released Matters"). As used in this Article 4, WSI includes any and all parents, divisions and subsidiaries of WSI.

3.2    Harari acknowledges that he is familiar with Section 1542 of the Civil Code of the State of California which provides as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

Harari waives any right or benefit which he has or may have under Section 1542 of the Civil Code of the State of California to the full extent that he may lawfully waive all such rights and benefits pertaining to the subject matter of this Agreement. Harari acknowledges that he is aware that he may hereafter discover claims or facts in addition to or different from those which he now knows or believes to exist with respect to the subject matter of this Agreement or WSI, and that it is his intention hereby fully, finally and forever to settle and release all of the Released Matters in consideration of WSI's execution and delivery of this Agreement. The release herein given shall remain in effect as a full and complete release notwithstanding the discovery or existence of any additional or different claim or fact.

3.3    Harari acknowledges and agrees that he shall continue to be bound by and comply with the terms of his Employee Agreement Regarding Confidentiality and Inventions dated February 22, 1984, a copy of which is attached to this Agreement.

## ARTICLE 4

4.1    This Agreement is personal to the parties and may not be assigned except (a) in the case of Harari's death, to his estate, or (b) by WSI to a third party in connection with any sale to or acquisition by such third party of that number of shares or other form of equity of WSI (or any entity to which WSI has assigned, in accordance with the terms hereof, the rights granted herein) representing the right to control WSI or any such entity, or upon a sale to any such third party of all or substantially all of the assets of WSI or such entity, provided that such third party assumes all the obligations of WSI as specified in this Agreement.  Subject to the foregoing sentence, this Agreement and the rights and obligations of the parties set forth herein shall inure to the benefit of, and shall be binding upon, WSI's and Harari's successors and assigns.

4.2    This Agreement sets forth the entire understanding between the parties as to its subject matter and merges all prior discussions between them, and no one of the parties shall be bound by any modification, or by any conditions, definitions, warranties, or representations, with respect to the subject matter of this Agreement, other than as is expressly provided in this Agreement, or as duly set forth subsequent to the date hereof in writing signed by a duly authorized representative thereof.

4.3    A notice, request, or statement hereunder shall be deemed to be sufficiently given or rendered when sent by certified mail and addressed to the addresses given above or to such other address as may be specified by written notice.

4.4    This Agreement may be executed in counterparts which, taken together, shall constitute one and the same agreement and shall be effective as of the date first written above.

4.5    This Agreement shall be governed by and construed in accordance with California law.

**IN WITNESS WHEREOF**, the parties have executed this Agreement making it effective as of the day first above written.

Date: _2.29.88_          _Eli Harari, Chairman_
                          Eliyahou Harari

                          WAFERSCALE INTEGRATION, INC.

Date: _2/29/88_          By: _____
                          Title: _PRESIDENT_

2703h
022588                                  5.

0824a
112283

## EMPLOYEE AGREEMENT REGARDING CONFIDENTIALITY & INVENTIONS

This Agreement is intended to formalize in writing certain understandings and procedures which have been in effect since the time I was initially employed by Wafer Scale Integration, Inc. ("Company").

In return for new or continued employment by Company, I acknowledge and agree that:

1.    All previous work done by me for Company in any way to the conception, design, development or support of products for Company is the property of Company.

2.    I will maintain in confidence and will not disclose or use, either during or after the term of my employment without the prior written consent of Company, any proprietary or confidential information or know-how belonging to Company ("Proprietary Information"), whether or not it is in written or permanent form, except to the extent required to perform duties on behalf of Company in my capacity as an employee.  Such Proprietary Information includes, but is not limited to, technical and business information relating to Company's inventions or products, research and development, production processes, manufacturing and engineering processes, machines and equipment, finances, customers, marketing, and production and future business plans.  Upon termination of my employment or at the request of my supervisor before termination, I will deliver to Company all written and tangible material in my possession incorporating the Proprietary Information or otherwise relating to Company's business.  These obligations with respect to Proprietary Information extend to information belonging to customers and suppliers of Company who may have disclosed such information to me as the result of my status as an employee of the Company.

3.    I will promptly disclose and describe to Company (i) all inventions, improvements, discoveries and technical developments ("Inventions"), whether or not patentable, made or conceived by me, either alone or with others, during the term of my employment, provided that Company shall receive such information in confidence.  I hereby assign and agree to assign to Company my entire right, title and interest in and to such Inventions which relate in any way to or are useful in Company's business as presently conducted or as conducted at any future time during my employment, and agree to cooperate with Company and its designee(s) both during and after my employment in the procurement and maintenance, at Company's expense and at its discretion, of patents, copyrights, and/or other protection of Company's rights in such inventions.  I will keep and maintain adequate and current written records of all such Inventions, which shall be and remain the property of Company.

4.    (a)  There is no other contract or duty on my part now in existence to assign Inventions.

     (b)  I will not disclose or induce Company to use any confidential information or material that I am now or shall become aware of which belongs to anyone other than Company.

     (c)  During my employment by Company, I will not engage in any employment, consulting or other activity in any business without the Company's express written agreement.

5.    All records, reports, notes, compilations, or other recorded matter, and copies or reproductions thereof, relating to Company's operations, activities or business, made or received by me during any period of employment with Company are and shall be the Company's exclusive property, and I will keep the same at all times in Company's custody and subject to its control, and will surrender the same at the termination of my employment if not before and will not take with me any reproduction of same or any Proprietary Information that is embodied in tangible medium of expression.

*Attachment A*

0824a
112283

5.    I have attached hereto a complete and detailed list of all inventions owned by me or by others, conceived or made by me prior to my employment by the Company. These are the only inventions which are not subject to this Agreement. In addition, I will provide the Company with a sealed envelope which contains written and pictorial descriptions of each such invention. Such envelope may be opened by the Company upon termination of my employment or five years from the date of this Agreement, whichever occurs first.

7.    A breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to Company for which there will be no adequate remedy of law, and Company shall be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including monetary damages if appropriate).

8.    I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I represent that I have not brought and will not bring to the Company or use in the performance of my responsibilities at the Company any materials or documents of a former employer that are not generally available to the public, unless I have obtained express written authorization from the former employer for their possession and use.

9.    The waiver by Company of a breach of provision of this contract by Employee shall not operate or be construed as a waiver of any other or subsequent breach by Employee. If any provision of this Agreement is held to be invalid, void or forceable, the remaining provisions shall nevertheless continue in full force and effect without being impaired or invalidated in any way. This Agreement shall be construed in accordance with, and governed by, the laws of the State of California. This Agreement shall be binding on me, my heirs, executors, assigns and administrators and shall inure to the benefit of the Company and its successors and assigns.

10.    Company has informed me that, in accordance with Section 2872 of the California Labor Code, this Agreement does no require me to assign to Company, any invention for which no equipment, supplies, facilities or trade secret information of Company was used and which was developed entirely on my own time, and (a) which does not relate (1) to the business of Company or (2) to Company's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for Company. This limited exclusion does not apply to any patent or invention covered by a contract between Company and the United States or any of its agencies requiring full title to such patent or invention to be in the United States. I ACKNOWLEDGE RECEIPT of a copy of this Agreement.

EMPLOYEE:

Date: _2.22.84_

Signature _____

Printed Name _E. HARARI_

COMPANY:

By _Edward R. Martin_

Title _DIRECTOR, HUMAN RESOURCES_

L  :  _2/22/84_

2.

ATTACHMENT A ( WSI )

List of patent disclosures belonging to Eli Harari

.ED    1.  A uniquely addressed high density RAM cell and its
           associated peripheral circuitry in a memory array.      } U.S. Patent
                                                                      issued.
.ED    2.  Low power high density charge pumped static RAM cells    } Fully covers
           and method of operating same in a memory array.         } 1 & 2.

✶  3.  A variable threshold MOSFET with graded substrate potential.

✶  4.  A double gate MOSFET with improved load characteristics.

✶  5.  A fast electrically programmable, UV erasable RAM (PRAM).

.ED    6.  A high efficiency EPROM and E$^2$PROM with drain overlap   Three U.S
           (device and process).                                     patents granted
                                                                     Fully covers 6.

✶  7.  A process to minimize encroachment of bird's beak effect.

✶  8.  A process for reduced diffusion parasitic capacitances
       by reduced field encroachment.

✶  9.  A high density decoder.

.ED   10.  High density dynamic RAM relying for storage on substrate  U.S. Paten
           potential.                                                 granted.
                                                                      Fully covers.

✶ 11.  Use of substrate potential for a radiation detector
       array or a thermal detector, or a sense amplifier.

.ED   12.  Dynamic Loadless logic for serial memory and pipeline    U.S. Patent
           parallel signal processing.                              granted.
                                                                    Fully covers
                                                                    12.
.ED   13.  Dynamic RAM cell with signal amplification.   Three U.S. patents filed
                                                         (Attorney designation
NG    14.  Static RAM cell with JFET bistable element.   M60, M601, M601
.ED        U.S patent filed. Not yet granted. Fully covers 14.   Fully covers 13.

NG    15.  E$^2$PROM cell with drain protection for read and program
.ED        disturb. U.S. patent filed. Not yet granted. Fully covers 15.

✶ 16.  PROM cell with vertical filament fuse element.

✶ Full description of these inventions is held in a sealed
  envelope by Harari's patent attorney's firm in
  Santa Clara — Mr. Alan MacPherson is the patent attorney.
                                                     408 246/405
                                                       2.13.84
Three patents in item 6. are covered in a
separate Agreement between WSI and E. Harari.  E.B.Harari



```
Superior Court of California, County of Alameda      Receipt Nbr: 181293
Hayward Hall of Justice                              Clerk: dosilva
24405 Amador Street                                  Date: 10/14/2005
Hayward, CA  94544
```

| Type | Case Number | Description | Amount |
|------|-------------|-------------|--------|
| Filing | HG05237216 | Complaint Business Tort/Unfair Busi | $314.50 |

```
              Total Amount Due:      $314.50
              Prior Payment:
              Current Payment:       $314.50
              Balance Due:             $.00
              Overage:
              Excess Fee:
              Change:

Payment Method:
              Cash:
              Check:                 $314.50
```

# Exhibit B

1  Michael A. Ladra, State Bar No. 64307
   James C. Yoon, State Bar No. 177155
2  Steven S. Baik, State Bar No. 184622
   WILSON SONSINI GOODRICH & ROSATI
3  Professional Corporation
   650 Page Mill Road
4  Palo Alto, CA 94304-1050
   Telephone: (650) 493-9300
5  Facsimile: (650) 565-5100
   mladra@wsgr.com
6  jyoon@wsgr.com
   sbaik@wsgr.com
7

8  Attorneys for Defendants
   Eliyahou Harari
9  SanDisk Corporation

10

11                    UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13  STMICROELECTRONICS, INC., a corporation  )   CASE NO.:
                                             )
14             Plaintiff,                    )   **NOTICE OF REMOVAL TO THE**
                                             )   **UNITED STATES DISTRICT**
15         vs.                               . )  **COURT FOR THE NORTHERN**
                                             )   **DISTRICT OF CALIFORNIA**
16  ELIYAHOU HARARI, an individual;          )   **UNDER 28 U.S.C. § 1441(a) & (b)**
    SANDISK CORPORATION, a corporation; and  )
17  DOES 1 to 20, inclusive.                 )
                                             )
18             Defendants.                   )
                                             )
19

20         PLEASE TAKE NOTICE that defendants Eliyahou Harari ("Harari"), an individual, and

21  SanDisk Corporation ("SanDisk"), a Delaware corporation, hereby remove to this Court the state

22  court action described below:

23         1.  On October 14, 2005, an action was commenced by plaintiff STMicroelectronics, Inc.

24  ("ST") in the Superior Court for the County of Alameda, captioned *STMicroelectronics, Inc. v.*

25  *Harari*, Case No. HG 05237216. A copy of the Complaint is attached as Exhibit A.

26         2.  Defendant SanDisk was served with the complaint on October 17, 2005. A copy of

27  the notice is attached as Exhibit B.

28

1    3.   This action is a civil action of which this Court would have original jurisdiction under

2    28 U.S.C. § 1331 and/or 28 U.S.C. § 1338, and which may be removed to this Court pursuant to

3    28 U.S.C. § 1441(a)&(b), because the complaint raises a federal question and this is a civil action

4    arising under the laws of the United States.

5    4.   Removal is timely because less than 30 days have elapsed between service of this suit

6    and this Notice of Removal as is required by 28 U.S.C. § 1446(b), therefore this action may

7    properly be removed to this Court under 28 U.S.C. § 1441(a)&(b).

8    5.   Although ST claims that none of the causes of action in the complaint "involve the

9    construction or application of federal law, including the patent laws of the United States," the

10   allegations in its complaint reveal that it is, in fact, pursuing claims that involve questions of

11   federal patent law. Exh. A at ¶ 54. For example, in its complaint, ST raises issues surrounding

12   the inventorship of several patents on which defendant Harari is a named inventor. *See, e.g.,*

13   Exh. A at ¶ 29. Thus, federal patent law is a necessary and essential element to ST's claims and

14   removal is proper under 28 U.S.C. § 1441(b).

15   6.   The issue of defendant SanDisk's ownership of patents raised in the complaint is also

16   subject to the original jurisdiction of this Court. There exist three pending cases between

17   SanDisk and ST in which SanDisk has alleged ownership of and infringement by ST of patents

18   that are claimed in the complaint for this action: *SanDisk Corp. v. STMicroelectronics, Inc.*, case

19   number C04-04379 JF, Northern District of California; *In the Matter of Certain NAND Flash*

20   *Memory Circuits and Products Containing Same*, Investigation No. 337-TA-526, International

21   Trade Commission; and *STMicroelectronics, Inc. v. SanDisk Corp.*, case number 4:05 CV00045,

22   Eastern District of Texas. Therefore this action may properly be removed to this Court under 28

23   U.S.C. § 1441(a).

24   7.   Because original jurisdiction for this action exists in Federal Court, this action may

25   also be properly removed under the All Writs Act, 28 U.S.C. § 1651.

26   8.   A copy of all process, pleadings, and orders served upon defendants is filed with this

27   notice. As required by 28 U.S.C. § 1446(d), defendants will provide written notice of the filing

28

1  of this notice to ST and also file a copy of this notice with the clerk of the Superior Court of the

2  State of California, County of Alameda.

3  ## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

4  Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

5  named parties, there is no such interest to report.

6

7

8  Dated: November 15, 2005                    Respectfully submitted,

9
                                              WILSON SONSINI GOODRICH & ROSATI
10                                             Professional Corporation

11

12  By: _____
                                                   Michael A. Ladra
13

14                                             Attorneys for Defendants
                                              Eliyahou Harari
15                                             SanDisk Corporation

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit C

1

2                                          **E-Filed 7/18/06**

3

4

5

6

7                              NOT FOR CITATION

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                            SAN JOSE DIVISION

11  STMICROELECTRONICS, INC.,              Case Number C 05-4691 JF

12                    Plaintiff,           ORDER[1] GRANTING PLAINTIFF'S
                                           MOTION FOR RECONSIDERATION
13            v.                           AND REMANDING ACTION TO
                                           ALAMEDA COUNTY SUPERIOR
14  ELIYAHOU HARARI, et al.,               COURT

15                    Defendants.          [re:  doc. no. 39]

16

17

18

19          Plaintiff STMicroelectronics, Inc. ("Plaintiff" or "ST") filed the instant action in the

20  Alameda County Superior Court on October 14, 2005, asserting seven state law claims for:  (1)

21  breach of fiduciary duty; (2) breach of written contract; (3) fraud; (4) conversion; (5) inducing

22  breach of contract; (6) unjust enrichment; and (7) unfair competition under California Business &

23  Professions Code § 17200 ("§ 17200").  Defendants Eliyahou Harari ("Harari") and SanDisk

24  Corporation ("SanDisk") removed the action to this Court on November 16, 2005 on the ground

25  that adjudication of the state law claims alleged in the complaint requires resolution of a

26  substantial issue of patent law.  This Court denied Plaintiff's motion for remand by order dated

27  _____

28        [1]        This disposition is not designated for publication and may not be cited.

Case No. C 05-4691 JF
ORDER GRANTING PLAINTIFF'S MOTION FOR RECONSIDERATION ETC.
(JFLC2)

1   March 20, 2006 ("March 20 Order).  Plaintiff seeks reconsideration of that order.  The Court has

2   considered the briefing of the parties as well as the oral arguments presented at the hearing on

3   June 9, 2006.  For the reasons discussed below, the Court will grant Plaintiff's motion for

4   reconsideration and will remand the action to the Alameda County Superior Court.[2]

5                                   **I. BACKGROUND**

6          This Court's March 20 Order sets forth the factual and procedural background of this

7   case, which need not be repeated in full.  As relevant here, Harari was a co-founder and key

8   employee of Wafer Scale Integration ("WSI"), the predecessor company of Plaintiff ST.  Harari

9   signed various agreements with WSI, including the agreement central to the instant dispute, the

10  "Employee Agreement Regarding Confidentiality & Inventions" ("Inventions Agreement").  The

11  relevant paragraph of that agreement reads in its entirety as follows:

12         3.      I will promptly disclose and describe to Company (i) *all inventions*,
           improvements, discoveries and technical developments ("Inventions"), whether or
13         not patentable, *made or conceived by me, either alone or with others, during the*
           *term of my employment*, provided that Company shall receive such information in
14         confidence.  *I hereby assign and agree to assign to Company my entire right, title*
           *and interest in and to such Inventions which relate in any way to or are useful in*
15         *Company's business as presently conducted or as conducted at any future time*
           *during my employment*, and agree to cooperate with Company and its designee(s)
16         both during and after my employment in the procurement and maintenance, at
           Company's expense and at its discretion, of patents, copyrights, and/or other
17         protection of Company's rights in such inventions.  I will keep and maintain
           adequate and current written records of all such Inventions, which shall be and
18         remain the property of Company.

19  Inventions Agreement ¶ 3 (emphasis added).

20         WSI was in the business of designing and selling programmable system devices,

21  including memory systems.  While serving as a director and consultant to WSI, Harari filed four

22  patent applications without disclosure to WSI.  After submitting his resignation to WSI but

23  before such resignation was accepted, Harari filed two more patent applications without

24  disclosure to WSI.  ST claims that all the inventions described in the applications were conceived

25  during the term of Harari's employment and related to WSI's business, and thus that the

26  _____

27         [2] Because it concludes that remand is appropriate, the Court will not address Defendants'
    pending motion for summary judgment and Plaintiff's motion pursuant to Federal Rule of Civil
28  Procedure 56(f), both of which also were argued on June 9, 2006.

                                            2
    Case No. C 05-4691 JF
    ORDER GRANTING PLAINTIFF'S MOTION FOR RECONSIDERATION ETC.
    (JFLC2)

1  inventions described in the applications fell within Harari's disclosure and assignment

2  obligations. Fifty patents[3] have issued from the six applications, all listing Harari as sole

3  inventor or co-inventor. All fifty patents have been assigned to SanDisk, a company started by

4  Harari that competes directly with ST.

5  ## II. PRIOR ORDER DENYING MOTION FOR REMAND

6  As set forth in the March 20 Order, Defendants assert that federal jurisdiction exists

7  because adjudication of Plaintiff's state law claims "necessarily depends on resolution of a

8  substantial question of federal patent law." *See Christianson v. Colt Indus. Operating Corp.*, 486

9  U.S. 800, 809 (1988). Specifically, Defendants assert that adjudication of Plaintiff's claims

10  requires an inventorship analysis; it is well-settled that inventorship raises a substantial question

11  of federal law. *See MCV, Inc. v. King-Seely Thermos Co.*, 870 F.2d 1568, 1571 (Fed. Cir. 1989).

12  Plaintiff asserts that its state law claims do not implicate inventorship issues at all, but rather

13  implicate only issues of ownership. Ownership and inventorship issues are completely separate

14  issues. *Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993). Ownership

15  "is a question of who owns legal title to the subject matter in a patent," while "inventorship is a

16  question of who actually invented the subject matter claimed in a patent." *Id.*

17  In its March 20 Order, the Court rejected two of Defendants' arguments. First,

18  Defendants claimed that Plaintiff seeks assignment of *all* of the patents that issued from the six

19  disputed applications, even those as to which Harari was a co-inventor rather than the sole

20  inventor. Defendants argued that in order for Plaintiff to prevail on those claims, a court would

21  have to determine that Harari actually was the sole inventor of the patents, such that assignment

22  to Plaintiff of Harari's rights would result in assignment of the patents in their entirety. The

23  Court concluded that Defendants were reading Plaintiff's complaint too broadly, and that fairly

24

25

26

_____

27  [3] Plaintiff states that fifty patents have issued from the subject applications, while
Defendants state that forty-eight patents have issued. This discrepancy does not bear on the

28  Court's analysis. For ease of reference, the Court uses the number fifty throughout this order.

3

read, the complaint actually seeks assignment only of *Harari's interest* in each of the patents.[4]

Second, the Court rejected Defendants' argument that Plaintiff is relying on violation of patent laws to support its state law unfair competition claim under § 17200. The Court concluded that the § 17200 claim is based upon breaches of state law fiduciary and contractual obligations and thus does not implicate federal patent laws.

What the Court did find persuasive was Defendants' argument that Harari's disclosure and assignment obligations extended only to those *portions* of the patented inventions that Harari personally conceived during his employment with WSI. Under this construction of the Inventions Agreement, Harari's "inventive contribution" to each patent must be identified before it can be determined whether the patented invention fell within Harari's disclosure and assignment obligations. Having reconsidered the matter, the Court now believes that this view is erroneous, for the reasons discussed below.

### III. RECONSIDERATION

It is unclear how Defendants, and subsequently the Court, came to inject the phrase "inventive contribution" into the discussion of Harari's contractual disclosure and assignment obligations. The phrase does not appear in the Inventions Agreement and, indeed, the express language of that agreement directly contradicts the notion that only Harari's "inventive contributions" had to be disclosed and assigned. As noted above, the Inventions Agreement required *disclosure* of "all inventions ... made or conceived by [Harari], either alone or with others, during the term of [Harari's] employment." Inventions Agreement ¶ 3. Accordingly, Harari was obligated to disclose the inventions described in the six disputed patent applications, regardless of whether those inventions were conceived by Harari alone or with others, if the inventions were conceived during the term of Harari's employment. This disclosure obligation was not limited to Harari's "inventive contribution" to such inventions and likewise was not limited to any particular subject matter; Harari was required to disclose *all* inventions, period, as

---

[4] Plaintiff's counsel confirmed this reading of the complaint at the original hearing on the motion for remand.

4

1  long as the temporal limitation in the Inventions Agreement was met (i.e., as long as the

2  invention was conceived during Harari's term of employment).

3        The Inventions Agreement also required *assignment* of Harari's "entire right, title and

4  interest in and to such Inventions which relate in any way to or are useful in Company's business

5  as presently conducted or as conducted at any future time during [Harari's] employment." *Id.*

6  This language did not require assignment of Harari's "inventive contribution" to such inventions;

7  it required assignment of Harari's *entire right* to any invention, whether conceived alone or with

8  others, that meets the temporal limitation (i.e., that was conceived during Harari's term of

9  employment) and that meets the subject matter limitation (i.e., that was related to or useful to

10  WSI's business).

11        It is undisputed that Harari is named as sole inventor or co-inventor on the fifty patents at

12  issue.  "Patent issuance creates a presumption that the named inventors are the true and only

13  inventors."  *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998).

14  "Because conception is the touchstone of inventorship, each joint inventor must generally

15  contribute to the conception of the invention."  *Id.* (internal quotation marks and citation

16  omitted).  "[E]ach co-inventor presumptively owns a pro rata undivided interest in the entire

17  patent, no matter what their respective contributions."  *Id.* at 1465.  As a matter of law, then, the

18  fact that Harari is named as a sole inventor or co-inventor on the patents at issue establishes that

19  he contributed to the conception of the inventions described therein and that he thereafter

20  acquired a pro rata undivided interest in each patent for which he is named an inventor.  Because

21  he was required to disclose to WSI *all* inventions that he conceived *alone or with others* during

22  his term of employment, and to assign *his entire right* in such inventions if they related to WSI's

23  business, there is no need to inquire into Harari's precise inventive contribution.  The only

24  relevant questions are whether the inventions described in the subject patents were "made or

25  conceived" during Harari's term of employment and, if so, whether the patented inventions

26  related to WSI's business as conducted during Harari's term of employment.

27        Defendants argue that these questions – whether the patented inventions meet the

28  temporal and subject matter limitations of the Inventions Agreement – require an inventorship

5

1  analysis that implicates federal law.  The *AT&T* decision cited by both sides suggests otherwise.

2  In that case, AT&T brought a state court action against four of its former employees[5] and

3  Integrated Network Corp. ("INC"), seeking title of a patent.  *Am. Tel. & Tel. Co.  v. Integrated*

4  *Network Corp.*, 972 F.2d 1321, 1322 (Fed. Cir. 1992).  AT&T claimed that the four former

5  employees were contractually obligated to assign the patent to AT&T under an inventions

6  agreement but breached their contractual obligations by assigning the patent to INC instead.  The

7  inventions agreement obligated the four individual defendants to assign to AT&T all of their

8  rights in inventions conceived during their employment.  *Id.* at 1323.  The Federal Circuit held

9  that whether the invention was "conceived" during the individual defendants' employment did

10 not present a substantial question of patent law, noting that "when an invention was conceived

11 may be more a question of common sense than patent law."  *Id.* at 1324.  Accordingly, this Court

12 concludes that whether the patented inventions were "made or conceived" during Harari's term

13 of employment presents a factual question that does not implicate a substantial question of patent

14 law.

15        The subject matter limitation likewise can be resolved without reference to federal patent

16 law.  The question is whether the subject patented inventions "relate in any way to or are useful"

17 to WSI's business as conducted during Harari's term of employment.  This factual determination

18 will require a comparison of the patented inventions with WSI's business at the relevant time.  It

19 will not require any inventorship analysis.

20        Because it concludes that adjudication of Plaintiff's state law claims does not require

21 resolution of a substantial question of patent law, the Court will set aside its prior ruling and will

22 grant Plaintiff's motion for remand on the ground of lack of subject matter jurisdiction.  *See* 28

23 U.S.C. § 1447(c) (providing that "[i]f at any time before final judgment it appears that the district

24 court lacks subject matter jurisdiction, the case shall be remanded").  Defendants have requested

25 that, in the event the Court is inclined to reconsider the aspect of the March 20 Order discussed

26

27        [5] The individual defendants actually were employed by Bell Telephone Laboratories, a
28 wholly owned subsidiary that merged into AT&T.

6

Case No. C 05-4691 JF
ORDER GRANTING PLAINTIFF'S MOTION FOR RECONSIDERATION ETC.
(JFLC2)

1  above, they be given an opportunity to seek reconsideration of other aspects of the March 20

2  Order.  The Court has reexamined the complaint, all of the briefing to date, and the relevant

3  authorities, and concludes that there is no potential basis for reconsideration of the aspects of the

4  March 20 Order to which Defendants refer.  Accordingly, the Court will not delay in remanding

5  the action to the Alameda County Superior Court.

6        In its motion for remand, Plaintiff requested an award of costs and attorneys' fees

7  pursuant to 28 U.S.C. § 1447(c).  Although after reconsideration it has concluded that removal

8  was improper, the Court will deny Plaintiff's request because – as evidenced by the Court's

9  initial ruling – the removal was not objectively unreasonable.  *See Martin v. Franklin Capital*

10  *Corp.*, — U.S. — , 126 S.Ct. 704, 711 (2005) (holding that "[a]bsent unusual circumstances,

11  courts may award attorney's fees under § 1447(c) only where the removing party lacked an

12  objectively reasonable basis for seeking removal").

13  **IV. ORDER**

14      (1)    Plaintiff's motion for reconsideration of the Court's March 20 Order is
               GRANTED;

15
16      (2)    the instant action is REMANDED to the Alameda County Superior Court;

17      (3)    Plaintiff's motion for costs and attorneys' fees is DENIED; and

18      (3)    the Clerk of the Court SHALL TRANSMIT the file in this action to the Alameda
               County Superior Court forthwith and SHALL CLOSE this Court's file.

19
20
21
22  DATED:  July 18, 2006

23
24  _____
     JEREMY FOGEL
     United States District Court

25
26
27
28

7

This Order has been served upon the following persons:

Edward V. Anderson     evanderson@sidley.com, nye@sidley.com

Steven S. Baik , Esq     sbaik@wsgr.com, cphillips@wsgr.com

Kevin P. Burke     kburke@sidley.com, sheila.brown@sidley.com

Teague I. Donahey     tdonahey@sidley.com, sheila.brown@sidley.com

Russell L. Johnson     rljohnson@sidley.com, sheila.brown@sidley.com

Michael A. Ladra     mladra@wsgr.com

Monica Mucchetti     mmucchetti@wsgr.com, dfernandes@wsgr.com

Bart Edward Volkmer , Esq     bvolkmer@wsgr.com

James C. Yoon     jyoon@wsgr.com, abaranski@wsgr.com; nfurino@wsgr.com

Case No. C 05-4691 JF
ORDER GRANTING PLAINTIFF'S MOTION FOR RECONSIDERATION ETC.
(JFLC2)

# Exhibit D

1   MICHAEL A. LADRA, State Bar No. 064307
    TERRY T. JOHNSON, State Bar No. 121569
2   JAMES C. YOON, State Bar No. 177155
    MATTHEW R. REED, State Bar No. 196305
3   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
4   650 Page Mill Road
    Palo Alto, CA 94304-1050
5   Telephone: (650) 493-9300
    Facsimile: (650) 565-5100
6
    Attorneys for Defendants
7   ELIYAHOU HARARI and
    SANDISK CORPORATION
8

9                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                          COUNTY OF SANTA CLARA

11  STMICROELECTRONICS, INC.,              )   CASE NO.: 1-07-CV-080123
                                           )
12          Plaintiff,                     )   **DEFENDANTS' NOTICE OF MOTION
                                           )   AND MOTION FOR JUDGMENT ON
13      v.                                 )   THE PLEADINGS; MEMORANDUM
                                           )   IN SUPPORT THEREOF**
14  ELIYAHOU HARARI, *et al.*,             )
                                           )   Date:      March 11, 2008
15          Defendants.                    )   Time:      9:00 a.m.
                                           )   Dept.:     10
16                                         )   Judge:     Honorable Neal Cabrinha
                                           )
17                                         )   No Trial Date Set
                                           )
18  _____)

19

20

21

22

23

24

25

26

27

28
                                                              3283198_3.DOC

1

# TABLE OF CONTENTS

2

**Page**

3  NOTICE OF MOTION & MOTION FOR JUDGMENT ON THE PLEADINGS ........................1

4  MEMORANDUM OF POINTS & AUTHORITIES .......................................................................2

5  I. INTRODUCTION.................................................................................................................2

6  II. FACTUAL BACKGROUND ...............................................................................................3

7    A. The Parties and the Relevant Agreements...............................................................3

8    B. ST's Claims in This Case ..........................................................................................4

9    C. Procedural History....................................................................................................5

10  III. ARGUMENT .......................................................................................................................6

11    A. Legal Standard...........................................................................................................6

12    B. This Court Does Not Have Subject Matter Jurisdiction Over ST's Claims that Seek Assignment to ST of Rights in and to Co-Invented Patents ....................6

13

14      1. The Federal Courts Have Exclusive Jurisdiction to Resolve Substantial Questions of Federal Patent Law..............................................6

15      2. State Courts Do Not Have Jurisdiction to Determine the Nature of a Co-Inventor's Contribution to a Patent ..........................................7

16

17      3. ST's Alleged Right to Relief Requires a Determination of Dr. Harari's Contribution to Each Invention Claimed in the Co-Invented Patents ...........................................................................................9

18

19      4. This Court Conducts an Independent Evaluation of the Jurisdiction Question .........................................................................................11

20  IV. CONCLUSION .................................................................................................................13

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AT&T Commc'ns, Inc. v. Superior Court*, 21 Cal. App. 4th 1673 (1994), *review denied* (Apr. 21, 1994), *cert. denied*, 513 U.S. 917 (1994)..............................................13

*Adams v. Pacific Bell Directory*, 111 Cal. App. 4th 93 (2003)......................................................13

*Air Prod. & Chem., Inc. v. Reichhold Chem., Inc.*, 755 F.2d 1559 (Fed. Cir. 1985)......................7

*Board of Regents v. Nippon Telephone and Telegraph Corp.*, 414 F.3d 1358 (Fed. Cir. 2005) ................................................................................................................7

*Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800 (1988) .........................................6

*Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456 (Fed. Cir. 1998) .......................................7, 8

*Gemstar-TV Guide Intern., Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352 (Fed. Cir. 2004)..........................................................................................................................8, 11

*Gerawan Farming, Inc. v. Lyons*, 24 Cal. 4th 468 (2000) ..............................................................6

*Gravitt v. Southwestern Bell Tel. Co.*, 430 U.S. 723 (1977) ........................................................12

*Holiday Matinee, Inc. v. Rambus, Inc.*, 118 Cal. App. 4th 1413 (2004).............................6, 8, 11

*Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318 (Fed. Cir. 1998) .......................8

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367 (Fed. Cir. 1986)..........................7

*Israel Bio-Engineering Project v. Amgen Inc.*, 475 F.3d 1256 (Fed. Cir. 2007) ................7, 8, 12

*Jones v. Hardy*, 727 F.2d 1524 (Fed. Cir. 1984)............................................................................7

*MCV, Inc. v. King-Seeley Thermos Co.*, 870 F.2d 1568 (Fed. Cir. 1989)................................9, 11

*Machinists Automotive Trades Dist v. Peterbilt Motors Co.*, 220 Cal. App. 3d 1402 (1990) ..............................................................................................................................13

*Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999)..........................8

*Pang v. Beverly Hospital, Inc.*, 79 Cal. App. 4th 986 (2000) .......................................................6

*People v. Dixon*, 153 Cal. App. 4th 985 (2007) ...........................................................................13

*Provience v. Valley Clerks Trust Fund*, 163 Cal. App. 3d 249 (1984) .........................................13

*Shum v. Intel Corp.*, 499 F.3d 1272 (Fed. Cir. 2007)....................................................................7

*Trovan, Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292 (Fed. Cir. 2002)..............................................8

*Union Oil Co. of Cal. v. Atlantic Richfield Co.*, 208 F.3d 989 (Fed. Cir. 2000)..........................12

3283198_3.DOC

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
Case No.: 1-07-CV-080123

1 | *United Investors Life Ins. Co. v. Waddell & Reed Inc.*, 360 F.3d 960 (9th Cir. 2004) ................. 12

2 | *Wise v. Pacific Gas and Elec. Co.*, 132 Cal. App. 4th 725 (2005)................................................... 6

3 | **STATUTES**

4 | 28 U.S.C. § 1338(a)............................................................................................................... 6

5 | 28 U.S.C. § 1447(d) ............................................................................................................ 12

6 | 35 U.S.C. § 112 .................................................................................................................... 7

7 | 35 U.S.C. § 116 ........................................................................................................... 7, 8, 12

8 | Cal. Code Civ. P. § 438(c)(1)(B)(i)............................................................................... 1, 6

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **<u>NOTICE OF MOTION & MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

2    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3          PLEASE TAKE NOTICE THAT on March 11, 2008 at 9:00 a.m., or as soon thereafter as

4    counsel can be heard, in Department 10 of this Court at Downtown Superior Court, 191 N. First

5    Street, San Jose, California 95113, before the Honorable Neal Cabrinha, Defendants SanDisk

6    Corporation and Dr. Eliyahou Harari will and hereby do move this Court for an order granting

7    judgment on the pleadings based on lack of subject matter jurisdiction with respect to the

8    question of ownership of jointly invented patents at issue in this action.  This motion is brought

9    pursuant to California Code of Civil Procedure Section 438(c)(1)(B)(i) on the grounds that

10    Plaintiff's causes of action require the resolution of a substantial question of federal patent law

11    and therefore exclusive jurisdiction is vested in federal court over this inquiry.

12          Defendants' Motion is based on this Notice of Motion and Motion for Judgment on the

13    Pleadings, Defendants' Memorandum of Points and Authorities in Support thereof, the

14    accompanying Declaration of Anthony J Weibell and the exhibits attached thereto, the

15    accompanying Request for Judicial Notice, the pleadings and records on file herein, and such

16    further oral and documentary evidence as may be presented at the hearing on this matter.

17

18

19

20

21

22

23

24

25

26

27

28

1      **MEMORANDUM OF POINTS & AUTHORITIES**

2   **I.      INTRODUCTION**

3           This motion seeks judgment on the pleadings that the Court does not have jurisdiction

4   over Plaintiff STMicroelectronics, Inc.'s ("ST") causes of action that seek to resolve ownership

5   questions regarding patents that Defendant Dr. Eliyahou Harari ("Dr. Harari") co-invented with

6   other inventors.  That ownership inquiry requires the resolution of a substantial question of

7   federal patent law over which federal courts have *exclusive* jurisdiction.

8           Dr. Harari founded a company named WaferScale Integration ("WSI") in 1983.  On

9   February 28, 1988, he resigned his position as an employee and officer of WSI at the direction of

10  the company.  After his employment ended, Dr. Harari founded a new company called SanDisk

11  Corporation ("SanDisk"), where he works to this day.  Until March 1989, Dr. Harari remained a

12  consultant to WSI while he worked at SanDisk with other engineers.  Dr. Harari's work at

13  SanDisk was open, notorious and known by WSI.  In this lawsuit, brought nearly two decades

14  after the fact, ST (as WSI's alleged successor-in-interest) claims that inventions created by Dr.

15  Harari during his post-employment consultancy with WSI should have been assigned to that

16  company and not to his employer, SanDisk.  Defendants vigorously dispute that proposition.

17  The relevant assignment agreement provides that Dr. Harari's invention assignment obligations

18  terminated with his employment.

19          This motion, however, addresses a more fundamental question:  do California courts have

20  jurisdiction to resolve ownership disputes with respect to patents that list multiple inventors

21  where only one of the inventors is alleged to have owed assignment obligations to the plaintiff?

22  Given the force of federal patent law, the answer to that question is "no."  Nearly half of the

23  patents to which ST seeks an ownership interest list Dr. Harari as a co-inventor (*i.e.*, those

24  patents list other co-inventors along with Dr. Harari).  These co-invented patents contain

25  multiple claims that each represents a separate invention, and a person listed on a patent as a co-

26  inventor need not have contributed to every separate invention claimed within a patent

27  application.  Therefore, it would be impossible for this Court to determine which inventions were

28  made by Dr. Harari alone, which inventions were made by a co-inventor alone, and which were

1    made together by Dr. Harari and his co-inventors, without conducting an inventorship analysis of

2    the patents in the first instance.  That analysis of the patents indisputably raises a substantial

3    question of federal patent law, which brings ST's causes of action within the exclusive

4    jurisdiction of the federal courts.  Accordingly, this Court does not have jurisdiction to decide the

5    ownerships questions raised by the Complaint with respect to the co-invented patents.

6    **II.    FACTUAL BACKGROUND**

7        **A.    The Parties and the Relevant Agreements**

8        SanDisk, headquartered in Santa Clara County, markets and sells "flash memory"

9    products.  Compl. ¶¶ 3, 42.  Flash memory is a type of semiconductor memory used in a wide

10   variety of electronic systems and digital devices that can be reprogrammed and erased but does

11   not require power to retain the data that it stores.  Compl. ¶ 16.  SanDisk was founded by

12   Dr. Harari in 1988.  Compl. ¶ 40.

13       ST is a Delaware corporation headquartered in Carrollton, Texas.  Compl. ¶ 1.  It is a

14   wholly owned subsidiary of STMicroelectronics N.V., a multinational firm with headquarters in

15   Geneva, Switzerland.  *See* Declaration of Russell Johnson, Ex. 4 at ¶¶ 2-3 (filed Aug. 23, 2006).

16   On July 27, 2000, ST acquired a company called WaferScale Integration ("WSI"), Dr. Harari's

17   previous employer.  Compl. ¶ 7.

18       Dr. Harari founded WSI in 1983.  Compl. ¶ 6.  On February 22, 1984, Dr. Harari signed

19   an "Employee Agreement Regarding Confidentiality & Inventions" ("1984 Inventions

20   Agreement") with WSI.  Compl., Ex. A.  Pursuant to that agreement, Dr. Harari agreed to

21   disclose to WSI any inventions "made or conceived by [him], either alone or with others, during

22   the term of [his] employment."  *Id.* at ¶ 3.  He further agreed to assign to WSI his rights to

23   inventions that "relate in any way to or are useful in [WSI's] business as presently conducted or

24   as conducted at any future time during [his] employment."  *Id.*

25       On February 29, 1988, Dr. Harari and WSI entered into an Agreement ("1988

26   Agreement") under which Dr. Harari agreed, at the direction of WSI, to resign his position as an

27   employee of the company.  Compl., Ex. C at ¶ 1.1.  WSI acknowledged that Dr. Harari was not

28   terminated for cause.  *Id.* at ¶ 1.2.  Dr. Harari agreed to be available as requested by WSI to

1    provide consulting services for 32 hours per month for a period of 11 months following the

2    termination of his employment. *Id.* at ¶ 2.4. Dr. Harari also acknowledged and agreed "that he

3    shall continue to be bound by and comply with the terms" of the 1984 Inventions Agreement. *Id.*

4    at ¶ 3.3. By its plain terms, the 1988 Agreement did not contain any new assignment obligations

5    and did not alter the scope of his previous agreement to assign.

6        **B.      ST's Claims in This Case**

7        In late 2004, SanDisk filed patent infringement lawsuits against ST in federal district

8    court and in the United States International Trade Commission for infringing three SanDisk

9    patents. Compl. ¶¶ 46-48. In response, ST filed the present action. ST alleges that nearly two

10   decades ago Dr. Harari failed to assign to WSI his rights to inventions disclosed in six patent

11   applications ("Harari Applications") that were filed with the PTO between April 26, 1988 and

12   April 13, 1989 (months after his employment with WSI ended). Compl. ¶¶ 24-30. Based on this

13   allegation, ST's Complaint alleges the following claims against Dr. Harari: (1) breach of

14   fiduciary duty; (2) breach of the 1984 Inventions Agreement and the 1988 Agreement; (3) fraud;

15   (4) conversion; and (5) unjust enrichment. Compl. ¶¶ 55-96. Against SanDisk, ST asserts

16   claims for: (1) conversion; (2) inducing breach of contract; (3) unjust enrichment; and (4) unfair

17   competition. *Id.* at ¶¶ 88-102.

18       In its Complaint, ST asks that "all inventions and the patents relating thereto which were

19   *conceived of or resulted from inventive activity on the part of Harari*, that took place [during

20   Harari's employment with WSI], be assigned to plaintiff." Compl. at 18, Prayer for Relief

21   (emphasis added). ST also asks that the Court grant ownership of all patents which issued or

22   claim priority from the applications filed by Harari during and after his tenure at WSI, "which

23   should have properly been assigned to WSI," to plaintiff "as the sole owner if Harari is the sole

24   inventor or as a co-owner if Harari is a co-inventor." *Id.* ST does not dispute that persons other

25   than Dr. Harari are named as co-inventors on twenty-four of the patents which have issued from

26   the Harari Applications. *See* Weibell Decl., Ex. 1 at 8 ("ST does not dispute that persons other

27   than Harari are listed as inventors on several of the patents"); *see also id.,* ¶¶ 6-29 and Exs. 4

28   through 27 (copies of the 24 co-invented patents). For those jointly-invented patent applications,

1  ST does not seek assignment of the entire patent applications and the resulting patents, but

2  rather, ST seeks assignment of only Dr. Harari's interest in those patent applications. *See*

3  Weibell Decl., Ex. 3 at 21:6-9 (Counsel for ST: "SanDisk keeps the co-inventors' interest. We're

4  not interested in getting it. We're only interested in getting . . . Dr. Harari's interest.").

5  **C.    Procedural History**

6       ST filed this action in Alameda County Superior Court on October 14, 2005. SanDisk

7  and Dr. Harari then removed the case to federal court, and ST filed a motion to remand. On

8  March 20, 2006, the federal district judge denied ST's motion to remand the case to Superior

9  Court. Weibell Decl., Ex. 1. The federal court ruled that ST's Complaint raised a substantial

10  question of federal patent law over which that court had exclusive jurisdiction:

11  > ST cannot at this time establish what patented inventions or parts thereof Harari
   > "conceived" during his employment with WSI, nor can ST establish what

12  > inventions "relate to" WSI's business, unless Harari's inventive contribution to
   > each patent first is identified. The question of whether the interest in a particular

13  > patent should have been assigned to WSI arises only after Harari's inventive
   > contribution to each patent has been identified. Accordingly, because

14  > determination of inventorship is critical to determination of ownership,
   > Defendants have shown that ST's right to relief "necessarily depends on

15  > resolution of a substantial question of federal patent law, in that patent law is a
   > necessary element of one of the well-pleaded claims."

16

17  *Id.* at 10 (citation and quotation omitted).

18       On July 18, 2006, the district court reconsidered its previous ruling, reached the opposite

19  conclusion, and granted ST's motion to remand the action to Alameda County Superior Court.

20  Weibell Decl., Ex. 2 at 6.

21       Defendants then filed a motion to transfer venue to Santa Clara County Superior Court,

22  and SanDisk filed an anti-SLAPP motion to strike ST's unfair competition cause of action. The

23  Alameda County Superior Court denied both motions. Defendants filed a writ with respect to the

24  venue transfer order and SanDisk filed an appeal regarding the anti-SLAPP motion. The Court

25  of Appeal directed the Alameda County Superior Court to transfer this action to Santa Clara

26  County Superior Court and affirmed the denial of SanDisk's anti-SLAPP motion.

27

28

3283198_3.DOC

III.    **ARGUMENT**

ST's claim to any ownership interest in co-invented patent applications depends *entirely* upon Dr. Harari's inventive contribution to those applications being assignable under a contract between Dr. Harari and WSI.  If Dr. Harari's contribution to a co-invented patent application was not assignable (*e.g.*, was not related to WSI's business or conceived during his employment with WSI), ST could not possibly claim an ownership interest in that application.  The inventive contribution of each inventor must therefore be identified before an ownership analysis can take place.  That inquiry raises a substantial question of federal patent law:  inventorship.  Accordingly, federal courts have *exclusive* jurisdiction to resolve the parties' dispute.

A.    **Legal Standard**

"A motion for judgment on the pleadings is akin to a general demurrer; it tests the sufficiency of the complaint to state a cause of action." *Wise v. Pacific Gas and Elec. Co.*, 132 Cal. App. 4th 725, 738 (2005) (citing *Pang v. Beverly Hospital, Inc.*, 79 Cal. App. 4th 986, 989 (2000)).  In deciding a motion for judgment on the pleadings, a court "assume[s] the truth of all factual allegations in the complaint, along with matters subject to judicial notice." *Id.* (citing *Gerawan Farming, Inc. v. Lyons*, 24 Cal. 4th 468, 515-516 (2000)).  A motion for judgment on the pleadings is proper where "[t]he court has no jurisdiction of the subject of the cause of action alleged in the complaint." Cal. Code Civ. P. § 438(c)(1)(B)(i).

B.    **This Court Does Not Have Subject Matter Jurisdiction Over ST's Claims that Seek Assignment to ST of Rights in and to Co-Invented Patents**

1.    **The Federal Courts Have Exclusive Jurisdiction to Resolve Substantial Questions of Federal Patent Law**

State courts lack subject matter jurisdiction over state law claims where the "right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Holiday Matinee, Inc. v. Rambus, Inc.*, 118 Cal. App. 4th 1413, 1427-28 (2004) (quoting *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 809 (1988)).  *See also* 28 U.S.C. § 1338(a) (federal district courts "shall have original jurisdiction of any civil action arising under any Act of Congress

1  relating to patents, . . . [s]uch jurisdiction shall be exclusive of the courts of the states"). To

2  determine whether a complaint presents substantial issues of patent law sufficient to deprive the

3  state court of subject matter jurisdiction, "a court must review and analyze the plaintiff's

4  pleadings with *special attention directed to the relief requested* by the plaintiff." *Board of*

5  *Regents v. Nippon Telephone and Telegraph Corp.*, 414 F.3d 1358, 1362 (Fed. Cir. 2005)

6  (emphasis added) (citing *Air Prod. & Chem., Inc. v. Reichhold Chem., Inc.*, 755 F.2d 1559, 1562

7  (Fed. Cir. 1985)).

8          2.    **State Courts Do Not Have Jurisdiction to Determine the Nature of a Co-Inventor's Contribution to a Patent**

9

10  Determining a co-inventor's contribution to the inventions claimed in a patent presents a

11  substantial question of federal patent law within the exclusive jurisdiction of the federal courts.

12  In a patent application, an inventor (or co-inventors) must set forth "one or more claims

13  particularly pointing out and distinctly claiming the subject matter which the applicant regards as

14  his invention." 35 U.S.C. § 112. Each individual claim set forth in a patent application

15  represents a separate and distinct invention from any other claim within the same patent. *Israel*

16  *Bio-Engineering Project v. Amgen Inc.*, 475 F.3d 1256, 1263 (Fed. Cir. 2007) ("*IBEP*") ("each

17  claim must be considered as defining a separate invention") (quoting *Jones v. Hardy*, 727 F.2d

18  1524, 1528 (Fed. Cir. 1984)). Thus a patent that contains more than one claim necessarily

19  contains more than one invention.

20  Each invention described in a claim of a patent application "may be the work of two or

21  more joint inventors." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir.

22  1998) (citing 35 U.S.C. § 116). To be listed as one of the inventors on a patent application, a co-

23  inventor must have contributed to the conception[1] of at least one of the inventions claimed in a

24  patent application, but need not have contributed to the conception of every invention claimed in

25

26      [1] Under federal patent law, "'[c]onception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be

27  applied in practice.'" *Shum v. Intel Corp.*, 499 F.3d 1272, 1277 (Fed. Cir. 2007) (quoting *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986)).

28

-7-                                        3283198_3.DOC

1  the patent. 35 U.S.C. § 116 ("Inventors may apply for a patent jointly even though . . . each did

2  not make a contribution to the subject matter of every claim of the patent"); *IBEP*, 475 F.3d at

3  1263-64 ("a co-inventor of even a single claim can then assert a right of joint ownership over an

4  entire patent with multiple claims"); *Trovan, Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292, 1302

5  (Fed. Cir. 2002). Accordingly, while all co-inventors listed on a patent application are

6  considered joint owners of the entire patent, a person's status as a listed co-inventor does not

7  mean that the inventor contributed to each and every invention claimed therein. *See IBEP*, 475

8  F.3d at 1263 ("when . . . multiple inventors are listed on the face of the patent, each co-owner

9  'presumptively owns a pro rata undivided interest in the entire patent, *no matter what their*

10  *respective contributions*'") (emphasis added) (quoting *Ethicon*, 135 F.3d at 1460).

11       Therefore, to determine which claimed inventions within a patent were conceived by a

12  particular inventor, the court must analyze that co-inventor's contributions "on a claim-by-claim

13  basis." *Gemstar-TV Guide Intern., Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1381 (Fed. Cir.

14  2004) ("Because co-inventors need not contribute to the subject matter of every claim of the

15  patent, inventorship is determined on a claim-by-claim basis."); *Trovan*, 299 F.3d at 1302

16  (same). The inventorship analysis "begins as a first step with a construction of each asserted

17  claim [in the patent application] to determine the subject matter encompassed thereby." *Id.*

18  "The second step is then to compare the alleged contributions of each asserted co-inventor with

19  the subject matter of the properly construed claim . . . ." *Id.*

20       Where a complaint requests relief that requires the court to perform the inventorship

21  analysis described above, the complaint lies within the exclusive jurisdiction of the federal

22  courts. *See Holiday Matinee*, 118 Cal. App. 4th at 1424 (recognizing the law of the Federal

23  Circuit that "inventorship issues" fall under federal jurisdiction) (citing *Hunter Douglas, Inc. v.*

24  *Harmonic Design, Inc.*, 153 F.3d 1318, 1330-31 (Fed. Cir. 1998), *overruled in part on other*

25  *grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999)).

26  Consequently, federal courts have exclusive jurisdiction where the relief requested requires a

27  plaintiff to establish that it is the rightful co-owner of a patent and where "co-ownership arises

28

1    from and depends solely on the patent law issue of inventorship." *MCV, Inc. v. King-Seeley*

2    *Thermos Co.*, 870 F.2d 1568, 1570-71 (Fed. Cir. 1989).

3              **3.    ST's Alleged Right to Relief Requires a Determination of Dr. Harari's**
                     **Contribution to Each Invention Claimed in the Co-Invented Patents**
4

5              ST's Complaint describes a single, three-part theory in support of its ownership claims

6    over the co-invented patent applications:

7              (1)    ST is allegedly the current successor to all of the property interests

8                     of WSI, Compl. ¶¶ 5-8;

9              (2)    Dr. Harari allegedly had an obligation under his contracts with

10                    WSI to assign to WSI any inventions "made or conceived by

11                    [him], either alone or with others, during the term of [his]

12                    employment" that "relate in any way to or are useful in [WSI's]

13                    business as presently conducted or as conducted at any future time

14                    during [his] employment," *id.* ¶¶ 11-12; and

15             (3)    the Harari Applications allegedly contained inventions that were

16                    made or conceived by Dr. Harari during the term of his

17                    employment with WSI that related to WSI's business but that were

18                    not assigned to WSI, *id.* ¶¶ 19-30.

19             Under the plain terms of that ownership theory, the Court must examine which inventions

20   were made by Dr. Harari and when they were made, and then decide whether those inventions

21   fall within the scope of his assignment agreement with WSI.  Conducting this task falls within

22   the exclusive jurisdiction of the federal courts because it requires the Court to identify Dr.

23   Harari's inventive contribution to the relevant patent applications as contrasted with his co-

24   inventors, who owed no assignment obligations to WSI whatsoever.  That inventorship analysis

25   raises a substantial question of federal law which must be resolved in federal court.

26             Under ST's theory, Dr. Harari's interest in a particular patent application should have

27   been assigned to WSI *only if* Dr. Harari conceived of at least one invention claimed within that

28   application during his employment with WSI, *and only if* that particular invention related to

                                            -9-                                    3283198_3.DOC

1  WSI's business.  If, on the other hand, Dr. Harari only contributed to inventions that were either

2  (a) not made during the term of his employment with WSI or (b) not related to WSI's business,

3  he would not have owed assignment obligations to WSI.  Independent inventions described in a

4  separate claim of a patent application to which Dr. Harari made no contribution are not

5  inventions "made or conceived by [Dr. Harari], either alone or with others" under the invention

6  assignment agreement between Dr. Harari and WSI.  *See* Compl., Ex. A, ¶ 3.

7       The following hypothetical and corresponding chart illustrate this point:  Assume Dr.

8  Harari is listed as a co-inventor on a patent application with Inventor X ("X") and Inventor Y

9  ("Y").  The patent application contains 3 claims, each describing a separate invention.  The

10  invention in Claim 1 was made by Harari, X, and Y during the term of Harari's employment with

11  WSI but does not relate to WSI's business.  The invention in Claim 2 was made by Harari and Y

12  after Harari's employment with WSI ended and does relate to WSI's business.  The invention in

13  Claim 3 was made by X and Y at the same time Harari was employed by WSI and was also

14  related to WSI's business.  Harari made no contribution to the invention in Claim 3 and had no

15  connection to its conception.  Under this hypothetical, and according to the theory set forth in

16  ST's complaint, Harari had no duty to assign to WSI his interest in any of the inventions

17  described in the hypothetical patent application, despite the fact that he is listed as a co-inventor

18  on the face of the application and despite the fact that the invention in Claim 3 was invented

19  during his employment with WSI and related to WSI's business:

| HYPOTHETICAL PATENT APPLICATION Co-Inventors Named on Face of Application: Harari, X, and Y | | | | |
|---|---|---|---|---|
| *Claim / Invention* | *Actual Inventors* | *Invented while Harari employed with WSI?* | *Related to WSI's Business?* | *Did Harari have duty to assign to WSI?* |
| 1 | **Harari**, X, Y | Yes | No | No |
| 2 | **Harari**, Y | No | Yes | No |
| 3 | X, Y | Yes | Yes | No |

3283198_3.DOC

1    Because the patent applications only name the co-inventors on the face of the application

2    and do not identify which co-inventors contributed to which claims within the applications, the

3    Court must engage in an inventorship analysis to identify the particular claims within the patent

4    applications that contain inventions "made or conceived by [Dr. Harari], either alone or with

5    others, during the term of [his] employment." *Gemstar-TV Guide Intern, Inc. v. Int'l Trade*

6    *Comm'n*, 383 F.3d 1352, 1381 (Fed. Cir. 2004) ("Because co-inventors need not contribute to

7    the subject matter of every claim of the patent, inventorship is determined on a claim-by-claim

8    basis."). This hypothetical is thus dispositive of the federal question inquiry because it reveals a

9    circumstance in which a proper ownership determination could not be made without first

10    conducting a threshold inventorship analysis, and federal courts have exclusive jurisdiction over

11    causes of action that require an inventorship analysis, *Holiday Matinee*, 118 Cal. App. 4th at

12    1424; *MCV*, 870 F.2d at 1570-71.

13    Therefore, this Court does not have jurisdiction over ST's causes of action that seek to

14    resolve questions of ownership regarding the co-invented patent applications.

15    **4.    This Court Conducts an Independent Evaluation of the Jurisdiction
         Question**

16

17    In opposition, ST will likely argue that this Court should give deference to the federal

18    district court's Order remanding this action to Superior Court. That argument in not well taken

19    for two reasons. First, the federal district court made an error of law in its reconsideration Order.

20    Second, the non-appealable Order remanding the case to this Court is not binding and does not

21    constitute law of the case. Instead, this Court conducts an independent evaluation of the

22    jurisdictional issue.

23    The federal district court, in reconsidering its previous order denying ST's motion to

24    remand, ruled as follows:

25    As a matter of law, then, the fact that Harari is named as a sole inventor or co-
       inventor on the patents at issue *establishes that he contributed to the conception of*

26    *the inventions described therein* and that he thereafter acquired a pro rata undivided
       interest in each patent for which he is named an inventor. Because he was required

27    to disclose to WSI all inventions that *he conceived alone or with others* during his
       term of employment, and to assign his entire right in such inventions if they related

28

3283198_3.DOC

**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**
Case No.: 1-07-CV-080123

1    to WSI's business, there is no need to inquire into Harari's precise inventive
2    contribution.

3    Weibell Decl., Ex. 2 at 5 (emphasis added).  The district court was thus under the mistaken belief

4    that because Dr. Harari was listed as a co-inventor, he contributed to all of the inventions

5    described in the patent, thus obviating the need to determine which contributions Dr. Harari

6    made to the co-invented patent applications.

7         The district court's conclusion that Dr. Harari contributed to and conceived of *each* of the

8    inventions described in the patents merely because he was listed as a co-inventor is clearly

9    wrong under black letter federal patent law.  35 U.S.C. § 116 ("Inventors may apply for a patent

10   jointly even though . . . each did not make a contribution to the subject matter of every claim of

11   the patent").[2]  Instead, the district court should have held that Dr. Harari's contribution was

12   unknowable simply by looking at the patents.  Had it considered that unassailable proposition,

13   the district court would have reached the proper conclusion: Dr. Harari's inventive contribution

14   to the patents must be isolated and compared with the invention assignment agreement before an

15   ownership analysis can take place, and that inventorship analysis raises a substantial question of

16   federal law.

17        Moreover, this Court is not obligated to follow the district court's erroneous conclusion

18   regarding jurisdiction.  Indeed, Defendants were not accorded an opportunity to appeal the order

19   to the federal appellate court for review.  *See* 28 U.S.C. § 1447(d) ("An order remanding a case

20   to the State court from which it was removed is not reviewable on appeal or otherwise . . . .").[3]

21   Instead, a defendant's *sole* remedy to challenge such an order is to file a motion in state court

22

23   [2] *IBEP*, 475 F.3d at 1263-64 ("a co-inventor of even a single claim can then assert a right of
     joint ownership over an entire patent with multiple claims"); *IBEP*, 475 F.3d at 1263 ("each
24   claim must be considered as defining a separate invention"); *Union Oil Co. of Cal. v. Atlantic
     Richfield Co.*, 208 F.3d 989, 1003 (Fed. Cir. 2000) ("It is well-established that each claim in a
25   patent constitutes a separate invention.") (Lourie, J., in dissent).

26   [3] *Gravitt v. Southwestern Bell Tel. Co.*, 430 U.S. 723, 723-24 (1977) (per curiam) ("The
     District Court's remand order was plainly within the bounds of [28 U.S.C. § 1447(c)] and hence
27   was unreviewable by the Court of Appeals, by mandamus or otherwise."); *United Investors Life
     Ins. Co. v. Waddell & Reed Inc.*, 360 F.3d 960, 967 (9th Cir. 2004) (section 1447(d) precludes
28   review of a district court's jurisdictional decision even if it was clearly wrong).

-12-                                    3283198_3.DOC

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
Case No.: 1-07-CV-080123

1    seeking a *de novo* examination of the subject matter jurisdiction question. *See AT&T Commc'ns,*

2    *Inc. v. Superior Court*, 21 Cal. App. 4th 1673, 1680-81 (1994) (after remand from federal district

3    court, state court reached opposite conclusion from district court and held that state courts lacked

4    subject matter jurisdiction over plaintiff's state law claims on federal preemption grounds),

5    *review denied* (Apr. 21, 1994), *cert. denied*, 513 U.S. 917 (1994); *Provience v. Valley Clerks*

6    *Trust Fund*, 163 Cal. App. 3d 249, 256-262 (1984) (same); *see also Machinists Automotive*

7    *Trades Dist v. Peterbilt Motors Co.*, 220 Cal. App. 3d 1402 (1990) (finding federal preemption

8    of state law claims after remand from federal court).

9            In short, the remand order is not binding in state court and is not law of the case. *See*

10   *AT&T*, 21 Cal. App. 4th at 1680-81 (after remand, California courts were not bound to follow

11   federal district court's ruling in deciding question of federal subject matter jurisdiction);

12   *Provience*, 163 Cal. App. 3d at 256-262 (same); *see also People v. Dixon*, 153 Cal. App. 4th 985,

13   1000 (2007) (California courts are not bound by decisions of federal district or appellate courts);

14   *Adams v. Pacific Bell Directory*, 111 Cal. App. 4th 93, 97 (2003) (state courts are not required to

15   adhere to decisions of federal courts even on federal questions). Therefore, it should not be

16   followed.

17   **IV.    CONCLUSION**

18           For the foregoing reasons, Defendants respectfully request that their Motion for Judgment

19   on the Pleadings be GRANTED.

20

21   Dated: February 7, 2008                      WILSON SONSINI GOODRICH & ROSATI
                                                   Professional Corporation
22

23

24                                                 By: _____
                                                       Michael A. Ladra
25

26                                                 Attorneys for Defendants
                                                   ELIYAHOU HARARI and
27                                                 SANDISK CORPORATION

28

# Exhibit E

1  Russell L. Johnson (SBN 53833), <rljohnson@sidley.com>
   Edward V. Anderson (SBN 83148), <evanderson@sidley.com>
2  Teague I. Donahey (SBN 197531), <tdonahey@sidley.com>
   Kevin P. Burke (SBN 241972), <kburke@sidley.com>
3  Patrick M. Lonergan (SBN 245807), <plonergan@sidley.com>
   SIDLEY AUSTIN LLP
4  555 California Street, Suite 2000
   San Francisco, California  94104
5  Telephone:    (415) 772-1200
   Facsimile:    (415) 772-7400
6
   *Attorneys for Plaintiff*
7  *STMicroelectronics, Inc.*

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  FOR THE COUNTY OF SANTA CLARA

10
11  STMICROELECTRONICS, INC.,        )  No. 1-07-CV-080123 (filed Oct. 14, 2005)
                                     )
12           Plaintiff,              )  **STMICROELECTRONICS, INC.'S**
                                     )  **OPPOSITION TO DEFENDANTS'**
                                     )  **MOTION FOR JUDGMENT ON THE**
13           vs.                     )  **PLEADINGS**
                                     )
14  ELIYAHOU HARARI; SANDISK         )  Hr'g Date:    Mar. 11, 2008
    CORPORATION; and DOES 1-20,      )  Hr'g Time:    9:00 a.m.
15                                   )  Location:     Dep't 10
             Defendants.             )  Judge:        Honorable Neal A. Cabrinha
16                                   )  Trial Date:   None

17

18                           **<u>OPPOSITION</u>**

19        STMicroelectronics, Inc. ("ST") hereby opposes Defendants' Motion for Judgment on the

20  Pleadings (Feb. 7, 2008).  ST's opposition is based on the points and authorities below as well as

21  ST's Request for Judicial Notice ("Exs. 1–20"), which is being filed today, February 20, 2008.

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................... 1

II.     FACTS .................................................................................................................... 1

III.    ARGUMENT ......................................................................................................... 3

        A.      ST's complaint concerns ownership, not inventorship ................................ 4

        B.      Under *Christianson*, ST's right to relief does not *necessarily depend* on
                resolution of a substantial question of federal patent law (i.e., inventorship),
                and thus there is *not* exclusive federal jurisdiction ...................................... 6

        C.      Judge Fogel has already concluded there is *not* exclusive federal jurisdiction
                over ST's complaint, and thus this Court should do the same ................................... 12

IV.     CONCLUSION ....................................................................................................... 13

1

## TABLE OF AUTHORITIES

2

### Cases

3

*Adams v. Pac. Bell Directory*,
　　111 Cal. App. 4th 93 (2003) ............................................... 13

4

*Air Prods. & Chems., Inc. v. Reichhold Chems., Inc.*,
5　　755 F.2d 1559 (Fed. Cir. 1985).......................................... 12

6

*AT&T Co. v. Integrated Network Corp.*,
　　972 F.2d 1321 (Fed. Cir. 1992)......................................passim
7

*Beech Aircraft Corp. v. EDO Corp.*,
8　　990 F.2d 1237 (Fed. Cir. 1993)............................................. 4

9

*Board of Regents v. NTT Corp.*,
　　414 F.3d 1358 (Fed. Cir. 2005).......................................7, 10
10

*Christianson v. Colt Indus. Operating Corp.*,
11　　486 U.S. 800 (1988) ..............................................1, 4, 6, 7

12

*E.I. DuPont de Nemours & Co. v. Okuley*,
　　344 F.3d 578 (6th Cir. 2003) ..........................................7, 11
13

*Ethicon, Inc. v. U.S. Surgical Corp.*,
14　　135 F.3d 1456 (Fed. Cir. 1998)......................................5, 6, 11

15

*Franchise Tax Bd. v. Constr. Laborers Vacation Trust*,
　　463 U.S. 1 (1983) ............................................................ 7
16

*Gemstar-TV Guide Int'l, Inc. v. ITC*,
17　　383 F.3d 1352 (Fed. Cir. 2004)............................................. 4

18

*Gerawan Farming, Inc. v. Lyons*,
　　24 Cal. 4th 468 (2000) ...................................................... 1
19

*Holiday Matinee, Inc. v. Rambus, Inc.*,
20　　118 Cal. App. 4th 1413 (2004) ............................................ 12

21

*Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*,
　　535 U.S. 826 (2002)........................................................ 7
22

*Hunter Douglas, Inc. v. Harmonic Design, Inc.*,
23　　153 F.3d 1318 (Fed. Cir. 1998)............................................. 6

24

*Israel Bio-Eng'g Project v. Amgen Inc.*,
　　475 F.3d 1256 (Fed. Cir. 2007), *cert. denied*, 127 S. Ct. 2994 (2007) ................... 5
25

*Jim Arnold Corp. v. Hydrotech Sys., Inc.*,
26　　109 F.3d 1567 (Fed. Cir. 1997)............................................. 4

27

*MCV, Inc. v. King-Seeley Thermos Co.*,
　　870 F.2d 1568 (Fed. Cir. 1989)........................................... 12
28

*Midwest Indus., Inc. v. Karavan Trailers, Inc.*,
  175 F.3d 1356 (Fed. Cir. 1999) (en banc in relevant part) .................................................. 6, 7

*Prize Frize, Inc. v. Matrix (U.S.) Inc.*,
  167 F.3d 1261 (9th Cir. 1999) ..................................................................................... 4

*Uroplasty, Inc., v. Advanced Uroscience, Inc.*,
  239 F.3d 1277 (Fed. Cir. 2001).................................................................................... 7

### **Statutes**

28 U.S.C. § 1338 ............................................................................................................. 1

35 U.S.C. § 112, ¶ 2 ........................................................................................................ 5

35 U.S.C. § 116 ............................................................................................................... 5

35 U.S.C. § 256 ............................................................................................................. 12

35 U.S.C. § 282 ............................................................................................................... 4

### **Other Authorities**

Weil & Brown, *Ca. Prac. Guide: Civ. Pro. Before Trial* ¶ 3:621 (The Rutter Group 2007) ............. 7

STMICROELECTRONICS, INC.'S OPPOSITION TO JUDGMENT ON THE PLEADINGS
No. 1-07-CV-080123

1    I.    **INTRODUCTION**

2        ST's complaint concerns *ownership*, not inventorship.  The motion filed by Defendants tries

3    to confuse the issues by framing everything as a question of *inventorship*.  But ST is not disputing

4    that Harari was properly named as an inventor on the patents at issue; ST is disputing SanDisk's

5    *ownership* of those patents.  The law is clear that ownership (unlike inventorship) is a question of

6    state law, and thus this Court has subject matter jurisdiction over ST's complaint.

7        The fallacy of Defendants' motion is that it depends on *hypothetical* fact patterns in which

8    the question of ownership might (or might not) turn on the question of inventorship.  But that is not

9    the test for exclusive federal jurisdiction under 28 U.S.C. § 1338.  Federal courts have limited

10   jurisdiction — and give respect to state court jurisdiction — and thus the test for exclusive federal

11   jurisdiction is quite stringent:  Defendants must show that ST's "well-pleaded complaint establishes

12   . . . that [ST's] right to relief *necessarily depends* on resolution of a substantial question of federal

13   patent law [i.e., inventorship]."  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809

14   (1988) (emphasis added).  There is a big difference between a complaint that might, hypothetically,

15   turn on the question of inventorship, and a complaint that *necessarily depends* on the question of

16   inventorship.  Again, ST is not disputing that Harari was properly named as an inventor, so it cannot

17   be said that ST's right to relief *necessarily depends* on resolution of an inventorship question.

18       These *exact same* issues were briefed and argued extensively to Judge Fogel in the U.S.

19   District Court in San Jose.  He rejected all of Defendants' arguments and remanded this case back to

20   state court.  Defendants' motion to this Court provides no reason to question the correctness of Judge

21   Fogel's opinion nor points to any changes in the law; instead Defendants' motion simply repeats all

22   the same arguments that Judge Fogel has already considered and rejected.  This Court should follow

23   Judge Fogel's lead and once again reject Defendants' arguments.

24   II.    **FACTS**

25       On a motion for judgment on the pleadings, this Court must "accept[] as true the factual

26   allegations that [ST] makes . . . . [and] give[] them a liberal construction."  *Gerawan Farming, Inc.*

27   *v. Lyons*, 24 Cal. 4th 468, 515–16 (2000) (vacating judgment on the pleadings).  Thus this Court

28   must accept as true the following allegations made in ST's complaint:

-1-

1    Harari co-founded WSI in 1983.  *See* Ex. 1, ¶ 9.  He served as Chief Executive Officer from

2    approximately 1983 to 1986; Chief Technology Officer from approximately 1986 to 1988; Director

3    from approximately 1983 to 1989; and Chairman of the Board at various times between 1983 and

4    1988.  *See id.*

5    In 1984, Harari signed an Inventions Agreement whereby he agreed to the following:

6            3.  I will promptly disclose and describe to [WSI] (i) all inventions,
   improvements, discoveries and technical developments ("Inventions"),

7    ***whether or not patentable***, made or conceived by me, either alone or
   with others, during the term of my employment, provided that [WSI]

8    shall receive such information in confidence.  ***I hereby assign and
   agree to assign to [WSI] my entire right, title and interest in and to***

9    ***such Inventions which relate in any way to or are useful in [WSI's]
   business as presently conducted or as conducted at any future time***

10   ***during my employment***, and agree to cooperate with WSI and its
   designee(s) both during and after my employment in the procurement

11   and maintenance, at [WSI's] expense and at its discretion, of patents,
   copyrights, and/or other protection of [WSI's] rights in such

12   inventions.  I will keep and maintain adequate and current written
   records of all such Inventions, which shall be and remain the property

13   of the [WSI].

14   Ex. 1, ¶ 12 & Ex. A (emphasis added).

15   In February 1988, two things happened:  First, Harari stepped down as Chief Technology

16   Officer and Chairman of the Board.  *See* Ex. 1, ¶ 9.  Second, Harari agreed to "continue to be bound

17   by and comply with" the Inventions Agreement above in exchange for continuing as a director of

18   WSI and receiving as a consultant his salary and benefits for one year.  *See id.* ¶¶ 20–21 & Ex. C,

19   ¶ 3.3.  A principal dispute between the parties is whether Harari was still obligated to disclose and

20   assign inventions to WSI after February 1988.  For purposes of this motion, however, this Court

21   must accept ST's allegations that Harari *was* still obligated under the agreement above to disclose

22   and assign his inventions to WSI after February 1988.

23   In fact, Harari did *not* disclose or assign his inventions to WSI after February 1988.  Instead,

24   he secretly filed the following six patent applications and assigned them to SanDisk, a company

25   which he founded in June 1988:

26       1.  Application No. 07/185,699 to Harari alone (April 26, 1988)

27       2.  Application No. 07/204,175 to Harari alone (June 9, 1988)

28       3.  Application No. 07/216,873 to Harari alone (July 8, 1988)

STMICROELECTRONICS, INC.'S OPPOSITION TO JUDGMENT ON THE PLEADINGS
No. 1-07-CV-080123

1          4.  Application No. 07/323,779 to Harari and others (March 15, 1989)

2          5.  Application No. 07/337,566 to Harari and others (April 13, 1989)

3          6.  Application No. 07/337,579 to Harari and others (April 13, 1989)

4    *See* Ex. 1, ¶¶ 24–30, 40, 45.  The six patent applications above have resulted in at least 50 issued

5    patents.  *See id.*

6          In 2000, ST acquired all the rights and property of WSI.  *See id.* ¶ 7.  In 2004, SanDisk sued

7    ST for infringing Harari's patents.  *See id.* ¶ 46.  Upon investigating the history of these patents, ST

8    discovered that Harari had breached his contractual and fiduciary obligations to WSI.  *See id.* ¶¶ 52–

9    53.  Accordingly, ST brought this lawsuit to get back its patents.  Specifically, ST's prayer for relief

10   requests the following:

11              D.  That ownership of all patents which issued or claim priority
                from the applications filed by Harari during and after his tenure as an
12              officer and/or director of WSI, which should have properly been
                assigned to WSI, be assigned to [ST], ***as the sole owner if Harari is***
13              ***the sole inventor or as a co-owner if Harari is a co-inventor***;

14              E.  That all[1] inventions and the patents relating thereto which
                were conceived of or resulted from the inventive activity on the part of
15              Harari, that took place while Harari was an employee, officer, and/or
                director of WSI, be assigned to [ST] . . . .
16

17   Ex. 1, at 18:22–:28 (emphasis added).

18   **III.    ARGUMENT**

19         Defendants do not challenge this Court's jurisdiction to consider whether Harari was

20   obligated to disclose and assign to WSI the first three patent applications above (and resulting

21   patents) in which Harari was named as the *sole* inventor.  Thus Defendants' motion only concerns

22   the last three patent applications (and resulting patents) in which Harari was named as a *co-inventor*.

23   As explained below, and as Judge Fogel properly concluded, it makes no difference for purposes of

24   exclusive federal jurisdiction whether Harari was named as the *sole* inventor or a *co-inventor* on the

25   _____

26       [1] Defendants originally argued to Judge Fogel that this prayer for relief (requesting that "all"
     inventions be assigned to ST) created exclusive federal jurisdiction.  *See* Ex. 3, at 5:1–6:2.  Judge
     Fogel rejected this argument because it "misconstrues ST's prayer for relief."  Ex. 6, at 10:7.
27   "[F]airly read, the complaint actually seeks assignment only of *Harari's interest* in each of the
     patents."  Ex. 19, at 3:23–4:1.  Defendants have not repeated the argument in this Court.
28

1    disputed applications and resulting patents.  In either case, he had an *ownership* interest in the *entire*

2    patent, and he had an obligation to assign that ownership interest to WSI, not SanDisk.  ST's

3    complaint does not dispute *inventorship* and does not turn on whether Harari was a *sole* inventor or a

4    *co-inventor*; ST's complaint only disputes *ownership*, which is a question of state law that does **not**

5    "*necessarily depend[ ]* on resolution of a substantial question of federal patent law [i.e.,

6    inventorship]."  *Christianson*, 486 U.S. at 809.  Accordingly, as Judge Fogel properly concluded,

7    federal courts do not have exclusive jurisdiction over ST's complaint, and this Court has jurisdiction

8    over *all* the disputed applications and resulting patents, not just those in which Harari was named as

9    the *sole* inventor.

10       A.    ST's complaint concerns ownership, not inventorship

11       "It is elementary that inventorship and ownership are separate issues."  *Beech Aircraft Corp.*

12   *v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993).  ST does not dispute that Harari was properly

13   named as an *inventor* on the disputed applications and resulting patents.  Indeed, given that "a patent

14   is presumed valid under 35 U.S.C. § 282, there follows a *presumption* that the named inventors on a

15   patent are the true and only inventors."  *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1381

16   (Fed. Cir. 2004) (emphasis added).  ST's complaint does not challenge this presumption.

17       ST's complaint concerns *ownership*, not inventorship.  "Claims concerning patent *ownership*

18   do not create federal jurisdiction."  *Prize Frize, Inc. v. Matrix (U.S.) Inc.*, 167 F.3d 1261, 1264 (9th

19   Cir. 1999) (emphasis added).  Indeed, it "long has been the law" that "the question of who *owns* the

20   patent rights and on what terms typically is a question exclusively for *state* courts."  *Jim Arnold*

21   *Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1572 (Fed. Cir. 1997) (emphasis added) (dismissing

22   for lack of federal jurisdiction).  That is why this Court has subject matter jurisdiction over ST's

23   complaint.

24       It makes no difference for purposes of this Court's jurisdiction whether Harari was named as

25   a *sole* inventor or a *joint* inventor.  In either case, there is a presumption that Harari had an

26   ownership interest in the *entire* patent.  This is an important point, and is the point that initially

27   confused Judge Fogel.  *See* Ex. 19, at 4:6–7:5.  The law works as follows:  A single patent usually

28   has many *claims*, which are the numbered paragraphs at the end of the patent that define the

-4-

1   exclusive rights of the patent owner.  *See* 35 U.S.C. § 112, ¶ 2.  *Inventorship* is done on a claim-by-

2   claim basis, which means (as Defendants repeatedly emphasize in their motion) that one claim in the

3   patent may have been invented by one person, while another claim may have been invented by

4   another person (or a combination of people).  "[A] co-inventor need not make a contribution to every

5   claim of a patent.  *See* 35 U.S.C. § 116.  A contribution to one claim is enough."  *Ethicon, Inc. v.*

6   *U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998).  Ownership, by way of contrast, is *not*

7   done on a claim-by-claim basis:  "property rights, including ownership, attach to *patents as a whole*,

8   not individual claims."  *Id.* at 1466 (emphasis added).  As a result, "a joint inventor as to even one

9   claim [e.g., Harari] enjoys a presumption of ownership in the *entire* patent."  *Id.* (emphasis added).

10  This has been described as the "steel trap of the *Ethicon* joint ownership rule" — a co-inventor of a

11  *single* claim gains ownership of the *entire* patent, even if the patent includes dozens of claims

12  invented by *other* people.  *See Israel Bio-Eng'g Project v. Amgen Inc.*, 475 F.3d 1256, 1265–68

13  (Fed. Cir. 2007) (holding that co-inventor of *one* claim had ownership interest in the *entire* patent),

14  *cert. denied*, 127 S. Ct. 2994 (2007); *Ethicon*, 135 F.3d at 1465–66 (same).

15          When Judge Fogel initially denied ST's motion to remand, he did not fully appreciate the

16  rule of *Ethicon* described above.  Upon reconsideration, Judge Fogel corrected his mistake:

17              In its March 20 Order, the Court rejected two of Defendants'
                arguments. . . .
18
19              What the Court did find persuasive was Defendants' argument that
                Harari's disclosure and assignment obligations extended only to those
20              *portions* of the patented inventions that Harari personally conceived
                during his employment with WSI.  Under this construction of the
21              Inventions Agreement, Harari's "inventive contribution" to each patent
                must be identified before it can be determined whether the patented
22              invention fell within Harari's disclosure and assignment obligations.
                Having reconsidered the matter, the Court now believes that this view
23              is erroneous, for the reasons discussed below.

24                  . . . .

25              It is undisputed that Harari is named as sole inventor or co-
                inventor on the fifty patents at issue.  "Patent issuance creates a
26              presumption that the named inventors are the true and only inventors."
                *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1460
27              (Fed. Cir. 1998).  "Because conception is the touchstone of
                inventorship, each joint inventor must generally contribute to the
28              conception of the invention."  *Id.* (internal quotation marks and
                citation omitted).  "[E]ach co-inventor presumptively owns a pro rata

-5-

undivided interest in the entire patent, no matter what their respective contributions." *Id.* at 1465.  As a matter of law, then, the fact that Harari is named as a sole inventor or co-inventor on the patents at issue establishes that he contributed to the conception of the inventions described therein and that he thereafter acquired a pro rata undivided interest in each patent for which he is named an inventor.  Because he was required to disclose to WSI *all* inventions that he conceived *alone or with others* during his term of employment, and to assign *his entire right* in such inventions if they related to WSI's business, ***there is no need to inquire into Harari's precise inventive contribution***.  The only relevant questions are whether the inventions described in the subject patents were "made or conceived" during Harari's term of employment and, if so, whether the patented inventions related to WSI's business as conducted during Harari's term of employment.

Ex. 19, at 3:17–5:26 (emphasis in bold added).

Thus, under the rule of *Ethicon*, it does not matter for purposes of ST's complaint *how many* claims of the patent were invented by Harari, or even *which* claims of the patent were invented by Harari, because there is a presumption that Harari contributed to *at least one* claim in each patent, which further creates a presumption that he had an ownership interest in the *entire* patent.  As Judge Fogel properly concluded, ST's complaint concerns that *ownership* interest in the entire patent and does not require resolution of Harari's precise inventive contribution.

**B.    Under *Christianson*, ST's right to relief does not *necessarily depend* on resolution of a substantial question of federal patent law (i.e., inventorship), and thus there is *not* exclusive federal jurisdiction**

The parties agree that the test for exclusive federal jurisdiction is the following:  Defendants must show that ST's "well-pleaded complaint establishes . . . that [ST's] right to relief *necessarily depends* on resolution of a substantial question of federal patent law [i.e., inventorship]." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988) (emphasis added) (holding that patent-law issue was not *necessary* to the success of plaintiff's antitrust claims).  The parties also agree that "inventorship" (like patent infringement or patent invalidity) is a "substantial question of federal patent law." *See Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1330 (Fed. Cir. 1998), *overruled on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1358–59 (Fed. Cir. 1999) (en banc in relevant part).[2]

---

[2] In *Midwest*, the Federal Circuit held that its own law, rather than regional circuit law, should govern the question of preemption, contrary to what *Hunter* had held.  *See Midwest*, 175 F.3d at

*(Footnote continued)*

STMICROELECTRONICS, INC.'S OPPOSITION TO JUDGMENT ON THE PLEADINGS
No. 1-07-CV-080123

The *Christianson* test for exclusive federal jurisdiction is a difficult test to meet:

- Defenses based on federal law are irrelevant:  "[S]ince 1887 it has been settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case."  *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 14 (1983) (9-0 decision) (remanding case to California state court); *see also Christianson*, 486 U.S. at 809 (following *Franchise Tax Board*).

- Counterclaims based on federal law are also irrelevant.  *See, e.g., Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 830–32 (2002) (counterclaim for patent infringement).

Furthermore, it is not enough for Defendants to show that ST's complaint *might*, hypothetically, turn on the question of inventorship.  Rather, Defendants must show that ST's ownership claim *necessarily depends* on resolution of an inventorship question.  This issue has repeatedly been considered by the federal courts of appeals and they have repeatedly held that complaints such as ST's complaint do *not necessarily depend* on resolution of an inventorship question.  *See Board of Regents v. NTT Corp*., 414 F.3d 1358, 1362–65 (Fed. Cir. 2005); *E.I. DuPont de Nemours & Co. v. Okuley*, 344 F.3d 578, 581–83 & n.1 (6th Cir. 2003); *Uroplasty, Inc., v. Advanced Uroscience, Inc*., 239 F.3d 1277, 1279–80 (Fed. Cir. 2001); *AT&T Co. v. Integrated Network Corp.*, 972 F.2d 1321, 1323–25 (Fed. Cir. 1992).

The leading case — and the case that Judge Fogel found most instructive — is *AT&T.  See* Ex. 19, at 6:1–:19.  That case concerned an employment agreement nearly identical to the employment agreement at issue in this case:

---

1358–59.  The question of preemption is distinct from the question of exclusive federal jurisdiction before this Court.  "[T]he fact that federal law preempts state law does not necessarily mean state courts are ousted of jurisdiction."  Weil & Brown, *Ca. Prac. Guide: Civ. Pro. Before Trial* ¶ 3:621 (The Rutter Group 2007).

STMICROELECTRONICS, INC.'S OPPOSITION TO JUDGMENT ON THE PLEADINGS
No. 1-07-CV-080123

| Contract term | *AT&T* case | This case |
|---|---|---|
| What must be disclosed/assigned: | "inventions . . . made or conceived" | "inventions, improvements, discoveries and technical developments ('Inventions'), whether or not patentable, made or conceived" |
| By whom: | "either solely or jointly with others" | "either alone or with others" |
| At what time: | "during the period of my employment" | "during the term of my employment" |
| Of what relevance: | "relating to any subject matter with which said Corporation is or may be concerned" | "which relate in any way to or are useful in [WSI's] business as presently conducted or as conducted at any future time during my employment" |

*See* 972 F.2d at 1323.  The fact pattern of *AT&T* is also very similar to the fact pattern of this case: In the mid-1980s, four men left AT&T over the course of nine months, joined a new company, and then immediately filed a patent application naming the four men as co-inventors.  *See id.*  When AT&T learned about the patent application, it sued the four men and their new company in state court to gain ownership of (i.e., "title" to) the patent.  *See id.* at 1322, 1324.  The defendants removed the case to federal court, arguing that the assignment obligations quoted above would require an inventorship analysis under federal patent law.  The Federal Circuit reversed and remanded the case to state court:

> The only possible patent issue is the purport of the language of the contract, "inventions . . . conceived."  We disagree with the district court that conception of inventions, as used in the employment agreement, is solely a technical question of patent law.  The former employees pledged to assign AT&T all rights to such inventions, but the contract sheds no further light on the meaning of inventions.  Notwithstanding, there is no reason to assume it meant to cover only those which are patentable.  It could include unpatentable inventions and inventions held as trade secrets as well.  Likewise, ***when an invention was conceived may be more a question of common sense than of patent law.***  For example, if what the employees "conceived" at AT&T had not been patentable, or no patent had been sought, but it nevertheless was treated as a trade secret, their conduct still could have been in breach of the contract.  In other words, the contract may have used conception in its generic, broadest sense.  ***We will not <u>assume</u> a bob-tailed meaning that could lead to derogation of the primary right of state courts to decide what state law has to say about this contract.***

STMICROELECTRONICS, INC.'S OPPOSITION TO JUDGMENT ON THE PLEADINGS
No. 1-07-CV-080123

1

2

3

4

      Under *Christianson*, every theory of a claim as pled must depend on patent law if there is to be federal jurisdiction. Because "inventions . . . conceived" has both patent and general law meanings, AT&T may rely on one theory with patent connotations, and on another theory involving no patent question. Therefore, any patent issue is not necessary to AT&T's claim, and is therefore not a substantial question of patent law; it is ancillary and cannot of itself sustain jurisdiction.

5

*Id.* at 1324 (emphasis added).

6

      The facts of this case are even more compelling than the facts in *AT&T* because the contract

7

in this case explicitly defines "Inventions" to cover *more* than just *patent* inventions: as shown in the

8

chart above, "Inventions" is defined to encompass "inventions, improvements, discoveries and

9

technical developments . . . ***whether or not patentable***." Thus Defendants are doubly incorrect when

10

they argue to this Court (as they argued to Judge Fogel, *see* Ex. 3, at 9:9–:12) that ST's complaint

11

"requires the Court to identify Dr. Harari's *inventive contribution* to the relevant patent applications

12

as contrasted with his co-inventors." Defs.' Mem. at 9:22–:24 (emphasis added). First, Harari's

13

contract covers *all* Inventions, even Inventions that are not patentable (and thus obviously would not

14

create a "substantial question of patent law"). Second, as Judge Fogel recognized, the phrase

15

"inventive contribution" "does not appear in the Inventions Agreement and, indeed, the express

16

language of that agreement directly contradicts the notion that only Harari's 'inventive

17

contributions' had to be disclosed and assigned." Ex. 19, at 4:16–:18.

18

      Remarkably, Defendants' motion does not even cite or discuss *AT&T*, even though it was the

19

case that Judge Fogel found most instructive. Instead, Defendants' motion argues that the following,

20

***hypothetical*** fact pattern proves that there is exclusive federal jurisdiction over the patents in which

21

Harari is named as a co-inventor:

22

23

| DEFENDANTS' HYPOTHETICAL PATENT APPLICATION | | | | |
|---|---|---|---|---|
| Co-Inventors Named on Face of Application:  Harari, X, and Y | | | | |
| *Claim / Invention* | *Actual Inventors* | *Invented while Harari employed with WSI?* | *Related to WSI's business?* | *Did Harari have duty to assign to WSI?* |
| 1 | **Harari**, X, Y | Yes | No | No |
| 2 | **Harari**, Y | No | Yes | No |
| 3 | X, Y | Yes | Yes | No |

24

25

26

27

28

STMICROELECTRONICS, INC.'S OPPOSITION TO JUDGMENT ON THE PLEADINGS
No. 1-07-CV-080123

1    Defs.' Mem. at 10:7–:27.  According to Defendants, "[t]his *hypothetical* is thus dispositive of the

2    federal question inquiry because it reveals a circumstance in which a proper *ownership*

3    determination could not be made without first conducting a threshold *inventorship* analysis."  *Id.* at

4    11:8–:10 (emphasis added).

5        Defendants' hypothetical turns the law on its head.  If a *hypothetical* fact pattern were all it

6    took to establish exclusive federal jurisdiction, then *AT&T* would have been decided the other way.

7    For example, consider the following *hypothetical* fact pattern involving the four co-inventors from

8    the *AT&T* case (call them A, B, C, and D) who "left AT&T at various times beginning in June 1985,

9    with [D] being the last to leave in February 1986," 972 F.2d at 1323.

| HYPOTHETICAL PATENT APPLICATION IN *AT&T* | | | | |
|---|---|---|---|---|
| Co-Inventors Named on Face of Application:  A, B, C, and D | | | | |
| Claim / Invention | Actual Inventor(s) | Invented while employed with AT&T? | Related to AT&T's business? | Duty to assign to AT&T? |
| 1 | A | Yes | No | No |
| 2 | B | No | Yes | |
| 3 | C | Yes | No | |
| 4 | D | No | Yes | |
| 5 | A, C | Yes | No | |
| 6 | B, D | No | Yes | |

19       As shown in the chart above, it is *possible* to construct a hypothetical fact pattern from *AT&T*

20   in which a proper *ownership* determination could not be made without first conducting a threshold

21   *inventorship* analysis, yet at the same time we know that the Federal Circuit found no federal

22   jurisdiction in *AT&T*.  That is because the test for exclusive federal jurisdiction is not whether there

23   *might*, hypothetically be an inventorship question, but rather whether there *must* be an inventorship

24   analysis:

25       • "[T]he presence of a ***possible*** question of inventorship does not convert the state law
            action into one arising under the patent laws."  *NTT*, 414 F.3d at 1363 (emphasis
26           added).

27       • "[P]atent law jurisdiction is only invoked when *all* alternative theories necessarily
            state a complaint under the patent law."  "The alternative rule, that federal patent

jurisdiction is only invoked whenever *any* of the theories on the basis of which a claim may succeed necessarily states a complaint under patent law, would eradicate *Beech Aircraft's* distinction between inventorship actions, arising under the federal patent law, and patent ownership actions, not arising under the federal patent law, as any patent ownership claim could **hypothetically** succeed on the basis that the claimant was the inventor, rather than the contractual purchaser of the invention." *DuPont*, 344 F.3d at 583 & n.1 (emphasis added).

- "We will not **assume** a bob-tailed meaning that could lead to derogation of the primary right of state courts to decide what state law has to say about this contract." *AT&T*, 972 F.2d at 1324 (emphasis added).

Furthermore, on a motion for judgment on the pleadings, ST's complaint must be taken as true, and thus this Court *must assume* that all of Harari's inventions took place while he was employed with WSI, and this Court *must assume* that those inventions related to WSI's business, as alleged in ST's complaint. *See* Ex. 1, ¶¶ 17, 24–27, 30. Finally, Defendants' chart is misleading because it implies that individual *claims* are assignable. To the contrary, as explained before, "property rights, including ownership, attach to *patents as a whole*, not individual claims." *Ethicon*, 135 F.3d at 1466 (emphasis added). The following chart corrects the mistakes in Defendants' chart and shows that an inventorship analysis is *not necessarily required* based on the facts alleged in ST's complaint:

| ST's Complaint, Taken as True and Construed Liberally | | | | |
|---|---|---|---|---|
| Co-Inventors Named on Face of Application: Harari, X, and Y | | | | |
| *Claim / Invention* | *Actual Inventors* | *Invented while Harari employed with WSI?* | *Related to WSI's business?* | *Did Harari have duty to assign **the patent** to WSI?* |
| 1 | **Harari**, X, Y | Yes | Yes | Yes |
| 2 | **Harari**, Y | Yes | Yes | |
| 3 | X, Y | Yes | Yes | |

Defendants argue that Judge Fogel reached the wrong conclusion because he was under the "mistaken belief" that Harari "contributed to *all* of the inventions described in the patent, thus obviating the need to determine which contributions Dr. Harari made to the co-invented patent applications." Defs.' Mem. at 12:3–:6 (emphasis added). But as shown in the chart directly above, one need not assume that Harari contributed to *all* of the inventions described in the patent to conclude that Harari was obligated to assign ownership of the patent to WSI. Furthermore, even if Judge Fogel had assumed that Harari contributed to *all* of the inventions described in the patent, that

1   assumption would have been a permissible basis for rejecting exclusive federal jurisdiction because

2   it proves that ST's complaint does *not necessarily require* an inventorship analysis.

3       In the end, Defendants' motion only cites three cases finding exclusive federal jurisdiction:

4   *Holiday Matinee, Inc. v. Rambus, Inc.*, 118 Cal. App. 4th 1413 (2004); *MCV, Inc. v. King-Seeley*

5   *Thermos Co.*, 870 F.2d 1568 (Fed. Cir. 1989); and *Air Products & Chemicals, Inc. v. Reichhold*

6   *Chemicals, Inc.*, 755 F.2d 1559 (Fed. Cir. 1985).  Each of those cases is distinguishable:

7   - In *Holiday Matinee*, "each of Holiday's claims **required** a showing that Rambus's
    patents were **invalid** and unenforceable."  118 Cal. App. 4th at 1426 (emphasis
8   added).  Thus the right to relief necessarily depended on resolution of a substantial
    question of patent law (i.e., patent invalidity).

9
    - In *MCV*, the "cause of action is created by [35 U.S.C. § 256] which explicitly
10  authorizes judicial resolution of co-**inventorship contests** over issued patents."  870
    F.2d at 1570 (emphasis added).  Thus the right to relief necessarily depended on
11  resolution of a substantial question of patent law (i.e., inventorship).

12  - In *Air Products*, the complaint "averred that Reichhold has **infringed**, and continues
    to infringe, the '388 patent . . . . [and] prayed that the district court grant preliminary
13  and final injunctive relief against Reichhold, and those in privity therewith, to prevent
    future violations of the rights secured to Air Products by the '388 patent."  755 F.2d
14  at 1562–63 (emphasis added).  Thus the right to relief necessarily depended on
    resolution of a substantial question of patent law (i.e., patent infringement).
15

16      For all of these reasons, there is not exclusive federal jurisdiction over any part of ST's

17  complaint, as Judge Fogel properly concluded.

18      **C.    Judge Fogel has already concluded there is *not* exclusive federal
            jurisdiction over ST's complaint, and thus this Court should do the same**
19

20      This Court should follow Judge Fogel's lead and reject Defendants' arguments.  Judge Fogel

21  considered *twelve* briefs on this issue and held *two* hearings.  *See* Exs. 2–19.  He gave an

22  extraordinary amount of attention to Defendants' arguments yet still found them unpersuasive.  This

23  Court should take advantage of Judge Fogel's hard work and reach the same conclusion.

24      Defendants argue this Court should ignore Judge Fogel's decision because "the remand order

25  is not binding in state court and is not law of the case."  Defs.' Mem. at 13:9.  But even if the

26  decisions by the Federal Circuit and Judge Fogel cited in this brief are not binding on this Court, this

27  Court should still give "great weight" to those decisions, "particularly . . . in the context of their

28  determination of federal law, as happened here."  *Adams v. Pac. Bell Directory*, 111 Cal. App. 4th

1  93, 97–98 (2003) (following determination by federal court that state courts had jurisdiction).

2  Indeed, if this Court *disagreed* with Judge Fogel, that would "endorse the incongruous conclusion

3  that neither the federal nor the state court has jurisdiction to decide this controversy.  The law does

4  not demand such an absurdity."  *Id.* at 95–96.

5          Furthermore, it would make little practical sense to disagree with Judge Fogel's decision and

6  grant Defendants' motion, given the balance of the hardships on the parties if it is determined on

7  appeal that Judge Fogel's decision was correct.  Defendants do not contest that this Court has

8  jurisdiction to consider whether Harari was obligated to disclose and assign to WSI the first three

9  patent applications (and resulting patents) in which Harari was named as the *sole* inventor.  Thus no

10  matter how the Court rules on this motion, this Court will end up resolving the gravamen of ST's

11  complaint — namely whether Harari breached his contractual and fiduciary obligations to WSI.

12  Accordingly, if this Court denies Defendants' motion, but that is later determined on appeal to be

13  erroneous, there would be no prejudice to Defendants because they would still need to litigate the

14  gravamen of ST's complaint either way.  By way of contrast, if this Court grants Defendants'

15  motion, and that is later determined on appeal to be erroneous, there would be enormous prejudice to

16  ST because the error would require ST to needlessly litigate the *same* basic issues in both state and

17  federal court at the same time.  Defendants have already been heard by Judge Fogel, who rejected

18  Defendants' arguments, and thus it is only fair that Defendants should have to wait for an appeal to

19  challenge Judge Fogel's decision.

20          In sum, this Court should adhere to Judge Fogel's decision because it was correct; this Court

21  should give "great weight" to Judge Fogel's opinion and the Federal Circuit cases he followed; and it

22  would make little practical sense to grant Defendants' motion given the balance of the hardships on

23  the parties if it is determined on appeal that Judge Fogel's decision was correct.

24  **IV.    CONCLUSION**

25          For the foregoing reasons, SanDisk's motion for judgment on the pleadings should be

26  DENIED.

27

28

STMICROELECTRONICS, INC.'S OPPOSITION TO JUDGMENT ON THE PLEADINGS
No. 1-07-CV-080123

1

2    Dated:  February 20, 2008                    By:  _Russell L. Johnson /rmc_

3                                                      Russell L. Johnson (SBN 53833)
                                                      SIDLEY AUSTIN LLP
4                                                     555 California Street, Suite 2000
                                                      San Francisco, California  94104
5                                                     Telephone:        (415) 772-1200
                                                      Facsimile:         (415) 772-7400
6
7                                                     *Attorneys for Plaintiff*
                                                      *STMicroelectronics, Inc.*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STMICROELECTRONICS, INC.'S OPPOSITION TO JUDGMENT ON THE PLEADINGS
No. 1-07-CV-080123

# Exhibit F

1   MICHAEL A. LADRA, State Bar No. 064307
    TERRY T. JOHNSON, State Bar No. 121569
2   JAMES C. YOON, State Bar No. 177155
    MATTHEW R. REED, State Bar No. 196305
3   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
4   650 Page Mill Road
    Palo Alto, CA 94304-1050
5   Telephone:  (650) 493-9300
    Facsimile:  (650) 565-5100
6
    Attorneys for Defendants
7   ELIYAHOU HARARI and
    SANDISK CORPORATION
8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                      COUNTY OF SANTA CLARA

11  STMICROELECTRONICS, INC.,          )   CASE NO.: 1-07-CV-080123
                                       )
12          Plaintiff,                 )   **DEFENDANTS' REPLY IN SUPPORT**
                                       )   **OF THEIR MOTION FOR**
13      v.                             )   **JUDGMENT ON THE PLEADINGS**
                                       )
14  ELIYAHOU HARARI, *et al.*,         )   Date:     March 11, 2008
                                       )   Time:     9:00 a.m.
15          Defendants.                )   Dept.:    10
                                       )   Judge:    Honorable Neal Cabrinha
16                                     )
                                       )   No Trial Date Set
17                                     )
                                       )
18  _____)

19

20

21

22

23

24

25

26

27

28

                                                        3296399_4.DOC

1

# TABLE OF CONTENTS

2

**Page**

I.    INTRODUCTION ........................................................................................................... 1

II.   ARGUMENT ................................................................................................................. 1

    A.    The Relief Sought By ST's Complaint Turns on "Inventorship" Issues
        Because ST's Alleged Co-Ownership Rights Arise From and Depend Solely
        on What Dr. Harari *Invented*, Not Merely What Dr. Harari *Owned* ...................... 1

    B.    ST's Claims *Necessarily Depend* on the Question of Inventorship Because
        *Every* Co-Invented Patent at Issue in this Case Must Be Subjected to an
        Inventorship Analysis in Order for ST to be Granted the Relief it Seeks .............. 3

    C.    ST Cannot Deprive the Federal Courts of Their Exclusive Jurisdiction Over
        a Substantial Question of Patent Law Merely By Alleging that this Question
        Will Be Resolved in Its Favor ................................................................................ 6

    D.    This Court Need Not and Should Not Give Any Weight to the District
        Court's Remand Order ........................................................................................... 7

    E.    Federal Law Deprives the Court of Jurisdiction Over ST's Claims
        Regardless of What ST Thinks is "Fair" ................................................................ 9

III.  CONCLUSION .............................................................................................................. 9

1

## TABLE OF AUTHORITIES

2
**Page(s)**

### CASES

3

*AT&T Co. v. Integrated Network Corp.*, 972 F.2d 1321 (Fed. Cir. 1992) .................................. 4, 5

4

*AT&T Commc'ns, Inc. v. Superior Court*, 21 Cal. App. 4th 1673 (1994) .................................. 7, 8

5

*Adams v. Pac. Bell Directory*, 111 Cal. App. 4th 93 (2003) .......................................... 8

6

*Breed v. Hughes Aircraft Co.*, 253 F.3d 1173 (9th Cir. 2001) .......................................... 9

7

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988) .......................................... 6, 9

8

*Gemstar-TV Guide Intern., Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352 (Fed. Cir. 2004).............................................................................. 4

9

10  *Holiday Matinee, Inc. v. Rambus, Inc.*, 118 Cal. App. 4th 1413 (2004).............................. 6, 7

11  *Israel Bio-Engineering Project v. Amgen Inc.*, 475 F.3d 1256 (Fed. Cir. 2007) ........................ 2, 4

12  *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 126 S. Ct. 2145 (2006) .......................... 7

13  *MCV, Inc. v. King-Seeley Thermos Co.*, 870 F.2d 1568 (Fed. Cir. 1989).................................. 2, 3

14  *Machinists Automotive Trades Dist. Lodge v. Peterbilt Motors Co.*, 220 Cal. App. 3d 1402 (1990) ............................................................................ 8

15

*Provience v. Valley Clerks Trust Fund*, 163 Cal. App. 3d 249 (1984) .......................... 8

16

### STATUTES

17

28 U.S.C. § 1338(a)..................................................................................... 7

18

28 U.S.C. § 1447(d) .................................................................................. 8

19

20

21

22

23

24

25

26

27

28

3296399_4.DOC

1  **I.    INTRODUCTION**

2        Plaintiff STMicroelectronics, Inc. ("ST") acknowledges that the issue of "inventorship" is

3  a "substantial question of federal patent law" within the exclusive jurisdiction of the federal

4  courts.  ST's Opposition thus rests entirely on the proposition that its Complaint does not raise

5  "inventorship" issues at all, but merely "ownership" questions.  Opp'n at 4.  ST is mistaken.  Its

6  ownership claims with respect to co-invented patents arise *solely* from what Dr. Harari *invented*

7  while employed with WaferScale Integration ("WSI"), not from the larger universe of what Dr.

8  Harari *owned* by virtue of being listed as a co-inventor on the patents at issue.  Because the right

9  to relief sought by ST requires the Court to parse out what Dr. Harari invented from what his co-

10  inventors invented, ST's ownership claims necessarily depend on resolution of substantial

11  questions of federal patent law.  Therefore, the federal courts have exclusive jurisdiction over

12  ST's claims, and Defendants respectfully request that the Court grant their Motion for Judgment

13  on the Pleadings.

14  **II.    ARGUMENT**

15      **A.    The Relief Sought By ST's Complaint Turns on "Inventorship" Issues**
           **Because ST's Alleged Co-Ownership Rights Arise From and Depend Solely**

16             **on What Dr. Harari *Invented*, Not What Dr. Harari *Owned***

17        ST admits that the issue of "inventorship" is a "substantial question of federal patent law"

18  within the exclusive jurisdiction of the federal courts.  Opp'n at 6.  Accordingly, the Court need

19  only determine whether or not ST's Complaint raises inventorship issues to decide the present

20  motion.  Because the Court cannot resolve ownership questions regarding co-invented patents

21  without first determining each inventor's respective contribution to those patents, an inventorship

22  analysis is required and a substantial federal question is necessarily present.

23        In an attempt to avoid this result, ST argues that its Complaint merely raises "ownership"

24  questions as opposed to "inventorship" issues because as a listed co-inventor, Dr. Harari is

25  presumed to have "an ownership interest in the *entire* patent." *Id.* at 6.  That argument is

26  misguided because Dr. Harari did not owe assignment obligations with respect to that which he

27  *owned*, only to that which *he invented* during his employment that was related to WSI's business.

28

3296399_4.DOC

1    *See* Compl. Ex. A ¶ 3 (Dr. Harari's agreement pertaining to "'Inventions' . . . made or conceived

2    by me, either alone or with others, during the term of my employment").[1]

3        Accordingly, the Court will need to determine what it was that Dr. Harari invented and

4    then decide whether that inventive contribution was assignable under the invention assignment

5    agreement. For its part, ST fails to set forth any theory under which it could possibly claim an

6    ownership right to a patent listing Dr. Harari as a co-inventor (and thus a co-owner of the entire

7    patent) where that patent contains some inventions related to WSI's business and some that are

8    not, and where Dr. Harari only participated in the invention of claims *not* related to WSI's

9    business. ST's failure in that regard is dispositive of the jurisdictional question because it

10   highlights the necessity of the threshold inventorship analysis.

11       Dr. Harari's ownership interest in the co-invented patents is simply irrelevant to the

12   inquiry because while a listed co-inventor is presumed to have ownership of an entire co-

13   invented patent, there is no presumption that the co-inventor actually contributed to all of the

14   inventions described in the co-invented patent. *See Israel Bio-Engineering Project v. Amgen*

15   *Inc.*, 475 F.3d 1256, 1263 (Fed. Cir. 2007) ("when . . . multiple inventors are listed on the face of

16   the patent, each co-owner 'presumptively owns a pro rata undivided interest in the entire patent,

17   *no matter what their respective contributions*'") (emphasis added); *see also* Opp'n at 5

18   (admitting that "[*i*]*nventorship* is done on a claim-by-claim basis, which means . . . that one

19   claim in the patent may have been invented by one person, while another claim may have been

20   invented by another person (or a combination of people)").

21       Not surprisingly, the relevant authorities make clear that federal courts have exclusive

22   jurisdiction where a plaintiff seeks to be named as a co-owner of a patent and where "co-

23   ownership arises from and depends solely on the patent law issue of inventorship." *MCV, Inc. v.*

24   *King-Seeley Thermos Co.*, 870 F.2d 1568, 1570-71 (Fed. Cir. 1989). In *MCV*, the plaintiff

25   _____

26   [1]    An example illustrates this point. If Dr. Harari had received by bequest a patent during his
     employment with WSI that related to WSI's business, he would not have owed a duty to assign
27   that patent to WSI based on his invention assignment agreement. The reason is manifest: the
     invention assignment agreement applies to *Dr. Harari's inventions*, not to inventions to which
28   Dr. Harari acquired an ownership interest.

1    sought an assignment of co-ownership rights to a patent, arguing that the defendant should have

2    listed the plaintiff's employee as a co-inventor on the patent because of his contributions to the

3    claimed invention, even though the employee had previously agreed to be left off of the patent

4    application. *Id.* at 1569.  The court determined that the plaintiff's ownership claim came within

5    the exclusive jurisdiction of the federal courts, not just because the complaint sought correction

6    of the named inventors, but also because plaintiff was seeking to be assigned co-ownership of the

7    patent by virtue of its employee's inventive contributions to the patent.  *Id.* at 1570-71.

8          The result should be no different here; ST's ownership claim requires the Court to

9    disaggregate inventive contributions to the co-invented patents.  That is a prototypical

10    inventorship analysis that can only be performed by federal courts.

11          **B.    ST's Claims *Necessarily Depend* on the Question of Inventorship Because**
             ***Every* Co-Invented Patent at Issue in this Case Must Be Subjected to an**
12            **Inventorship Analysis in Order for ST to be Granted the Relief it Seeks**

13          ST concedes that this Court lacks jurisdiction if Defendants "show that ST's ownership

14    claim *necessarily depends* on resolution of an inventorship question."  Opp'n at 7 (emphasis in

15    original).  Defendants have made that very showing because every co-invented patent at issue in

16    this case must be subjected to an inventorship analysis to resolve ST's ownership allegations

17    under the invention assignment agreement between Dr. Harari and WSI.

18          Under the theory alleged in ST's complaint, Dr. Harari owed no assignment obligations

19    to WSI if that patent did not contain at least one claim describing an invention: (1) conceived by

20    Dr. Harari (either alone or with others); (2) made during Dr. Harari's employment with WSI; *and*

21    (3) related to WSI's business.  Compl. ¶ 11-12.  If there is no single claim within a patent that

22    individually satisfies all three of these criteria, Dr. Harari would not have owed any assignment

23    obligations for that patent.[2]  Therefore, to determine whether ST is entitled to the relief it seeks,

24    the Court must answer three questions with respect to every patent at issue in this case:

25    _____

26          [2] ST points out that individual claims within a patent are not separately assignable.  *See*
       Opp'n at 11.  While that may be true, a determination of whether or not Dr. Harari contributed to
27    a particular claim is a necessary step in determining whether he had any assignment obligation
       with respect to the patent as a whole because ST's ownership claims derive solely from what Dr.
28    Harari invented.

                                                    -3-                          3296399_4.DOC

1    (1) Which of the inventions[3] described in this patent were conceived by Dr. Harari
     either alone or with others?

2

3    (2) Of those inventions conceived by Dr. Harari, were any conceived by Dr. Harari
     during his employment with WSI?

4    (3) Of those inventions conceived by Dr. Harari during his employment with WSI,
     were any related to WSI's business?

5

6        The first of the above three questions in particular cannot be answered without

7    performing an inventorship analysis to parse out the inventions made by Dr. Harari from the

8    inventions to which Dr. Harari made no contribution. As admitted by ST, this analysis is

9    performed on a claim-by-claim basis. Opp'n at 5; *see also Gemstar-TV Guide Intern., Inc. v.*

10   *Int'l Trade Comm'n*, 383 F.3d 1352, 1381 (Fed. Cir. 2004) ("Because co-inventors need not

11   contribute to the subject matter of every claim of the patent, inventorship is determined on a

12   claim-by-claim basis.").

13       Because the Court must perform an inventorship analysis in order to answer this first

14   question, the primary case upon which ST bases its opposition, *AT&T Co. v. Integrated Network*

15   *Corp.*, 972 F.2d 1321 (Fed. Cir. 1992), is inapposite.[4] In *AT&T*, the court did not have to answer

16   this first question regarding inventorship because <u>all</u> of the co-inventors listed on the patent at

17   issue were allegedly under an obligation to assign their inventions to the plaintiff. *Id.* at 1322.

18

19   _____

20       [3] Each patent with multiple claims necessarily contains more than one invention because
     "each claim must be considered as defining a separate invention." *Israel Bio-Engineering*

21   *Project v. Amgen Inc.*, 475 F.3d 1256, 1263 (Fed. Cir. 2007) ("*IBEP*") ("each claim must be
     considered as defining a separate invention")

22

     [4] In *AT&T*, the plaintiff sued four former employees and the new company they formed

23   ("INC"). AT&T alleged that the four employees invented a communications terminal while
     employed by AT&T and breached their invention assignment agreement with AT&T by

24   assigning a patent covering the terminal to INC instead of AT&T. *Id.* at 1322. Defendants
     argued that federal patent law issues would necessarily have to be applied in order for AT&T to

25   prove *when* the invention was conceived, that is, either while the inventors were employees of
     AT&T or of INC. *Id.* at 1323. The Federal Circuit held that determination of when the

26   "inventions" as defined by the contract had been "conceived" did not necessarily involve patent
     issues because there was no indication that the contract was intended only to cover patentable

27   inventions or that the contract intended to afford only a patent law meaning to the word
     "conceive." *Id.* at 1324.

28

1  Hence, the court did not have to determine which inventors conceived of which inventions.[5] The

2  defendants in *AT&T* did not even argue that an inventorship analysis was necessary.[6] *See*

3  *generally id.* at 1323-25.  Nor did they attempt to argue that the patented inventions were not

4  related to their former employer's business.  *See id.* at 1323.  Absent these arguments, the

5  Federal Circuit recognized that "[t]he only possible patent issue" in *AT&T* related to when the

6  inventions were conceived and the meaning of the contract language "conceived." *Id.* at 1324.

7  Thus, in *AT&T*, the court did not consider the primary issue presented by the present case:

8  whether a substantial question of federal patent law must be resolved to grant relief to a plaintiff

9  seeking an assignment of the rights of a single co-inventor to patents with multiple inventors.

10       Accordingly, the holding of *AT&T* is inapplicable to the issues raised by the Defendants'

11  present motion.  Here, unlike in *AT&T*, Dr. Harari is the only one of the co-inventors listed on

12  the patent applications at issue that is alleged to have had any assignment obligations to WSI.

13  *See generally* Compl. ¶¶ 11-12.  Consequently, an inventorship analysis cannot be bypassed

14  because the Court will be required to parse out the inventions made by Dr. Harari from the

15  inventions made solely by his co-inventors for every co-invented patent of which ST seeks an

16  assignment.  Therefore, ST's claims necessarily depend on questions of inventorship, bringing

17  ST's claims within the exclusive jurisdiction of the federal courts.

18

19

20

21       [5] The fact that all of the named co-inventors on the patent at issue in *AT&T* allegedly had

22  assignment obligations to the plaintiff renders irrelevant the individual contributions of the co-
   inventors and meaningless ST's chart illustrating a "Hypothetical Patent Application in *AT&T*."

23  *See* Opp'n at 10.

24       [6] ST incorrectly states that the defendants in *AT&T* argued that an "inventorship analysis"
   was required to resolve the parties' dispute.  *See* Opp'n at 8.  However, a thorough review of the

25  *AT&T* case reveals that the defendants made no such argument.  Rather, the defendants' sole
   jurisdictional argument was based on the fact that the court would have to determine "when the

26  invention was conceived" by the co-inventors.  *See id.* at 1323.  The Federal Circuit's opinion
   reveals no dispute regarding "*who*" conceived of the particular elements of the invention at issue

27  or whether or not a claim-by-claim analysis was even necessary to parse out the individual
   contributions of the co-inventors.

28

1

2

**C.    ST Cannot Deprive the Federal Courts of Their Exclusive Jurisdiction Over a Substantial Question of Patent Law Merely By Alleging that this Question Will Be Resolved in Its Favor**

3    ST argues that an inventorship analysis is not required because the Court must assume the

4    truth of the factual allegations contained in the Complaint at the pleadings stage. Specifically,

5    ST contends that the Court "*must assume* that all of Harari's inventions took place while he was

6    employed with WSI, and this Court *must assume* that those inventions related to WSI's business,

7    as alleged in ST's complaint." [7]  Opp'n at 11 (emphasis in original). In other words, ST asks the

8    Court to ignore the *path* by which ST must travel to prove its claims, even though the Court will

9    be required to resolve substantial questions of federal patent law along that path. ST's argument

10    must be rejected because it would obliterate the doctrine of exclusive federal jurisdiction if it

11    were accepted. ST cannot escape the exclusive jurisdiction of the federal courts over the

12    inventorship analysis required by ST's claims merely by alleging that this substantial question of

13    patent law will be resolved in its favor.

14    Although the Court must assume the truth of all matters alleged in the complaint at this

15    stage, a plaintiff cannot deprive the federal courts of exclusive jurisdiction over substantial

16    questions of patent law merely by alleging in the complaint that federal questions are not

17    implicated or that federal questions will turn ultimately in its favor. To the contrary, in deciding

18    a jurisdictional question based upon the presence of substantial questions of federal patent law,

19    the court must look down the road to determine what steps must be performed to *resolve* the

20    dispute and then determine whether the plaintiff's "right to relief necessarily depends on

21    *resolution* of a substantial question of federal patent law." *Holiday Matinee, Inc. v. Rambus,*

22    *Inc.*, 118 Cal. App. 4th 1413, 1427-28 (2004) (quoting *Christianson v. Colt Indus. Operating*

23    *Corp.*, 486 U.S. 800, 809 (1988)) (emphasis added). The relevant inquiry is *how* ST must prove

24

25    [7]  Aside from its other deficiencies, this argument overlooks the fact that ST does not allege in its complaint that "all of Harari's inventions took place while he was employed with WSI" or

26    that "those inventions related to WSI's business." The complaint only makes these allegations with respect to three of the many patents and patent applications at issue in this complaint. *See*

27    Compl. ¶ 47 (with respect to the '338 patent), ¶ 49 (with respect to the 07/204,175 patent application), and ¶ 50 (with respect to the 07/337,566 patent application).

28

1    its case, and that inquiry cannot be avoided by merely adverting to the truism that factual

2    allegations are accepted as true on pleadings motions.

3          If, as ST suggests, a plaintiff could avoid a demurrer for lack of subject matter

4    jurisdiction merely by alleging the outcome of a substantial question of federal patent law, *every*

5    complaint brought in state court in which a plaintiff based its right to relief on alleged

6    infringement of a patent, invalidity of a patent, or inventorship of a patent would be allowed to

7    proceed in state court.  Such a notion is absurd, not only because it would frustrate the purpose of

8    28 U.S.C. § 1338(a), but also because ST's suggestion is clearly not the law.  *See, e.g., Holiday*

9    *Matinee, Inc. v. Rambus, Inc.*, 118 Cal. App. 4th 1413, 1426-28 (2004) ("Complaint was

10   demurrable because of the absence of jurisdiction over the subject matter of the action" where

11   complaint was based upon the alleged invalidity and unenforceability of defendant's patents).

12   Accordingly, in determining its jurisdiction over ST's claims, the Court must determine if the

13   relief sought in the pleadings requires it to perform an inventorship analysis to resolve the

14   parties' dispute.

15        **D.    This Court Need Not and Should Not Give Any Weight to the District**
              **Court's Remand Order**
16

17        In deciding whether the federal courts have exclusive jurisdiction over ST's claims, this

18   Court need not and should not give any weight to the district court's remand order.

19        Following remand, the state court "is perfectly free to reject the remanding court's

20   reasoning."  *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 126 S. Ct. 2145, 2156-57 (2006)

21   (holding that, after remand, defendants "could ask for dismissal . . . when they return to the state

22   court" with "no bar to such a revisitation of the [issue decided by the remanding district court]").

23   Accordingly, California courts can and do dismiss claims that have been remanded from federal

24   district court despite a contrary ruling by the district court prior to remand.  *See, e.g., AT&T*

25   *Commc'ns, Inc. v. Superior Court*, 21 Cal. App. 4th 1673, 1680-81 (1994) (after remand from

26   federal district court, state court reached opposite conclusion from district court and held that

27   state courts lacked subject matter jurisdiction over plaintiff's state law claims on federal

28   preemption grounds)*, review denied* (Apr. 21, 1994), *cert. denied*, 513 U.S. 917 (1994);

1  *Provience v. Valley Clerks Trust Fund*, 163 Cal. App. 3d 249, 256-262 (1984) (same);

2  *Machinists Automotive Trades Dist. Lodge v. Peterbilt Motors Co.*, 220 Cal. App. 3d 1402

3  (1990) (finding federal preemption of state law claims after remand from federal court).

4      While ST asks the Court to give "great weight" to the decision of the district court that

5  remanded this action, Opp'n at 12-13 (citing *Adams v. Pac. Bell Directory*, 111 Cal. App. 4th 93,

6  97-98 (2003)), such deference cannot be given to a federal trial court under California law.

7  Indeed, the one case that ST cites accorded "great weight" to a prior federal court decision only

8  because that opinion came from the Ninth Circuit Court of Appeals, as opposed to a trial court.

9  *See Adams*, 111 Cal. App. 4th at 97-98 ("But, although not binding, we give great weight to

10  federal *appellate court* decisions.") (emphasis added).  In that circumstance, it is "appropriate to

11  apply the principles of the law of the case."  *Id.*  However, "the doctrine of law of the case

12  applies *only* to *appellate court* decisions" and not to the decisions of federal trial courts.  *AT&T*,

13  21 Cal. App. 4th at 1680 (emphasis added).  Here, no appellate court has ruled on the jurisdiction

14  issue presented by Defendants' motion, and Defendants were not permitted to appeal the remand

15  order of the federal district court.  *See* 28 U.S.C. § 1447(d) ("An order remanding a case to the

16  State court from which it was removed is not reviewable on appeal or otherwise . . . .").

17  Therefore, the prior remand order of the district court is not entitled to any deference at all, let

18  alone "great weight."

19      ST also argues that this Court should follow the federal district court's remand order in

20  deciding this motion because the district court "considered twelve briefs on this issue and held

21  two hearings."  Opp'n at 12.  The facts underlying that argument actually cut decidedly in favor

22  of Defendants' position that deference should not be accorded to the remand order.  Indeed, after

23  considering a full cycle of briefs and conducting a hearing, the district court *ruled in favor of*

24  *Defendants and denied ST's motion to remand*.  *See* Weibell Decl. Ex. 1.  The fact that the

25  present inquiry touches upon such complex issues of federal patent law that the district court

26  considered twelve briefs, heard oral argument at two separate hearings, and issued two

27  contradictory opinions belies any notion that another court examining the same issue could not

28

1  reasonably reach a conclusion opposite that of the district court's remand order.  Therefore, this

2  Court should certainly consider the jurisdictional issue independently.

3      **E.    Federal Law Deprives the Court of Jurisdiction Over ST's Claims
           Regardless of What ST Thinks is "Fair"**

4

5      As a last gasp, ST argues that the Court should "consider the balance of the hardships on

6  the parties" and exercise jurisdiction "because it is only fair."  Opp'n at 13.  This argument is

7  misguided because the only fair result here is for federal questions to be resolved in federal court

8  as Congress required.  Regardless, the point need not be belabored because arguments related to

9  "fairness" and "equity" are not considered by the Court when deciding a question of subject

10  matter jurisdiction.  *See Christianson*, 486 U.S. at 818 (court lacking jurisdiction to hear a case

11  may not reach the merits even if acting "in the interest of justice"); *Breed v. Hughes Aircraft Co.*,

12  253 F.3d 1173, 1179 (9th Cir. 2001) ("Regrettably, questions of convenience or efficiency can

13  play no role in our decision.  Harsh as a transfer at this stage of the litigation may seem, we are

14  constrained by statute and Supreme Court precedent.  Jurisdiction is not a question of equity").

15  Accordingly, the Court should decide the jurisdictional issue without reference to ST's "fairness"

16  and convenience arguments.

17  **III.    CONCLUSION**

18      For the foregoing reasons and the reasons set forth in Defendants' opening memorandum,

19  Defendants respectfully request that their Motion for Judgment on the Pleadings be GRANTED.

20

21  Dated: February 27, 2008              WILSON SONSINI GOODRICH & ROSATI
                                          Professional Corporation
22

23

24                                        By: _____
                                             Michael A. Ladra
25
                                          Attorneys for Defendants
26                                        ELIYAHOU HARARI and
                                          SANDISK CORPORATION
27

28

# Exhibit G

(ENDORSED)
**F I L E D**

MAR 1 1 2008

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY_____ DEPUTY
DAVID K. WALKER

1
2
3
4
5
6
7

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SANTA CLARA**

STMICROELECTRONICS, INC.,

      Plaintiff,

v.

ELIYAHOU HARARI, *et al.*,

      Defendants.

Case No. 1-07-CV-080123

ORDER RE: DEFENDANTS' MOTION
FOR JUDGMENT ON THE PLEADINGS

    The motion of defendants Eliyahou Harari and SanDisk Corporation for judgment on the pleadings came on for hearing before the Honorable Neal A. Cabrinha on March 11, 2008, at 9:00 A.M. in Department 10.  The matter having been submitted, the Court now rules as follows:

    The requests by defendants and plaintiff for judicial notice are granted.

    Defendants have failed to show from the face of the Complaint, or matters judicially noticeable, that any of plaintiff's causes of action are created by federal patent law or that plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law. (*Christianson v. Colt Industries Operating Corp.* (1988) 486 U.S. 800, 809.)

1

1        The Complaint in this case concerns a question of patent ownership, a

2    question exclusively for state courts. (*Jim Arnold Corp. v. Hydrotech Sys., Inc.*

3    109 F.3d 1567, 1572 (Fed. Cir. 1997).)

4        Accordingly, defendants' motion for judgment on the pleadings is denied.

5

6    March _11_, 2008

                                        NEAL A. CABRINHA

7                                  JUDGE OF THE SUPERIOR COURT

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit H

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C. 20436

Before the Honorable Charles E. Bullock
Administrative Law Judge

In the Matter of

Certain Flash Memory Controllers, Drives,
Memory Cards, and Media Players and
Products Containing Same

Inv. No. 337-TA-619

## REPLY TO (1) SANDISK'S MEMORANDUM IN OPPOSITION TO RESPONDENTS' MOTION TO TERMINATE THE INVESTIGATION FOR GOOD CAUSE OR ALTERNATIVELY TO STAY THE INVESTIGATION; (2) COMMISSION INVESTIGATIVE STAFF'S RESPONSE TO TERMINATE, OR ALTERNATIVELY STAY, THE INVESTIGATION AS TO THE '808 PATENT

Respondents Phison Electronics Corp., Kingston Technology Co., Kingston Technology Corp., MemoSun, Inc., Payton Technology Corp. (collectively "Respondents") present this Reply Brief to (1) address several inaccurate statements of law upon which SanDisk's opposition is based; and (2) address the points raised by the Commission Investigative Staff in its Response. As described further below, a termination or a stay of the '808 patent is the only way to spare the Judge and the ITC the burden of having to analyze and adjudicate a complex morass of California state law only to find these efforts ultimately dependent on the future rulings of a California state court. At a time when the Commission and the Administrative Law Judges are busier than ever before, it is a waste of Commission resources to proceed down this duplicative and ultimately fruitless path. This is especially true in the current investigation where SanDisk apparently intentionally omitted from its complaint any reference to the California litigation regarding ownership of the '808 patent, which denied the Commission the opportunity to consider this situation prior to institution. Now, in its opposition, SanDisk has compounded that omission by egregiously misstating black letter law in a manner likely to mislead the Judge into believing that the California state litigation will not destroy its standing under the '808 patent.

## I.    It is Black Letter Law that STMicroelectronics cannot be Involuntarily Joined

Section III.C. of SanDisk's Opposition is entitled "Even if ST Were a Co-Owner, Its

Current Absence From This Investigation Does Not Affect SanDisk's Right to Sue." However,

as will be described below, this statement is <u>patently false</u>. Within the past year, the Federal

Circuit has unambiguously stated that the failure to join a co-owner is a <u>fatal jurisdictional defect</u>

and that a co-owner <u>cannot be involuntarily joined</u> under Federal Rule of Civil Procedure No. 19.

First, in *Israel Bio-Engineering Project v. Amgen, Inc.*, the Federal Circuit held that "one co-

owner has the right to <u>limit the other co-owner's ability to sue infringers</u> by refusing to join

voluntarily in the patent infringement suit." 475 F.3d 1256, 1264 (Fed. Cir. 2007) (emphasis

added). Then, less than a month ago, the Federal Circuit noted in *DDB Technologies L.L.C. v.*

*MLB Advanced Media, L.P.* that:

> [W]e have explicitly held that Rule 19 <u>does not permit the involuntary</u>
> <u>joinder of a patent co-owner in an infringement suit brought by another</u>
> <u>co-owner</u>. *See Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d
> 1456, 1468 (Fed. Cir. 1998) ("[A]s a matter of substantive patent law, all
> co-owners must ordinarily consent to join as plaintiffs in an infringement
> suit.")

Case No. 2007-1211, page 7, footnote no. 2 (February 13, 2008) (emphasis added), attached

hereto as Exhibit 1 and *available at* http://www.cafc.uscourts.gov/opinions/07-1211.pdf.

In light of this precedent, SanDisk has no legal basis for its assertion that "[a] fair case

could also be made that, if ST were adjudicated a co-owner, it would nonetheless not be

necessary to join ST." SanDisk's Opposition, page 10. Tellingly, SanDisk cites no authority in

support of this proposition, nor does it attempt to distinguish the Federal Circuit's holding in

*Israeli Bio-Engineering*, despite the fact that this case was cited and discussed in Respondents'

initial moving papers[1].

There is no case, fair or otherwise, to be made for SanDisk's assertion that it can proceed

on the '808 patent "regardless of the result in the California state case." *Id.* Notwithstanding

---

[1] Interestingly, one of the attorneys for SanDisk in this investigation was counsel for the defendants in the *Israel
Bio-Engineering* case.

2

this binding authority, SanDisk spends two pages of its opposition attempting to convince the Judge that the opposite is true, concluding on page 10 with "[t]hus, if ST were a necessary party, ST could, in fact, be joined." However, as described above, the law is quite clearly the opposite, and an STM victory in the California state litigation would be fatal to the '808 patent unless STM could be convinced to join, which, given the combative history between SanDisk and STM, is unlikely.

## II.    Respondents will be Able to Assert STM's Non-Joinder as a Defense

In section III.D. of its opposition, SanDisk asserts that "[i]t has long been settled that a claim that an inventor had an obligation to assign his interest in a patent to a third party 'may not be asserted as a defense in an action for infringement.'" Opposition, page 11, lines 9-12. As an initial point, Respondents note that Section 337(c) provides expressly that "[a]ll legal and equitable defenses may be presented in all cases," and SanDisk's standing defect certainly qualifies as both a legal and equitable defense. Notwithstanding this, to support its assertion of "long settled" law, SanDisk cites to a 1975 Seventh Circuit case and a 1970 Court of Claims case. Notably, SanDisk did not cite a single Federal Circuit case to support its statements. The reason for this conspicuous absence is that the Federal Circuit has ruled just the opposite in numerous cases including those cited above. Non-joinder of a co-owner of a patent is a jurisdictional issue that can be raised as a defense by any accused party. *See Israel Bio-Engineering*, 475 F.3d at 1263 (noting that "[t]he key question on appeal is whether IBEP had standing to maintain the patent infringement action against Amgen without the joinder of Yeda [a third party]); *see also Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1376 (Fed. Cir. 2000) ("As a threshold issue, we must determine whether any of the Appellees in this suit had standing to maintain an infringement action against A-Roo without joining Southpac [a third party]").

Moreover, contrary to SanDisk's statements, the California state litigation is not about whether Dr. Harari "had an obligation to assign his interest," but rather about converting STM's

equitable title into a legal title. As stated in the *DDB Technologies* case, "[i]f the contract expressly grants rights in future inventions, 'no further act [is] required once an invention [comes] into being," and "the transfer of title [occurs] by operation of law.'" Exhibit 1, Case No. 2007-1211 at 10 *quoting FilmTec v. Allied Signal*, 939 F.2d 1568,1573 (Fed. Cir. 1991). Dr. Harari's assignment stated that he "assign[ed]…my entire right, title, and interest in and to such Inventions which relate in any way to or are useful in Company's business." STM Complaint, exhibit A, paragraph 3, included as Exhibit 1 of Respondents Motion to Terminate the '808 Patent. The assignment did not say that he <u>would</u> assign or that he was <u>obligated</u> to assign. Accordingly, under the *DDB Technologies* case and its predecessors, there was no contractual obligation to assign the '808 patent, because the assignment took place automatically upon invention. As such, STM appears to already have equitable title to the '808 patent, and as a non-joined owner, STM's absence from the investigation of the '808 patent is a jurisdictional defect that is available as a defense to Respondents.[2]

## III.     SanDisk and the Staff Underestimate the Efficiency to be Gained by a Stay

Both SanDisk and the Staff assert that a stay would not be efficient, because the investigation would continue with regard to the remaining four patents. *See* Opposition at 16, and Staff's Response at 5. Respondents concede that the investigation of the four other patents would likely continue, but due to the number of unique issues and factors that swirl around the '808 patent, and the '808 patent alone, a stay of the '808 patent would radically reduce the scope of this investigation. Among the issues unique to the '808 patent are the following:

- The California state litigation.[3]

---

[2] Respondents also note that SanDisk spent considerable time in its opposition arguing that STM is "precluded from asserting ownership of the '808 patent, both by *res judicata* and by the compulsory counterclaim requirement." Opposition, page 1. To the best of Respondents knowledge, however, this argument has not been raised as a defense in the California state litigation. *See* SanDisk's Case Management Statement, Respondents' Motion to Terminate, Exhibit 5. Respondents find it curious that this argument is featured so prominently in SanDisk's Opposition, but does not appear to be asserted as one of its actual defenses.

[3] As described in Respondents' Motion to Terminate, if the investigation of the '808 patent proceeds, the ALJ will essentially have to duplicate the proceedings of the California state court. As the text of the Opposition and the

- There are at least four separate reported prior litigations involving the '808 patent itself or other patents in the same patent family (including an appeal to the Federal Circuit). Each of these previous cases carries with it a voluminous record that will have to be examined at every stage of the proceedings, including the upcoming *Markman* hearing.

- The '808 patent is the oldest of the patents and its investigation will involve a different universe of prior art than the much newer asserted patents 6,426,893; 6,763,424, and 7,130,011. The only asserted patent that is even remotely close in time is 6,947,332, which involves a completely different subject matter.[4]

- As the oldest patent asserted, the '808 patent uses terms in ways that are distinctly different from the usage of the same terms in later patents.

- At least seven of Respondents' Affirmative Defenses involve only the '808 patent.

The '808 patent has taken and will continue to take considerably more time and resources than the remaining four patents. In a normal case, this fact would not be important, but in this investigation, proceeding with the '808 patent is essentially gambling a tremendous amount of public and private resources on the outcome of the California state litigation. In the likely event that the California state litigation is decided in STM's favor, all of the time and effort invested in investigating the '808 patent would have been wasted.

At a time when the Commission is busier than ever, it is not in the public interest to gamble public and private resources on the outcome of a state court proceeding. It is far more efficient and logical to either stay or terminate the '808 patent until the California state court resolves this dispute. This is especially true in this investigation, because SanDisk has asserted the remaining four patents against the same products and parties as the '808 patent. This means that SanDisk's remedy would remain the same regardless of whether the '808 patent is stayed or

---

28 exhibits attached thereto indicate, this endeavor will be time consuming and complicated, involving numerous decision under California law.

[4] The '332 patent involves emulation of a hard disk drive system, including flash memory chips and a controller. It is significantly different than the '808 patent which concerns only the internal operation of the flash memory of the chips alone, and not the controllers for those chips.

terminated.  Given this and the potential to greatly reduce the complexity and scope of the investigation, a termination or stay of the '808 patent would be prudent and fair to all of the parties.[5]

## IV.    The Judge has the Power to Terminate the Investigation for Good Cause

In its response, the Staff asserts that the Judge does not have the authority to terminate the investigation based on the California state litigation.  Staff Response, page 2, lines 12-16.  As an initial point, Respondents note that its Termination request is premised both on SanDisk's lack of standing based on the California state litigation and SanDisk's inexplicable omission of this litigation from the Complaint and its pre-institution discussions with the Staff, which denied the Commission and Staff the opportunity to examine this litigation prior to institution.

The Staff bases its argument on *Farrel Corporation v. United States International Trade Commission*, 949 F.2d 1147 (Fed. Cir. 1991).  Staff's Response, page 2.  The section of *Farrel* relied upon by the Staff states that "the statutory language states that after a section 337 investigation is instituted, its non-conclusive termination may be based only on those grounds explicitly provided for in the statute itself."  949 F.2d at 1153.  The Staff construes this section of *Farrel* to hold that the Judge may only terminate investigations that "fall within any of the categories set forth in Section 337(c)(1)," namely a settlement, arbitration, or a consent order. Staff's Response, page 3, lines 2-5.

The Staff reads *Farrel* too broadly.  Indeed, elsewhere in the *Farrel* case, the Federal Circuit noted that "other situations could arise where a section 337 investigation <u>may be terminated without a conclusive determination</u>...[such as when] the complaint is withdrawn...[or when] the issue becomes moot," but the Federal Circuit declined to address those situations. *Farrel,* 949 F.2d at 1152 (emphasis added).  If termination were truly restricted solely to the categories set forth in Section 337(c)(1), the Federal Circuit would not have left open this

---

[5] Respondents would equally favor a stay of the entire investigation if the termination or stay of the '808 patent alone is not viewed as appropriate under the circumstances or as an efficient use of Commission resources.

exception for "other situations." *See id.* This exception suggests that *Farrel* is a limited holding directed solely to "whether the Commission can avoid its statutorily mandated duty to reach a determination . . . [when there is] a private arbitration agreement." *Id.* at 1154.

In any event, the Commission's activities since *Farrel* indicate that the Commission also believes that *Farrel* is limited to arbitration agreements only. The current version of Commission Rule 210.21(a), which was proposed and enacted <u>after</u> *Farrel*, provides that any party may move to terminate "on the basis of withdrawal of the complaint or certain allegations contained therein, or <u>for good cause</u> <u>other than the grounds listed in paragraph (a)(2) of this</u> <u>section.</u>" 19 C.F.R. 210.21(a) (emphasis added). As the grounds listed in paragraph (a)(2) are the grounds listed in Section 337(c), clearly the Commission did not think that *Farrel* restricted termination to just these grounds. If the Staff's interpretation of *Farrel* is correct, it would mean that the Commission intentionally drafted and promulgated rules that contradict the mandate of the Federal Circuit in *Farrell*. Respondents do not think that this is the case.[6]

Respondents assert that the Commission intended the Judges to have the power to terminate based on withdrawal, or for good cause, under Rule 210.21(a), the latter specifically applicable to situations such as this one. Defending against a complaint in an ITC investigation is one of the most expensive legal proceedings in which a party can find itself. The compressed schedule and broad discovery typically mean that the cost of even simple investigations can run into the millions of dollars. These extreme litigation costs have a high potential for abuse, and many Respondents, especially smaller Respondents, are often forced to settle because they cannot afford to defend themselves.

The Commission has two primary mechanisms to ensure that the investigation process is not abused. The first is the Commission's pre-institution review of the complaint, and the second is the ALJ's authority to terminate an investigation in the interest of good cause under Rule 210.21(a). ALJ Bullock has employed the authority under 210.21(a) numerous times. *See*

---

[6] It would also mean that the innumerable parties that were terminated based on a withdrawal of the allegations, were improperly terminated.

*Universal Transmitters for Garage Door Openers*, 337-TA-497, Order No. 14. (terminating based on the *res judicata* effect of a district court decision even though an appeal to the Federal Circuit was pending); *Certain Rechargeable Lithium-Ion Batteries, Components Thereof, and Products Containing Same*, 337-TA-600, Order No. 19 (terminating based on settlement agreements with a Respondent's suppliers).

In the present investigation, the Judge's authority to terminate is more important than usual, because SanDisk's improper omissions from the complaint from the California state court litigation denied the Commission the opportunity to consider whether SanDisk actually had standing to assert the '808 patent. Instituting a rule that would deny Respondents relief in this situation would only serve to encourage Complainants to withhold information from the Commission, secure in the knowledge that the Judge has no power to address this behavior and affect the outcome of the investigation.

## V.     Conclusion

For each of the reasons set forth above, Respondents believe termination of the investigation as to the '808 patent under Commission Rule 210.21(a) for good cause, or alternatively a stay of the '808 patent, is not only warranted under the rules, but a fair and proper result.

Respectfully Submitted,

Dated: <u>March 3, 2008</u>                FISH & RICHARDSON P.C.

David M. Barkan
FISH & RICHARDSON P.C.
500 Arguello St., Suite 500
Redwood City, CA 94063
Tel: (650) 839-5070
Fax: (650) 839-5071

Michael Chibib
David Hoffman
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810

8

111 Congress Avenue
Tel.: (512) 472-5070
Fax: (512) 320-8935

Joseph V. Colaianni, Jr.
Jeffrey R. Whieldon
FISH & RICHARDSON P.C.
1425 K Street, N.W., Suite 1100
Washington, DC 20005
Tel.: (202) 783-5070
Fax: (202) 783-2331

*Attorneys for Respondents Phison Electronics Corp.,*
*Kingston Technology Co., Kingston Technology Corp.,*
*MemoSun, Inc., and Payton Technology Corp*

S.J. Christine Yang
LAW OFFICES OF S.J. CHRISTINE YANG
17220 Newhope Street
Suites 101 & 102
Fountain Valley, CA  92708
(714) 641-4022

*Attorney for Respondents Kingston Technology Co.,*
*Kingston Technology Corp., MemoSun, Inc., and*
*Payton Technology Corp.*

9

## CERTIFICATE OF SERVICE

It is hereby certified that copies of the foregoing MOTION FOR LEAVE TO FILE A

REPLY TO (1) SANDISK'S MEMORANDUM IN OPPOSITION TO RESPONDENTS'

MOTION TO TERMINATE THE INVESTIGATION FOR GOOD CAUSE OR

ALTERNATIVELY TO STAY THE INVESTIGATION; (2) COMMISSION

INVESTIGATIVE STAFF'S RESPONSE TO TERMINATE, OR ALTERNATIVELY STAY,

THE INVESTIGATION AS TO THE '808 PATENT and REPLY were served this 3rd day of

March, 2008, on:

Marilyn Abbott
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436

SERVED BY ELECTRONIC FILING

The Honorable Charles E. Bullock
U.S. International Trade Commission
500 E Street, S.W., Room 112-F
Washington, D.C. 20436

SERVED BY HAND DELIVERY
(2 copies)

*SERVED BY EMAIL:*
*Jennifer.Whang@USITC.gov*

Christopher G. Paulraj, Esq.
Office of Unfair Import Investigations
U.S. International Trade Commission
500 E Street, S.W., Room 112-F
Washington, D.C. 20436

SERVED BY E-MAIL:
Christopher.Paulraj@usitc.gov

Michael A. Ladra
James C. Yoon
Julie Holloway
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050

Attorneys for Complainant
SANDISK Corp.

SERVED BY E-MAIL:
JYoon@wsgr.com
mladra@wsgr.com
jochs@wsgr.com
abaranski@wsgr.com
jholloway@wsgr.com

10

Nicole W. Stafford
Wilson Sonsini Goodrich & Rosati
8911 Capital of Texas Highway
North Westech 360, Suite 3350
Austin, TX 78759

Attorneys for Complainant
SANDISK Corp

SERVED BY E-MAIL:
nstafford@wsgr.com

Steven E. Adkins
Eric S. Namrow
Ric Macchioroli
Richard Fieman
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001

Attorneys for Complainant
SANDISK Corp.

SERVED BY E-MAIL:
337-619@jonesday.com

Robert W. Dickerson
JONES DAY
555 S. Flower St., 50th Fl.
Los Angeles, CA 90071

Attorneys for Complainant
SANDISK Corp.

SERVED BY E-MAIL:
337-619@jonesday.com

Michael J. Bettinger
Chien-Wei Chou
Harold H. Davis Jr.
KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
55 Second Street, Suite 1700
San Francisco, CA, 94105-3493

Attorneys for Respondent
ACER Inc.

SERVED BY E-MAIL:
SanDisk_itc_619@klgates.com

Brian K. McCalmon
KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
1601 K Street, NW
Washington, D.C. 20006-1600

Attorneys for Respondent
ACER Inc.

SERVED BY E-MAIL:
SanDisk_itc_619@klgates.com

11

Sturgis M. Sobin
Maureen Browne
Johnny C. Chiu
HELLER EHRMAN LLP
1 E. Main Street, Suite 201
Madison, WI  53703-5118

Attorneys for Respondents A-DATA
TECHNOLOGY CO., LTD., A-DATA
TECHNOLOGY (USA) CO., Ltd.,
CORSAIR MEMORY, INC., POWER
QUOTIENT INTERNATIONAL,
INC., POWER QUOTIENT
INTERNATIONAL (HK), INC. LTD.,
PQI CORP., CHIPSBRAND
MICROELECTRONICS (HK) CO.,
LTD., CHIPSBANK
TECHNOLOGIES (SHENZHEN) CO.,
LTD., SHENZHEN CHIPSBANK
MICROELECTRONICS CO., LTD.,
SKYMEDI CORP., AND USBEST
TECHNOLOGY, INC.

SERVED BY E-MAIL:
DC-
337FlashMemory@hellerehrman.com

Add-On Technology Co.
Attn: General Counsel
IF, No. 11, Lane 206
Da-An, Road Sec. 1
Taipei, Taiwan, R.O.C.

Respondent
SERVED BY MAIL

12

Michael J. Bettinger
Chien-Wei Chou
Harold H. Davis Jr.
KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
55 Second Street, Suite 1700
San Francisco, CA, 94105-3493
Telephone: (415) 882-8200

Attorneys for Respondents
APACER TECHNOLOGY, INC.,
APACER MEMORY AMERICA,
INC., TRANSCEND INFORMATION
INC., TRANSCEND INFORMATION
MARYLAND, INC., SILICON
MOTION TECHNOLOGY Corp.,
SILICON MOTION INC. (a Taiwan
corporation),
SILICON MOTION, INC. (a California
Corporation), and SILICON MOTION
INTERNATIONAL, INC.

SERVED BY E-MAI:L
SanDisk_itc_619@klgates.com

Brian K. McCalmon
KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
1601 K Street, NW
Washington, D.C. 20006-1600

Attorneys for Respondents
APACER TECHNOLOGY, INC.,
APACER MEMORY AMERICA,
INC., TRANSCEND INFORMATION
INC., TRANSCEND INFORMATION
MARYLAND, INC., SILICON
MOTION TECHNOLOGY CORP.,
SILICON MOTION INC. (a Taiwan
corporation), SILICON MOTION,
INC. (a California Corporation), and
SILICON MOTION
INTERNATIONAL, INC.

SERVED BY E-MAIL:
SanDisk_itc_619@klgates.com

Behavior Tech Computer (USA) Corp. (dba BTC
USA)
Attn: General Counsel
4180 Business Center Drive
Fremont, CA 94538

Respondent
SERVED BY MAIL

Behavior Tech Computer Corp.
Attn: General Counsel
20F-B, No.98, Sec. 1, Hsin Tai 5th Rd.,
Hsichih City, Taipei 22102,
Taiwan, R.O.C.

Respondent
SERVED BY MAIL

13

Charles C.H. Wu
WU & CHEUNG, LLP
98 Discovery
Irvine, CA  92618-3105

Attorneys for Respondents DANE
ELEC CORP. USA (dba
INTERVALLE CORP., DBA DANE-
ELEC MFG. USA), DANE-ELEC
MEMORY S.A., and
DEANTUSAIOCHT DANE-ELEC
TEO (dba DANE-ELEC MFG.)

SERVED BY E-MAIL:
cchwu@wclawyers.com

Emprex Technologies Corp.
Attn: General Counsel
20F, 108 Hsin Tai Wu Rd., Sec. 1
Hsichih City, Taipei County
Taiwan, R.O.C.

Respondent
SERVED BY MAIL

Peter H. Kang,
Theodore W. Chandler
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, California  94104-1522

Attorneys for Respondents LG
ELECTRONICS, INC., and
LG ELECTRONICS U.S.A., INC.

SERVED BY E-MAIL:
sf-lgesandiskitc@sidley.com

Brian Koo,
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005

Attorneys for Respondents LG
ELECTRONICS, INC., and
LG ELECTRONICS U.S.A., INC.

SERVED BY E-MAIL:
sf-lgesandiskitc@sidley.com

14

Louis Mastriani
ADUCCI MATRIANI & SCHAUMBERG, LLP,
1200 17th St., N.W.,
Washington, D.C.,  20036

Attorneys for Respondents IMATION
CORP., IMATION ENTERPRISES
CORP., and MEMOREX CORP.

SERVED BY E-MAIL:
IMA-002@adduci.com


B. Todd Jones
Ron Schutz
Richard Martinez
ROBINS KAPLAN MILLER & CIRESI, LLP,
2800 La Salle Plaza,
800 La Salle Ave.,
Minneapolis, MN, 55402

Attorneys for Respondents IMATION
CORP., IMATION ENTERPRISES
CORP., and MEMOREX CORP.

SERVED BY E-MAIL:
btjones@rkmc.com
rjschutz@rkmc.com
rmmartinez@rkmc.com


Yitai Hu
Richard Chae
AKIN GUMP STRAUSS HAUER & FELD LLP
2 Palo Alto Square
3000 El Camino Real, Suite 400
Palo Alto, CA 94306

Attorneys for Respondents SKYMEDI
CORP., TRANSCEND
INFORMATION INC., and
TRANSCEND INFORMATION
MARYLAND, INC.

SERVED BY E-MAIL:
yhu@akingump.com
rchae@akingump.com


Tobias Zimmerman
AKIN GUMP STRAUSS HAUER& FELDL LP
1333 New Hampshire Ave, N.W.
Washington, D.C. 20036

Attorneys for Respondents SKYMEDI
CORP., TRANSCEND
INFORMATION INC., and
TRANSCEND INFORMATION
MARYLAND, INC.

SERVED BY E-MAIL:
tzimmerman@akingump.com


Syscom Development Co., Ltd.
c/o Insigner Corporation Services (BVI) Ltd.
Palm Grow Service House
PO Box 438
Road Town, Tortola, British Virgin Islands

Respondent
SERVED BY MAIL

15

Perry Clark                                    Attorneys for Respondent
Sarah Forney                                   VERBATIM CORP.
Kimberly Spencer
KIRKLAND & ELLIS LLP                           SERVED BY E-MAIL:
555 California Street                           INV337-619-Verbatim@kirkland.com
San Francisco, California 9410


Zotek Electronic Co., Ltd. (dba Zodata Technology    Respondent
Ltd.)                                                SERVED BY MAIL
Attn: General Counsel
13F No. 508 Chung Hsiao E. Road
Taipei City, 11083
Taiwan, R.O.C.

16

# Exhibit 1

# United States Court of Appeals for the Federal Circuit

2007-1211

DDB TECHNOLOGIES, L.L.C.,

Plaintiff-Appellant,

v.

MLB ADVANCED MEDIA, L.P.,

Defendant-Appellee.

Michael D. Gannon, McDonnell Boehnen Hulbert & Berghoff LLP, of Chicago, Illinois, argued for plaintiff-appellant. With him on the brief were Michael H. Baniak, and Christina L. Brown.

Sharon R. Barner, Foley & Lardner LLP, of Chicago, Illinois, argued for defendant-appellee. With her on the brief were Jonathan R. Spivey and Michael R. Houston. Of counsel on the brief was Anat Hakim, of Washington, DC.

Appealed from: United States District Court for the Western District of Texas

Judge Lee Yeakel

# United States Court of Appeals for the Federal Circuit

2007-1211

DDB TECHNOLOGIES, L.L.C.,

Plaintiff-Appellant,

v.

MLB ADVANCED MEDIA, L.P.,

Defendant-Appellee.

Appeal from the United States District Court for the Western District of Texas in case no. 04-CV-352, Judge Lee Yeakel.

———————————

DECIDED: February 13, 2008

———————————

Before NEWMAN, Circuit Judge, CLEVENGER, Senior Circuit Judge, and DYK, Circuit Judge.

Opinion for the court filed by Circuit Judge DYK.    Opinion dissenting in part and concurring in part filed by Circuit Judge NEWMAN.

DYK, Circuit Judge.

Appellant DDB Technologies, L.L.C. ("DDB") appeals from a decision of the United States District Court for the Western District of Texas.    The district court dismissed DDB's patent infringement suit against MLB Advanced Media, L.P. ("MLBAM") for lack of subject matter jurisdiction.    We hold that the district court correctly held that DDB's asserted statute of limitations and equitable defenses were not available and that no jury trial was required on the issue of standing.    However, we hold that the district court erred in denying DDB's request for jurisdictional discovery.    Therefore we affirm in part and vacate in part the judgment of the district court, and we

remand for limited jurisdictional discovery and for further consideration of the district court's jurisdiction based on that discovery.

BACKGROUND

I

Plaintiff-Appellant DDB is a company formed by Dr. David Barstow and his brother Daniel Barstow. The two Barstow brothers were the named inventors of the patents in suit. Those patents include three "Computer Simulation Patents," U.S. Patent Nos. 5,526,479 ("'479 patent"), 5,671,347 ("'347 patent"), and 6,204,862 ("'862 patent"), all relating to a method for generating a computer simulation of a live event for display on a viewer's computer, and one "Pattern-Matching Patent," U.S. Patent No. 5,189,630 ("'630 patent"), relating to a method allowing a viewer to search for certain information about a live event. In 1998, the Barstow brothers assigned these patents to DDB, which they had formed to commercialize and further develop their inventions.

The ultimate question here is whether the interest of Dr. David Barstow ("Barstow") in these patents was previously assigned to his former employer, Schlumberger Technology Corporation ("Schlumberger").[1]  Barstow, a computer scientist, worked for Schlumberger from 1980 until 1994. At the start of his employment, Barstow entered into an employment agreement that included the following relevant provisions:

> 3. Employee shall promptly furnish to Company a complete record of any and all technological ideas, inventions and improvements, whether patentable or not, which he, solely or jointly, may conceive, make or first disclose during the period of his employment with [Schlumberger].

---

[1]     There is no contention that Daniel Barstow's interest was assigned to Schlumberger. All of Daniel Barstow's interest was assigned to DDB.

    4. Employee agrees to and does hereby grant and assign to Company or its nominee his entire right, title and interest in and to ideas, inventions and improvements coming within the scope of Paragraph 3:

        a) <u>which relate in any way to</u> the business or activities of [Schlumberger], or

        b) <u>which are suggested by or result from</u> any task or work of Employee for [Schlumberger], or

        c) which relate in any way to the business or activities of Affiliates of [Schlumberger],

together with any and all domestic and foreign patent rights in such ideas, inventions and improvements. Employee agrees to execute specific assignments and do anything else properly requested by [Schlumberger], at any time during or after employment with [Schlumberger], to secure such rights.

J.A. at 470-71 (emphasis added).

    During his employment with Schlumberger, Barstow worked on several projects related to the development of computer software used to control and record data measured by physical sensors used in logging oil wells, and on other software development projects. Barstow also worked on several personal projects during that time period, including collaborating with his brother Daniel on a method for broadcasting data about a live event, such as a baseball game, and producing a simulation of that event to be viewed on a computer. This project eventually led to the applications for the four patents in suit, two of which were filed and one of which was issued during Barstow's employment with Schlumberger.

    While employed at Schlumberger, Barstow discussed this project with Charles Huston, Schlumberger's general counsel for software matters, and Dr. Reid Smith, the director of the lab in which Barstow worked. Both Huston and Smith testified that they knew Barstow was working on a "baseball simulator" project, J.A. at 153, that they had

discussed the project with Barstow and also between themselves, and that they did not believe at the time that the project belonged to Schlumberger. Huston stated, "Dave came to Re[i]d and myself and said this is what I'm doing. If there is any problem with this let me know and Re[i]d and I discussed it and we don't see how it applies to Schlumberger's business." J.A. at 154. Smith testified that Barstow's project was "general knowledge" at Schlumberger, that he had never "suggest[ed] to Dr. Barstow that the personal work he was doing belonged to Schlumberger," and that he was not "aware of anyone at Schlumberger ever stating a belief that Dr. Barstow's personal work belonged to Schlumberger." J.A. at 165-66. However, the extent of Huston and Smith's knowledge of the project is unclear from the record.

The only written communication from Barstow produced at the hearing was an e-mail sent from Barstow to Smith requesting permission to "include a short biography of [Barstow] in the biographical section" on a product resulting from a "project of [his] brother's . . . involv[ing] a scheme for recording symbolic descriptions of baseball games . . . and providing software for home computers that would do things like simulation and search." J.A. at 965. Barstow also advised Smith that "some patents may issue this year, in both of our names," and promised to "let [Smith] know if it actually happens." Id. Smith forwarded the e-mail to Huston, who wrote back, "I see no problem with Dave having his biography included if he is a coauthor of the work." Id. Although Huston testified that he did not think Barstow "concealed details of his personal project," J.A. at 153, he also admitted that he did not recall any documentation about the project, other than the e-mail, being provided. Similarly, Smith stated that he did not know what other documentation about the project Barstow had provided to others at Schlumberger.

II

In 2004, DDB filed this patent infringement action against MLBAM, alleging that MLBAM provides several Internet services related to baseball that infringe the Computer Simulation Patents and the Pattern-Matching Patent. More than a year later, immediately before the close of discovery, MLBAM entered into negotiations with Schlumberger to acquire any interest that Schlumberger had in the patents in suit. Several months later, on April 7, 2006, Schlumberger and MLBAM entered into an agreement that assigned to MLBAM all of Schlumberger's rights and interest in the patents in suit and granted MLBAM a retroactive license to practice under those patents.

On May 1, 2006, MLBAM moved the district court to dismiss the action for lack of subject matter jurisdiction, based on DDB's failure to join all owners of the patents in suit (including MLBAM) and on DDB's inability to pursue an infringement claim against MLBAM by virtue of its newly acquired ownership interest in those patents. DDB subsequently filed a motion to extend the briefing schedule and to obtain limited expedited discovery and depositions on the issues raised by MLBAM's motion to dismiss. MLBAM indicated that it would agree to a thirty-day extension for "reasonable discovery," J.A. at 892, although it now disputes the extent of the discovery it was willing to provide. Nonetheless, the district court denied DDB's discovery motion, and scheduled a hearing on the motion to dismiss for June 8, 2006. The court held a telephonic conference to determine whether the parties would be allowed to present witness testimony at the hearing, and ultimately decided to allow each party thirty minutes and to use part of its thirty-minute argument time to present witness testimony.

At the hearing, DDB used its time to present the testimony by Huston and Smith described above. MLBAM presented testimony by Dale Gaudier, Schlumberger's general patent counsel, about the nature of Schlumberger's business at the time Barstow worked for the company.

On September 26, 2006, the district court granted MLBAM's motion to dismiss. The court found that the patents in suit fell within the scope of Barstow's employment agreement because they were both "suggested by" and "related to" his work for Schlumberger. In determining that the patents in suit were "suggested by" Barstow's work, the district court relied particularly on their relation to two prior patents issued to Schlumberger that named Barstow as the inventor. During the prosecution of three of the four patents in suit, one of these patents was listed by the patent examiners as prior art (although not cited by the applicant as prior art). In determining that the patents in suit were "related to" Barstow's work, the court relied in part on a 1992 letter from Barstow to his brother Daniel which the district court interpreted as an admission by Barstow of such a relation. Because the language of the employment agreement provided for an automatic assignment of Barstow's rights, the court rejected DDB's statute of limitations, waiver, estoppel, and laches defenses. The court also held that the equitable defenses were not available because Barstow had not complied with the disclosure requirements of Paragraph 3 of the employment agreement. Having concluded that Schlumberger, and thereafter MLBAM, was a co-owner of the patents, the court determined that it lacked subject matter jurisdiction because DDB had not joined Schlumberger and could not join MLBAM. See Israel Bio-Eng'g Project v. Amgen Inc., 475 F.3d 1256, 1264-65 (Fed. Cir. 2007) ("Absent the voluntary joinder of all co-

owners of a patent, a co-owner acting alone will lack standing.").[2]  The court did not address whether DDB was entitled to a jury trial on the disputed jurisdictional facts.

DDB timely appealed the district court's dismissal to this court.  We have jurisdiction under 28 U.S.C. § 1295(a)(1).

DISCUSSION

The district court's decision as to the lack of subject matter jurisdiction is a question of law that we review de novo.  See Pennington Seed, Inc. v. Produce Exch. No. 299, 457 F.3d 1334, 1338 (Fed. Cir. 2006).  We review the district court's underlying factual determinations for clear error.  See Plumtree Software, Inc. v. Datamize, LLC, 473 F.3d 1152, 1158 (Fed. Cir. 2006).

I

DDB first argues that, even if the patents in suit were within the scope of the employment agreement, Schlumberger's claim of ownership is barred by the statute of limitations; that Schlumberger has waived any claim of ownership it may have had through its long period of inaction in asserting an interest in the patents in suit; and that Schlumberger is subject to estoppel by laches based on its unreasonable delay in

---

[2]  Contrary to the dissent, we have explicitly held that Rule 19 does not permit the involuntary joinder of a patent co-owner in an infringement suit brought by another co-owner.  See Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456, 1468 (Fed. Cir. 1998) ("[A]s a matter of substantive patent law, all co-owners must ordinarily consent to join as plaintiffs in an infringement suit.") (emphasis added).  Ethicon notes two exceptions, neither of which is applicable to this case:  (1) an exclusive licensee may join the patent owner as an involuntary plaintiff in an infringement suit, see Independent Wireless Telegraph Co. v. Radio Corp. of America, 269 U.S. 459, 469 (1926); and (2) a co-owner who, by agreement, waives his right to refuse to join suit, may be forced to join an infringement suit, see Ethicon, 135 F.3d at 1468 n.9.  Notably, the appellant does not assert that MLBAM could be joined as an involuntary plaintiff.

asserting its rights.    DDB also argues estoppel by acquiescence based on Schlumberger's implicit and explicit assurances that the patents belonged to Barstow, and equitable estoppel based on Barstow's reliance on communications from Schlumberger that led him to believe the company was not claiming rights in the patents.  The district court determined that the assignment under the agreement was automatic, and that under such circumstances Texas law precluded the assignor from asserting waiver, estoppel by acquiescence, and equitable estoppel against the assignee.  See DDB Techs., L.L.C. v. MLB Advanced Media, L.P., 465 F. Supp. 2d 657, 669 (W.D. Tex. 2006); Johnson v. Structured Asset Servs., Inc., 148 S.W.3d 711, 722 (Tex. App. 2004) ("An assignor cannot urge estoppel or waiver against his assignee after making a valid assignment."); Univ. of Tex. Med. Branch v. Allan, 777 S.W.2d 450, 453 (Tex. App. 1989).  DDB does not dispute that state law would bar these defenses if there had been an automatic assignment; rather, it urges that there was no automatic assignment.

We must first determine whether the question of automatic assignment is governed by federal or state law.  Although state law governs the interpretation of contracts generally, see Thatcher v. Kohl's Department Stores, Inc., 397 F.3d 1370, 1373 (Fed. Cir. 2005), the question of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent cases.  We have accordingly treated it as a matter of federal law.  See Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1253 (Fed. Cir. 2000); Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d 1574, 1580-81 (Fed. Cir. 1991); cf. Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp., 284 F.3d 1323, 1328 (Fed. Cir. 2002)

(holding that bona fide purchaser defense is governed by federal law).  Applying federal law, we have held that whether an assignment of patent rights in an agreement such as the one in this case is automatic, requiring no further act on the part of the assignee, or merely a promise to assign depends on the contractual language.   If the contract expressly grants rights in future inventions, "no further act [is] required once an invention [comes] into being," and "the transfer of title [occurs] by operation of law." FilmTec, 939 F.2d at 1573 (contract provided that inventor "agrees to grant and does hereby grant" all rights in future inventions); see also Speedplay, 211 F.3d at 1253 (contract provided that employee's inventions within the scope of the agreement "shall belong exclusively to [employer] and [employee] hereby conveys, transfers, and assigns to [employer] . . . all right, title and interest in and to Inventions").  Contracts that merely obligate the inventor to grant rights in the future, by contrast, "may vest the promisee with equitable rights in those inventions once made," but do not by themselves "vest legal title to patents on the inventions in the promisee."  Arachnid, 939 F.2d at 1581 (contract provided that, for inventions within the scope of the agreement, "all rights . . . will be assigned by [inventor] to CLIENT").

Paragraph 4 of Barstow's employment agreement with Schlumberger stated that Barstow "agrees to and does hereby grant and assign" all rights in future inventions falling within the scope of the agreement to Schlumberger.  J.A. at 471 (emphasis added).  This contractual language was not merely an agreement to assign, but an express assignment of rights in future inventions.[3]  The district court therefore correctly

---

[3]      DDB argues that the employment agreement itself contemplated an additional act of assignment, and that reading the agreement to create an automatic assignment is therefore inappropriate.  DDB relies on the clause in the agreement that

determined that, if the patents in suit were within the scope of the employment agreement, they would have been automatically assigned to Schlumberger by operation of law with no further act required on the part of the company.  Accordingly, DDB's statute of limitations, waiver, and estoppel defenses have no merit.

We turn then to the question whether the employment agreement covered the patents in suit because they "relate in any way to the business or activities" of Schlumberger, or "are suggested by or result from" Barstow's work for Schlumberger. Those issues, of course, are governed by Texas law.

II

The sole jury trial issue in this case concerns whether DDB is entitled to a jury trial on the jurisdictional issue of standing.  We hold that it is not.  DDB argues that, because the jurisdictional issue and the merits of the case are intertwined, the district court should not have dismissed the case on jurisdictional grounds without a jury trial on the merits as to the question of whether the contract provided for assignment of the patents in suit.  Because the question of a patentee's right to a jury trial "implicates the jurisprudential responsibilities of this court in a field within its exclusive jurisdiction, i.e., patent law," Gardco Manufacturing, Inc. v. Herst Lighting Co., 820 F.2d 1209, 1212 (Fed. Cir. 1987), we apply our own law rather than the law of the regional circuit.  The right to a jury trial on disputed jurisdictional facts that also implicate the merits of plaintiff's cause of action is an issue of first impression for this court.

---

states:  "Employee agrees to execute specific assignments and do anything else properly requested by Company, at any time during or after employment with Company, to secure such rights."  J.A. at 471.  We see nothing in this clause that conflicts with the clear language of the present, automatic assignment provision in the agreement.

2007-1211                             10

Most of the regional circuits look to the degree of intertwinement between the jurisdictional facts and the facts underlying the merits of the cause of action to determine whether dismissal on jurisdictional grounds is appropriate, or whether resolution of the issues must await summary judgment proceedings or trial on the merits. See, e.g., Torres-Negrón v. J&N Records, LLC, 504 F.3d 151, 163 (1st Cir. 2007) (whether jurisdictional and merits issues are "distinct and independent").[4] We agree with the majority of the regional circuits that the degree of intertwinement of jurisdictional facts and facts underlying the substantive claim should determine the appropriate procedure for resolution of those facts. This inquiry can present complex questions. In this case, however, we think that the interpretation of the employment agreement, which depends in part on state contract law and in part on this circuit's law

---

[4]        See also Autery v. United States, 424 F.3d 944, 956 (9th Cir. 2005) (whether "jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits") (citation omitted); Morrison v. Amway Corp., 323 F.3d 920, 926 (11th Cir. 2003) (whether same statute provides basis for both subject matter jurisdiction and substantive claim for relief); Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002) ("[T]he underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.") (citation omitted); London v. Polishook, 189 F.3d 196, 198 (2d Cir. 1999) (whether "jurisdiction is so intertwined with the merits that its resolution depends on the resolution of the merits") (citation omitted); United States v. North Carolina, 180 F.3d 574, 581 (4th Cir. 1999) ("[W]hile the merits and jurisdictional questions are not identical, they are so closely related that the jurisdictional issue is not suited for resolution in the context of a motion to dismiss for lack of subject matter jurisdiction."); Osborn v. United States, 918 F.2d 724, 730 (8th Cir. 1990) (whether "the jurisdictional issue is 'so bound up with the merits that a full trial on the merits may be necessary to resolve the issue'") (citation omitted); Weidner Commc'ns, Inc. v. H.R.H. Prince Bandar Al Faisal, 859 F.2d 1302, 1310 n.11 (7th Cir. 1988) ("call[ing] to the attention of the district court" on remand a Ninth Circuit case holding that "where jurisdictional issues and substantive issues are so intertwined that the issue of jurisdiction is dependent on resolution of factual issues going to the merits," dismissal on jurisdictional grounds is inappropriate); Eubanks v. McCotter, 802 F.2d 790, 793 (5th Cir. 1986) (whether "the [same] statute provides both the basis of federal court subject matter jurisdiction and the cause of action") (citation omitted).

regarding patent assignment clauses, is not so intertwined with the substantive federal patent law governing DDB's infringement claims and MLBAM's invalidity counterclaims that dismissal on jurisdictional grounds would be inappropriate. We therefore reject DDB's argument that the district court erred by holding a preliminary hearing, rather than awaiting jury trial on the merits, to resolve the jurisdictional issues. Although we hold that DDB has no right to a jury trial on the issue of standing, there of course remains a right to jury trial on other appropriate issues in the case.

III

DDB also argues that the district court erred by not granting its motion for jurisdictional discovery before dismissing on jurisdictional grounds. In general, "[w]e review the district court's denial of additional discovery, an issue not unique to patent law, for abuse of discretion, applying the law of the regional circuit." Digeo, Inc. v. Audible, Inc., 505 F.3d 1362, 1370 (Fed. Cir. 2007). However, "[i]n determining the relevance of a request for jurisdictional discovery, we apply Federal Circuit law." Commissariat à l'Energie Atomique v. Chi Mei Optoelectronics Corp., 395 F.3d 1315, 1323 (Fed. Cir. 2005). In this case, the limited jurisdictional discovery requested by DDB clearly was relevant to the existence of subject matter jurisdiction.

Plainly, the employment agreement is ambiguous as to what is "related to" or "suggested by" Barstow's work for Schlumberger, because resort to extrinsic evidence, for example, as to the nature of Schlumberger's business or to that of Barstow's work, is necessary to determine whether the provision applies. DDB argues that the patents in suit are not within the scope of these terms because Schlumberger's business and Barstow's work for Schlumberger during the 1980 to 1994 period involved controlling

and recording data from physical sensors used in the oil business, whereas the patents in suit describe a technique for broadcasting information about live events, such as sporting events, using a computer simulation. MLBAM, with equal fervor, argues that the patents in suit are covered by the agreement.

Under both Texas contract law and general contract law, when a contract is ambiguous, "[c]onduct of the parties which indicates the construction that the parties themselves placed on the contract may . . . be considered in determining the parties' true intent." Consolidated Eng'g Co. v. S. Steel Co., 699 S.W.2d 188, 192-93 (Tex. 1985); see also 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 32:14 (4th ed. 1993) ("[T]he parties' own practical interpretation of the contract—how they actually acted, thereby giving meaning to their contract during the course of performing it—can be an important aid to the court."). Here, evidence that the parties during performance agreed that Barstow's work leading to the patents in suit was not covered by the agreement would be highly relevant, if not dispositive.

At the hearing on MLBAM's motion to dismiss, DDB presented witness testimony suggesting that Schlumberger knew about Barstow's work on the project leading to the patents in suit, considered whether it fell within the scope of the employment agreement, and concluded that it did not. Charles Huston, Schlumberger's in-house counsel for software matters from 1990 to 1995, testified that he knew Barstow was working on a personal project related to computer simulations of baseball games, that he had discussed the project with Dr. Reid Smith, the director of the laboratory in which Barstow worked, and that they had concluded that it did not apply to Schlumberger's business. Likewise, Dr. Smith testified that neither he nor anyone else at Schlumberger

2007-1211                           13

had ever suggested that Barstow's project belonged to the company. Barstow testified by declaration that he had discussed the project several times with Huston and Smith, and that "[n]o one from Schlumberger, including Mr. Smith, and Mr. Huston ever told [him] that the DDB patented techniques belonged to Schlumberger." J.A. at 951. Moreover, during the period from 1994, when Barstow left Schlumberger, until September 2005, when MLBAM contacted the company to initiate negotiations for an assignment of rights, Schlumberger did nothing to indicate that it believed it had an ownership interest in the patents in suit.

However, Schlumberger's view that the agreement did not apply (and its silence) would only be significant if Schlumberger had been aware of the nature of Barstow's project. The crucial question thus was the extent of Schlumberger's knowledge of the project at the time that the company's officers concluded that the project was not within the scope of the agreement. The problem is that DDB was denied discovery on this central issue. MLBAM filed its motion to dismiss on May 1, 2006, several months after the close of discovery. DDB on May 12, 2006, filed a motion to extend the discovery period and for limited jurisdictional discovery. The motion listed several categories of pertinent documents, including those related to "Schlumberger's ownership interest in [the patents in suit]," "[c]ommunications between Dr. David Barstow and Schlumberger, including those pertaining to inventions of Dr. David Barstow," "[a]ny agreements between Dr. David Barstow and Schlumberger including, but not limited to, any employment agreement," and "[a]ny alleged breach of any agreements between Dr.

David Barstow and Schlumberger."[5]  J.A. at 886.  On the same day, MLBAM's counsel indicated by e-mail to counsel for DDB that it would "agree to extend 30 days for reasonable discovery and will work with you if there needs to be a slightly longer extension."  J.A. at 892.  DDB then, inter alia, filed a subpoena for Schlumberger, seeking documents and Rule 30(b)(6) deposition on a variety of pertinent subjects.  The district court denied the discovery motion on May 18, 2006.

DDB's discovery requests could have led to the production of documents (if they existed) such as copies of the applications for the patents in suit in Schlumberger's files, notes of conversations by Schlumberger employees demonstrating the extent of the company's knowledge of the inventions, further communications between Barstow and Schlumberger regarding the inventions, or communications as to whether Schlumberger's officers or employees believed that Schlumberger had an ownership interest in those inventions.[6]

---

[5]    MLBAM argues that this document discovery would have been futile, because its witness, Dale Guadier, testified at the hearing that "even before DDB's subpoena, a search was made and no additional documents were located."  Br. of Def.-Appellee at 20 n.10.  This is not an accurate characterization of Gaudier's testimony. Although Gaudier testified that he had not found "any other documentation regarding the technology at issue," J.A. at 138, he also clearly testified that he had seen the list of documents requested by DDB in its subpoena but did not "go through and try to find all the documents that are described . . . in [that] schedule of documents."  Id. at 143. Gaudier did state that he had not found an agreement assigning patent rights from Schlumberger back to Barstow, but if Schlumberger had never believed it had any rights in the patents in suit, no such document would be expected to exist.

[6]    This discovery would also have been relevant to the question of whether Barstow complied with his obligation under the employment agreement to provide Schlumberger with a complete record of his inventions.  We need not decide how or whether Barstow's breach of the agreement would in any way affect Schlumberger's rights under the agreement if it had nonetheless been fully aware of the nature of Barstow's work.

The question is whether the district court's refusal to grant that discovery was an abuse of discretion.  In cases where the jurisdictional and merits issues are intertwined but separable, the Fifth Circuit has explained that "the district court must give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss." Williamson v. Tucker, 645 F.2d 404, 414 (5th Cir. 1981); see also McLain v. Real Estate Bd. of New Orleans, 583 F.2d 1315, 1323 n.9 (5th Cir. 1978) (explaining that "[t]he effective use of discovery is a crucial feature of this case," where "the issues necessarily determinative of jurisdiction can be isolated and explored through discovery"), vacated on other grounds, 444 U.S. 232 (1980).[7]

In general we give substantial deference to a district court's decisions on issues of discovery.  However, under the circumstances of this case, given the central relevance of the information sought in discovery, it was an abuse of discretion for the district court to deny DDB jurisdictional discovery, including document and deposition requests.  See, e.g., McAllister v. FDIC, 87 F.3d 762, 766 (5th Cir. 1996) (district court abused its discretion in denying discovery on jurisdictional issue); see also Commissariat à l'Energie Atomique, 395 F.3d at 1323-24 (same).  On remand, the district court should allow DDB to conduct reasonable discovery relevant to the issue of whether the patents in suit fall within the scope of Barstow's employment agreement

_____

Further discovery might also shed light on the significance of Barstow's statement in his November 1992 letter to his brother that "[i]t's curious how [the project] and my Schlumberger work go hand in hand." J.A. at 842.

[7]    Other circuits have said that when jurisdictional facts are in dispute, "a refusal to grant discovery constitutes an abuse of discretion if the denial results in prejudice to a litigant." Sizova, 282 F.3d at 1326; see also Filus v. Lot Polish Airlines, 907 F.2d 1328, 1332 (2d Cir. 1990); Majd-Pour v. Georgiana Cmty. Hosp., Inc., 724

with Schlumberger.   We do not here attempt to specify exactly which discovery the district court should allow; the district court is in a far better position to make such determinations than are we.   If such discovery in this case produces relevant and material evidence, a new hearing may be required with additional witness testimony.

Because we hold that further jurisdictional discovery was warranted, we do not reach the issue of whether the district court correctly held on the previous record that the patents in suit fell within the scope of Barstow's employment agreement with Schlumberger.

CONCLUSION

For the foregoing reasons, we affirm in part and vacate in part the district court's decision, and we remand for further proceedings in accordance with this opinion.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

COSTS

No costs.

---

F.2d 901, 903 (11th Cir. 1984); Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 430 n.24 (9th Cir. 1977).

# United States Court of Appeals for the Federal Circuit

2007-1211

DDB TECHNOLOGIES, L.L.C.,

Plaintiff-Appellant,

v.

MLB ADVANCED MEDIA, L.P.,

Defendant-Appellee.

Appeal from the United States District Court for the Western District of Texas in case no. 04-CV-352, Judge Lee Yeakel.

NEWMAN, Circuit Judge, dissenting in part, concurring in part.

I do not object to the remand for additional discovery relevant to "the issue of whether the patents in suit fall within the scope of Barstow's employment agreement with Schlumberger." Maj. op. at 16. Although the testimony in the district court was undisputed that Schlumberger agreed that the Barstow inventions concerning computerized replays of sporting events were not within the scope of Barstow's employment obligations, it may be that further discovery will ameliorate the doubts that apparently concern my colleagues.

I write separately because several aspects of the majority opinion embody errors of law, substantive and procedural. Thus the panel majority rules prematurely that the issues of "the asserted statute of limitations and equitable defenses were not available and that no jury trial was required," maj. op. at 1, even as the case is remanded for discovery that is directly related to these issues. Other errors include the ruling that determination of Dr. Barstow's rights and obligations under his employment agreement is preempted by federal law because "standing" is involved, although disputes arising from employment

agreements are and have always been a matter of state law. In addition, the ruling against the jury role is gratuitous and premature, for there was no such ruling by the district court, and it is not yet known if the employment agreement issue may require trial. The court also errs in its ruling negating the procedures of the Federal Rules to join involuntary parties if those parties are necessary to the action. Further, the court improperly designates various merits issues as "jurisdictional." These complex areas require greater depth and clarity than are here dispensed. I elaborate briefly on some of the flaws in the majority view:

### The Issues of Waiver, Estoppel, and Laches

It is not disputed that during Dr. Barstow's employment the responsible Schlumberger officials agreed that the inventions relating to the computerized recall and replay of sporting events were not within the scope of his employment agreement. In 2006, sixteen years after the first patent application was filed (in 1990), thirteen years after the first patent was issued (in 1993), and twelve years after Dr. Barstow left Schlumberger (in 1994), Schlumberger reportedly represented to the defendant MLB Advanced Media (MLBAM) that Schlumberger owns the Barstow inventions and the four patents thereon, including those filed after Dr. Barstow left Schlumberger. Schlumberger did not assert that the Barstow inventions were for use in the Schlumberger oil and gas well business, but asserted ownership of the sporting events media inventions for sale to MLBAM, a sporting events media purveyor. At the time the Barstow inventions originated and patent applications were filed, however, Schlumberger officials told Dr. Barstow, unequivocally, that these inventions were not within the scope of his employment obligations. These statements were the subject of testimony in the district court, by the persons responsible at Schlumberger.

2007-1211                                  2

Testifying at the hearing in the district court, Dr. Reid Smith, Vice President and Director of the Schlumberger Laboratory for Computer Science from 1989 to 1994, at which Dr. Barstow was employed, answered "No" to the question of whether he is "aware of anyone at Schlumberger ever stating a belief that Dr. Barstow's personal work belonged to Schlumberger," and "No" to whether he ever "suggest[ed] to Dr. Barstow that the personal work he was doing belonged to Schlumberger."  Schlumberger's then patent counsel Charles Huston testified that Dr. Barstow "came to Reed [sic] and myself" regarding this invention and "Reed [sic] and I discussed it and we don't see how it applies to Schlumberger's business."  (The quotations are from the transcript of the hearing.)

In apparent conflict with its recognition of this undisputed testimony, the panel majority states that "evidence that the parties during performance agreed that Barstow's work leading to the patents in suit was not covered by the agreement would be highly relevant, if not dispositive." Maj. op. at 13.  And despite now ordering additional discovery on these issues, the panel majority prematurely rules that "DDB's statute of limitations, waiver, and estoppel defenses have no merit." Maj. op. at 10.  These conflicting positions do not add clarity to the procedures ordered on remand, for the issues of waiver and estoppel and laches may well be informed by this same further discovery.  The district court is not constrained from obtaining full exploration of these related issues, as well as determining, on the entirety of the evidence, the issues of employment obligations and ownership with respect to the inventions at issue.

### Preemption of State law; the Jury Role

The panel majority acknowledges "state contract law", but announces that federal law preempts state law for employment contracts that include rights to patents, reasoning

2007-1211                                3

that "[a]lthough state law governs the interpretation of contracts generally, the question of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent cases" and therefore is "a matter of federal law". Maj. op. at 8. That is grievous overreaching, as well as contrary to law and precedent.

Interpretation of employment contracts, including clauses establishing employer-employee obligations with respect to inventions and patents, is a traditional state matter. This is a quite different issue from "standing in patent cases," supra. The rule that a plaintiff must own the property on which he sues in federal court does not preempt the laws governing property ownership. The adjudication of property rights that arise from an employment agreement is not preemptively removed from state law when the agreement concerns patent property.

State statutory and common law have long been recognized as governing the ownership of patent property. See, e.g., Jim Arnold Corp. v. Hydrotech Sys., Inc., 109 F.3d 1567, 1572 (Fed. Cir. 1997) ("[T]he question of who owns the patent right and on what terms typically is a question exclusively for state courts."); Roach v. Crouch, 524 N.W.2d 400, 403 (Iowa 1994) (question of patent ownership is properly triable in state court). There is no conflict between the creation of the patent as a creature of federal law, and ownership of patent property governed by state law. Federal preemption of state property law is not casually invoked. See, e.g., California v. ARC America, 490 U.S. 93, 100 (1989) (no preemption when compliance with both state and federal law is possible). Absent a specific act of Congress, there must be a conflict between federal and state law before the state is deprived of its authority. See Cipollone v. Liggett Group, 505 U.S. 504, 516 (1992)

2007-1211                                    4

("In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law."). No statutory preemption or federal/state conflict is here postulated. There is no authority for preempting state law, no authority for eliminating state law principles of property ownership, no authority for divesting state authority to determine rights and obligations set by employment contract, no authority for rejecting the extensive state precedent of law and procedure governing these issues.

State law governing employment contract interpretation is not excised when patents are involved. Employment contracts are generally governed by the law of the state of employment, in turn founded on the common law and state policy considerations embodied in statute. The complex balance between an employer's rights to control its proprietary information and safeguard its commercial interests, and an employee's rights to use his experience for purposes outside of the employer's interests, has traditionally been subject of state law, and when dispute arises, has been subject to trial to a jury. The experience, and precedent, of state courts is extensive on these questions. See, e.g., Anderson, Greenwood & Co. v. Martin, 44 S.W.3d 200, 220 (Tex. App. 2001) (jury trial of ownership of patent rights and contractual intent); Taborsky v. State, 659 So. 2d 1112, 1115 (Fla. App. 1995) (jury verdict on patent ownership and obligation to assign patent); Edwards v. Gramling Eng'g, 588 A.2d 793, 799 (Md. 1991) (jury trial of ownership of invention as between employer and employee); Mount Sinai Hosp. of Greater Miami, Inc. v. Cordis Corp., 329 So. 2d 380, 381 (Fla. App. 1976) (question of whether the hospital or the instrument manufacturer it hired was entitled to ownership of the patent was for the jury).

Ignoring precedent, in this case the factual issues of the employment contract and ownership of the Barstow inventions have been distorted into a question that the panel

2007-1211                                    5

majority calls "standing." and on this basis my colleagues affirm the district court's procedure of summary disposition--albeit without the constraints of the summary judgment rules. Neither state employment law, nor the jury role, can be eliminated by designating a disputed factual issue as related to "standing" and therefore "jurisdictional."

### Joinder of Necessary Parties

As another flawed ruling, my colleagues state that if a necessary party refuses to join the case voluntarily, the plaintiff is out of court. That is inaccurate. A necessary party can be joined as a party plaintiff or a party defendant. See Fed. R. Civ. P. 19(a)(2) ("If a person has not been joined as required, the court must order that the person be made a party. A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff."). Rule 19 requires that a plaintiff have the opportunity to effect any necessary joinder when the issue is raised; my colleagues' prejudgment of this issue is unwarranted. The rule as applied to patent cases was early established, in a variety of factual situations. In Independent Wireless Telegraph Co. v. Radio Corporation of America, 269 U.S. 459, 468-469 (1926) the Court stated that "[i]f the owner of a patent, being within the jurisdiction, refuses or is unable to join an exclusive licensee as coplaintiff, the licensee may make him a party defendant by process," citing Littlefield v. Perry, 21 Wall. 205, 223 (1874) and extensive additional precedent. See, also, e.g., Brammer v. Jones, 4 F.Cas. 11 (C.C. Ohio 1867); Gamewell Telegraph Co. v. Brooklyn, 14 F. 255 (C.C.N.Y. 1882); Waterman v. Shipman, 55 F. 982, 986 (2nd Cir. 1893); Libbey Glass Co. v. McKee Glass Co., 216 F. 172 (D.C. Pa. 1914), aff'd, 220 F. 672 (3rd Cir. 1915); Hurd v. Goold, 203 F. 998 (2nd Cir. 1913).

2007-1211                             6

The Federal Circuit has followed precedent and the Federal Rules, although I have noted strained application to specific facts. However, the general rule dominates, as reflected in, <u>e.g.</u>, <u>IpVenture, Inc. v. Prostar Computer, Inc.</u>, 503 F.3d 1324, 1325 (Fed. Cir. 2007) ("Thus all entities with an independent right to enforce the patent are indispensable or necessary parties to an infringement suit. When such an entity declines to join in the suit it may be joined involuntarily, either as a party plaintiff or party defendant; the purpose is to assure that all interested parties are before the court and that their interests are considered, as the Court explained in <u>Shields v. Barrow</u>, 58 U.S. (17 How.) 130, 141 (1854) . . ."); <u>Intellectual Prop. Dev., Inc. v. TCI Cablevision of California, Inc.</u>, 248 F.3d 1333, 1347 (Fed. Cir. 2001) ("As a general rule, in accordance with *Independent Wireless*, this court adheres to the principle that a patent owner should be joined, either voluntarily or involuntarily, in any patent infringement suit brought by an exclusive licensee having fewer than all substantial patent rights."); <u>McNeilab, Inc. v. Scandipharm, Inc.</u>, 95 F.3d 1164, 1996 WL 431352, *2 (Fed. Cir. 1996) ("The Federal Rules of Civil Procedure authorize joinder of a necessary party, either voluntarily or involuntarily, as the circumstances may warrant."); <u>Abbott Laboratories v. Diamedix Corp.</u>, 47 F.3d 1128, 1133 (Fed. Cir. 1995) (patentee who does not voluntarily join can be joined as a defendant or involuntary plaintiff). In <u>Israel Bio-Engineering Project v. Amgen, Inc.</u>, 475 F.3d 1256 (Fed. Cir. 2007), like <u>Ethicon, Inc. v. United States Surgical Group</u>, 135 F.3d 1456, 1468 n.9 (Fed. Cir. 1998), on which the panel majority relies, the court's rulings applied to the facts of the case, but did not hold that a necessary party can never be involuntarily joined or that a co-owner with adverse interests can always prevent the other owners from obtaining judicial relief.

2007-1211                                    7

The dicta of those cases cannot reverse the Federal Rules and binding precedent.  As Independent Wireless concludes, permitting joinder of an unwilling but necessary party "would seem to be in accord with general equity practice." 269 U.S. at 469, citing Waldo v. Waldo, 17 N.W. 709 (Mich. 1883) and drawing analogy to the joinder of an unwilling trustee to protect the subject of the trust.

My colleagues summarily dispose of the case, ruling that neither Schlumberger, the self-appointed owner of the Barstow inventions, nor Schlumberger's customer who is the accused infringer MLBAM, can be reached by any process in any action.  This ruling, along with the arbitrary inclusion of all four patents, whenever the inventions of those patents were made and all of which deal with baseball, not oil and gas drilling, cannot support this court's anticipatory rulings on the issues of waiver, estoppel, laches, standing, etc.

*Jurisdiction*

The panel majority calls its further discovery "jurisdictional discovery," in its relation to the ownership of the Barstow inventions and patents.  It is hard to predict what may evolve from further discovery, which may adduce information about the conception and development of these inventions by Dr. Barstow and his brother, during and after Dr. Barstow's employment, as well as additional evidence concerning Schlumberger's contemporaneous negation of both interest and rights in these inventions.  The circumstances surrounding the sale to MBLAM may also be informative.  These are not matters of "jurisdiction," but of the merits of the ultimate questions.

The Court has commented on the trend to conflation of jurisdiction and merits.  In Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 89 (1998) the Court explained: "It is firmly established in our cases that the absence of a valid (as opposed to arguable)

2007-1211                          8

cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case." (emphasis in original). The Court criticized what it called "drive-by jurisdictional rulings" where there is subject matter jurisdiction but an underlying fact is in dispute. <u>Id.</u> This criticism aptly fits the majority's designation of its remand as "jurisdictional discovery." As the Court explained in <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500 (2006): "A plaintiff properly invokes §1331 jurisdiction when she pleads a colorable claim 'arising under' the Constitution or laws of the United States." 546 U.S. at 513. In <u>Arbaugh</u> the Court referred to the "subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy" and observed that a dismissal for lack of jurisdiction "when some threshold fact has not been established" results in an "unrefined" disposition known as "drive-by jurisdiction." <u>Id.</u> at 511.

As in <u>Arbaugh</u>, the issues before us are not jurisdictional; they are of the merits. Indeed, the extensive authority throughout the regional circuits is footnoted in the majority opinion at n.3, but ignored, starting with the case of <u>Autery v. United States</u>, 424 F.3d 944, 956 (9th cir. 2005) (whether "jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits") (internal citation omitted).

***Summary***

I concur in the remand for further discovery, with the understanding that the information adduced will be available for consideration with respect to any issue that may be relevant, including issues of waiver, estoppel, laches, and any others that may evolve. I respectfully dissent from the various erroneous pronouncements of law, fact, and procedure with which this opinion is encumbered.

2007-1211                                            9

# Exhibit I

1   Russell L. Johnson (SBN 053833)
    Edward V. Anderson (SBN 083148)
2   Teague I. Donahey (SBN 197531)
    Kevin P. Burke (SBN 241972)
3   Patrick M. Lonergan (SBN 245807)
    Sidley Austin LLP
4   555 California Street
    San Francisco, California 94104
5   Telephone:    (415) 772-1200
    Facsimile:    (415) 772-7400
6
    Attorneys For Plaintiff
7   STMicroelectronics, Inc.

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                FOR THE COUNTY OF SANTA CLARA

10

11  STMICROELECTRONICS, INC., a corporation   )   Case No. 1-07-CV-080123
                                              )
12          Plaintiff,                        )   **PLAINTIFF STMICROELECTRONICS,**
                                              )   **INC.'S FIRST SUPPLEMENTAL**
13      v.                                    )   **RESPONSES TO DEFENDANT SANDISK'S**
                                              )   **FIRST SET OF FORM**
14  ELIYAHOU HARARI, an individual;           )   **INTERROGATORIES – LIMITED CIVIL**
    SAN DISK CORPORATION, a corporation;      )   **CASES (ECONOMIC LITIGATION)**
15  and DOES 1 through 20, inclusive,         )
                                              )
16          Defendants.                       )
                                              )
17  _____  )

18

19  **PROPOUNDING PARTY:  Defendant SanDisk Corporation**

20  **RESPONDING PARTY:    Plaintiff STMicroelectronics, Inc.**

21  **SET NO:                One**

22

23

24

25

26

27

28

1          Pursuant to section 2031.210 *et seq.* of the California Code of Civil Procedure, Plaintiff

2    STMicroelectronics, Inc's ("ST") responds as follows to defendant SanDisk Corporation's

3    ("SanDisk") First Set of Form Interrogatories - Limited Civil Cases (Economic Litigation)

4    ("Interrogatories"), dated December 14, 2007.

5          The following responses are based upon ST's present state of recollection, knowledge and

6    belief.  They are at all times subject to additional or different information that discovery may

7    disclose, and while based on the present state of recollection, are subject to such refreshing

8    recollection, and such knowledge of facts, as may result from further investigation by ST or its

9    attorneys.

10          ST's responses and objections are made without in any way waiving or intending to waive,

11    but on the contrary, intending to preserve and preserving:

12          1.     All questions as to competency, relevancy, materiality, privilege, and admissibility as

13    evidence for any purpose of the responses or subject matter thereof, in any subsequent proceeding in

14    or at the trial of this or any other action, and the production of documents pursuant to these requests

15    is, similarly, not to be deemed an admission as to the competency, relevancy, materiality, privilege,

16    or admissibility as evidence for any purpose in the above-entitled case;

17          2.     The right to object on any ground to the use of said responses, or the subject matter

18    thereof, in any subsequent proceeding in the trial of this or any other action; and

19          3.     The right to object on any ground at any time to other interrogatories, requests for

20    production, or other discovery procedures involving or relating to the subject matter of these

21    requests.

22          **GENERAL OBJECTIONS**

23          1.     ST objects to the Interrogatories to the extent any such interrogatory calls for the

24    disclosure of information protected by the attorney-client privilege, work product doctrine, or any

25    other applicable privilege.  Any response should be understood to exclude such privileged

26    information.

27          2.     All of the responses set forth below are based solely on such information and

28    documents that are available to and specifically known to ST at this time.  It is anticipated that

2

1  further discovery, independent investigation, and analysis may lead to substantial additions to,

2  changes in, and variations from the responses set forth herein.

3        3.    ST objects to the Interrogatories to the extent that they seek information that is

4  confidential or proprietary to, and/or a trade secret of, a third party.  Unless ordered by the Court to

5  do so, ST will not divulge such information to the extent that it is under any obligation to maintain

6  the third party information in confidence and not to disclose it, unless the third party grants

7  permission to do so.

8        4.    ST objects to the Interrogatories to the extent that they call for information not

9  reasonably available to, or not within the possession, custody, or control of ST or information that is

10  equally available to SanDisk.

11        5.    ST objects to the definition of "INCIDENT" on the grounds that it is unduly

12  burdensome and oppressive, overbroad and seeks information not reasonably available to ST.  ST

13  further objects to the definition of "INCIDENT" as vague and ambiguous.

14        6.    ST objects to the Interrogatories as unduly burdensome and harassing because they

15  are duplicative, and in fact, almost identical to SanDisk Corporation's First Set of Form

16  Interrogatories which were served at the same time.

17  **RESPONSE TO FORM INTERROGATORIES**

18  **FORM INTERROGATORY NO. 101.1:**

19      State the name, ADDRESS, telephone number, and relationship to you of each PERSON

20  who prepared or assisted in the preparation of the responses to these interrogatories.  (Do not

21  identify anyone who simply typed or reproduced the responses.)

22  **RESPONSE TO FORM INTERROGATORY NO. 101.1:**

23      ST incorporates by reference its general objections, set forth above, and makes the following

24  additional objections to this interrogatory.  ST objects to this interrogatory on the grounds that it

25  calls for the disclosure of information protected by the attorney-client privilege, work product

26  doctrine, or any other applicable privilege.  ST further objects to the phrases "relationship to you"

27  and "prepared or assisted in the preparation of" as vague and ambiguous as used in this

28  interrogatory.  Finally, ST objects to this interrogatory in that it is not reasonably calculated to lead

3

to the discovery of admissible evidence, and seeks information not relevant to the claims or defenses of any party.

Subject to, and without waiving its general and specific objections, ST responds as follows: Counsel for ST assisted in the preparation of the responses.

**FORM INTERROGATORY NO. 103.1:**

State your current business name and ADDRESS, type of business entity, and your title.

**RESPONSE TO FORM INTERROGATORY NO. 103.1:**

ST incorporates by reference its general objections, set forth above, and makes the following additional objections to this interrogatory. ST objects to this interrogatory on the grounds that it seeks information that is publicly available, and thus equally available to SanDisk. ST further objects to the phrase "your title" as vague and ambiguous as used in this interrogatory. ST further objects to this interrogatory as harassing because it is duplicative of at least Form Interrogatory 3.1 served by SanDisk on December 14, 2007.

Subject to, and without waiving its general and specific objections, ST responds as follows: STMicroelectronics, Inc. is a corporation located at 1310 Electronics Dr., Carrollton, TX 75006.

**FORM INTERROGATORY NO. 104.1:**

State the name and ADDRESS of each insurance company and the policy number and policy limits of each policy that may cover you, in whole or in part, for the damages related to the INCIDENT.

**RESPONSE TO FORM INTERROGATORY NO. 104.1:**

ST incorporates by reference its general objections, set forth above, and makes the following additional objections to this interrogatory. ST objects to the term "INCIDENT" as used in this interrogatory as vague and ambiguous. ST further objects to this interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence and seeks information not relevant to the claims or defenses of any party. ST further objects to this interrogatory as harassing because it is duplicative of at least Form Interrogatory 4.1 served by SanDisk on December 14, 2007.

Subject to, and without waiving its general and specific objections, ST responds as follows:

4

1  ST incorporates by reference its response to Form Interrogatory 4.1 served by SanDisk in this action

2  on December 14, 2007.

3  **FORM INTERROGATORY NO. 109.1:**

4      Describe each other item of damage or cost that you attribute to the INCIDENT, stating the

5  dates of occurrence and the amount.

6  **RESPONSE TO FORM INTERROGATORY NO. 109.1:**

7      ST incorporates by reference its general objections, set forth above, and makes the following

8  additional objections to this interrogatory.  ST objects to the term "INCIDENT" as used in this

9  interrogatory as vague and ambiguous.  ST further objects to the phrase "each other item of damage

10  or cost" as vague and ambiguous as used in this interrogatory.  Finally, ST objects to this

11  interrogatory on the grounds that the interrogatory is premature given that expert reports have not

12  been served and expert discovery has not yet commenced.  Expert discovery will be exchanged by

13  the parties in accordance with the schedule set by the Court.  ST further objects to this interrogatory

14  as harassing because it is duplicative of at least Form Interrogatory 9.1 served by SanDisk on

15  December 14, 2007.

16      Subject to, and without waiving its general and specific objections, ST responds as follows:

17  ST incorporates by reference its response to Form Interrogatory 9.1 served by SanDisk in this action

18  on December 14, 2007.

19  **FORM INTERROGATORY NO. 112.1:**

20      State the name, ADDRESS, and telephone number of each individual who has knowledge of

21  facts relating to the INCIDENT, and specify his or her area of knowledge.

22  **RESPONSE TO FORM INTERROGATORY NO. 112.1:**

23      ST incorporates by reference its general objections, set forth above, and makes the following

24  additional objections to this interrogatory.  ST objects to the term "INCIDENT" as used in this

25  interrogatory as vague and ambiguous.  ST further objects to the phrase "relating to the INCIDENT"

26  as vague and ambiguous as used in this interrogatory.  Finally, ST objects to this interrogatory as

27  incomprehensible in the context of this litigation, especially with respect to the fact that it is clearly

28  drafted to discover facts related to a claim in which there is an INCIDENT that is capable of being

witnessed and a scene of the INCIDENT.  ST further objects to this interrogatory as harassing

because it is duplicative of at least Form Interrogatory 12.1 served by SanDisk on December 14,

2007.

Subject to, and without waiving its general and specific objections, ST responds as follows:

ST incorporates by reference its response to Form Interrogatory 12.1 served by SanDisk in this

action on December 14, 2007.

**FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORY NO. 112.1:**

Subject to, and without waiving, its general and specific objections, ST responds as follows:

ST incorporates by reference its first supplemental response to Form Interrogatory 12.1 served on

April 4, 2008.

**FORM INTERROGATORY NO. 112.2:**

State the name, ADDRESS, and telephone number of each individual who gave a written or

recorded statement relating to the INCIDENT and the date of the statement.

**RESPONSE TO FORM INTERROGATORY NO. 112.2:**

ST incorporates by reference its general objections, set forth above, and makes the following

additional objections to this interrogatory.  ST objects to this interrogatory on the grounds that it

calls for the disclosure of information protected by the attorney-client privilege, work product

doctrine, or any other applicable privilege.  ST also objects to the term "INCIDENT" as used in this

interrogatory as vague and ambiguous.  ST further objects to the phrase "written or recorded

statement relating to the INCIDENT" as vague and ambiguous as used in this interrogatory.  ST

further objects to this interrogatory as harassing because it is duplicative of at least Form

Interrogatory 12.3 served by SanDisk on December 14, 2007.

Subject to, and without waiving its general and specific objections, ST responds as follows:

ST incorporates by reference its response to Form Interrogatory 12.3 served by SanDisk in this

action on December 14, 2007.

**FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORY NO. 112.2:**

Subject to, and without waiving, its general and specific objections, ST responds as follows:

ST incorporates by reference its first supplemental response to Form Interrogatory 12.3 served on

1   April 4, 2008.

2   **FORM INTERROGATORY NO. 112.3:**

3   State the name, ADDRESS, and telephone number of each PERSON who has the original or

4   a copy of a written or recorded statement relating to the INCIDENT.

5   **RESPONSE TO FORM INTERROGATORY NO. 112.3:**

6   ST incorporates by reference its general objections, set forth above, and makes the following

7   additional objections to this interrogatory.  ST objects to this interrogatory on the grounds that it

8   calls for the disclosure of information protected by the attorney-client privilege, work product

9   doctrine, or any other applicable privilege.  ST also objects to the term "INCIDENT" as used in this

10  interrogatory as vague and ambiguous.  ST further objects to the phrase "written or recorded

11  statement relating to the INCIDENT" as vague and ambiguous as used in this interrogatory.  ST

12  further objects to this interrogatory as harassing because it is duplicative of at least Form

13  Interrogatory 12.3 served by SanDisk on December 14, 2007.

14  Subject to, and without waiving its general and specific objections, ST responds as follows:

15  ST incorporates by reference its response to Form Interrogatory 12.3 served by SanDisk in this

16  action on December 14, 2007.

17  **FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORY NO. 112.3:**

18  Subject to, and without waiving, its general and specific objections, ST responds as follows:

19  ST incorporates by reference its first supplemental response to Form Interrogatory 12.3 served on

20  April 4, 2008.

21  **FORM INTERROGATORY NO. 112.4:**

22  Identify each document or photograph that describes or depicts any place, object, or

23  individual concerning the INCIDENT or plaintiff's injuries, or attach a copy.  (If you do not attach a

24  copy, state the name, ADDRESS, and telephone number of each PERSON who had the original

25  document or photograph or a copy.).

26  **RESPONSE TO FORM INTERROGATORY NO. 112.4:**

27  ST incorporates by reference its general objections, set forth above, and makes the following

28  additional objections to this interrogatory.  ST objects to this interrogatory on the grounds that it

7

1  calls for the disclosure of information protected by the attorney-client privilege, work product

2  doctrine, or any other applicable privilege.  ST also objects to the term "INCIDENT" as used in this

3  interrogatory as vague and ambiguous.  ST further objects to the phrases "place, object, or individual

4  concerning the INCIDENT or plaintiff's injuries" and "plaintiffs injuries" as vague and ambiguous

5  as used in this interrogatory.  ST further objects to this interrogatory as harassing because it is

6  duplicative of at least Form Interrogatory 12.4 served by SanDisk on December 14, 2007.

7         Subject to, and without waiving its general and specific objections, ST responds as follows:

8  ST incorporates by reference its response to Form Interrogatory 12.4 served by SanDisk in this

9  action on December 14, 2007.

10  **FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORY NO. 112.4:**

11         Subject to, and without waiving, its general and specific objections, ST responds as follows:

12  ST identifies the following documents:  SD-545-068177; SD-545-068195; SD-545-068197; SD-545-

13  068206; SD-545-068206; SD-545-068207; SD-545-068208-09; SD-545-068209; SD-545-068218;

14  SD-545-068223-26; SD-545-068231; SD-545-068243-44; SD-545-068250; SD-545-068252-55; SD-

15  545-068256-58; SD-545-068265; SD-545-068278; SD-545-068283; SD-545-068290; SD-545-

16  068323; SD-545-068347; SD-545-068376-77; SD-545-068381; SD-545-068450; SD-545-068456-

17  58; SD-545-068503-04; SD-545-068506-07; SD-545-068538; SD-545-068672-73; SD-545-068677;

18  SD-545-068678-81; SD-545-068682-84; SD-545-069997; SD-545-070772; SD-545-070836; SD-

19  545-070902; SD-545-070905; SD-545-088778-81; SD-545-088824; SD-545-088852-53; SD-545-

20  091556; SD-545-098294-96; SD-545-098297-301; SD-545-099807; SD-545-102833; SD-545-

21  102843; SD-545-102852; SD-545-102855; SD-545-102861; SD-545-102867; SD-545-109247; SD-

22  545-109252-54; SD-545-109391; SD-545-109993-96; SD-545-110177; SD-545-185608-616; SD-

23  545-185680; SD-545-185704; SD-545-185706-10; STMH000758-68; STMH000769-80;

24  STMH000784; STMH000787-89; STMH000790-91; STMH000792; STMH000793-96;

25  STMH000884-85; STMH000886-96; STMH000897-98; STMH000921-31; STMH001006-08;

26  STMH001009-12; STMH001013; STMH001014-19; STMH001020; STMH001021; STMH001022-

27  24; STMH001076; STMH001246; STMH001277-81; STMH001282-322; STMH001323-27;

28  STMH001329-36; STMH001329-36; STMH001329-36; STMH001329-36; STMH001330;

8

1   STMH001330-31; STMH001330-31; STMH001343-45; STMH001377-81; STMH001396-99;

2   STMH001401-08; STMH001409-27; STMH001438-54; STMH001463-65; STMH001466-71;

3   STMH001472; STMH001474-83; STMH001487-530; STMH001754-823; STMH001835-40;

4   STMH001841-44; STMH001845-48; STMH001849-54; STMH001855-61; STMH001864-82;

5   STMH001883-84; STMH001885-91; STMH001907-13; STMH001914; STMH001915-66;

6   STMH001989-92; STMH001993-94; STMH001996-97; STMH001998-2003; STMH002004-05;

7   STMH002007-09; STMH002010; STMH002011; STMH002016-19; STMH002020-27;

8   STMH002083-110; STMH002116-18; STMH002148-55; STMH002157-58; STMH002159-60;

9   STMH002161-67; STMH002186-91; STMH002198-02; STMH002206-08; STMH002209-12;

10   STMH002213-17; STMH002218-28; STMH002268-71; STMH002276-79; STMH002286-91;

11   STMH002304-11; STMH002322-25; STMH002332-46; STMH002374-75; STMH002376-91;

12   STMH002392-93; STMH002398-402; STMH002405-28; STMH002434-40; STMH002443-46;

13   STMH002447-57; STMH002459-60; STMH002464-67; STMH002475-80; STMH002481-82;

14   STMH002484-93; STMH002506-09; STMH002511-14; STMH002514; STMH002518-21;

15   STMH002522-23; STMH002525-26; STMH002530;STMH002531-33; STMH002535;

16   STMH003087-196; STMH003197-313; STMH004040-42; STMH004043-53; STMH004084-110;

17   STMH004120-127; STMH004473-557.  Discovery is ongoing and ST will supplement its response

18   if it discovers other information relevant to this response.

19   **FORM INTERROGATORY NO. 112.5:**

20        Identify each other item of physical evidence that shows how the INCIDENT occurred or the

21   nature or extent of plaintiff's injuries, and state the location of each item, and the name, ADDRESS,

22   and telephone number of each PERSON who has it.

23   **RESPONSE TO FORM INTERROGATORY NO. 112.5:**

24        ST incorporates by reference its general objections, set forth above, and makes the following

25   additional objections to this interrogatory.  ST objects to this interrogatory on the grounds that it

26   calls for the disclosure of information protected by the attorney-client privilege, work product

27   doctrine, or any other applicable privilege.  ST also objects to the term "INCIDENT" as used in this

28   interrogatory as vague and ambiguous.  ST further objects to the phrases "other item of physical

9

1  evidence," "shows how the INCIDENT occurred," and "nature or extent of plaintiff's injuries" as

2  vague and ambiguous as used in this interrogatory.  ST further objects to this interrogatory as

3  harassing because it is duplicative of at least Form Interrogatory 12.5 served by SanDisk on

4  December 14, 2007.

5        Subject to, and without waiving its general and specific objections, ST responds as follows:

6  ST incorporates by reference its response to Form Interrogatory 12.5 served by SanDisk in this

7  action on December 14, 2007.

8  **FORM INTERROGATORY NO. 114.1:**

9        If you contend that any PERSON involved In the INCIDENT violated any statute, ordinance,

10  or regulation and that the violation was a cause of the INCIDENT, identify each PERSON and the

11  statute, ordinance, or regulation.

12  **RESPONSE TO FORM INTERROGATORY NO. 114.1:**

13        ST incorporates by reference its general objections, set forth above, and makes the following

14  additional objections to this interrogatory.  ST also objects to the term "INCIDENT" as used in this

15  interrogatory as vague and ambiguous.  ST further objects to the phrase "that the violation was a

16  cause of the INCIDENT" as vague and ambiguous as used in this interrogatory.  ST further objects

17  to this interrogatory as harassing because it is duplicative of at least Form Interrogatory 14.1 served

18  by SanDisk on December 14, 2007.

19        Subject to, and without waiving its general and specific objections, ST responds as follows:

20  ST incorporates by reference its response to Form Interrogatory 14.1 served by SanDisk in this

21  action on December 14, 2007.

22  **FORM INTERROGATORY NO. 115.1:**

23        State in detail the facts upon which you base your claims that the PERSON asking this

24  interrogatory is responsible for your damages.

25  **RESPONSE TO FORM INTERROGATORY NO. 115.1:**

26        ST incorporates by reference its general objections, set forth above, and makes the following

27  additional objections to this interrogatory.  ST also objects to the term "damages" as used in this

28  interrogatory as vague and ambiguous.

Subject to, and without waiving its general and specific objections, ST responds as follows: To date, SanDisk and Harari have refused to substantively respond to any of the discovery requests ST has served in this action. Because of SanDisk and Harari's refusal to substantively respond to ST's discovery requests, the facts upon which ST bases its claims that Sandisk is responsible for ST's damages are described in ST's October 14, 2005 Complaint as follows:

## FACTS COMMON TO ALL COUNTS

### ST Acquired Wafer Scale Integration And Is The Successor In Interest To All Of Its Legal Rights

5.    The claims for relief at issue in this case had their genesis in Harari's breach of his fiduciary and other legal obligations while an employee, officer, consultant and/or director of Wafer Scale Integration, Inc. ("WSI"). ST is the successor to all WSI's legal rights, including the present claims against Harari and SanDisk.

6.    WSI was a California corporation with its principal place of business in Fremont, California. It was co-founded in 1983 by Harari. WSI designed and sold programmable system devices, including memory systems and nonvolatile memories. While Harari was an officer and/or a director of WSI, it was designing and developing flash memory products.

7.    On July 27, 2000, ST and WSI merged, with ST remaining as the surviving corporation. Pursuant to the Agreement and Plan of Merger between ST and WSI, ST succeeded to "all rights and property" of WSI.

8.    As a result of the 2000 merger, WSI is no longer a separate legal entity from ST.

### Harari Was An Officer And/Or Director Of WSI From Its Founding In 1983 Until His Resignation In 1989

9.    Harari was a co-founder of WSI, and served numerous roles at WSI between its founding on August 1, 1983 and his resignation in March of 1989, including:

- Chief Executive Officer (CEO): August 1, 1983 until June 11, 1986;

- Chief Technology Officer (CTO): June 11, 1986 until February 28, 1988;

- Director: August 1, 1983 through March 15, 1989; and

- Chairman of the Board: November 30, 1983 until June 15, 1985, and again from June 11, 1986 until February 28, 1988.

10.    On information and belief, during at least a part of this time

11

WSI was located, and Harari worked, in Fremont, California.

### Harari's Obligation to Assign Inventions to WSI

11.    Early in the period that Harari was an employee, officer and director of WSI, he signed two agreements with the company: (1) an Employee Agreement Regarding Confidentiality and Inventions dated February 22, 1984 (the "Inventions Agreement") (attached hereto as Exhibit A); and (2) a Key Employee Agreement dated February 27, 1984 (the "Key Employee Agreement") (attached hereto as Exhibit B).

12.    Through the Inventions Agreement, Harari agreed to the following:

2.    I will maintain in confidence and will not disclose or use, either during or after the term of my employment without the prior written consent of [WSI], any proprietary or confidential information or know-how belonging to [WSI] …. Upon termination of my employment or at the request of my supervisor before termination, I will deliver to [WSI] all writtern and tangible material in my possession incorporating the Proprietary Information or otherwise relating to [WSI's] business. …

3.    I will promptly disclose and describe to [WSI] (i) all inventions, improvements, discoveries and technical developments ("Inventions"), whether or not patentable, made or conceived by me, either alone or with others, during the term of my employment, provided that [WSI] shall receive such information in confidence. I hereby assign and agree to assign to [WSI] my entire right, title and interest in and to such Inventions which relate in any way to or are useful in [WSI's] business as presently conducted or as conducted at any future time during my employment, and agree to cooperate with WSI and its designee(s) both during and after my employment in the procurement and maintenance, at [WSI's] expense and at its discretion, of patents, copyrights, and/or other protection of [WSI's] rights in such inventions. I will keep and maintain adequate and current written records of all such Inventions, which shall be and remain the property of the [WSI].

4.    ….

(c) During my employment by [WSI], I will not engage in any employment, consulting or other activity in any business without [WSI's] express written agreement.

### WSI's Development of Flash Electrically Erasable Programmable Read Only Memory

13.    WSI, a company which designed and produced various kinds of semiconductor memory (memory on a chip) for computers and electronic devices, dedicated substantial resources and effort to

12

research and development of new memory technologies.

14.    Semiconductor memory can be either volatile or nonvolatile. Volatile memory requires a power source to maintain data in memory while nonvolatile memory requires no power to retain data.

15.    The main memory in computers has traditionally been dynamic random access memory ("DRAM") or static random access memory ("SRAM") both of which are volatile memories.  Thus, if the computer is turned off, any data stored in a DRAM or SRAM will be lost.

16.    Computers have also used nonvolatile memories such as read only memory ("ROM") and programmable read only memory (PROM) and electrically programmable read-only memory (EPROM). In the late 1980s, when Harari was still an employee, officer and director of WSI, a new nonvolatile memory technology called electrically erasable programmable read only memory (EEPROM or E2PROM) was developed which offered a substantial advantage over ROM, PROM or EPROM because it was electrically reprogrammable. When an EEPROM is quickly erasable and reprogrammable it is referred to as "flash EEPROM," or "flash memory."  If the computer is turned off, data in these memories is not lost.

17.    WSI, while Harari was its chief technical officer, began development work on flash memory.  By at least 1987, WSI was involved in research and development efforts regarding flash memory technology.  By 1989, WSI had a prototype flash memory product, and was anticipating revenues from this line of business.  As an employee, CTO and/or director of WSI, Harari was aware of WSI's research and development efforts with regard to flash memory.

18.    As a director and officer of WSI, Harari was in a position of trust and confidence and had fiduciary obligations, including at least the following: (a) to act in good faith and in the best interests of WSI and its shareholders; (b) to put the interests of WSI and its shareholders ahead of his private interests; (c) to not enter into any business in competition with WSI; (d) to bring business opportunities in the line of business of WSI to the attention of WSI and not to appropriate the opportunity for himself; (e) to protect and preserve the assets of WSI; and (f) to disclose material facts to WSI concerning his business dealings in the same field as WSI's business endeavors.

### Harari Filed Four Patent Applications While A Director Of and Consultant to WSI, But Did Not Assign Them To WSI

19.    WSI, in order to protect its intellectual property, routinely applied for United States patents to cover inventions developed in the course of its business.  As an employee, officer, and director of WSI, Harari had fiduciary and contractual obligations to assist WSI with the protection of its intellectual property, and to assign inventions which

13

related to WSI's business to WSI.

20.    Harari and WSI entered into an Agreement dated February 29, 1988 (the "Consulting and Directorship Agreement") (attached hereto as Exhibit C).  In this agreement Harari resigned his duties as an employee and officer of WSI effective February 28, 1988.

21.    In the Consulting and Directorship Agreement WSI and Harari also agreed that: (a) WSI would continue to nominate Harari as a director until an IPO took place; (b) Harari would be a paid consultant to WSI for 11 months at his then current salary; (c) WSI had the right to extend the consulting agreement for a period of six months; and (d) Harari would "continue to be bound by and comply with the terms of his Employee Agreement Regarding Confidentiality and Inventions dated February 22, 1984" – the Inventions Agreement.  The obligations in the Inventions Agreement as extended by the Consulting and Directorship Agreement included, among other things, three important obligations.  First, to maintain in confidence and not to use or disclose any proprietary, confidential or know-how of WSI without the company's prior written consent. Second, to assign "all inventions, improvements, discoveries and technical developments ("Inventions"), whether or not patentable."  And, third, Harari's agreement that he would "not engage in any employment, consulting or other activity in any business without the Company's express written agreement."

22.    On information and belief, the Consulting and Directorship Agreement was entered into, and at least some of the obligations of both WSI and Harari were to be performed, in Fremont, California.

23.    Furthermore, as a director of WSI, Harari continued in a position of trust and confidence and had all of the same fiduciary obligations he previously had when he was an officer and director. See, supra, ¶ 18.

24.    On April 26, 1988, less than two months after resigning as an officer of WSI, but while still serving as a director of and consultant to WSI with a continuing obligation to assign inventions to WSI, Harari filed Patent Application 07/185,699 with the United States Patent and Trademark Office ("PTO"), which resulted in U.S. Patent 4,933,739, entitled "Trench resistor structures for compact semiconductor memory and logic devices."  This patent relates to memory devices that were within WSI's line of business.

25.    On June 8, 1988, while still serving as a director of and consultant to WSI with a continuing obligation to assign inventions to WSI, Harari filed Patent Application 07/204,175 with the PTO, which resulted in twenty-two issued patents.  This application related to flash memory products that were within WSI's line of business.

26.    On July 8, 1988, while still serving as a director of and consultant to WSI with a continuing obligation to assign inventions to WSI, Harari filed Patent Application 07/216,873 with the PTO, which

14

resulted in three issued patents.  This application related to memory products that were within WSI's line of business.

27.    On March 15, 1989, Harari filed Patent Application 07/323,779 with the PTO, which resulted in U.S. Patent 5,070,032, entitled "Method of making dense flash EEPROM semiconductor memory structures."  This patent relates to flash memory devices that were within WSI's line of business.

28.    On March 21, 1989, Harari tendered his resignation from the Board of Directors of WSI, requesting that his resignation date be back dated to March 15, 1989 – the same day he had filed his most recent patent application.  Harari made this request without disclosing to the Board that he had filed any of the above-referenced patent applications.

### Harari Filed Two Patent Applications Three Weeks After Tendering His Resignation As A Director Of WSI

29.    In addition to the four applications Harari filed while still a director of WSI, Harari filed two more patent applications three weeks after tendering his resignation as a director of WSI, but before the Board of Directors accepted his resignation.  On information and belief, ST alleges that the inventions disclosed in these applications were invented and developed while Harari was an officer and/or director and/or a consultant of WSI.

30.    Specifically, on April 13, 1989, Harari filed two Patent Applications with the PTO – numbered 07/337,566 and 07/337,579.  These applications related to flash EEPROM memories which were then under development at WSI.  Patent Application 07/337,566 has resulted in the issuance of twenty-one patents and Patent Application 07/337,579 has resulted in the issuance of two patents.

31.    On May 17, 1989, the Board of Directors of WSI met and accepted Harari's resignation effective after the Board meeting of March 15, 1989.  The Board agreed to Harari's request to back date his resignation without knowing that Harari had filed patent applications on April 26, 1988, June 8, 1988, July 8, 1988, March 15, 1989, and April 13, 1989.

### While An Employee, Officer and/or Director Of WSI, Harari Only Disclosed and Assigned One Patent Application to WSI

32.    On information and belief, Harari did not disclose any of the following six patent applications to WSI at any time:  (a) 07/185,699; (b) 07/204,175; (c) 07/216,873; (d) 07/323,779; (e) 07/337,566; or (f) 07/337,579.  WSI had no way of knowing of Harari's conduct, as patent applications filed with the PTO are confidential and Harari did

15

not disclose this information to WSI.

33.     On information and belief, the ideas disclosed in these patent applications were known to or conceived by Harari while he was as a director and/or consultant of WSI, and the evidence at trial may prove that he had or conceived of these ideas during his tenure as an employee and officer as well.  Moreover, on information and belief, ST believes that Harari actively worked on the preparation of all these patent applications during his tenure as a director and/or consultant to WSI, and that Harari concealed this activity from WSI.

34.     These six patent applications all contain ideas and designs that would have benefited the design and development work being done at WSI on flash memory.

35.     In contrast to the six patent applications Harari filed in his own name without disclosing them to WSI, Harari disclosed only one patent application to WSI during his entire five-and-a-half year tenure as an employee, officer, director and/or consultant.  Harari was forced to disclose that patent application because there was a co-inventor on the application who would fulfill his obligations to make the disclosure.  In other words, Mr. Harari concealed from WSI every patent application he was able to conceal because he was either listed as the sole inventor or a co-inventor with a non-WSI employee.

36.     Harari's assignment of only a single application to WSI is particularly noteworthy in light of the significant number of applications he has filed during his career.  Over a period of twenty-eight years, Harari has filed one hundred and thirty-one patent applications – an average of almost five applications per year.  However, Harari disclosed only one patent application to WSI during his entire five-and-one-half-year tenure as an employee, officer, director and/or consultant of that company.  In fact, from 1975 until 1983, Harari filed at least one patent application each year.

37.     However, in 1984, 1985, 1986, and 1987, all years during which Harari served as an employee, officer and/or director of WSI, Harari did not file a single patent application.

38.     In the years following his departure from WSI, from 1989 until 2002, Harari filed at least four patent applications each year.  Indeed, within the first five months after Harari resigned his position as CTO of WSI, while still a director and consultant to WSI with an obligation to assign inventions, Harari filed three different applications with the PTO – none of which were disclosed or assigned to WSI.  Each of these patent applications likely would have been in process for months before filing with the PTO.

39.     Perhaps most tellingly, Harari filed an application on March 15, 1989, a date which he later requested be set as his effective date of resignation from the board of directors of WSI.  Harari's attempt to back-date his resignation to coincide with the filing of this application

16

is clear evidence of his intent to conceal his patent-filing activities from WSI, and to obtain for himself patent rights that he knew should have been assigned to WSI.

### Harari Founded SanDisk, A Competitor Of WSI, While Serving As A Director Of WSI

40.     In or about June 1988, Harari founded SanDisk Corporation. (SanDisk was originally named "SunDisk," but changed its name in 1995 prior to its initial public offering.  For clarity, this Complaint will consistently refer to the corporation as "SanDisk.")

41.     Harari founded SanDisk while serving as a Director of WSI, and therefore was under a fiduciary obligation not to enter into any business in competition with WSI.  Moreover, Harari had a fiduciary obligation to present corporate opportunities in WSI's line of business to WSI, and not to appropriate such opportunities to himself or another company.

42.     On information and belief, SanDisk, since its inception, has focused its research and development efforts on developing cost-effective flash memory storage products – a technology which WSI had been developing since at least 1987, and was continuing to develop at the time SanDisk was formed by Harari.

43.     Moreover, at the time Harari founded SanDisk, he was well aware of WSI's research into flash memory technology.  Harari served as CTO of WSI, and thus headed WSI's research efforts on flash memory until February of 1988.  As a Director of WSI, Harari received reports regarding WSI's flash memory work until at least January of 1989, several months after he founded SanDisk and filed four of the patent applications whose ownership is at issue in this suit.

44.     On information and belief, from its inception and founding by Harari, SanDisk was in direct competition with WSI.  As an officer and/or director of WSI, Harari had an obligation to present any corporate opportunity appropriate for WSI to it.  Harari's involvement with SanDisk was a serious violation of Harari's fiduciary duties to WSI.

45.     Furthermore, Harari assigned the patents which resulted from the above-described applications to SanDisk, thereby benefiting a company in direct competition with WSI, to whom he owed fiduciary duties of loyalty and good faith.  As alleged in more detail below, those assignments have recently resulted in injury to ST who is the successor-in-interest to WSI.

### SanDisk Sued ST, The Successor Of WSI, For Infringement Of Patents Which Should Have Been Assigned to WSI

46.     On October 15, 2004, SanDisk filed two complaints alleging

17

1
2
3
4
5
6
7

that ST infringed U.S. Patent 5,172,338 ("the '338 patent").  One complaint styled *In the Matter of Certain NAND Flash Memory Circuits and Products Containing Same,* Investigation No. 337-TA-526 was filed in the United States International Trade Commission (the "ITC action") and the other styled *SanDisk Corp. v. STMicroelectronics, Inc.,* case number C04-04379 JF, was filed in the Northern District of California (the "Northern District action").  The International Trade Commission initiated an investigation in the ITC action and a hearing before the Administrative Law Judge ("ALJ") has occurred and the initial determination of the ALJ is due in October 2005.  In the Northern District action, the claims of infringement of the '338 patent have been stayed pending completion of the ITC action.

8
9
10

47.    The '338 patent resulted from the continuation-in-part of an application filed by Harari less than one month after he resigned as a director of WSI.  On information and belief, any invention disclosed in the '338 patent was conceived of or made, and the application was being prepared, while Harari was still a director of WSI.

11
12
13
14
15

48.    On April 22, 2005, SanDisk filed its answer, affirmative defenses and counterclaims in an action styled *STMicroelectronics, Inc. v. SanDisk Corp.,* case number 4:05CV45 pending in the United States District Court of the Eastern District of Texas (Sherman Division).  In its counterclaims, SanDisk alleged that ST infringed U.S. Patents 5,583,812 (the "812 patent") and 5,719,808 (the "808 patent").

16
17
18
19

49.    The '812 patent resulted from various continuations-in-part and divisional applications going back to the June 8, 1988 patent application 07/204,175, from which it claimed priority.  On information and belief, any invention disclosed in the June 8, 1988 patent application 07/204, 175 from which the '812 patent claims priority was conceived of or made, and the application was being prepared, while Harari was still a director of WSI.

20
21
22
23

50.    The '808 patent resulted from various continuations-in-part and divisional applications going back to the April 13, 1989 patent application 07/337,566, from which it claimed priority.  On information and belief, any invention disclosed in the April 13, 1989 patent application 07/337,566 from which the '808 patent claims priority was conceived of or made, and the application was being prepared, while Harari was still a director of WSI.

24
25
26

51.    These applications and the patents which ultimately issued from these applications, should have been assigned to WSI and then to ST when it acquired WSI.  ST has suffered substantial damage as a result of the assertion of these patents by SanDisk.

27
28

52.    When ST began to defend itself in this suit, it, like its predecessor WSI, was unaware of Harari's filing of the undisclosed patent applications in 1988 and 1989.  During the course of preparing

18

its defense, ST slowly discovered the disparate facts from which it began to piece together Harari's conduct during and following his tenure as an employee, officer and director of WSI.

53.    WSI, and later ST, were unaware of Harari's assignment of these patents and applications until well after SanDisk filed suit against ST in October 2004 because Harari had concealed his patent applications from WSI, despite his contractual and fiduciary obligations to disclose and/or assign them.

All of the causes of action asserted by ST in this action relate to this nucleus of facts.  SanDisk is responsible for ST's damages based on its knowing exploitation or ratification of Harari's breach of contractual and fiduciary duties.  *Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 353 (1966) (finding unfair competition as a matter of law where defendant company "was aware of or ratified [other party's] breach of his fiduciary duties" and "cooperated . . . in . . . and . . . received the benefits of" the breach); *see also GAB Bus. Servs. v. Lindsey & Newsom Claim Servs.*, 83 Cal. App. 4th 409, 425 (2000) (similar), *overruled on other grounds by Reeves v. Hanlon*, 33 Cal. 4th 1140, 1154 (2004). Because Harari founded SanDisk and serves as its CEO, SanDisk had full knowledge of Harari's misappropriation.  SanDisk thus ratified Harari's acts by accepting and benefiting from the patent assignments.  *See also* 3 Witkin, SUMMARY OF CAL. LAW (10th ed. 2005) *Agency & Law* §§ 139, 141.

Discovery is currently ongoing and ST will supplement its response if it becomes aware of additional information responsive to this interrogatory.

**FORM INTERROGATORY NO. 115.2:**

State in detail the facts upon which you base your contention that you are not responsible, in whole or in part, for plaintiff's damages.

**RESPONSE TO FORM INTERROGATORY NO. 115.2:**

ST incorporates by reference its general objections, set forth above, and makes the following additional objections to this interrogatory.  ST objects to the phrase "you are not responsible, in whole or in part, for plaintiff's damages" as vague and ambiguous as used in this interrogatory.  In particular, this interrogatory is unintelligible as directed to ST, because, as drafted, "you" and "plaintiff" appear to refer to different people, despite the fact that ST is the plaintiff.

19

1        Subject to, and without waiving its general and specific objections, ST responds as follows:

2 The interrogatory is unintelligible.  ST is the plaintiff.

3 **FORM INTERROGATORY NO. 115.3:**

4        State the name, ADDRESS, and the telephone number of each PERSON, other than the

5 PERSON asking this interrogatory, who is responsible, in whole or in part, for damages claimed in

6 this action.

7 **RESPONSE TO FORM INTERROGATORY NO. 115.3:**

8        ST incorporates by reference its general objections, set forth above, and makes the following

9 additional objections to this interrogatory.  ST objects to the phrase "damages claimed in this action"

10 as vague and ambiguous as used in this interrogatory.

11        Subject to, and without waiving its general and specific objections, ST responds as follows:

12 ST incorporates by reference the Complaint it filed in this action on October 14, 2005.  Discovery is

13 currently ongoing and ST will supplement its response if it becomes aware of additional information

14 responsive to this interrogatory.

15 **FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORY NO. 115.3:**

16        Subject to, and without waiving, its general and specific objections, ST responds as follows:

17 ST currently believes that, in addition to SanDisk, at least Dr. Harari is responsible in whole or in

18 part, for damages claimed in this action.  Discovery is currently ongoing and ST will supplement its

19 response if it becomes aware of any other individuals that it believes are responsible in whole or in

20 part, for damages claimed in this action.

21 **FORM INTERROGATORY NO. 150.1:**

22        Identify all DOCUMENTS that are part of the agreement and for each state the name,

23 ADDRESS, and telephone number of the PERSON who has each DOCUMENT.

24 **RESPONSE TO FORM INTERROGATORY NO. 150.1:**

25        ST incorporates by reference its general objections, set forth above, and makes the following

26 additional objections to this interrogatory.  ST objects to this interrogatory on the grounds that it

27 calls for the disclosure of information protected by the attorney-client privilege, work product

28 doctrine, or any other applicable privilege.  ST also objects to the term "agreement" as used in this

20

1    interrogatory as vague and ambiguous.  ST further objects to this interrogatory as harassing because

2    it is duplicative of at least Form Interrogatory 50.1 served by SanDisk on December 14, 2007.

3          Subject to, and without waiving its general and specific objections, ST responds as follows:

4    ST incorporates by reference its response to Form Interrogatory 50.1 served by SanDisk in this

5    action on December 14, 2007.

6    **FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORY NO. 150.1:**

7          Subject to, and without waiving, its general and specific objections, ST responds as follows:

8    ST identifies the documents attached as Exhibits A, B, and C to ST's complaint in this action, which

9    constitute the relevant agreements.  These documents should at least be in the possession of Dr.

10   Harari, ST, counsel for ST, and counsel for Dr. Harari and SanDisk Corporation.  Discovery is

11   ongoing and ST will supplement its response if it discovers other information relevant to this

12   response.

13   **FORM INTERROGATORY NO. 150.2:**

14         State each part of the agreement not in writing, the name, ADDRESS, and telephone number

15   of each PERSON agreeing to that provision, and the date that part of the agreement was made.

16   **RESPONSE TO FORM INTERROGATORY NO. 150.2:**

17         ST incorporates by reference its general objections, set forth above, and makes the following

18   additional objections to this interrogatory.  ST objects to this interrogatory on the grounds that it

19   calls for the disclosure of information protected by the attorney-client privilege, work product

20   doctrine, or any other applicable privilege.  ST also objects to the term "agreement" as used in this

21   interrogatory as vague and ambiguous.  ST further objects to this interrogatory as harassing because

22   it is duplicative of at least Form Interrogatory 50.1 served by SanDisk on December 14, 2007.

23         Subject to, and without waiving its general and specific objections, ST responds as follows:

24   ST incorporates by reference its response to Form Interrogatory 50.1 served by SanDisk in this

25   action on December 14, 2007.

26   **FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORY NO. 150.2:**

27         Subject to, and without waiving, its general and specific objections, ST responds as follows:

28   ST does not currently believe that any part of the agreement is not in writing.  Discovery is ongoing

21

1  and ST will supplement its response if it discovers other information relevant to this response.

2  **FORM INTERROGATORY NO. 150.3:**

3      Identify all DOCUMENTS that evidence each part of the agreement not in writing, and for

4  each state the name, ADDRESS, and telephone number of the PERSON who has each

5  DOCUMENT.

6  **RESPONSE TO FORM INTERROGATORY NO. 150.3:**

7      ST incorporates by reference its general objections, set forth above, and makes the following

8  additional objections to this interrogatory.  ST objects to this interrogatory on the grounds that it

9  calls for the disclosure of information protected by the attorney-client privilege, work product

10  doctrine, or any other applicable privilege.  ST also objects to the term "agreement" as used in this

11  interrogatory as vague and ambiguous.  ST further objects to this interrogatory as harassing because

12  it is duplicative of at least Form Interrogatory 50.1 served by SanDisk on December 14, 2007.

13      Subject to, and without waiving its general and specific objections, ST responds as follows:

14  ST incorporates by reference its response to Form Interrogatory 50.1 served by SanDisk in this

15  action on December 14, 2007.

16  **FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORY NO. 150.3:**

17      Subject to, and without waiving, its general and specific objections, ST responds as follows:

18  ST does not currently believe that any part of the agreement is not in writing.  Discovery is ongoing

19  and ST will supplement its response if it discovers other information relevant to this response.

20  **FORM INTERROGATORY NO. 150.4:**

21      Identify all DOCUMENTS that are part of each modification to the agreement, and for each

22  state the name, ADDRESS, and telephone number of the PERSON who has each DOCUMENT.

23  **RESPONSE TO FORM INTERROGATORY NO. 150.4:**

24      ST incorporates by reference its general objections, set forth above, and makes the following

25  additional objections to this interrogatory.  ST objects to this interrogatory on the grounds that it

26  calls for the disclosure of information protected by the attorney-client privilege, work product

27  doctrine, or any other applicable privilege.  ST also objects to the term "agreement" as used in this

28  interrogatory as vague and ambiguous.  ST further objects to this interrogatory as harassing because

22

1   it is duplicative of at least Form Interrogatory 50.1 served by SanDisk on December 14, 2007.

2          Subject to, and without waiving its general and specific objections, ST responds as follows:

3   ST incorporates by reference its response to Form Interrogatory 50.1 served by SanDisk in this

4   action on December 14, 2007.

5   **FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORY NO. 150.4:**

6          Subject to, and without waiving, its general and specific objections, ST responds as follows:

7   ST does not currently believe that there are any modifications to the agreement.  Discovery is

8   ongoing and ST will supplement its response if it discovers other information relevant to this

9   response.

10  **FORM INTERROGATORY NO. 150.5:**

11         State each modification not in writing, the date, and the name, ADDRESS, and telephone

12  number of the PERSON agreeing to the modification, and the date the modification was made.

13  **RESPONSE TO FORM INTERROGATORY NO. 150.5:**

14         ST incorporates by reference its general objections, set forth above, and makes the following

15  additional objections to this interrogatory.  ST objects to this interrogatory on the grounds that it

16  calls for the disclosure of information protected by the attorney-client privilege, work product

17  doctrine, or any other applicable privilege.  ST also objects to the term "modification not in writing"

18  as used in this interrogatory as vague and ambiguous.  ST further objects to this interrogatory as

19  harassing because it is duplicative of at least Form Interrogatory 50.1 served by SanDisk on

20  December 14, 2007.

21         Subject to, and without waiving its general and specific objections, ST responds as follows:

22  ST incorporates by reference its response to Form Interrogatory 50.1 served by SanDisk in this

23  action on December 14, 2007.

24  **FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORY NO. 150.5:**

25         Subject to, and without waiving, its general and specific objections, ST responds as follows:

26  ST does not currently believe that there are any modifications to the agreement.  Discovery is

27  ongoing and ST will supplement its response if it discovers other information relevant to this

28  response.

1  **FORM INTERROGATORY NO. 150.6:**

2       Identify all DOCUMENTS that evidence each modification of the agreement not in writing

3  and for each state the name, ADDRESS, and telephone number of the PERSON who has each

4  DOCUMENT.

5  **RESPONSE TO FORM INTERROGATORY NO. 150.6:**

6       ST incorporates by reference its general objections, set forth above, and makes the following

7  additional objections to this interrogatory.  ST objects to this interrogatory on the grounds that it

8  calls for the disclosure of information protected by the attorney-client privilege, work product

9  doctrine, or any other applicable privilege.  ST also objects to the term "modification of the

10  agreement not in writing" as used in this interrogatory as vague and ambiguous.  ST further objects

11  to this interrogatory as harassing because it is duplicative of at least Form Interrogatory 50.1 served

12  by SanDisk on December 14, 2007.

13       Subject to, and without waiving its general and specific objections, ST responds as follows:

14  ST incorporates by reference its response to Form Interrogatory 50.1 served by SanDisk in this

15  action on December 14, 2007.

16  **FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORY NO. 150.6:**

17       Subject to, and without waiving, its general and specific objections, ST responds as follows:

18  ST does not currently believe that there are any modifications to the agreement.  Discovery is

19  ongoing and ST will supplement its response if it discovers other information relevant to this

20  response.

21  **FORM INTERROGATORY NO. 150.7:**

22       Describe and give the date of every act or omission that you claim is a breach of the

23  agreement.

24  **RESPONSE TO FORM INTERROGATORY NO. 150.7:**

25       ST incorporates by reference its general objections, set forth above, and makes the following

26  additional objections to this interrogatory.  ST objects to this interrogatory on the grounds that it

27  calls for the disclosure of information protected by the attorney-client privilege, work product

28  doctrine, or any other applicable privilege.  ST also objects to the term "agreement" as used in this

1  interrogatory as vague and ambiguous.  ST further objects to this interrogatory as harassing because

2  it is duplicative of at least Form Interrogatory 50.2 served by SanDisk on December 14, 2007.

3          Subject to, and without waiving its general and specific objections, ST responds as follows:

4  ST incorporates by reference its response to Form Interrogatory 50.2 served by SanDisk in this

5  action on December 14, 2007.

6  **FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORY NO. 150.7:**

7          Subject to, and without waiving, its general and specific objections, ST responds as follows:

8  Under the agreement, Dr. Harari had a duty to disclose and describe for WSI all inventions,

9  improvements, discoveries and technical developments, whether or not patentable, made or

10  conceived by him, either alone or with others, during the term of his employment as an employee,

11  officer, consultant and/or director of WSI.  ST believes that Dr. Harari breached the agreement each

12  and every instance in which he had a duty to disclose or describe to WSI all inventions,

13  improvements, discoveries and technical developments, whether or not patentable, made or

14  conceived by him, either alone or with others, during the term of his employment as an employee,

15  officer, consultant or director of WSI, but failed to do so.  Such instances include, but may not

16  be limited to:  his filing of Patent Application 07/185,699 with the United States Patent and

17  Trademark Office on April 26, 1988, his filing of Patent Application 07/216,873 with the United

18  States Patent and Trademark Office on June 8, 1988, his filing of Patent Application 07/204,175

19  with the United States Patent and Trademark Office on July 8, 1988, his filing of Patent Application

20  07/323,779 with the United States Patent and Trademark Office on March 15, 1989, his filing of

21  Patent Applications 07/337,566 and 07/337,579 with the United States Patent and Trademark Office

22  on April 13, 1989, his filing of all related applications, and his subsequent assignment of the

23  aforementioned applications to SanDisk, even though these applications were automatically assigned

24  to WSI per the terms of the agreement.  The dates of the acts constituting a breach of the agreement

25  may have occurred earlier than stated above, but thus far SanDisk has refused to provide ST with

26  critical information, such as when Dr. Harari conceived of the inventions disclosed in the patent

27  applications listed above.  Finally, this response does not include additional duties to WSI that Dr.

28  Harari breached, such as the duties he owed to WSI as a fiduciary.  Discovery is ongoing and ST

1    will supplement its response if it discovers other information relevant to this response.

2    **FORM INTERROGATORY NO. 150.8:**

3    Identify each agreement excused and state why performance was excused.

4    **RESPONSE TO FORM INTERROGATORY NO. 150.8:**

5    ST incorporates by reference its general objections, set forth above, and makes the following

6    additional objections to this interrogatory.  ST objects to this interrogatory on the grounds that it

7    calls for the disclosure of information protected by the attorney-client privilege, work product

8    doctrine, or any other applicable privilege.  ST also objects to the terms "agreement" and "excused"

9    as used in this interrogatory as vague and ambiguous.  ST further objects to this interrogatory as

10   harassing because it is duplicative of at least Form Interrogatory 50.3 served by SanDisk on

11   December 14, 2007.

12   Subject to, and without waiving its general and specific objections, ST responds as follows:

13   ST incorporates by reference its response to Form Interrogatory 50.3 served by SanDisk in this

14   action on December 14, 2007.

15   **FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORY NO. 150.8:**

16   Subject to, and without waiving, its general and specific objections, ST responds as follows:

17   ST does not currently believe that any agreement was excused.  Discovery is ongoing and ST will

18   supplement its response if it discovers other information relevant to this response.

19   **FORM INTERROGATORY NO. 150.9:**

20   Identify each agreement terminated by mutual agreement and state why it was terminated,

21   including dates.

22   **RESPONSE TO FORM INTERROGATORY NO. 150.9:**

23   ST incorporates by reference its general objections, set forth above, and makes the following

24   additional objections to this interrogatory.  ST objects to this interrogatory on the grounds that it

25   calls for the disclosure of information protected by the attorney-client privilege, work product

26   doctrine, or any other applicable privilege.  ST also objects to the terms "agreement" and

27   "terminated" as used in this interrogatory as vague and ambiguous.  ST further objects to this

28   interrogatory as harassing because it is duplicative of at least Form Interrogatory 50.4 served by

26

1    SanDisk on December 14, 2007.

2         Subject to, and without waiving its general and specific objections, ST responds as follows:

3    ST incorporates by reference its response to Form Interrogatory 50.4 served by SanDisk in this

4    action on December 14, 2007.

5    **FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORY NO. 150.9:**

6         Subject to, and without waiving, its general and specific objections, ST responds as follows:

7    ST is not presently aware of any agreement terminated by mutual agreement.  Discovery is ongoing

8    and ST will supplement its response if it discovers other information relevant to this response.

9    **FORM INTERROGATORY NO. 150.10:**

10        Identify each unenforceable agreement and state the facts upon which your answer is based.

11   **RESPONSE TO FORM INTERROGATORY NO. 150.10:**

12        ST incorporates by reference its general objections, set forth above, and makes the following

13   additional objections to this interrogatory.  ST objects to this interrogatory on the grounds that it

14   calls for the disclosure of information protected by the attorney-client privilege, work product

15   doctrine, or any other applicable privilege.  ST also objects to the term "agreement" as used in this

16   interrogatory as vague and ambiguous.  ST further objects to this interrogatory as harassing because

17   it is duplicative of at least Form Interrogatory 50.5 served by SanDisk on December 14, 2007.

18        Subject to, and without waiving its general and specific objections, ST responds as follows:

19   ST incorporates by reference its response to Form Interrogatory 50.5 served by SanDisk in this

20   action on December 14, 2007.

21   **FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORY NO. 150.10:**

22        Subject to, and without waiving its general and specific objections, ST responds as follows:

23   ST does not presently believe that any agreement is unenforceable.  Discovery is ongoing and ST

24   will supplement its response if it discovers other information relevant to this response.

25   **FORM INTERROGATORY NO. 150.11:**

26        Identify each ambiguous agreement and state the facts upon which your answer is based.

27   **RESPONSE TO FORM INTERROGATORY NO. 150.11:**

28        ST incorporates by reference its general objections, set forth above, and makes the following

27

1  additional objections to this interrogatory.  ST objects to this interrogatory on the grounds that it

2  calls for the disclosure of information protected by the attorney-client privilege, work product

3  doctrine, or any other applicable privilege.  ST also objects to the terms "agreement" and

4  "ambiguous" as used in this interrogatory as vague and ambiguous.  ST further objects to this

5  interrogatory as harassing because it is duplicative of at least Form Interrogatory 50.6 served by

6  SanDisk on December 14, 2007.

7    Subject to, and without waiving its general and specific objections, ST responds as follows:

8  ST incorporates by reference its response to Form Interrogatory 50.6 served by SanDisk in this

9  action on December 14, 2007.

10  **FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORY NO. 150.11**:

11    Subject to, and without waiving, its general and specific objections, ST responds as follows:

12  ST does not presently believe that any agreement is ambiguous.  Discovery is ongoing and ST will

13  supplement its response if it discovers other information relevant to this response.

14

15  Dated:  April 7, 2008        SIDLEY AUSTIN LLP

16

17              By:

18

19

20              _____

21              Teague I. Donahey
            Attorneys for Plaintiff
22              STMicroelectronics, Inc.

23

24

25

26

27

28

## **VERIFICATION**

In accordance with Cal. Code. of Civ. Pro. § 2030.250, on behalf of STMicroelectronics, Inc., I, Steven K. Rose, Vice President, Secretary, and General Counsel of STMicroelectronics, Inc., declare under penalty of perjury under the laws of the State of California, that the foregoing answers to interrogatories are, to the best of my knowledge, information and belief, founded upon reasonable inquiry, true, and correct.

Dated:  April 4, 2008    _____

Steven K. Rose

FIRST SUPPLEMENTAL RESPONSE TO FORM INTERROGATORIES – ECONOMIC LITIGATION
Case No. 1-07-CV-080123

# Exhibit J

1  Russell L. Johnson (SBN 053833)
   Edward V. Anderson (SBN 083148)
2  Teague I. Donahey (SBN 197531)
   SIDLEY AUSTIN LLP
3  555 California Street
   San Francisco, California 94104
4  Telephone:    (415) 772-1200
   Facsimile:    (415) 772-7400
5
   James P. Bradley (SBN 056308)
6  Li Chen (*Pro Hac Vice*)
   SIDLEY AUSTIN LLP
7  717 North Harwood
   Dallas, Texas 75201
8  Telephone:    (214) 981-3300
   Facsimile:    (214) 981-3400
9
   Attorneys for Plaintiff
10 STMicroelectronics, Inc.

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                    FOR THE COUNTY OF SANTA CLARA

13

14 STMICROELECTRONICS, INC., a corporation )  Case No. 1-07-CV-080123
                                           )
15              Plaintiff,                 )  Complaint Filed:  October 14, 2005
                                           )  Trial Date:  None Set
16        v.                               )  Judge:  Honorable Neal A. Cabrinha
                                           )
17 ELIYAHOU HARARI, an individual;         )  **REPLY IN SUPPORT OF ST'S MOTION**
   SAN DISK CORPORATION, a corporation;    )  **TO COMPEL DISCOVERY TO SANDISK**
18 and DOES 1 through 20, inclusive,       )  **CORPORATION**
                                           )
19              Defendants.                )  Date:   April 18, 2008
                                           )  Time:   10:00 a.m.
20                                         )  Place:  Department 7
                                           )  Judge: Hon. Socrates Manoukian
21                                         )
                                           )
22                                         )
                                           )
23 ────────────────────────────────────────)

24

25                              **CONFORMED COPY**

26

27

28

─────────────────────────────────────────────────────────────────

## I.    INTRODUCTION

For over two (2) years SanDisk has frustrated ST's efforts to advance this case.  With the denial of certiorari by the California Supreme Court, Defendant's procedural maneuvers have finally been exhausted.  But SanDisk is still impeding case progress by refusing to provide basic discovery.  Defendant's Opposition mischaracterizes the record, ignores facts, and distorts precedent.  ST submits this Reply to clear the record.

SanDisk argues the Court should deny ST's Motion because ST's Declaration does not specifically set forth Plaintiff's efforts to resolve the disputes through the meet and confer process.  Importantly, SanDisk does not claim ST's meet and confer efforts were inadequate.  It cannot.  Over the past four (4) months, ST conferred with and wrote to SanDisk's counsel on approximately a dozen separate occasions to address ST's concerns with SanDisk's inadequate discovery responses.  *See* Ex. 1-7.[1]  ST brought this Motion only because its efforts were unsuccessful.  No more can reasonably be expected from the meet and confer process.  Remarkably, while SanDisk does not contest the fact that ST has met and conferred, it nonetheless asks the Court to deny ST's motion based on alleged technical deficiencies in ST's Declaration.  SanDisk's arguments distort California precedent.

To promote private resolution of disputes, the Discovery Act requires the moving party to declare that he or she has made a serious attempt to obtain an informal resolution of each issue before bringing a motion to compel.  *See, Stewart v. Colonial Western Agency, Inc.,* (2001) 87 Cal.App.4th 1006, 1016, 105 Cal. Rptr.2d 115.  SanDisk argues ST's Declaration fails this standard.  Defendant is mistaken.  ST's Motion makes clear Plaintiff has made extensive efforts to informally

---

[1]  *See, e.g.,* the following letters attached as Exhibits 1-7.  Each detail SanDisk's discovery deficiencies and describe the on-going disputes between the parties that were the subject of several meet and confer teleconferences over the past four months:  Exhibit 1 Letter from E. Anderson to M. Reed dated January 30, 2008 (also referencing teleconference between counsel on January 25, 2008 and prior discussions between lead counsel);  Exhibit 2 Letter from L. Chen to M. Reed and B. Volkmer dated February 5, 2008 (also referencing teleconference between counsel on February 4, 2008); Exhibit 3 Letter from L. Chen to M. Reed and B. Volkmer dated February 11, 2008; Exhibit 4 Letter from L. Chen to M. Reed dated February 22, 2008 (also referencing teleconference between counsel on February 12, 2008); Exhibit 5 Letter from L. Chen to M. Reed and B. Volkmer dated March 11, 2008 (also referencing call scheduled for March 11, 2008); Exhibit 6 Letter from L. Chen to M. Reed and B. Volkmer dated March 11, 2008; and Exhibit 7 Letter from T. Donahey to M. Reed (also referencing teleconference on March 12, 2008).

1    resolve these discovery disputes: "Over the past few months, ST has conferred with SanDisk over

2    half a dozen times through letters and telephone calls." Plaintiff STMicroelectronics Inc's Notice of

3    Motion and Motion to Compel Discovery to SanDisk Corporation at 8. Similarly, ST's Declaration

4    specifically incorporates a February 15, 2008 letter from SanDisk's counsel. The letter revealed

5    ST's efforts to secure a production schedule was futile, and it references another conference between

6    the parties. The fact is ST has satisfied its meet and confer obligations. California law requires no

7    more. *See, Stewart v. Colonial Western Agency, Inc* (2001) 87 Cal.App.4th 1006, 1016, 105 Cal.

8    Rptr.2d 115; *Obregon v. Superior Court* (1998) 67 Cal.App.4th 424, 431, 79 Cal.Rptr.2d 62.

9        Unfortunately, the meet and confer argument is not the only instance where Defendant

10   attempts to elevate form over substance. SanDisk also urges the Court to deny ST's motion because

11   ST does not cite to precedential authority in its briefing papers. While it is true that ST's motion

12   relies more on logic and reason than cases based on dissimilar facts, it is error for SanDisk to suggest

13   this Court is now precluded from considering relevant authority. Section 451(a) of the California

14   Evidence Code, by way of example, specifically states "Judicial notice shall be taken of . . . The

15   decisional . . . law of this state . . ." More importantly, the Court need not rely on precedent to

16   compel SanDisk to provide discovery responses. There can be no reasonable question about the

17   Court's power to control the conduct of discovery in its cases: *e.g.*, "Undoubtedly the discovery

18   statute vest a wide discretion in the trial court in granting or denying discovery." *Obregon v.*

19   *Superior Court* (1998) 67 Cal.App.4th 424, 431 - 32, 79 Cal.Rptr.2d 62. Again, SanDisk's

20   contention to the contrary is unfounded.

21   **II.    DISCUSSION**

22       **A.    ST's Requests for Admission are Clear, SanDisk's Claim of Confusion is Not**
23   **Credible**

24       The ownership of numerous patents issued by the United States Patent and Trademark Office

25   and by foreign authorities is at issue in this case. Approximately fifty (50) U.S. patents are currently

26   encompassed by ST's claims (the number is dynamic, as new patents are continuing to issue from

27   the disputed applications). As Defendants are well aware, Plaintiff's claim is based on the timing of

28   Dr. Harari's invention. If an invention was conceived when Dr. Harari owed WSI a contractual and

1  fiduciary duty to disclose and assign his inventions,[2] then ST is the rightful owner (whether sole or

2  joint) of all patents that flowed from the disputed patent application.

3      It is indisputable that Dr. Harari conceived many of the subject inventions while he was still

4  affiliated with WSI. But ST's claims also reach patent applications that Dr. Harari filed on

5  April 13, 1989, which is approximately a month after the effective date of Dr. Harari's resignation

6  from the Board. This is because although WSI's Board accepted Dr. Harari's resignation on

7  May 17, 1989, and backdated the effective date of the resignation to March 15, it did so without

8  being aware of Dr. Harari's secret patent filings. From April of 1988 through 1989, Dr. Harari filed

9  six (6) patent applications with the U.S. Patent Office. Not once did he disclose his patent filings to

10  WSI's Board. This questionable history increases the likelihood that Dr. Harari conceived the

11  inventions claimed in his April 13, 1989 applications while he was still affiliated with WSI. The

12  conception dates have important implications for these and other issues in the case, ST needs to

13  secure this information to prepare its case, and Dr. Harari and SanDisk are the only parties with this

14  information.

15      ST's Requests for Admission ask SanDisk to affirm Dr. Harari made certain claimed

16  inventions before March 15, 1989 (RFAs 4-6), and that the claimed inventions were not disclosed to

17  WSI prior to March 15, 1989 (RFAs 7-12). With respect to RFAs 4-6, Defendant previously stated

18  "SanDisk will respond to these requests with the understanding that word 'making' means

19  'conceived and/or reduced to practice' as those terms are used under federal patent law . . . ." *See*

20  *also*, Ex. 8 at 15-16 (Defendant applied this same definition of "making" in response to Document

21  Requests No. 15 & 16). This definition, which Defendant crafted for itself, is precisely what ST

22  meant by "made." It is what ST is asking SanDisk to apply. And it casts doubt on Defendant's

23  claims of confusion. But instead of answering these requests according to the definition crafted by

24  its own attorneys, SanDisk's responses focus on April 13, 1989, a time frame that is outside of and

25  not relevant to the RFAs. This is not sufficient. SanDisk should admit or deny RFAs 4-6.

26      It is similarly difficult to comprehend SanDisk's refusal to respond to RFAs 7-12. There is

---

[2] To be clear, it is ST's position that the agreement between WSI and Dr. Harari operated to automatically assign his inventions to WSI, and that his subsequent assignments to SanDisk amount to additional breaches.

1  no one better positioned than Dr. Harari to state whether he disclosed his secret patent filings to

2  WSI, and whether he made such alleged disclosures before March 15, 1989, the official date of his

3  departure from the company. Remarkably, SanDisk's Opposition suggests Defendant has not even

4  *asked* Dr. Harari whether he allegedly disclosed these secret filing activities to WSI. *See,* SanDisk's

5  Opposition at 14 ("inquiring of Dr. Harari whether he disclosed the inventions to WSI prior to that

6  date woud not enable SanDisk to respond … to these requests"). Instead, Defendant argues ST did

7  not specifically direct the RFAs at Dr. Harari. But the fact that ST's RFAs are not limited to Dr.

8  Harari does not excuse Defendant from its duty of inquiry. If either Dr. Harari or SanDisk contend

9  they disclosed these filings to WSI before March 15, 1989, Defendant should have denied the RFA

10 and explained that denial in response to Form Interrogatory 17.1. If Dr. Harari and SanDisk

11 concealed these filings from WSI, then ST is entitled to at least a partial admission from SanDisk

12 that Dr. Harari and SanDisk failed to disclose the secret filings to WSI before

13 March 15, 1989 (*i.e.,* that Defendants concealed the filings from WSI).

14       ST's RFAs seek basic information that is critical to the development of this case. SanDisk's

15 objections and arguments contradict Defendant's own positions and distort the requests.

16 Defendant's continuing efforts to resist legitimate discovery is highly improper.

17       **B.    SanDisk's Interrogatory Answers have been Woefully Inadequate**

18       SanDisk did not specifically object to ST's Motion to Compel further responses for Form

19 Interrogatories 16.1, 17.1, 115.2, 116.1, & 116.6. It is not clear if the omission was an oversight or

20 if SanDisk is implicitly acknowledging its need to supplement its responses. Importantly, SanDisk is

21 not likely to have legitimate bases to support its continuing denial to provide discovery. The Court

22 should compel SanDisk to provide meaningful responses to these Form Interrogatories, which would

23 require Defendant to state, among other things, all facts upon which it bases: its contention that

24 others, if any, contributed to ST's injuries; its refusal to give an unqualified admission in response to

25 ST's RFAs; its contention that it is not responsible for ST's damages; or its contention that ST's

26 claims of loss of earnings or income (as identified in the Complaint) is unreasonable.

27       Defendant re-raises on page 9 of its Opposition the notion that the parties did not confer on

28 Form Interrogatories 16.2, 115.3, 150.6, 150.7, 150.9, and 150.11. Defendant is again mistaken.

1    Form Interrogatories 16.2, 115.3, 150.6, and 150.11 are virtually identical to Form Interrogatories

2    116.2, 16.1, 50.1, and 50.6, interrogatories on which the parties have specifically conferred.[3]

3         Form Interrogatory 15.1 asks SanDisk to state all facts upon which Defendant bases its denial

4    of a material allegation or a special or affirmative defense.  Although SanDisk provided a 7-page

5    response, that response consists almost entirely of argument.  Defendant's response does little to

6    address the information sought by this interrogatory, and the Court should compel SanDisk to

7    provide meaningful responses, rather than attorney argument.

8         Form Interrogatories 115.3 & 16.2[4] ask Defendant to identify anyone else that is responsible

9    for the damages claimed in this case or the facts upon which Defendant bases its claim that ST was

10   not injured.  SanDisk also refused to respond to these requests, choosing instead to hide behind

11   privilege and immunity claims.  It is well settled, however, that a litigant cannot use privilege as both

12   a sword and a shield.  If someone other than SanDisk is responsible for the damages claimed in the

13   action, it is difficult to see how privilege attaches to the identity of that individual (which

14   presumably includes Dr. Harari).  Similarly, unless SanDisk is willing to forego its right to argue ST

15   has not been injured, it is difficult to understand how all facts relating to that argument could be

16   shielded by a privilege claim.

17        Form Interrogatories 12.3, 12.6, and 112.2-4[5] ask SanDisk to identify the individuals that

18   provided or received a written or recorded statement concerning the claims in this case.  Defendant

19   alleges this information is protected from discovery.  SanDisk is mistaken.  California law does not

20   permit a Defendant to shield the existence of relevant information under a claim of privilege.  *See,*

21   *Lipton et al. v. Superior Court* (1996) 48 Cal.App.4th 1599, 1619, 56 Cal.Rptr.2d 341.  Indeed, if

22   that were the case, no litigant would ever have to provide a privilege log.  The fact that Defendant's

23   position is far afield is demonstrated by the authority on which it relies.  In *Nacht & Lewis*

---

24   [3] Similarly, Form Interrogatories 150.7 and 150.9 are parallel to 50.2 and 50.4.  Because ST's notes
25   and SanDisk's differ on whether interrogatories 50.2 and 50.4 were discussed, ST elected to omit
     them from the Motion to Compel rather than debate the issue.  ST now also withdraws
26   Interrogatories 150.7 and 150.9 from its Motion.
     [4] Page 5 of ST's Motion to Compel contains a typographical error, twice referencing 16.1 instead of
27   addressing 16.1 & 16.2.
     [5] Counsel for SanDisk has acknowledged the need to supplement their response to Interrogatory No.
28   112.4 but have yet to do so.  *See,* Dec. of Matthew R. Reed ISO Defendants' Opposition to ST's
     Motion to Compel Discovery at ¶ 7.

*Architects*, the court specifically acknowledged "a list of potential witnesses who turned over to counsel their independently prepared statements would have no tendency to reveal counsel's evaluation of the case . . . statements written or recorded independently by witnesses neither reflect an attorney's evaluation of the case nor constitute derivative material." *Nacht & Lewis Architects, Inc., et al. v. Superior Court* (1996) 47 Cal.App.4th 214, 217-18, 54 Cal.Rptr.2d 575.

The information sought by these interrogatories is directed to written statements from lay witnesses, not counsel. Insofar as SanDisk claims privilege over those documents, it must provide a privilege log that, at a minimum, identifies the parties involved in the communication, the date of the document, and the subject matter to which the document pertains. *See, Lipton et al. v. Superior Court* (1996) 48 Cal.App.4th 1599, 1619, 56 Cal.Rptr.2d 341 ("The party claiming the privilege has the burden to show that the communication sought to be suppressed falls within the terms of the claimed privilege."). A blanket statement that there is no non-privileged information to provide is inappropriate and improper.

Although Defendant provides preliminary responses to Form interrogatories 50.1, 50.3, 50.6, 150.1-9, and 150.11, which ask SanDisk to identify, among other things, any ambiguities, any alleged breach or termination, and any obligations that were excused, there is no way for ST to assess the adequacy of SanDisk's response. This is problematic. By way of example, Defendant appears to not have even asked Dr. Harari to answer straightforward questions before responding to ST's RFAs.

ST does not seek to "discover the details of SanDisk's attorneys' investigations of the case," but a Court Order compelling SanDisk to state all facts called for by these interrogatories by a date certain (or be precluded from presenting such facts at a future date) would give ST the assurance that SanDisk has performed the proper internal investigation. If SanDisk has in fact conducted a reasonable inquiry, it could comply with such an Order with virtually no additional effort.

1

    **C.**    **ST is being Prejudiced by SanDisk's Production Delays[6]**

2        This case and ST's discovery requests have been pending for over two (2) years.  SanDisk

3    has taken extraordinary measures to delay and frustrate the progress of this suit, including pursuing

4    every possible appeal and re-raising arguments of dubious merit – arguments that have been rejected

5    by multiple courts.  Although the case was stayed during Defendant's appeals, ST's discovery

6    requests have been pending during this entire period, and there was never any question that SanDisk

7    had to respond to these requests after exhausting its appeals.  Defendant's discovery obligations

8    continued, and it should have been diligent in preserving and collecting relevant information.

9        SanDisk knew it had to produce relevant documents from parallel litigation between the

10    parties.  It knew that under the applicable protective orders ST had to destroy the documents in its

11    possession at the conclusion of those cases.  These documents have been reviewed, processed, and

12    produced by SanDisk in parallel proceedings.  These documents were flagged by ST in multiple

13    correspondence.  And they should have been promptly produced after SanDisk exhausted its appeals.

14    Instead, SanDisk waited three (3) months after its final appeal was rejected before producing any

15    documents, and that initial production comprised a paltry 48,000 pages of mostly public documents.

16    The production did not contain any of the litigation files that ST identified in prior correspondence.

17        Even at the time of that initial production Defendant had already identified approximately 2

18    million pages of relevant documents.  Although Defendant slightly increased its production rate after

19    numerous complaints from ST, things were still progressing at a snail's pace, and SanDisk would

20    have taken another eighteen (18) months to conclude its initial production.  Faced with the

21    possibility of a 4-5 year delay before concluding discovery, and given Defendant's consistent refusal

22    to provide a production schedule, ST was forced to seek relief from this Court.  *Fuller et al. v.*

23    *Superior Court* (2001) 87 Cal.App.4th 299, 306-37, 104 Cal.Rptr.2d 525 ("Plaintiffs are entitled to

24    an expeditious and fair resolution of their civil claims without being subjected to unwarranted

25    surprise.  Among the myriad purposes of the civil discovery statutes is to safeguard against surprise

26

27
28

[6] In a footnote, SanDisk argues ST's Motion is time-barred.  But it cannot be reasonably argued that CCP 2031.310(c) has any applicability to this Motion.  It applies to motions to compel further responses to RFPs.  ST's Motion, however, is being brought pursuant to CCP 2031.320(a).  ST acknowledges it referred to the wrong section in its opening Motion.

1  and gamesmanship, and to prevent delay.").

2      SanDisk recently produced another 600,000 pages in a two (2) week period, and it compiled

3  and produced a sizable privilege log during that time.[7]  Significantly, this progress came only after

4  ST filed its Motion to Compel.  Defendant argues its recent production volume demonstrates

5  SanDisk's good faith and moots ST's requested relief.  Not so.  The history of SanDisk's discovery

6  conduct in this case, the remarkable positions that it has taken in response to ST's RFAs and Form

7  Interrogatories, and the liberties that SanDisk continues to take with the facts and the law

8  demonstrate Defendant has little interest in cooperation.  Indeed, SanDisk's recent discovery

9  progress suggests it was well within Defendant's means to be more forthcoming and responsive –

10  yet it chose to wait until ST filed its Motion to Compel.

11      ST has been prejudiced by SanDisk's delay tactics.  *Id.* at 306-37, 104 Cal.Rptr.2d 525.  ST

12  intends to move the Court for an aggressive schedule, but the only way to accomplish this feat would

13  be to secure Defendant's cooperation in discovery, whether voluntarily or through Court Order.

14  Indeed, until SanDisk's production is substantially complete, ST cannot meaningfully depose key

15  witnesses in this case.

16  **III.  CONCLUSION**

17      Dr. Harari breached his contractual and fiduciary duty to WSI when he concealed valuable

18  inventions from the company, filed patent applications for these inventions in secret, and assigned

19  the rights in many of the disputed patent applications and resulting patents to SanDisk when ST was

20  and continues to be the rightful owner (whether sole or joint).  All of the disputed patent applications

21  were filed on or before April 13, 1989, before WSI accepted and backdated Dr. Harari's resignation

22  from the Board, and most were filed by March 15, 1989, when Dr. Harari served as a WSI consultant

23  and Board member.

24      For close to twenty (20) years, Dr. Harari and SanDisk have conspired to fraudulently

---

26  [7] SanDisk's privilege log runs 47 pages, but ST could not find a single entry that discloses Dr.
Harari's engagement of his patent prosecution counsel.  With respect to the entries that disclose
27  work involving draft patent applications, there is no identification of the application at issue, which
effectively precludes ST from assessing the completeness of SanDisk's privilege entries.  ST will
28  separately confer with SanDisk regarding the need to update its privilege descriptions, but the Court
should compel Defendant to complete its privilege log.

1    conceal his breaches of contractual and fiduciary duties to WSI.  Approximately fifty (50) patents

2    have issued in the United States alone from these illicit activities, and Defendants have significantly

3    leveraged this portfolio to secure handsome profit.  The 2 million pages of relevant documents

4    identified by SanDisk is a significant volume, but given the magnitude of the issue and the

5    significant passage of time, there is every reason to expect SanDisk will locate substantially more

6    documents and information as this case progresses.  Allowing SanDisk to continue its questionable

7    discovery path will likely delay this case by a number of additional years and prompt an increasing

8    number of discovery battles.  Defendant's conduct in this case has demonstrated SanDisk will not

9    voluntarily engage in discovery absent Court Order.  The Court should Order SanDisk to produce all

10   relevant documents, complete its privilege log, and supplement its responses to the applicable

11   interrogatories and RFAs within a month of the Court's Order.

12

13

14   Dated:  April 11, 2008                                SIDLEY AUSTIN LLP

15                                                         By:  _____

16                                                         Teague I. Donahey
                                                           Attorneys for Plaintiff
17                                                         STMicroelectronics, Inc.

18

19

20

21

22

23

24

25

26

27

28

ST'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL DISCOVERY RESPONSES
Case No. 1-07-CV-080123

# Exhibit K

1 | Michael A. Ladra, State Bar No. 064307 (mladra@wsgr.com)
2 | Terry T. Johnson, State Bar No. 121569 (tjohnson@wsgr.com)
  | James C. Yoon, State Bar No. 177155 (jyoon@wsgr.com)
  | Matthew R. Reed, State Bar No. 196305 (mreed@wsgr.com)
3 | WILSON SONSINI GOODRICH & ROSATI
  | Professional Corporation
4 | 650 Page Mill Road
  | Palo Alto, CA 94304-1050
5 | Telephone: (650) 493-9300
  | Facsimile:  (650) 565-5100
6 |
7 | Attorneys for Defendants
  | ELIYAHOU HARARI and
8 | SANDISK CORPORATION

ORIGINAL FILED
08 MAY -6 PH 1: 56
RICHARD W. WIEKING
U.S. CLERK
NO. DISTRICT COURT
[...] A.S.J.

E-FILING

ADR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

C 08 02332 MMC

| | |
|---|---|
| STMICROELECTRONICS, INC., a corporation | CASE NO.: |
| Plaintiff, | **NOTICE OF REMOVAL** |
| vs. | |
| ELIYAHOU HARARI, an individual; SANDISK CORPORATION, a corporation; and DOES 1 to 20, inclusive. | |
| Defendants. | |

1      1.     PLEASE TAKE NOTICE that defendants Eliyahou Harari ("Harari"), an

2  individual, and SanDisk Corporation ("SanDisk"), a Delaware corporation, (collectively

3  "Defendants"), hereby remove the civil action pending in the Superior Court of the State of

4  California, County of Santa Clara, captioned *STMicroelectronics, Inc. v. Harari, et al.*, case

5  number 1-07-CV-080123, to the United States District Court for the Northern District of

6  California.

7      2.     As requested by the clerk's office for the Northern District of California, San Jose

8  division, Defendants provide a copy of the initial Complaint in response to the requirement under

9  28 U.S.C. § 1446(a). *See* Exhibit 1. If, at a future date, the Court should require copies of any

10  other process, pleadings, and/or orders served upon Defendants in the above referenced civil

11  action, Defendants will promptly provide such copies. As required by 28 U.S.C. § 1446(d),

12  Defendants will provide written notice of the filing of this Notice of Removal to Plaintiff, and

13  also file a copy of this Notice with the clerk of the Superior Court of the State of California,

14  Santa Clara County.

15               **GROUNDS FOR REMOVAL JURISDICTION**

16      3.     This action is a civil action of which this Court would have original jurisdiction

17  under 28 U.S.C. § 1331 and/or 28 U.S.C. § 1338, and which may be removed to this Court

18  pursuant to 28 U.S.C. § 1441, because papers recently provided by STMicroelectronics, Inc.

19  ("Plaintiff") raise a substantial question under federal law. In particular, Plaintiff recently

20  disclosed for the first time a dramatically new interpretation of the contract language at the core

21  of the case and which is indisputably a question of federal law.

22      4.     On October 14, 2005, Plaintiff commenced an action in the Superior Court for the

23  County of Alameda.

24      5.     Defendants removed the action to federal court on November 16, 2005 and

25  answered the Complaint. Plaintiff filed a motion to remand, which this Court denied (the

26  Honorable Jeremy Fogel presiding). Defendants then filed a summary judgment motion based

27  on the statute of limitations, establishing that Plaintiff had constructive notice of the patents it

28  now claims to own, and actual notice of the question of ownership of these patents well prior to

1   the statutory period.  The motion was fully briefed, but on July 18, 2006, before resolution of

2   Defendants' motion, the Court remanded the action to Alameda County Superior Court based on

3   Plaintiff's request for reconsideration of the Court's prior order denying Plaintiff's motion to

4   remand.

5           6.      On August 11, 2006, Defendants filed a motion to transfer venue to Santa Clara

6   County Superior Court.  The Alameda County Superior Court denied the motion on September

7   12, 2006.  On October 6, 2006, Defendants filed a Petition for Writ of Mandate regarding the

8   venue transfer order.  On January 17, 2007, the Court of Appeal issued a writ, and on January 23,

9   2007, the Alameda Superior Court transferred the case to Santa Clara County Superior Court.

10          7.      The Santa Clara County Superior Court held a case management conference on

11  December 4, 2007 and requested that Defendants file an early motion for summary adjudication

12  on the question of the statute of limitations.

13          8.      Having successfully avoided judicial consideration of Defendants' statute of

14  limitations defense for almost two years, Plaintiff was soon to face the issue on the merits.  In

15  light of the strength of the statute of limitations issue, and in an obvious attempt to rely on recent

16  Federal Circuit case law to circumvent Defendants' defense, Plaintiff recently indicated a change

17  in position on a substantial federal issue integral to its allegations.  Throughout the entire history

18  of this case, the parties had not disputed that the terms of Defendant Harari's Employee

19  Agreement Regarding Confidentiality and Inventions, dated February 22, 1984 (the "Inventions

20  Agreement") constituted an agreement to assign (and not a present assignment).  The parties'

21  dispute was focused instead on whether the Inventions Agreement provided Plaintiff the right to

22  demand assignment of the inventions at issue in this case.  For example, Plaintiff stated to this

23  Court in opposition to Defendants' motion for summary judgment nearly two years ago that

24  "[u]nder the terms of the Inventions Agreement, Harari was obligated to assign his patent rights

25  to WSI [Plaintiff's predecessor in interest], but *only if* WSI chose, in its discretion, to seek

26  patents on Harari's inventions."  Pltf's Opp'n to Defs' Mot. for Summary Judgment, filed

27  5/19/2006 at 19.

28

1      9.      In a complete about-face, on April 7, 2008, Plaintiff changed its position on the

2  interpretation of the Inventions Agreement, and for the first time indicated that, in its view,

3  Harari's inventions "were automatically assigned to WSI per the terms of the agreement." Pltf's

4  First Suppl. Resp. to Def. SanDisk's First Set of Form Interrogs. – Limited Civil Cases

5  (Economic Litigation) at 25.[1]  By interpreting the Inventions Agreement so as to effect an

6  *automatic assignment* of Harari's inventions, Plaintiff changed its position one hundred and

7  eighty degrees, and by so doing put at issue a substantial question of federal law.

8      10.     The Federal Circuit recently stated that "the question of whether a patent

9  assignment clause creates an automatic assignment or merely an obligation to assign is

10  intimately bound up with the question of standing in patent cases.  We have accordingly treated

11  it as a matter of federal law." *DDB Technologies L.L.P. v. MLB Advanced Media, L.P.*, 517 F.3d

12  1284, 1290 (Fed. Cir. 2008).  In the present case, the federal question of whether the Inventions

13  Agreement constitutes an automatic assignment or merely an obligation to assign is at the very

14  core of Plaintiff's claims.

15      11.     Removal is timely pursuant to 28 U.S.C. § 1446(b) because less than 30 days

16  have elapsed since April 7, 2008, the date Plaintiff served the interrogatory response first

17  indicating this substantial question of federal law.  Therefore, this action may properly be

18  removed to this Court under 28 U.S.C. § 1441.

19

20

21

22

23

24

25

---

26      [1]  In a subsequent pleading with the Superior Court, Plaintiff reiterated its change of position
27  on this issue by stating "[t]o be clear, it is ST's position that the agreement between WSI and
   Dr. Harari operated to automatically assign his inventions to WSI."  Reply in Support of ST's
28  Mot. to Compel Discovery to SanDisk Corporation, dated 4/11/2008, at 3 n.2.

NOTICE OF REMOVAL                          -3-                              3349838_2.DOC

1    **INTRADISTRICT ASSIGNMENT**

2        12.    Pursuant to Civil Local Rule 3-2(c), this action may be assigned on a district-wide

3    basis because this action falls in the category of an Intellectual Property action.

4

5    Dated: May 6, 2008                          Respectfully submitted,

6                                                WILSON SONSINI GOODRICH & ROSATI
                                                 Professional Corporation
7

8

9                                                By: _____
                                                          Michael A. Ladra
10

11                                               Attorneys for Defendants
                                                 ELIYAHOU HARARI and
12                                               SANDISK CORPORATION

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  RUSSELL L. JOHNSON (SBN 53833)
   rljohnson@sidley.com
2  EDWARD V. ANDERSON (SBN 83148)
   evanderson@sidley.com
3  TEAGUE I. DONAHEY (SBN 197531)
   tdonahey@sidley.com
4
5  SIDLEY AUSTIN LLP
   555 California Street, Suite 2000
   San Francisco, California 94104-1715
6  Telephone:    415-772-1200
   Facsimile:    415-772-7400
7
8  Attorneys for Plaintiff
   STMicroelectronics, Inc.

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                   SAN JOSE DIVISION

12

13

| | |
|---|---|
| STMICROELECTRONICS, INC., a Corporation, | Case No. C 05-04691 JF |
| Plaintiff, | Related Case No. C 08-02332 MMC |
| vs. | [PROPOSED] ORDER GRANTING PLAINTIFF STMICROELECTRONICS, INC.'S MOTION TO REMAND CASE TO STATE COURT |
| ELIYAHOU HARARI, an individual; SANDISK CORPORATION, a corporation; and DOES 1 TO 20, inclusive | |
| Defendants. | Before:      Hon. Jeremy Fogel |
| | Date:        July 25, 2008 |
| | Time:        9:00 a.m. |
| | Courtroom:   3 |
| | |
| | **MOTION TO SHORTEN TIME FILED** |

1      Plaintiff STMicroelectronics, Inc. ("ST") moved pursuant to 28 U.S.C. § 1447(c): (1) to

2  remand this case to the Superior Court for the State of California, County of Santa Clara; and (2) for

3  an award to ST of its just costs and actual expenses, including attorneys fees, incurred as a result of

4  the removal.

5      After consideration of the papers submitted and all other matters presented to the Court, it is

6  hereby **ORDERED** that ST's motion is **GRANTED**, and that:

7      1.      This case is forthwith remanded to the Superior Court for the State of California,

8  County of Santa Clara;

9      2.      Defendants lacked an objectively reasonable basis for seeking removal, and therefore

10  ST is awarded its just costs and actual expenses, including attorneys fees, incurred as a result of the

11  removal; and

12      3.      Within 10 days of the date of this order, ST shall submit an application for such costs

13  and expenses.

14

15

16  Dated: _____, 2008      _____

17                                          UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

27

28